## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | **Case No. 08CV4210** |
| COUNTRYWIDE FINANCIAL CORPORATION, COUNTRYWIDE HOME LOANS, INC., FULL SPECTRUM LENDING, COUNTRYWIDE HOME LOANS SERVICING LP, and ANGELO MOZILO, | ) ) ) ) ) ) ) | **Judge Elaine E. Bucklo** |
| Defendants. | ) ) | |

## AMENDED NOTICE OF REMOVAL

Pursuant to 28 U.S.C. §§ 1331, 1334, 1367, 1441, 1442, 1446, and 1452, Defendants Countrywide Financial Corporation, Countrywide Home Loans, Inc., Full Spectrum Lending, Countrywide Home Loans Servicing LP, and Angelo Mozilo ("Defendants") hereby submit this amended notice of removal of this case, which was originally removed on July 24, 2008 from the Circuit Court of Cook County, Illinois to the United States District Court for the Northern District of Illinois, Eastern Division. In support of this Amended Notice of Removal, Defendants aver as follows:

## BACKGROUND

1.     On June 25, 2008, Plaintiff commenced this action in the Circuit Court of Cook County, Illinois. In accordance with 28 U.S.C. § 1446(a), a copy of the Summons and Complaint is attached hereto as Exhibit A.

2.      Plaintiff sent Defendants' counsel a Notice and Acknowledgement of Receipt of the Summons and Complaint (*i.e.*, a request for waiver of service) on July 10, 2008. (*See* Exhibit B hereto.)  Defendants' counsel executed and returned the waiver of service to Plaintiff on July 14, 2008.  (*See* Exhibit C hereto.)  On July 22, 2008, Plaintiff filed the waiver of service with the Circuit Court of Cook County.  (*See* Exhibit D hereto.)  An original notice of removal was filed with this Court on July 24, 2008.  This amended removal notice is timely under 28 U.S.C. § 1446(b) because it is being filed before 30 days have elapsed from the effective date of service.

3.      All Defendants consent to and join in this notice of removal.  "Full Spectrum Lending" is named as a Defendant.  That entity no longer exists as a separate company.  It is now a division of Defendant Countrywide Home Loans, Inc., which consents to this removal.  To the extent any consent to removal of "Full Spectrum Lending" is required, Countrywide Home Loans, Inc. hereby consents to removal on its behalf.

## BASES FOR REMOVAL JURISDICTION

4.      <u>Substantial federal question</u>.  This action is a civil action over which this Court has original jurisdiction under 28 U.S.C. § 1331 and is one which may be removed to this Court by Defendants pursuant to 28 U.S.C. § 1441(b) in that Plaintiff asserts claims that will necessitate the adjudication of substantial, disputed questions of federal law.

5.      <u>Federal officer removal</u>.  The claims asserted against Countrywide Home Loans Servicing LP in this action are removable pursuant to 28 U.S.C. § 1442 because Countrywide Home Loans Servicing LP is a person acting under one or more federal officers (including, for example, the Secretary of the Department of Housing and Urban Development and the Secretary of the Department of Veterans Affairs), there is a causal nexus between the

Plaintiff's claims and Countrywide Home Loans Servicing LP's alleged conduct, and Countrywide Home Loans Servicing LP has raised colorable federal defenses. *See Jefferson County v. Acker*, 527 U.S. 423, 431 (1999).

6. <u>Bankruptcy</u>. In the alternative, and only in the event that the Court finds that it does not have jurisdiction based on at least one of the other two grounds alleged in this notice (substantial federal question and federal officer removal), the claims asserted against the Defendants in this action are removable based on federal bankruptcy jurisdiction, pursuant to 28 U.S.C. §§ 157, 1331, 1334, 1367, 1441, and 1452, and Rule 9027 of the Federal Rules of Bankruptcy Procedure, because this is a civil action arising under the Bankruptcy Code or arising in one or more cases under the Bankruptcy Code. *See* 28 U.S.C. § 1334(b). Pursuant to Rule 9027(a)(1) of the Federal Rules of Bankruptcy Procedure, Defendants hereby state that upon removal of the causes of action, the proceeding is core.

## SUBSTANTIAL FEDERAL QUESTION

7. Federal question jurisdiction exists over this action pursuant to 28 U.S.C. § 1331 because Plaintiff asserts claims that will necessitate the adjudication of substantial, disputed questions of federal law.

8. Federal question jurisdiction is available in actions involving only state-law claims where those claims necessarily involve the resolution of underlying disputed questions of federal law. *See, e.g., Grable & Sons Metal Prods. v. Darue Eng'g & Mfg.*, 545 U.S. 308 (2005) (affirming federal-question jurisdiction over state quiet-title action based on need to resolve predicate issue under federal Internal Revenue Code).

9. Plaintiff's complaint asserts claims that necessitate resolution of substantial, disputed questions of federal law, including but not limited to the Truth-in-Lending

Act ("TILA"), 15 U.S.C. §§ 1601 *et seq.*, and the Real Estate Settlement Procedures Act ("RESPA"), 12 U.S.C. §§ 2601 *et seq.* A determination of whether Plaintiff may recover for the conduct described in its complaint will necessarily turn on substantial, disputed questions of federal law. Hence, there is federal question jurisdiction over Plaintiff's claims pursuant to 28 U.S.C. § 1331.

　　　　　10.　　Plaintiff's complaint asserts claims relating to the mortgage origination and servicing practices of Countrywide Financial Corporation, Countrywide Home Loans, Inc., and/or Countrywide Home Loans Servicing LP (individually and collectively, "Countrywide"). Plaintiff alleges that Countrywide originated or serviced residential mortgage loans, including Pay Option Adjustable Rate Mortgages ("ARMs") and Hybrid ARMs, in an unfair or deceptive fashion by misrepresenting or concealing the terms, risks, or suitability of the loans such that consumers could not understand or afford the loans. (Compl. (Ex. A) ¶¶ 72-171, 231-269.) Plaintiff repeatedly asserts that the interest rates, amortization, and other terms applicable to the loans were not adequately disclosed. (*See, e.g., id.* ¶¶ 158-171, 297(b), (d), (f), (h).) Plaintiff also alleges that Countrywide excessively or otherwise inappropriately compensated mortgage brokers for their services by giving them incentives to improperly inflate revenue they could earn from yield spread premiums ("YSPs"), the difference between an interest rate for which a borrower qualifies and the (higher) rate he or she is charged. (*Id.* ¶¶ 172-193; *see also id.* ¶ 183 ("By slightly increasing an already low 'teaser' rate, increasing the margin, and adding a three-year prepayment penalty, brokers could maximize the YSP Countrywide paid them."); *id.* ¶ 298(e) (Countrywide "[r]eward[ed] brokers for selling loans with certain risky loan features such as prepayment penalties without ensuring that borrowers received a benefit from the risky features"); *id.* ¶ 298(f) (Countrywide "[s]tructur[ed] the compensation for option ARMS in such

a way that brokers were incentivized to sell a product that was riskier than necessary—to the exclusion of other products—in order to obtain the maximum yield spread premium possible.").)

11.     Plaintiff's claims for relief purport to be brought under state law—the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/2 *et seq.* ("ICFA"), and the Illinois Fairness in Lending Act, 815 ILCS 120/1 *et seq.*  (Compl. ¶¶ 292-299.)  The ICFA, however, expressly provides that "[n]othing in this Act shall apply to any of the following: (1) Actions or transactions specifically authorized by laws administered by any regulatory body or officer acting under statutory authority of this State or the United States." 815 ILCS 505/10b.

12.     Courts have applied 815 ILCS 505/10b to dismiss claims purportedly pled under state law if federal law—including TILA and RESPA—governs the conduct at issue in the claims and the plaintiff failed to plead facts that established defendants' conduct was not authorized by federal law.  *Jackson v. South Holland Dodge, Inc.*, 755 N.E. 2d 462, 470 (Ill. 2001) (affirming dismissal of ICFA complaint because defendant complied with TILA); *Lanier v. Assoc. Fin., Inc.*, 499 N.E. 2d 440, 445 (Ill. 1986) (affirmed dismissal of plaintiff's ICFA claim because the complaint failed to state a claim under TILA); *Johnson v. Matrix Fin. Servs. Corp.*, 820 N.E. 2d 1094, 1103-04 (Ill. App. Ct. 2004) (affirming dismissal of ICFA claim because complaint failed to allege a violation of RESPA); *Fiore v. First Am. Title Ins. Co.*, No. 05-cv-474, 2006 U.S. Dist. LEXIS 60952, at *9 (S.D. Ill. Aug. 28, 2006) (dismissing ICFA claim because the complaint did not allege facts sufficient to support a claim under RESPA). These cases establish that when conduct is governed by TILA or RESPA, a plaintiff's right to relief under state law necessarily depends on the application or construction of federal law.  Such state claims, therefore, arise under federal law.  *Grable*, 545 U.S. at 315.

13.    As in those cases, Plaintiff's claims here are phrased in terms of state law but implicate and require resolution of substantial, disputed questions of federal law. In particular, Plaintiff's allegations relating to inflated yield spread premiums and other forms of mortgage broker compensation necessarily implicate RESPA, which provides, in pertinent part, that "[n]o person shall give and no person shall accept any portion, split, or percentage of any charge made or received for the rendering of a real estate settlement service in connection with a transaction involving a federally related mortgage loan *other than for services actually performed.*" 12 U.S.C. § 2607(b) (emphasis added); *see also* 12 U.S.C. § 2607(a) ("No person shall give and no person shall accept any fee, kickback, or thing of value pursuant to any agreement or understanding, oral or otherwise, that business incident to or part of a real estate settlement service involving a federally related mortgage loan shall be referred to any person.").

14.    The federal agency with enforcement authority under RESPA, the Department of Housing and Urban Development, has issued detailed guidance concerning the propriety of yield spread premiums. *See* "Real Estate Settlement Procedures Act (RESPA) Statement of Policy 1999-1 Regarding Lender Payments to Mortgage Brokers," 64 Fed. Reg. 10080, 10085 (March 1, 1999) and "Real Estate Settlement Procedures Act Statement of Policy 2001-1: Clarification of Statement of Policy 1999-1 Regarding Lender Payments to Mortgage Brokers, and Guidance Concerning Unearned Fees Under Section 8(b)," 66 Fed. Reg. 53052 (October 18, 2001).

15.    Thus, in order to establish liability under its purportedly state-law claims relating to mortgage broker compensation, Plaintiff will need to demonstrate that Countrywide violated RESPA. *See, e.g., Johnson*, 820 N.E. 2d at 1103-04; *Fiore*, 2006 U.S. Dist. LEXIS 60952, at *9.

16.     Similarly, to prove an entitlement to relief on the claim that Countrywide inadequately disclosed the terms of the loans alleged in the complaint, Plaintiff will have to prove that Countrywide violated TILA, a federal statute. *Jackson*, 755 N.E. 2d at 470; *Lanier*, 499 N.E. 2d at 445. "The declared purpose of [TILA] is 'to assure a meaningful disclosure of credit terms so that the consumer will be able to compare more readily the various credit terms available to him and avoid the uninformed use of credit, and to protect the consumer against inaccurate and unfair credit billing and credit card practices.'" *Beach v. Ocwen Fed. Bank*, 523 U.S. 410, 412 (1998) (quoting 15 U.S.C. § 1601(a)). "Accordingly, [TILA] requires creditors to provide borrowers with clear and accurate disclosures of terms dealing with things like finance charges, annual percentage rates of interest, and the borrower's rights." *Id.* (citing 15 U.S.C. §§ 1631, 1632, 1635, 1638). Among the matters governed by TILA that are of particular relevance to this case are the disclosure of the terms under which interests rates adjust and of the possibility of negative amortization, and credit advertising generally.

17.     Because Plaintiff's state law claims necessarily involve the resolution of underlying substantial, disputed questions of federal law, including whether Defendants' disclosures were adequate under TILA and implementing regulations, federal question jurisdiction is appropriate.

18.     There is a significant federal interest in the adjudication of these claims in a federal forum. *Grable*, 545 U.S. at 314. Furthermore, the exercise of federal question jurisdiction here will not "disturb[] any congressionally approved balance of federal and state judicial responsibilities." *Id.* To the contrary, TILA and RESPA each authorizes a federal private right of action in certain circumstances. *See, e.g.*, 15 U.S.C. §§ 1635, 1640 (TILA); 12 U.S.C. §§ 2607, 2614 (RESPA). This demonstrates that there is a significant federal interest in

adjudicating this type of dispute in federal court. *Grable*, 545 U.S. at 317-18 (existence of a federal private right of action weighs in favor of federal question jurisdiction, while absence weighs against) (citing *Merrell Dow Pharms., Inc. v. Thompson*, 478 U.S. 804 (1986)).

19.    Finally, several putative consumer class actions recently have been filed in federal court against Defendants alleging claims under Sections 17200 and 17500 for violating disclosure laws and requirements based on conduct that is similar or identical to that alleged in the Complaint. (*See Leyvas v. Bank of America Corp.*, Case No. CV08-787 DOC (MLGx) (C.D. Cal., filed July 17, 2008); *Sizemore v. Countrywide Financial Corp.*, Case No. CV07-006094-SVW (AJWx) (C.D. Cal., filed Sept. 19, 2007).) Together, these actions seek recovery on behalf of the many of the same borrowers Plaintiff purports to represent in this action, and they advance essentially the same theory of wrongdoing on the part of Countrywide.

20.    Thus, there is a significant interest in having these federal issues adjudicated in a federal forum, and removal of this action will not disrupt any balance between federal and state judicial responsibilities over related disputes.

## FEDERAL OFFICER REMOVAL

21.    The claims asserted against Countrywide Home Loans Servicing LP in this action are removable pursuant to 28 U.S.C. § 1442 because Countrywide Home Loans Servicing LP is a person acting under one or more federal officers, there is a causal nexus between the Plaintiff's claims and Countrywide Home Loans Servicing LP's alleged conduct, and Countrywide Home Loans Servicing LP has raised colorable federal defenses. *See Jefferson County v. Acker*, 527 U.S. 423, 431 (1999).

22.    *First*, Countrywide Home Loans Servicing LP is a person acting under one or more federal officers, including but not limited to the Secretary of the Department of

Housing and Urban Development ("HUD") and the Secretary of the Department of Veterans Affairs ("VA"), for purposes of 28 U.S.C. § 1442(a)(1), in connection with the servicing of mortgage loans insured by the federal government.

23.      Through the Federal Housing Administration ("FHA") program, HUD guarantees and insures the performance of thousands of loans that Countrywide Home Loans Servicing LP services.  HUD regulations provide that in order to be approved to participate in insurance programs authorized under the National Housing Act, including the FHA program, and to maintain approval, "[a] lender shall service or arrange for servicing of the loan in accordance with the requirements of part 201 of this chapter.  A mortgagee shall service or arrange for servicing of the mortgage in accordance with the servicing responsibilities contained in subpart C of part 203 and in part 207 of this chapter, with all other applicable regulations contained in this title, and with such additional conditions and requirements as the Secretary may impose." 24 C.F.R. § 202.5(e).

24.      The regulations include detailed loss mitigation procedures that emphasize, among other things, mortgagees' need to minimize the risk of financial loss to HUD in connection with the mortgagees' servicing of FHA-insured loans:  "[m]ortgagees must consider the comparative effects of their elective servicing actions, and *must take those appropriate actions which can reasonably be expected to generate the smallest financial loss to the Department*.  Such actions include, but are not limited to, deeds in lieu of foreclosure under § 203.357, pre-foreclosure sales under § 203.370, partial claims under § 203.414, assumptions under § 203.512, special forbearance under §§ 203.471 and 203.614, and recasting of mortgages under § 203.616."  24 C.F.R. § 203.501 (emphasis added).

25.     For example, these regulations permit a mortgagee to modify a mortgage for the purposes of changing the amortization provisions, but only within specified constraints, and with notice to HUD: "The mortgagee may modify a mortgage for the purpose of changing the amortization provisions by recasting the total unpaid amount due for a term not exceeding 360 months. The mortgagee must notify HUD of such modification in a format prescribed by HUD within 30 days of the execution of the modification agreement." 24 C.F.R. § 203.616.

26.     As another example, mortgagees' power to grant special forbearance relief for FHA-insured mortgage loans, and the nature of the relief, is limited to circumstances defined by HUD: "If the mortgagee finds that a default is due to circumstances beyond the mortgagor's control, as defined by HUD, the mortgagee may grant special forbearance relief to the mortgagor in accordance with the conditions prescribed by HUD." 24 C.F.R. § 203.614.

27.     HUD has issued handbooks providing further, detailed requirements relating to mortgage modifications and forbearance for FHA-insured loans, such as HUD Handbook 4330.1, REV-5 (Administration of Insured Home Mortgages). (*See* http://www.hud.gov/offices/adm/hudclips/handbooks/hsgh/4330.1/index.cfm.) The Handbook is frequently supplemented with bulletins and explanatory letters, including Mortgagee Letters (collectively, the "HUD Handbook").

28.     Among other provisions, the HUD Handbook dictates procedures the servicer "must" provide for the servicing of defaulted loans, including requirements concerning delinquency counseling, foreclosure avoidance, and pre-foreclosure review. (*See generally* HUD Handbook, Chapter 1-9, 7-7, 7-11, and 7-12.)

29.     The HUD Handbook has detailed requirements concerning workouts and forbearances. (*See generally* HUD Handbook, Chapter 8.) The HUD Handbook prescribes the

available forbearance agreements (informal, formal, and special), and defines those agreements and procedures for which specific HUD approval is—or is not—required.  (*See* HUD Handbook, Sections 8-3 and 8-4.)  HUD also has delegated certain authority to servicers, such as Countrywide Home Loans Servicing LP, for the recasting and modification of loans in some circumstances.  (*See* HUD Handbook, Chapter 3, Chapter 8-6.)

      30.     The performance of FHA loans is guaranteed by the Government National Mortgage Association (commonly referred to as Ginnie Mae or GNMA), which is part of HUD. Ginnie Mae also imposes requirements on the servicing of loans that are in default and/or in foreclosure.  (Ginnie Mae Handbook, Chapter 18.)  Those requirements are dictated to Countrywide as issuer and servicer.

      31.     A mortgagee's failure to employ FHA-directed and GNMA-directed servicing requirements and loss-mitigation measures, as set forth in regulations, handbooks, and other directives, can result in a mortgagee losing its power to service FHA-insured loans or being subject to other restrictions or penalties, or may result in a loss or curtailment of default insurance coverage with respect to particular loans.

      32.     In addition to the above-referenced rules relating to the ability to modify mortgage loans and offer forbearance agreements, there are detailed regulations relating to other servicing obligations for FHA-insured and GNMA-guaranteed loans.  *See* 24 C.F.R. §§ 203.500-203.681; *see also* HUD Handbook, Chapters 1, 2, 4, 9.  The regulations provide that "[t]he servicer must fully discharge the servicing responsibilities of mortgagees as outlined in this part. The mortgagee shall remain fully responsible to the Secretary [of HUD] for proper servicing, and the actions of its servicer shall be considered the actions of the mortgagee.  The servicer also shall be fully responsible to the Secretary for its actions as a servicer."  24 C.F.R. § 203.502(a).

The regulations and the Handbooks impose detailed requirements on mortgagees and their servicers in connection with servicing such loans. For example:

- **Providing loan information to mortgagors**. These regulations require that: "[t]he mortgagee must establish written procedures and controls to assure prompt responses to inquiries;" "[a]ll mortgagors must be informed of the system available for obtaining answers to loan inquiries;" and "[a]t the mortgagor's request, the mortgagee shall furnish a statement of the escrow account sufficient to enable the mortgagor to reconcile the account." 24 C.F.R. § 203.508.

- **Escrow accounts**. These regulations require that: "[m]ortgagees must establish controls to insure that bills payable from the escrow fund or the information needed to pay such bills is obtained on a timely basis"; "[p]enalties for late payments for items payable from the escrow account must not be charged to the mortgagor unless it can be shown that the penalty was the direct result of the mortgagor's error or omission;" that "[t]he mortgagee shall not institute foreclosure when the only default of the mortgagor occupant is a present inability to pay a substantial escrow shortage, resulting from an adjustment pursuant to this section, in a lump sum." 24 C.F.R. § 203.550.

- **Fees and charges after endorsement**. These regulations provide detailed requirements as to fees and charges, and provide that the "mortgagee may collect reasonable and customary fees and charges from the mortgagor after insurance endorsement *only* as provided" in the regulations. 24 C.F.R. § 203.552 (emphasis added). The regulated fees and charges include late charges (as set forth in other regulations), charges for processing uncollectible checks, and attorney's and trustee's fees and expenses in connection with foreclosure. *Id.* The regulations also provide that the "reasonable and customary

charges" shall *not* include such charges as "[c]harges for servicing activities of the mortgagee or servicer." *Id.*  In addition, the mortgages and deeds of trust executed by mortgagors whose loans are insured by HUD often provide that fees and charges are permitted as set forth by HUD.

- **Contact with the mortgagor**.  The regulations require the mortgagee to "have a face-to-face interview with the mortgagor, or make reasonable efforts to arrange such a meeting, before three full monthly installments due on a mortgage are unpaid."  24 C.F.R. § 203.604(b).

- **Loss mitigation performance**.  The regulations require that "[b]efore four full monthly installments due on the mortgage have become unpaid, the mortgagee shall evaluate on a monthly basis all the loss mitigation techniques provided at § 203.501 to determine which is appropriate.  Based on such evaluations, the mortgagee shall take appropriate loss mitigation action."  24 C.F.R. § 203.605(a).

- **Pre-foreclosure review**.  The regulations require that "[b]efore initiating foreclosure, the mortgagee must ensure that all servicing requirements of this subpart have been met."  24 C.F.R. § 203.606(a).

    33.    The HUD requirements cited above are applicable to Countrywide Home Loans Servicing LP's servicing of FHA-insured and GNMA-guaranteed loans, as provided therein.  Under these requirements, Countrywide Home Loans Servicing LP is expressly charged with specific servicing obligations for such loans, and is subject to specific constraints directed by the federal government with regard to loan modifications and forbearance.  In addition, Countrywide Home Loans Servicing LP has been specifically approved by HUD as a "non-supervised mortgagee," and it and its affiliates are approved by GNMA as Issuers, which entitles

Countrywide Home Loans Servicing LP to, among other things, service FHA-insured and GNMA-guaranteed loans.

34.    As part of the FHA program, HUD reviews the performance of Countrywide Home Loans Servicing, LP and its compliance with the requirements, and imposes penalties with respect to particular loans or that affect the company's overall status when loans are not serviced pursuant to the applicable regulations, Handbooks, and other requirements.

35.    As a result of the above-referenced circumstances, the Secretary of HUD has delegated legal authority to Countrywide Home Loans Servicing LP in connection with the servicing of FHA-insured and GNMA-guaranteed mortgage loans and is directing the conduct and acts of Countrywide Home Loans Servicing LP, such that Countrywide Home Loans Servicing LP is acting under the Secretary of HUD for purposes of 28 U.S.C. § 1442(a)(1). Confirming that Countrywide Home Loans Servicing LP is acting under a federal officer, the servicing of federally-insured and guaranteed mortgage loans is something that, absent these regulations and approvals, a federal officer or agency (such as HUD or its Secretary) would have to do itself.  Hence, Countrywide Home Loans Servicing LP is directly assisting the federal government in providing a service that it would otherwise provide on its own.  *See, e.g., Watson v. Philip Morris Cos.*, 127 S. Ct. 2301, 2308 (2007) (observing that federal officer removal would be appropriate where the removing party is "helping the Government to produce an item that it needs" or "performed a job that ... the Government itself would [otherwise] have had to perform.").

36.    Similarly, Countrywide Home Loans Servicing LP services loans guaranteed by the VA pursuant to instructions and directions provided by the VA by regulation and handbook.  38 C.F.R. Part 36.4300 et seq.; VA Handbook H26-94-1. These requirements

include detailed direction with respect to default servicing, alternatives to foreclosures (such as forbearances and modifications), and foreclosure. *Id.*   HUD reviews servicing performance with respect to VA loans as it does with FHA loans.  VA-guaranteed loans are also guaranteed by GNMA, and subject to the requirements sets forth above with respect to FHA loans.  As such, the Secretary of the VA has delegated legal authority to Countrywide Home Loans Servicing LP in connection with the servicing of VA-guaranteed mortgage loans and is directing the conduct and acts of Countrywide Home Loans Servicing LP, such that Countrywide Home Loans Servicing LP is acting under the Secretary of the VA for purposes of 28 U.S.C. § 1442(a)(1). Confirming that Countrywide Home Loans Servicing LP is acting under a federal officer, the servicing of federally-insured mortgage loans is something that, absent these regulations and approvals, a federal agency or officer (such as the VA or its Secretary) would have to do itself. Hence, Countrywide Home Loans Servicing LP is directly assisting the federal government in providing a service that it would otherwise provide on its own. *See, e.g., Watson*, 127 S. Ct. at 2308.

37.     ***Second***, there is a causal nexus between the claims asserted against Countrywide Home Loans Servicing LP and the conduct performed by Countrywide Home Loans Servicing LP in connection with its servicing of mortgage loans insured by the federal government, including FHA-insured and guaranteed loans and VA-guaranteed loans.

38.     For example, the Complaint's allegations against Countrywide Home Loans Servicing LP fall squarely within the duties delegated by the Secretaries of HUD and the VA to Countrywide Home Loans Servicing LP pursuant to the regulations and approvals referenced above.  The Complaint alleges that Countrywide Home Loans Servicing LP "services loans originated by Defendant COUNTRYWIDE HOME LOANS, INC., the Federal National

Mortgage Association (Fannie Mae), the Federal Home Loan Mortgage Corporation (Freddie Mac), the Government National Mortgage Association (Ginnie Mae), the United States Department of Housing and Urban Development, and the United States Veterans Administration." (Compl. ¶ 19.) The Complaint alleges that "Countrywide Home Loans Servicing, LP, unfairly and deceptively required borrowers to make additional payments just to consider whether they would qualify for a loan repayment or modification plan—regardless of the feasibility or affordability of such a plan." (*Id.* ¶ 74.)

39.    The Complaint devotes an entire section to alleged "Unfair and Deceptive Practices in the Servicing of Borrowers' Residential Mortgage Loans" by Countrywide Home Loans Servicing LP. (Compl. ¶¶ 270-285.) This portion of the Complaint alleges the following conduct by Countrywide Home Loans Servicing LP in its dealings with "[c]onsumers who ask what can be done to avoid foreclosure proceedings" (*id.* ¶ 270):

- "Countrywide servicing generally demands an initial payment from the consumers prior to even discussing whether anything can be done to keep the consumers in their homes." (*id.* ¶ 271);

- The repayment plans offered by Countrywide Home Loans Servicing LP are "often [] unworkable and unaffordable solution[s] to most consumers' mortgage payment problems" (*id.* ¶ 275); and

- "Even when Countrywide Servicing comes up with a loan modification plan, the company often fails to discuss the plan with the consumer to confirm it is affordable or to send timely documentation to the consumer regarding the specific details of the plan." (*id.* ¶ 278.)

- "Consumers have complained that Countrywide Servicing fails to send them the payoff statements necessary to complete the refinance in a timely manner." (*id.* ¶ 281.)

- "There are also occasions when Countrywide Servicing acts improperly towards consumers who are not in foreclosure, but have a problem with the application of funds from an escrow account." (*id.* ¶ 284.)

40.     Along similar lines, Count I of the Complaint, which alleges violations of ICFA, asserts that "Countrywide Home Loans Servicing, LP engaged in unfair and/or deceptive acts or practices during the servicing of residential mortgage loans through practices such as, but not limited to,

a.     Inducing borrowers to pay Countrywide Servicing monies under the premise that Countrywide Servicing would be able to assist borrowers, even though Countrywide Servicing had not done any analysis to determine whether assistance was feasible in light of the borrowers' particular factual circumstances;

b.     Misleading borrowers into paying Countrywide Servicing additional monies under a repayment plan or loan modification plan that Countrywide Servicing knew or should have known was unaffordable; and

c.     Recklessly facilitating the foreclosure of borrowers' homes by misleading borrowers or failing to respond to borrowers' requests for assistance." (Compl. ¶ 299.)

41.     The above-referenced allegations relating to contacting borrowers, providing information to borrowers about their loans, escrow accounts, and loss mitigation measures (including forbearance and the terms on which loans may be modified) directly challenge Countrywide Home Loans Servicing LP's performance of its appointed duties in

servicing federally-insured mortgage loans, including under the regulations, handbooks, and approvals of HUD, the VA, and GNMA cited above.

42.    Accordingly, there is a causal nexus between Plaintiff's claims and Countrywide Home Loans Servicing LP's conduct in carrying out its duties in connection with servicing mortgage loans insured by the federal government.  *See, e.g., Isaacson v. Dow Chemical Co.*, 517 F.3d 129, 137-38 (2d Cir. 2008) ("[t]o show causation, Defendants must only establish that the act that is the subject of Plaintiffs' attack . . . occurred *while* Defendants were performing their official duties.") (emphasis in original).

43.    *Finally*, federal officer removal is appropriate because Countrywide Home Loans Servicing LP raises colorable federal defenses.  Countrywide Home Loans Servicing LP acted in compliance with federal law—including the HUD, VA, and GNMA regulations and requirements and the specific HUD, VA, and GNMA approvals of its servicing responsibilities—in its servicing of federally-insured mortgage loans.  Hence, Countrywide Home Loans Servicing LP raises colorable federal defenses that arise out of its duties pursuant to its relationship with the government in servicing federally-insured mortgage loans.  *See, e.g., Isaacson*, 517 F.3d at 139 (compliance with federal law can provide a colorable federal defense for purposes of federal officer removal); *Magnin v. Teledyne Continental Motors*, 91 F.3d 1424, 1428 (11th Cir. 1996) (colorable federal defense where "[a]t least part of Smith's defense is that he acted within the scope of his federal duties, that what he did was required of him by federal law, and that he did all federal law required.").

44.    In light of the foregoing, this action is removable pursuant to 28 U.S.C. § 1442.

## BANKRUPTCY REMOVAL

45.    In the alternative, and only in the event that the Court finds that it does not have jurisdiction based on at least one of the other two grounds alleged in this notice (substantial federal question and federal officer removal), the claims asserted against the Defendants in this action are removable based on federal bankruptcy jurisdiction, pursuant to 28 U.S.C. §§ 157, 1331, 1334, 1367, 1441, and 1452, and Rule 9027 of the Federal Rules of Bankruptcy Procedure, because this is a civil action arising under the Bankruptcy Code or arising in one or more cases under the Bankruptcy Code. *See* 28 U.S.C. § 1334(b). In that event, Defendants will file an appropriate motion to stay any referral to bankruptcy court and to remain in district court.

46.    This action is brought on behalf of Illinois residents who are borrowers of non-prime mortgage loans and on behalf of borrowers, wherever located, of non-prime mortgage loans secured by Illinois real property. Many of those borrowers have filed bankruptcy proceedings in United States bankruptcy courts within the last four years. Since July 2004, one or more Defendants have serviced 451,334 non-prime mortgage loans with property addresses in Illinois. Of those 451,334 loans, 8,347 involved borrowers ("debtors") who have sought relief in United States bankruptcy courts, including in this District. Defendants will, at the appropriate time, be prepared to attempt to identify the names and case numbers of some or all of the debtors who sought relief in bankruptcy court in this District.

47.    Some or all of the claims asserted in the instant case are pre-petition assets that belong to the estates of bankrupt borrowers rather than to the bankrupt borrowers individually. These claims are property of the bankruptcy estates under 11 U.S.C. §§ 541 and 1306(a). Even though some of the bankruptcy cases have been closed, or the debtors have been discharged, the claims remain the property of the bankruptcy estates, and not of the individual

debtors, if the debtors failed to schedule those claims under 11 U.S.C. § 521(1) and/or those claims were not exempt or were not administered or abandoned during the bankruptcy case. 11 U.S.C. § 554(d). To the extent a debtor in a pending or previous bankruptcy case has raised claims similar to those raised in this case, the claims are part of the estate or are already at issue in bankruptcy cases. This Court has original and exclusive jurisdiction over claims and over property of the various bankruptcy cases filed in this district, including the claims asserted in the instant (state court) case filed by the Illinois Attorney General.

48.    Upon removal, this proceeding is a core matter in numerous bankruptcy cases because, for example, it is a proceeding that affects the liquidation of assets of the estate. *See* 28 U.S.C. § 157(b)(2)(O).

49.    If the Court exercises jurisdiction based on bankruptcy removal, and to the extent a separate jurisdictional basis is required as to claims brought for the benefit of persons other than debtors, this Court has supplemental jurisdiction over those claims pursuant to 28 U.S.C. § 1367 because they are so related to the claims brought on behalf of debtors that they form part of the same case or controversy under Article III of the United States Constitution.

50.    Although filed by the Illinois Attorney General, this action is not properly understood as an exercise of regulatory or police power under 28 U.S.C. § 1452(a) because it seeks to protect a pecuniary interest in property of the debtors or their bankruptcy estates. *See FTC v. First Alliance Mortg. Co. (In re First Alliance Mortg. Co.)*, 264 B.R. 634, 646 (Bankr. C.D. Cal. 2001) (citing legislative history of the police power removal exception stating that it "is intended to be given a narrow construction in order to permit governmental units to pursue actions to protect the public health and safety and not to apply to actions by a governmental unit

to protect a pecuniary interest in property of the debtor, or property of the estate."). Accordingly, bankruptcy removal is proper here.

## PROPRIETY OF REMOVAL

51.    For the foregoing reasons, this Court has jurisdiction over this matter based on federal question jurisdiction under 28 U.S.C. § 1331, bankruptcy jurisdiction under 28 U.S.C. § 1334, and federal officer removal under 28 U.S.C. § 1442. Hence, this action may be removed to this Court pursuant to 28 U.S.C. §§ 1441(a) and (b), 1442, and 1452.

52.    The United States District Court for the Northern District of Illinois is the federal judicial district encompassing the Circuit Court of Cook County, Illinois, where this suit was originally filed. Venue therefore is appropriate in this district under 28 U.S.C. § 1441(a).

53.    Accordingly, this action may be removed from the Circuit Court of Cook County, Illinois, and brought before the United States District Court for the Northern District of Illinois, Eastern Division, pursuant to 28 U.S.C. §§ 1331, 1334, 1441(a) and (b), 1442, and 1452.

54.    Pursuant to 28 U.S.C. § 1446(d), Defendants will promptly file a copy of this Amended Notice of Removal with the clerk of the Circuit Court of Cook County, Illinois, and will serve a copy of the same upon counsel for the Plaintiff.

Respectfully submitted,


___/s/ Tyrone C. Fahner___
Tyrone C. Fahner
MAYER BROWN LLP
71 South Wacker Drive
Chicago, IL 60606-4637
(312) 782-0600 (telephone)
(312) 701-7711 (facsimile)

*Attorneys for Defendants Countrywide*
*Financial Corporation, Countrywide Home*
*Loans, Inc., Full Spectrum Lending,*
*Countrywide Home Loans Servicing, LP,*
*and Angelo Mozilo*

Dated:  August 14, 2008

OF COUNSEL

John H. Beisner
Brian D. Boyle
O'MELVENY & MYERS LLP
1625 Eye Street, N.W.
Washington, D.C.  20006-4001
(202) 383-5300 (telephone)
(202) 383-5414 (facsimile)

# EXHIBIT A

Atty. No. 99000

## IN THE CIRCUIT COURT OF COOK COUNTY, STATE OF ILLINOIS
## COUNTY DEPARTMENT, CHANCERY DIVISION

FILED

2008 JUN 25  AM 10: 18

CIRCUIT COURT OF COOK
COUNTY, ILLINOIS
CHANCERY DIV.
DOROTHY BROWN ←CLERK

THE PEOPLE OF THE STATE OF
ILLINOIS,

        Plaintiff,

v.

COUNTRYWIDE FINANCIAL
CORPORATION, a Delaware
corporation; COUNTRYWIDE HOME
LOANS, INC., a New York
corporation also d/b/a Full Spectrum
Lending; FULL SPECTRUM
LENDING, a California corporation
formerly doing business in Illinois;
COUNTRYWIDE HOME LOANS
SERVICING, LP, a Texas partnership;
and ANGELO R. MOZILO,
individually and in his capacity as
Chief Executive Officer of Defendant
COUNTRYWIDE FINANCIAL
CORPORATION;

        Defendants.

(
(
(
(
(
(
(
(
(
(
(
(
(
(
(
(
(
(
(
(
(
(

08CH22994

## COMPLAINT FOR INJUNCTIVE AND OTHER RELIEF

NOW COMES the Plaintiff, THE PEOPLE OF THE STATE OF ILLINOIS, by LISA

MADIGAN, Attorney General of the State of Illinois, and complains of Defendants

COUNTRYWIDE FINANCIAL CORPORATION, a Delaware corporation, COUNTRYWIDE

HOME LOANS, INC., a New York corporation also doing business as Full Spectrum Lending,

FULL SPECTRUM LENDING, a California corporation formerly doing business in Illinois,

COUNTRYWIDE HOME LOANS SERVICING LP, a Texas partnership, and ANGELO R.

MOZILO, individually and in his capacity as Chief Executive Officer of Defendant COUNTRYWIDE FINANCIAL CORPORATION.

Countrywide, in pursuit of market share, engaged in unfair and deceptive practices including the loosening of underwriting standards, structuring unfair loan products with risky features, engaging in misleading marketing and sales techniques, and incentivizing employees and brokers to sell more and more loans with risky features. Countrywide's business practices resulted in unaffordable mortgage loans and increased delinquencies and foreclosures for Illinois homeowners.

Countrywide's explosive growth was paralleled by the demand for loans with non-traditional risky features on the secondary market. Through the securitization process, Countrywide shifted the risk of the failure of these non-traditional loans to investors. Moreover, securitization allowed Countrywide to gain much needed capital to fuel the origination process and reach its goal of capturing more and more market share. As the risky Countrywide loans began to fail, it was forced to repurchase or replace the failing loans in the investor pools. This created further pressure to increase the volume of loan origination.

To facilitate the increase in loan origination volume, Countrywide relaxed its underwriting standards and sold unaffordable and unnecessarily expensive loans. Reduced documentation underwriting guidelines were heavily used to qualify many borrowers for unaffordable loans. Countrywide created so-called "affordability" loan products, such as adjustable rate mortgages and interest-only loan products, that only required qualifying borrowers at less than the full interest rate for the loan products. Countrywide pushed products that containing layers of unduly risky features, such as pay option ARMs and mortgage loans for 100% of the value of borrowers' homes. Unfair and deceptive advertising, marketing and sales

2

practices were utilized to push mortgages, while hiding the real costs and risks to borrowers. These practices included enticing borrowers with low teaser rates, low monthly payments and "no closing cost" loans that failed to make clear and conspicuous disclosures of the products' risks. Finally, Countrywide engaged in unfair and deceptive acts and practices while servicing borrowers' loans, such as requiring borrowers to make initial payments without regard to whether a loan repayment plan or loan modification was even possible.

## JURISDICTION AND VENUE

1.     This action is brought for and on behalf of THE PEOPLE OF THE STATE OF ILLINOIS, by LISA MADIGAN, Attorney General of the State of Illinois, pursuant to the provisions of the Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/1 *et seq.*, the Illinois Fairness in Lending Act, 815 ILCS 120/1 *et seq.*, and her common law authority as Attorney General to represent the People of the State of Illinois.

2.     Venue for this action properly lies in Cook County, Illinois, pursuant to Section 2-101 of the Illinois Code of Civil Procedure, 735 ILCS 5/2-101, in that the Defendants are doing business in Cook County, Illinois.

## PARTIES

3.     Plaintiff, THE PEOPLE OF THE STATE OF ILLINOIS, by LISA MADIGAN, Attorney General of the State of Illinois, is charged, *inter alia,* with the enforcement of the Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/1 *et seq.* and the Illinois Fairness in Lending Act, 815 ILCS 120/1 *et seq.*

4.     Defendant ANGELO R. MOZILO is a co-founder of Defendant COUNTRYWIDE FINANCIAL CORPORATION, which was formed as Countrywide Credit Industries in 1969.

5.      Defendant MOZILO participates in, manages, controls, and has knowledge of the day-to-day activities of Defendant COUNTRYWIDE FINANCIAL CORPORATION.  He has been the Chairman of Defendant COUNTRYWIDE FINANCIAL CORPORATION'S Board since March 1999 and Chief Executive Officer of the company since February 1998.  Defendant MOZILO was also President of the company from March 2000 through December 2003 and has served in other executive capacities since the company's formation.

6.      Defendant MOZILO has stated that he has "devoted [his] life to building from the ground up a mortgage banking company focused on providing homeownership opportunities to all Americans" for the last four decades.

7.      Although Defendant MOZILO resides in California, his companies conduct business in Illinois and, on at least two occasions, he has engaged in purposeful activity to further the interests of Defendant COUNTRYWIDE FINANCIAL CORPORATION (and its subsidiaries) while in the State of Illinois.

8.      Specifically, during an April 27, 2006 earnings conference call, Defendant MOZILO reported that he had just finished a tour of the offices of the subsidiary that handles the securitization of mortgage loans originated by Defendant COUNTRYWIDE FINANCIAL CORPORATION.  As he reported, one of those offices was in Chicago.

9.      In addition, during October 1998, Defendant MOZILO appeared at the Mortgage Banker's Association of America's annual convention in Chicago.  At this appearance, Defendant MOZILO discussed the turbulence in the mortgage business and stated that only big firms with adequate resources to maintain access to bank lenders and the capital markets would survive.  He predicted that Defendant COUNTRYWIDE FINANCIAL CORPORATION would be a beneficiary of the market turbulence.

4

10.    Defendant COUNTRYWIDE FINANCIAL CORPORATION is a thrift holding company.  It has numerous subsidiaries that originate, purchase, securitize, sell and service residential and commercial loans; provide loan closing services such as credit reports, appraisals and flood determinations; conduct fixed income securities underwriting and trading activities; provide property, life and casualty insurance; and manage a captive mortgage reinsurance company.

11.    Since December 23, 1980, Defendant COUNTRYWIDE HOME LOANS, INC., a wholly-owned subsidiary of Defendant COUNTRYWIDE FINANCIAL CORPORATION, has been a registered foreign corporation in the State of Illinois.  Defendant COUNTRYWIDE HOME LOANS, INC. is a licensed Illinois mortgage bank, holding mortgage banker license MB.0000139, which is issued by the Illinois Department of Financial and Professional Regulations, Division of Banking.  Since 2004, Defendant COUNTRYWIDE HOME LOANS, INC. has also done business in Illinois as Full Spectrum Lending.

12.    Defendant FULL SPECTRUM LENDING, INC., was a registered foreign corporation in the State of Illinois from October 3, 1996 through April 25, 2005.  FULL SPECTRUM LENDING, INC. was a licensed Illinois mortgage bank, holding mortgage banker license MB.0004910, which was issued by the Illinois Department of Professional Regulations, Division of Banking.  Defendant FULL SPECTRUM LENDING, INC. became a division of Defendant COUNTRYWIDE HOME LOANS, INC. in 2004.  In April 2005, FULL SPECTRUM LENDING, INC. withdrew as a registered foreign corporation and began operating in Illinois as Full Spectrum Lending, a division of COUNTRYWIDE HOME LOANS, INC.

13.    In its annual reports from 1999 to 2006, Defendant COUNTRYWIDE FINANCIAL CORPORATION emphasized that mortgage banking, which has historically been conducted

5

through Defendant COUNTRYWIDE HOME LOANS, INC. for prime loan originations and Defendant FULL SPECTRUM LENDING, INC. for subprime loan originations, was its core business. Defendant COUNTRYWIDE FINANCIAL CORPORATION has stated that the company is engaged primarily in residential mortgage lending and that Defendant COUNTRYWIDE HOME LOANS, INC. is its primary subsidiary.

14.     During the entire time period from 1999 to 2006, there was a significant identity in the corporate governance and managing directors of Defendant COUNTRYWIDE FINANCIAL CORPORATION and Defendant COUNTRYWIDE HOME LOANS, INC. For example, between 1999 and 2005, Stanford Kurland was the Chief Executive Officer for Defendant COUNTRYWIDE HOME LOANS, INC. and he was also the Chief Operating Officer for Defendant COUNTRYWIDE FINANCIAL CORPORATION. In 2006, David Sambol became Chairman of the Board and Chief Executive Officer for Defendant COUNTRYWIDE HOME LOANS, INC. and President and Chief Operating Officer of Defendant COUNTRYWIDE FINANCIAL CORPORATION.

15.     There was also overlap between the management of Defendant FULL SPECTRUM LENDING, INC., when it was a separate company, and Defendant COUNTRYWIDE FINANCIAL CORPORATION. Specifically, Gregory Lumsden has been the President and Chief Executive Officer for Defendant FULL SPECTRUM LENDING, INC. from 2001, when it was a separate company, to the present day, when it is a division of Defendant COUNTRYWIDE HOME LOANS, INC. He has been and is currently a managing director for Defendant COUNTRYWIDE FINANCIAL CORPORATION.

16.     Defendant COUNTRYWIDE FINANCIAL CORPORATION issues consolidated annual reports and SEC filings with Defendant COUNTRYWIDE HOME LOANS, INC. Additionally,

Defendant COUNTRYWIDE FINANCIAL CORPORATION files a consolidated federal income tax return and a combined state income tax return in California with Defendant COUNTRYWIDE HOME LOANS, INC. and Defendant FULL SPECTRUM LENDING, INC. Defendant COUNTRYWIDE FINANCIAL CORPORATION also issued consolidated earnings statements and balance sheets for itself, Defendant COUNTRYWIDE HOME LOANS, INC. and Defendant FULL SPECTRUM LENDING, INC.

17. Defendant COUNTRYWIDE FINANCIAL CORPORATION controls the policies and operations and profits from the activities of Defendant COUNTRYWIDE HOME LOANS, INC. and Defendant FULL SPECTRUM LENDING, INC. Defendant COUNTRYWIDE FINANCIAL CORPORATION arranged and profited from the securitization and/or sale of loans originated and serviced by Defendant COUNTRYWIDE HOME LOANS, INC. and Defendant FULL SPECTRUM LENDING, INC.

18. Because they acted cooperatively in carrying out the conduct alleged in this Complaint, Defendants ANGELO R. MOZILO, COUNTRYWIDE FINANCIAL CORPORATION, COUNTRYWIDE HOME LOANS, INC. and FULL SPECTRUM LENDING, INC. are collectively referred to as "Countrywide," unless otherwise specified, and each is responsible for the unlawful conduct alleged herein.

19. Defendant COUNTRYWIDE HOME LOANS SERVICING, LP is a licensed mortgage bank, holding mortgage banker license MB.0006041, which was issued by the Illinois Department of Financial and Professional Regulation, Division of Banking. Defendant COUNTRYWIDE HOME LOANS SERVICING, LP is a Texas limited partnership directly owned by two wholly-owned subsidiaries of Defendant COUNTRYWIDE HOME LOANS, INC. Defendant COUNTRYWIDE HOME LOANS SERVICING, LP services loans originated

7

by Defendant COUNTRYWIDE HOME LOANS, INC., the Federal National Mortgage

Association (Fannie Mae), the Federal Home Loan Mortgage Corporation (Freddie Mac), the

Government National Mortgage Association (Ginnie Mae), the United States Department of

Housing and Urban Development, and the United States Veterans Administration.

20.    Any allegation about any acts of Defendants COUNTRYWIDE HOME LOANS, INC.,

COUNTRYWIDE FINANCIAL CORPORATION, FULL SPECTRUM LENDING, INC. or

COUNTRYWIDE HOME LOANS SERVICING, LP, means that the entities did the acts alleged

through their officers, directors, employees, agents and/or representatives while they were acting

within the actual or ostensible scope of their authority.

## COMMERCE

21.    Section 1(f) of the Consumer Fraud and Deceptive Business Practices Act, 815 ILCS

505/1(f), defines "trade" and "commerce" as follows:

> The terms 'trade' and 'commerce' mean the advertising, offering for sale,
> sale, or distribution of any services and any property, tangible or
> intangible, real, personal, or mixed, and any other article, commodity, or
> thing of value wherever situated, and shall include any trade or commerce
> directly or indirectly affecting the people of this State.

22.    Defendants are and were, at all relevant times hereto, engaged in trade and commerce in

the State of Illinois, in that they offered mortgage lending services to the general public of the

State of Illinois.

23.    The Attorney General's Office has received over 200 complaints related to Countrywide

since 2005.

8

## COUNTRYWIDE'S BUSINESS PRACTICES RESULTED IN UNAFFORDABLE MORTGAGE LOANS AND INCREASED FORECLOSURES IN ILLINOIS

Countrywide's Domination of the Mortgage Industry

24.     Both Countrywide Financial Corporation ("CFC") and Countrywide Home Loans, Inc. are based in Calabasas, California.  CFC was formed by David Loeb and Angelo Mozilo as Countrywide Credit Industries in 1969. The company went public shortly thereafter.  Loeb retired in 2000.  The company restructured in 2001 and assumed its current name in 2002.

25.     Through its numerous subsidiaries, CFC is involved in virtually every segment of the residential mortgage industry.  The company sells, purchases, securitizes and services residential and commercial loans; provides loan closing services such as credit reports, appraisals and flood determinations; conducts fixed income securities underwriting and trading activities; provides property, life and casualty insurance; and manages a captive mortgage reinsurance company.

26.     CFC's primary subsidiary, Countrywide Home Loans, Inc., offers loans to consumers through three production channels.  The first channel is comprised of Countrywide's prime consumer-direct (retail) lending locations, referred to as the Consumer Markets Division, and nonprime consumer-direct (retail) lending locations, referred to as Full Spectrum Lending.  The second channel is wholesale lending through a network of mortgage loan brokers and other financial intermediaries.  The third channel is correspondent lending through which Countrywide provides lines of credit to financial institutions such as independent mortgage companies, commercial banks, savings and loans and credit unions, purchases the mortgages made pursuant to the lines of credit, and then arranges for the securitization of these loans.

27.     Today, Countrywide is America's largest mortgage lender.  In the first quarter of 2008, the company originated $73 billion dollars nationally in mortgage loans.  Countrywide has also been a significant originator of subprime mortgages.  By the first quarter of 2007, Countrywide

9

had become the largest originator of subprime loans, with a total subprime loan volume of roughly $ 7,881,000,000.

28.    Countrywide is also the nation's largest loan servicer. The company administers $1.5 trillion in loans made by both it and other institutions. Countrywide's servicing operation generated $1.4 billion in revenue in the first quarter of 2008.

29.    Countrywide has a significant presence in Illinois. At the peak of its presence in Illinois, Countrywide operated approximately 100 retail branch offices and its mortgage loan products were offered by numerous mortgage brokers licensed to do business in Illinois. Countrywide also purchased loans through a network of some 2,100 correspondent lenders.

30.    Countrywide was the largest lender in Illinois in 2004, 2005, and 2006. During these years, Countrywide sold approximately 94,000 loans to Illinois consumers.

31.    In addition, Countrywide is the largest lender in the Chicago area. In 2006, for example, Countrywide made over 21,000 loans to consumers in the seven county Chicago area.

The Explosive Growth of a Market for Loans with Non-Traditional Risky Features

32.    Countrywide's growth paralleled and was fueled by the rise of private-label securitization in the mortgage industry.

33.    Securitization of mortgage loans is a relatively recent phenomenon. Historically, mortgages were long-term, fixed rate, amortizing products sold by depository institutions. From the post-World War II era to 1973, savings and loan institutions held the majority of all mortgages.

34.    The privatization of the Federal National Mortgage Association (Fannie Mae) in 1968 and the creation of the Federal Home Loan Mortgage Corporation (Freddie Mac) in 1970 laid the groundwork for securitization of mortgages and the secondary market's role in the mortgage

industry. Fannie Mae and Freddie Mac, also known as government-sponsored entities ("GSEs"), began purchasing loans from financial institutions. These financial institutions were required to make limited representations and warranties regarding the quality of the loans. Any remaining risk passed on to the GSEs.

35.     After purchase, the GSEs bundled the mortgages into pools in order to sell the income stream to investors. An asset-backed or mortgage-backed security is ultimately created from such a pool of loans. The entire process is generally referred to as securitization. As used by the GSEs, the primary purpose of securitization was to create liquidity for funding more residential mortgage loans.

36.     There are limits on the types of loans that Fannie Mae and Freddie Mac purchase. The loans they purchase are subject to certain standards regarding loan amount and credit risk, which generally must be demonstrated through written documents showing the borrower's credit score, income, assets and liabilities and the value of the home securing the loan. Loans that meet the underwriting standards are referred to in the mortgage industry as "conforming loans." Like other mortgage lenders, Countrywide marketed and sold conforming loans to borrowers and then sold these loans to the GSEs.

37.     Until the early 1990s, "non-conforming loans," or loans that did not meet the GSEs' underwriting standards, were rare and expensive. Borrowers who were considered subprime (due to credit profiles riskier than the minimum required for conforming loans) or were unable to document income and assets, or who wanted loan amounts in excess of the GSEs' underwriting guidelines had few options. This situation would soon change.

38.     In the early 1990s, banking regulators adopted new rules at a time when banks were under considerable financial stress from the 1991 recession. For the first time, the new rules

11

measured bank health through the use of a capital to asset ratio. Unable to raise new capital to increase the ratio, banks found it easier to reduce assets instead, and securitization proved particularly useful for that task. These assets included mortgage loans.

39.     Once banks had an incentive to divest assets, and with securitization enabling them to pass at least part of the risk of a loan's failure to investors, financial institutions became less wary of making riskier non-conforming loans. Securitization was no longer just a tool to create liquidity in the conforming mortgage industry. Instead, mortgage originators could employ it as a way of shedding much of the credit risk associated with non-conforming loans that they originated.

40.     Wall Street became aware of the potential cash flow from the securities backed by non-conforming mortgage loans. Investors were attracted to these securities because they assumed that non-conforming mortgage-backed securities would share the same stable performance of the conforming mortgage-backed securities issued by the GSEs. The favorable investment grade ratings given to the securities by the various ratings agencies – which allowed institutional investors such as state pension funds to buy the products – seemed to corroborate this assumption.

41.     In addition, the yields on the non-conforming loan securities were attractive. While subprime loans – a type of non-conforming loan – carry greater risks, they also produce higher returns. For a time, the large returns on subprime mortgage-backed securities outpaced (and concealed) high failure rates of loans in securitization pools.

42.     Investors paid a premium for certain types of loans and certain loan features, such as loans with high interest rates (i.e., subprime loans) or loans with prepayment penalties. Indeed, investors' growing appetite for mortgage-backed securities fueled a surge in the origination of

subprime mortgage lending. Between 1994 and 2005, subprime mortgage lending grew from $35 billion to $625 billion. By the first quarter of 2007, subprime mortgage-backed securities were being sold at a rate of $100 billion per quarter. The explosive growth in subprime mortgage lending also marked a shifting away from traditional underwriting standards.

43.    Lenders, such as Countrywide, were aware of the types of loans and loan features for which investors would pay a premium. Investor demand and secondary market valuation, therefore, became the primary concern when determining what types of loans to market and sell and at what price, rather than the consumers' ability to repay the loans. Countrywide sought to place greater numbers of borrowers into loans laden with these premium-enhancing features.

44.    Countrywide had already established a small presence in the subprime lending field in the late 1990s, when it formed its retail subprime lending unit, Full Spectrum Lending. Following David Loeb's retirement in 2000, Countrywide became more aggressive in growing its business in an effort to be the nation's largest mortgage lender. Countrywide expanded the range of non-conforming loan products that it offered to consumers and began to concentrate more on subprime lending and exotic mortgage products. For example, in 2002, Countrywide originated roughly $9 billion in subprime loans. In 2005, that number shot up to over $44 billion.

45.    Countrywide also changed its corporate strategy to focus on increasing loan volume, which would in turn generate more loan origination fees for the company. Instead of focusing on fixed rate loans to creditworthy borrowers, the company began to emphasize reduced documentation loans and adjustable rate products. For example, in 2003, only 18% of the loans originated by Countrywide had adjustable interest rates. In 2004, however, that number had grown to 49%.

13

46.     By 2005, Countrywide's growth in both revenue and number of loans originated was fueled by the company's origination of a menu of risky loan products, such as reduced documentation loans, option ARMs, and loans for 100% of a home's value.

<u>Record Numbers of Foreclosures Nationally and in Illinois</u>

47.     For many years, rising home prices concealed the consequences of Countrywide's increased drive to sell loans regardless of the borrower's credit risk and ability to repay the loan. Borrowers were often lured into expensive home loans with the promise that they could refinance if the loan became unaffordable. As long as housing prices continued to rise and credit remained available, many borrowers followed this strategy. Predictably, with the collapse of the mortgage market and concomitant drop in housing prices, the days when borrowers could refinance out of an unaffordable mortgage ended, and, as has been widely documented, defaults and foreclosures nationwide are rapidly rising.

48.     In the third quarter of 2007, 24% of all outstanding subprime loans and 30% of subprime ARMs were either delinquent or in foreclosure. The Center for Responsible Lending has projected that 2.2 million homeowners nationwide will lose their homes as a result of failed subprime home loans originated from 1998 through 2006. This number could very well grow larger, as the projection was made before subprime default rates skyrocketed in 2007.

49.     In the Chicago area, the foreclosure crisis resulting from subprime loan origination will likely linger longer than in other parts of the country. In 2006, the Chicago metropolitan area had more "high-cost" (i.e., subprime) mortgages than any other metropolitan area in the country, according to a *Chicago Reporter* study. This marked the third year in a row that the Chicago metro area claimed the nation's top spot for high-cost mortgages. Countrywide led the way with high-cost loans in Chicago – in 2006 it was the leader in high-cost lending.

14

50.     Ultimately, although homeownership for subprime borrowers increased during recent years, it appears that there will be a net loss in homeownership nationwide. With the number of completed subprime foreclosures from 1998 to 2006 exceeding the number of homebuyers who used a subprime loan to enter the marketplace, the Center for Responsible Lending estimates that subprime mortgage lending has resulted in a net loss in homeownership of 900,000 homes nationwide. According to federal government figures, in 2007 homeownership suffered the biggest one-year drop on record.

51.     The failure of subprime loans explains only part of the homeownership crisis. Risky loan origination practices used in the prime mortgage market, such as volatile loan products like option ARMs and lax underwriting standards, also contributed to the current situation. Nationally, roughly 243,000 homes were in some stage of the foreclosure process in April 2008. This is up 65% from April 2007. The nationwide delinquency rate on mortgage payments grew to 6.35% in the first quarter of 2008, the highest since 1979.

52.     Illinois' home foreclosure rates have ranked among the highest in the nation for more than a year. Illinois experienced a 46% increase in the number of unique properties in foreclosure from 2006 to 2007 – 64,310 properties in 2007 as compared with 44,047 the year before. Lenders filed 9,670 foreclosures in May of this year alone, placing the state eighth in the number of new foreclosures filed. This represents a 41.71% increase from May 2007.

53.     The external costs of the mortgage collapse, in terms of declining property values and shrinking tax bases, are estimated to run over $200 billion nationally, with urban centers hit hardest. In Illinois, the loss is projected to be $15 billion, with $13 billion in Chicago.

15

<u>Countrywide's Role in the Foreclosure Crisis Nationally and in Illinois</u>

54.    The delinquency rate on the mortgage loans of America's biggest mortgage lender and servicer, Countrywide, was 9.27% by the end of March 2008. The company originated $7 billion nationally in mortgage loans in *one quarter* of 2008. The March 2008 9.27% delinquency rate was an increase from 5.02% at the end of 2006 and 3.68% in March 2006.

55.    The incidence of "seriously delinquent" loans – loans that are 90 days or more past due or in foreclosure – is also increasing. Countrywide's latest financial filing says that 4.81% of the loans it services were seriously delinquent as of the end of March 2008. This serious delinquency rate was up almost four times from 1.70% at the same time in 2007.

56.    In terms of actual foreclosures, the percentage of Countrywide loans in foreclosure at the end of March 2008, 1.28%, had almost doubled from 0.69% at the end of March 2007.

57.    Countrywide's subprime loans have failed even more frequently. By the end of the first quarter of 2008, 35.88% of the subprime loans serviced by Countrywide were delinquent, up from 19.62% in the first quarter of 2007. Slightly over 21% of all Countrywide subprime loans serviced by the company were seriously delinquent by the end of March 2008, up from 7.82% in March 2007.

58.    The number of Countrywide foreclosure filings in Illinois is troubling. From 2006 to 2007, all foreclosure complaint filings in Cook Country increased by 46%. For this same period, however, Countrywide Home Loans, Inc.'s foreclosure complaint filings increased by 117%. From January 2004 through June 2008, Countrywide Home Loans, Inc. has foreclosed upon at least 2,534 Cook County homeowners. Note that this number does not include foreclosures filed by Full Spectrum Lending or any other Countrywide entity.

16

<u>Securitization Sleight of Hand Masked Countrywide's Systemic Loan Origination Issues</u>

59.     Countrywide's delinquency and foreclosure numbers show that there were systemic problems with the company's loan origination standards.  These loosened loan origination standards came into place due to Countrywide's securitization practices.

60.     Countrywide's quest for domination in the mortgage lending industry is well-documented.  During a May 24, 2005 investor conference, Defendant and Countrywide CEO Angelo Mozilo stated: "I am going to – little question – it's a question of dominance, you have heard this before we – we have [no] intention to structure the company to be at second place or third place."  This sentiment was echoed by then-Countrywide President and Chief Operating Officer Stanley Kurland, who stated:  "In the past, we talked about origination market share reaching 30% by 2008 and, as we've noted, this was intended to be a stretch goal as it is part of our culture, part of our nature to set aggressive targets."  Ultimately, this quest for market domination created a self-perpetuating cycle in which Countrywide raced against time to originate loans of decreasing quality to cover up the failure of its prior loan originations.

61.     This cycle began with Countrywide's attempt to gain market share.  The company had to acquire capital to fund loans and find borrowers to buy the loans.  To find borrowers, Countrywide both expanded its menu of nonconforming mortgage products and loosened the standards for selling its products to reach untapped consumers.  To gain capital, Countrywide relied on securitizing the loans that it made from its menu of nonconforming mortgage products and loosened loan origination standards.

62.     Securitization allowed Countrywide to generate capital using one of two methods.  In one method, Countrywide sold the loans it made to third parties who then aggregated the loans into pools and sold the income streams from the pooled loans to investors.  In this arrangement, a

17

party other than a Countrywide-controlled entity had an opportunity to evaluate the quality of the loans being aggregated. This party was able to enforce any representations and warranties that Countrywide made when selling the mortgage loans.

63.     In the other method, Countrywide eliminated the third-party intermediaries and completed the securitization process by itself. Countrywide Financial Corporation created numerous subsidiaries for this exact purpose. These subsidiaries purchased loans from Countrywide entities, pooled them, and issued securities that were later sold through a brokerage house. Securitization done through affiliated entities reduced any potential for delay in the process.

64.     This second method allowed Countrywide to control the entire origination and securitization process. In other words, Countrywide sold the loans itself, purchased and aggregated the loans itself, and issued the securities itself.[1] The same corporate executive could even sign off on securitization contracts as both the originator of the underlying mortgage loans and the purchaser of the same loans.

65.     Countrywide had strong incentives to securitize its loans quickly. In order for an asset-backed security to meet the Securities and Exchange Commission's requirements, it may not have non-performing loans and delinquent loans may not constitute 50% or more of the pool on the date the pool is readied for sale.[2]

66.     The securitization process was beneficial for Countrywide because it both generated capital and allowed Countrywide to shed "credit risk" from the possible failure of the underlying

---

[1] In this self-dealing method, it is unclear how the required representations and warranties regarding the quality of the underlying loans would be enforced. Moreover, the Bank for International Settlements issued a 1992 report noting that "[t]here is at least a potential conflict of interest if a bank originates, sells, services and underwrites the same issue of securities." BIS is an international organization established in 1930 which fosters international monetary and financial cooperation and serves as a bank for central banks.

[2] Under this analysis, pay-option ARMs would have been among the most desirable products to satisfy this element since, with their very low teaser rate and option to make less than full interest payments for a certain period, they are unlikely to experience early payment defaults.

mortgage loans. Credit risk is the potential for financial loss resulting from the failure of a borrower to pay on a mortgage loan. As CFC noted in its annual regulatory filing for 2003, it managed "mortgage credit risk principally by securitizing substantially all mortgage loans that we produce, and by only retaining high credit quality mortgages in our loan portfolio." In comments to federal regulators, Countrywide advised that any guidance on nontraditional mortgage products "contain explicit acknowledgement that the risk profile of a lender who *effectively transfers the economic risks of a loan to the secondary market* is lower than that of a portfolio lender" (emphasis added).

67.    By selling loans onto the secondary market, Countrywide created loan pooling agreements through which it sought to limit its responsibility for the performance of the loans. For instance, Countrywide is required to repurchase the loan from investors under these agreements only in the event of documentation errors, underwriting errors, fraud, or early payment defaults (i.e., the borrower defaults within one or two months after the loan sale).

68.    Although Countrywide attempted to shed the risk of originating loans of lower quality, it retained some credit risk due to the representations and warranties that it is required to make when selling mortgage loans to either third parties or itself for securitization. As a result, investors still have some level of recourse against the company for defective loans.

69.    This recourse generally takes one of two forms. In some cases, these agreements required Countrywide to indemnify the investors for the defective loans. In other cases, however, Countrywide could simply swap in new loans for the defective loans through the "removal of accounts provisions" included in some of its securitization agreements. Swapping loans was preferable to lenders because it does not them to actually give investors cash.

70.     Under this approach, a lender, like Countrywide, needed to generate more loans if it both wanted to continue securitizing and needed to replace the defaulting loans removed from the securitized pools. In addition, the lender, who is not able to transfer the defaulted loans it takes back from the pools to anyone else, will want to hold more good loans on its balance sheet to offset the increasing numbers of bad loans it is holding. The lender must originate more loans to hold on its books – in the hope that a sufficient number of the new loans will not default – to offset the bad loans. Countrywide admitted that it did as much in its December 31, 2005 10-K filing, in which the company disclosed that "[t]he impact in the increase of the allowance for [delinquent option] loan losses will be partially mitigated by the addition of new loans to our portfolio."

71.     As Countrywide well knew or should have known, the loans that underpinned Countrywide's securitizations were unstable. In fact, the loans began to fail at a precipitous rate. As the company observed in 2007, the volume of claims for breaches of its representations and warranties grew due to the deterioration in credit performance of its loans. Thus, Countrywide had to accelerate origination to satisfy increased investor claims at precisely the time when it was already increasing origination to simply obtain capital to maintain its market position.

**Defendants' Unfair and Deceptive Underwriting Standards, Loan Products, Sales Techniques and Servicing Practices**

72.     Countrywide's need to accelerate loan originations compelled the company to develop a business model that, beginning in at least 2003 or 2004 and lasting into 2007, reflected the company's indifference to whether homeowners could afford its loans. As part of this model, Countrywide: (a) originated mortgage loans to borrowers who did not have the ability to repay the loan; (b) originated mortgage loans with multiple layers of risk that exposed borrowers to an unnecessarily high risk of foreclosure or loss of home equity; (c) originated unnecessarily more

20

expensive mortgage loans to unknowing borrowers; and (d) engaged in unfair and/or deceptive marketing and advertising acts or practices.

73.    Also, Countrywide implemented a compensation structure that incentivized broker and employee misconduct without exercising sufficient oversight to ensure that misconduct did not occur due to:

    a.  Implementing a compensation structure that incentivized employees to maximize loan sales without proper oversight, resulting in the sale of unaffordable and/or unnecessarily expensive loans;

    b.  Failing to adequately supervise and/or implement proper underwriting guidelines to see whether brokers used and sold reduced documentation loans to avoid revealing borrowers' true income and assets;

    c.  Rewarding brokers for selling loans with certain risky loan features such as prepayment penalties without ensuring that borrowers received a benefit from the risky features; and

    d.  Structuring the compensation for option ARMs in such a way that brokers were incentivized to sell this riskier loan product – to the exclusion of other products – in order to obtain the maximum yield spread premium possible.

74.    Countrywide's servicing division, Countrywide Home Loans Servicing, LP, unfairly and deceptively required borrowers to make additional payments just to consider whether they would qualify for a loan repayment or modification plan – regardless of the potential feasibility or affordability of such a plan.

75.    Former employees commented on Countrywide's increasing disregard for a borrower's ability to repay a mortgage loan. For example, a former Full Spectrum Lending Division

21

employee stated that the division (which was Countrywide's subprime lending arm) had underwriting guidelines that would approve virtually any loan. Likewise, an underwriter in Countrywide's Wholesale Lending Division said that her supervisor would approve most of the loans that she herself did not feel comfortable approving.

76.     Even though former employees noted that Countrywide had loose underwriting standards, the company also had a system to grant exceptions to those standards. A Countrywide wholesale account executive said that in the beginning of 2006, Countrywide became very aggressive in granting exceptions to their underwriting criteria – further diluting borrower protections.

77.     This employee also explained that she was pushed to sell more "Expanded Criteria" loans. Another wholesale account executive remarked that Countrywide paid its employees more to sell "Expanded Criteria" loans. Expanded Criteria loans included loans with reduced documentation underwriting, higher loan-to-value ratios and other risky loan features.

78.     Countrywide itself observed in its first quarter 2008 10-Q the consequences of this expansion into risky products and practices. It disclosed that, since 2007, it had "observed a marked decline in credit performance (as adjusted for age) for recent vintages, especially those loans with higher risk characteristics, including reduced documentation, high loan to value ratios or low credit scores."

79.     As described, Countrywide's expansion into riskier products and practices became apparent in a number of ways.

> Countrywide Sold Unaffordable and More Expensive Loans to Borrowers Due to its Lax Underwriting Standards

80.     For the reasons described above, Countrywide relaxed its underwriting standards in recent years. These relaxed underwriting standards allowed the mass selling of reduced

documentation loans and the failure to ensure borrowers had sufficient capacity to repay the mortgages Countrywide sold them.

A.     Countrywide Inappropriately Sold Reduced Documentation Loans

81.     Countrywide's relaxation of traditional underwriting standards is evident in its increased reliance on reduced documentation loans.  From 2005 through the first half of 2007, a majority of the Countrywide mortgages sold in Illinois were reduced documentation loans, often called "stated-income" or "liar's loans."   Countrywide underwrote these loans with less documentation and, consequently, less verification, of borrowers' income and assets than traditional mortgages.

82.     The four types of reduced documentation loans sold by Countrywide from at least 2004 through the first half of 2007 are described as follows:

    a.   The "Stated Income Verified Assets" loan, often referred to as a "SIVA," required the disclosure of employment, income and assets on the loan application. Employment and assets were verified, but income was not verified by Countrywide.  A debt-to-income ratio was calculated based on the stated income and it typically had to meet certain requirements.  This product was the most commonly sold reduced documentation loan.  In addition to the SIVA product, Countrywide sold a product known as the "Fast 'n' Easy" that had similar underwriting criteria.  Borrowers whose credit score exceeded a certain threshold could qualify for the Fast 'n' Easy as opposed to the SIVA product.

    b.   The "No Ratio" loan, often called a "NIVA," required the disclosure of employment and assets on the loan application, both of which were verified. However, income could not be disclosed on the loan application, and

23

Countrywide did not calculate debt-to-income ratios in qualifying borrowers for these loans.

c. A "Stated Income Stated Assets" loan, or "SISA," required that employment be disclosed and verified, but neither income nor assets were verified by Countrywide.

d. A "No Income No Assets No Employment" loan, also called a "No Doc" or "NINA" loan, prohibited disclosure of employment, income and assets on the loan application. No debt-to-income ratio was calculated to qualify the borrower.

83. The various types of reduced documentation loans sold by Countrywide are collectively referred to in this Complaint as "reduced documentation" or "stated income" loans.

84. Countrywide sold reduced documentation loans to prime borrowers and some types of reduced documentation loans to subprime borrowers. Over time, Countrywide actually lowered the minimum credit score for which it would approve a reduced documentation loan to include a broader set of borrowers. Countrywide also lessened underwriting standards for reduced documentation loans sold to subprime borrowers, increasing the numbers of subprime borrowers who were eligible to receive these loans. In fact, during recent years, a significant percentage of the subprime loans Countrywide sold to Illinois borrowers were reduced documentation loans.

85. Because a majority of the loans sold in Illinois in recent years were reduced documentation loans, Countrywide employees and brokers clearly sold reduced documentation loans to borrowers regardless of the borrowers' ability of the borrower to document income and assets. In fact, Countrywide sold some of its reduced documentation loans to salaried borrowers who received W-2's from their employment. Countrywide had no rules restricting the sale of reduced documentation loans to borrowers who had difficulty documenting their income.

Rather, they could be sold to borrowers regardless of the ease or difficulty of documenting their income, employment or assets.

86. Countrywide had very few safeguards on the use and underwriting of reduced documentation loans. The only check on fraudulent income was a reasonableness standard allegedly used by Countrywide. Early on, Countrywide employees merely used their judgment in deciding whether or not a stated income loan seemed reasonable. In or around 2005 or 2006, Countrywide required its employees to use salary.com – a website that provides a salary range for a given job title or profession in a certain zip code – to determine whether the income stated on the loan application appeared reasonable. However, if the stated income fell outside of the range provided by salary.com, Countrywide underwriters could still approve the loan.

87. In addition to a lack of controls on these risky underwriting guidelines, Countrywide pushed their sales employees, both retail and wholesale, and their underwriters to sell and close large volumes of loans without due regard for the risk to borrowers as quickly as possible. Countrywide fired employees for low production when they failed to originate and close sufficient numbers of loans.

88. To encourage the fast origination of loans, Countrywide compensated its sales employees, at least in part, on the volume of loans sold. The more loans its employees sold, the more money Countrywide paid them. Countrywide sales employees were paid on a tiered bonus system that compensated them more for each tier of sales volume they reached during the month. Once an employee sold enough loans to put him in the next tier for that month, he would earn more on *each* loan he had sold during that month. A substantial portion of the salary of Countrywide sales employees, both retail and wholesale, was based on sales volume. In fact, wholesale account executives—Countrywide employees who dealt with brokers—were paid only

on commission, they had no base salary. Countrywide employees, therefore, had incentives to sell as many loans as possible – regardless of credit risk.

89.    Countrywide's underwriters were also compensated based on the number of loans they underwrote. They were paid a base salary, but a large percentage of their total salary was a bonus payment based on the number of loans underwritten. In addition, the goal for underwriters who reviewed broker files was to approve and process purchase files in 24 hours and refinance files in 48-72 hours. One underwriter stated that, for a period of time, she was required to underwrite 25 loan files a day during the week and 25-35 loan application files over the weekend. Thus, Countrywide underwriters also had a large incentive to underwrite as many loans as possible as quickly as possible, and Countrywide pushed them to do so.

90.    In addition to these compensation incentives for its own employees, Countrywide enticed its mortgage brokers to sell reduced documentation loans with advertisements proclaiming

> Expanded Criteria: More ways to say yes! Qualify more of your borrowers with Expanded Criteria programs from Countrywide®, America's Wholesale Lender®. Countrywide offers some of the most flexible documentation guidelines in the industry. Our extensive Expanded Criteria programs provide you with solutions that help you close more loans. You'll see that when it comes to lower documentation loans; no one delivers like Countrywide.

91.    Countrywide also enticed brokers with advertisements that said "Designed to deliver Low Doc and No Doc solutions to meet the needs of virtually every type of borrower," "NO INCOME NO ASSETS DOC OPTIONS," "Reduced Doc – Simplified and Enhanced!," and "Low down payment, low documentation solutions."

92.    The lack of rules and oversight on stated income loans, and the push for employees to sell more loans and to close loans quickly, facilitated rampant fraud in the sales of reduced documentation loans. Countrywide sales employees and brokers used reduced documentation loans as a way to qualify borrowers for loans they could not afford. One former Countrywide

employee has estimated that approximately 90% of all reduced documentation loans sold out of the branch where he worked in Chicago had inflated incomes.

93.    As noted in a Chicago Tribune article, the Mortgage Asset Research Institute reviewed 100 stated income loans, comparing the income on the loan documents with the borrowers' tax documents. The review found that almost 60% of the income amounts were inflated by more than 50%, and that 90% of the loans had inflated income of at least 5%.

94.    Countrywide sales employees sometimes received income documentation (e.g. W-2's or tax returns) and determined that the borrower could not qualify for the loan based on their real income. The employee would then submit the loan as a stated income loan, inflating the borrower's income to qualify him for the loan. Countrywide "stretch[ed] the income" on reduced documentation loans as far as possible.

95.    In the review of one Illinois mortgage broker's sales of Countrywide loans, the vast majority of the loans had inflated income, almost all without the borrowers' knowledge.

96.    Many Countrywide borrowers were not aware they were receiving a reduced documentation loan, and did not realize they were being sold a loan they could not afford and were not qualified to receive.

97.    In addition to a lack of rules concerning what borrowers were appropriate for reduced documentation loans, Countrywide failed to have sufficient controls concerning what loan programs could be sold as reduced documentation loans. Many of the riskier exotic and "affordability" products offered by Countrywide were sold with reduced documentation. For example, Countrywide's option ARM and interest-only products could be sold with reduced documentation underwriting. Countrywide also sold loans with very high loan-to-value ratios with reduced documentation underwriting.

27

98.    Countrywide pushed these products in advertisements to its mortgage brokers like: "Check Out Countrywide's Expanded Criteria 80/20 Loans with Reduced Documentation!"; "Low down payment, low documentation solutions. Qualify more borrowers with high LTVs and low doc options from Countrywide®, America's Wholesale Lender®;" "Stated Income Program Enhancements. Up to 100% LTV;" and "The PayOption ARM from Countrywide®, America's Wholesale Lender® offers your qualified borrowers reduced paperwork with the Stated Income/Stated Assets (SISA) documentation option."

99.    Not surprisingly, reduced documentation loans have higher delinquency rates than full documentation loans, further suggesting the prevalence of fraud in these loans.

100.    Countrywide acknowledged the existence of higher default rates for reduced documentation loans in its 10-Q filing for the first quarter of 2008:

> We attribute the overall increase in delinquencies in our servicing portfolio from March, 31, 2007 to March 31, 2008, to increased production of loans in recent years with higher loan-to-value ratios and reduced documentation requirements, combined with a weakening housing market and significant tightening of available credit and to portfolio seasoning.

101.    Even if income was not inflated, Countrywide charged many borrowers more for reduced documentation loans. Countrywide employees used reduced documentation loans because they were faster, easier to sell, and to underwrite. It took as little as 30 minutes to underwrite some reduced documentation loans, and some loans closed the same day the application was taken from the borrower. This scheme enabled Countrywide employees to sell more loans and make more money. So, some borrowers who could easily have documented their income were sold more expensive reduced documentation loans by Countrywide employees and brokers.

102.    In short, Countrywide's sale of reduced documentation loans put many Illinois borrowers into unnecessarily riskier and more costly loans and, for many borrowers, loans that they could not afford.

**B.**    Countrywide Inappropriately Qualified Borrowers For Adjustable Rate and Interest-Only Mortgages Based on Less than a Fully-Indexed Rate or Less Than Fully-Amortizing Payments

103.    In addition to increased sales of reduced documentation loans, in recent years Countrywide also increased its sale of "affordability" products. These loans allowed borrowers to obtain a loan with low initial payments that would not continue for the life of the loan. Countrywide qualified borrowers at this initial low payment knowing that they would not be able to repay the loan in its entirety.

104.    One affordability product Countrywide sold was an interest-only loan. An interest-only loan allows borrowers to make payments covering only the interest on their loan during the first years of the loan, usually the first 3, 5, 7 or 10 years. After this initial period, borrowers must make fully-amortizing payments to pay off their principal balance plus interest over the remaining life of the loan. The interest-only payments at the beginning of the loan are much lower than the later fully-amortizing payments.

105.    According to an article by the New York Times published on November 11, 2007, Countrywide was the second leading originator of interest-only loans from 2006 through the second quarter of 2007.

106.    Countrywide sold interest-only loans to prime and subprime borrowers as stated income loans. In 2005 and 2006, Countrywide's interest-only loan was sold to a borrower with a credit score as low as 560 , and as a stated income loan to a borrower with a credit score as low 620.

107.    In 2007, Countrywide qualified non-prime borrowers to receive interest-only loans for up to $1 million with a minimum credit score of 600 and up to $850,000 with a minimum credit score of 580.  Interest-only loans in lesser amounts were also available to non-prime borrowers as stated income loans.  One Countrywide ad to brokers touts "Interest-Only loans from Countrywide®, America's Wholesale Lender® offer low monthly payments for the initial loan period, possibly helping your non-prime customers qualify for a bigger loan amount."

108.    During at least part of the time from 2003 through 2007, Countrywide qualified its borrowers at less than fully-amortized payments on its interest-only products.  According to comments Countrywide provided to federal regulators concerning the proposed Interagency Guidance on Nontraditional Mortgage Products, Countrywide stated that "[i]nterest-only loans are designed to be an affordability product, allowing borrowers to qualify at the 'minimum' or lower non-amortizing interest only payment for a fixed and extended term.  We [Countrywide] believe that it is appropriate to qualify borrowers based on the interest only payment."

109.    Countrywide advertised these loose underwriting standards to its brokers in ads like "Maximize your borrower's cash flow with Interest-Only loans.  Qualify based on the Interest-Only payment."

110.    The practice of qualifying borrowers at low interest-only payments, which, under the terms of the mortgage, can only be paid during a certain period of the loan and then a higher, fully amortizing payment will be required, places borrowers into loans that they ultimately may not be able to afford.  Such a practice implicitly relies on borrowers either changing their financial circumstances or being able to sell their home or refinance their loan.

111.    Moreover, these interest-only loans could be given using the loose standards of a Stated Income; No Ratio; Stated Income, Stated Asset; and a No Income, No Assets or Employment (No Doc) loan, creating even more risk that the borrower would not be able to afford the loan.

112.    Countrywide advertised its "flexible qualifying criteria" even to brokers selling this product to subprime borrowers. In one ad to brokers titled "Interest Only Now Available for Non-Prime Stated Wage Earners," Countrywide told its brokers that their "Interest Only loan options give Stated Wage Earners more flexible qualifying criteria." Countrywide went on to entice brokers to "learn more about how our Non-Prime Interest Only loan programs can help you increase your business and qualify more borrowers for their dream home . . .". This interest-only product could be sold as a stated income loan to a borrower with a credit score as low as 620.

113.    The interest-only loan advertised above could also be a hybrid ARM. Borrowers who took out this loan as a hybrid adjustable rate mortgage ("ARM") received a loan that (1) allowed them to pay only the interest portion of their full payment for the first years of the loan, and (2) came with a discounted interest rate that would likely increase after the first few years. Such borrowers were set up for a payment shock once the discounted fixed rate term and interest-only portion of their loan was over.

114.    Countrywide used these products to entice unsuspecting borrowers with low monthly payments and to qualify more borrowers for loans – often loans that they might not be able to afford long-term.

115.    Another affordability product sold by Countrywide was the hybrid ARM. These loans typically have a two-or three- year fixed rate followed by 28 or 27 years of a variable rate, and are often referred to as a 2/28 and 3/27. These loans usually came with low, discounted interest

rates during the short fixed-rate period. After the fixed-rate period ended, the rate would adjust—but could only adjust up, not down—every six months to a year, based on an index plus a margin. Countrywide sold these loans to prime and subprime borrowers.

116.    Countrywide also qualified its borrowers at less than fully-indexed rates on its 2/28's and 3/27's, meaning that Countrywide qualified the borrowers based on low rates that would adjust upward in two or three years without regard to whether the borrowers could afford the higher rates. This scheme forced borrowers into unaffordable payments once the fixed rate period of their loans terminated because they were not qualified at these higher payments.

117.    One Illinois consumer's experience provides an example of Countrywide's business practice of placing borrowers in unaffordable hybrid ARM loans. Countrywide was the servicer for a 64 year-old widow's mortgage loan. This widow lived on a fixed income. At the time Countrywide purchased the servicing rights for her loan, the widow had a 30-year fixed-rate mortgage with a monthly payment of approximately $300. In January 2005, Countrywide refinanced this 64 year-old borrower into a 3/27 interest-only loan with a fixed rate for only the first three years of the loan. The consumer's monthly payment more than doubled to approximately $800 a month. Even before this consumer's loan reset, however, she was unable to afford her mortgage payment – showing that Countrywide refinanced her into an unaffordable adjustable rate mortgage.

118.    Countrywide acknowledged in a May 7, 2007 letter to the Office of Thrift Supervision commenting on a proposed federal Statement on Subprime Mortgage Lending that: "Specifically looking at originations in the fourth quarter of 2006, we know that almost 60% of the borrowers who obtained subprime hybrid ARMs [from Countrywide] would not have qualified at the fully indexed rate." Countrywide also acknowledged that "almost 25% of the borrowers would not

have qualified for any other [Countrywide] product." Even removing the added risk layers of reduced documentation and high loan-to-value ratios, Countrywide knew that a majority of the borrowers who received their hybrid ARMs, at least during this period, were likely unable to afford the loans unless they refinanced by the time the introductory fixed period expired.

119.    Countrywide did not inform its borrowers who were qualified at less than a fully-indexed rate or less than a fully-amortizing payment, that they were not qualified at the higher payments after the loans reset.

120.    Countrywide made loans to borrowers that they ultimately would not be able to afford, relying on the premise that borrowers would be able to continue to refinance out of their unaffordable loans into new loans – and without making clear to borrowers the costs and risks of such loans.

### Countrywide Pursued Market Share With Products That Layered Borrowers' Loans with Unnecessary Additional Risk

121.    Even as it was relaxing its underwriting standards to increase loan origination, Countrywide also sought to increase its market share by offering new products packed with features that compounded risk to the borrower. These included option ARM mortgage products and loans for all or close to all of a homeowner's equity in a home.

122.    The New York Times aptly described Countrywide's increasing origination of exotic products during the period from 2005 into 2007 with a quote from a former Countrywide executive that: "To the extent that more than 5 percent of the market was originating a particular product, any new alternative mortgage product, then Countrywide would originate it."

A.    Countrywide's Combined its PayOption ARM with Unnecessary Layers of Risk, Improper Marketing, Confusing Disclosures, Inappropriate Sales Incentives and Inadequate Oversight

123.    Countrywide's marketing and selling of option ARM mortgage loans exemplifies the company's increasing reliance on unfair and deceptive loan products and sales techniques to increase its market share.

124.    From their inception, option ARMs were intended to be "a niche product aimed at sophisticated and well-heeled borrowers who wanted flexibility." Starting in 2003, however, option ARM origination grew beyond this narrow market, particularly at Countrywide.

125.    Option ARMs, frequently referred to as "exotic" mortgage products, have three core features that sharply contrast with traditional mortgage loan products.

126.    First, for a certain period of time, borrowers have four options as to which payment to make each month. These payment options are (1) a minimum payment that covers none of the principal and only part of the interest normally due each month; (2) an interest-only payment; (3) a payment that is amortized to pay off the loan in 30 years; and (4) a payment that is amortized to pay off the loan in 15 years.

127.    Second, an option ARM may result in negative amortization – meaning that the amount owed increases over time. The amount of accrued interest that is not paid each month is added onto the borrower's loan balance. Therefore, the balance of the borrower's loan will actually increase by the amount of the unpaid interest if the borrower makes only minimum payments.

128.    Traditionally, failure to pay the amount of accrued interest on a loan each month results in default and, ultimately, foreclosure. This outcome is a negative event for both the borrower and the lender. With option ARMs, however, Countrywide was able to neutralize this negative

34

event – at least for itself. Countrywide simply added this uncollected interest to the borrower's loan as additional principal and calculated the interest on this new, higher amount of principal.

129.    There was, however, a cap to the amount of unpaid interest growing from negative amortization that could be added to the principal of the loan. Once the loan balance hit a certain ceiling – typically 115% of the loan's value -- the minimum and interest-only payment options were removed and the borrower had to make fully-amortizing principal and interest payments. This "recasting" of the loan is the third core feature of a option ARM.

130.    The fully-amortizing payments that borrowers must make after recast are far more than the minimum payment that the borrowers had been previously making. Taking one consumer's loan as an example, the monthly minimum payment was $751, but the fully amortizing payment was $1834. The payment shock experienced by option ARM borrowers when the interest rate on their adjustable rate mortgage fluctuated was small compared to the payment shock from a loan recasting to require the fully-amortizing payment. Assuming steady interest rates, recasting for consumers who consistently make the minimum required payment will occur approximately three to four years after origination of the loan.

131.    Countrywide quickly became a leader in this profitable and growing part of the mortgage market. Option ARMs increased from approximately 3% of the company's loan production during the quarter ended June 30, 2004, to approximately 21% of its production during the quarter ended June 30, 2005.

132.    The reason for Countrywide's increasing origination of option ARMs is clear: profit. An investigation by the New York Times revealed that option ARMs "were especially lucrative. Internal company documents from March [2007] show that Countrywide made gross profit

margins of more than 4 percent on such loans, compared with 2 percent margins earned on loans backed by the Federal Housing Administration."

133.    At the same time that Countrywide touted the profitability of these loans, it also acknowledged that they were riskier for borrowers. The company said in its June 30, 2005 10-Q filing, "[w]hen the monthly payments for pay-option loans eventually increase, borrowers may be less likely to pay the increased amounts and, therefore, more likely to default on the loan, than a borrower using a normal amortizing loan." Angelo Mozilo even acknowledged that "it isn't clear how successful borrowers ultimately will be in paying off their option ARMs."

134.    As discussed below, it is now clear that many borrowers will not only fail to pay off their option ARMs, but will lose equity in their homes and perhaps the ownership of their homes altogether. The full breadth of the problem has yet to emerge, but the numbers show that borrowers are losing ground. During the nine months ended September 30, 2007, 76% of borrowers elected to make less than full interest payments – much less than a payment that would cover any amount of the outstanding loan principal. This represents a 10% increase over the number of borrowers making less than full interest payments during the same period in 2006.

135.    While attention is now focused on the meltdown in the subprime mortgage industry, option ARMs – which are classified as "prime" loan products – are ticking time bombs contained in lenders' prime loan portfolios and in securitized loan pools. According to Moody's Economy.com, monthly payments on roughly $229 billion of option ARMs will recast to include market-rate interest and principal from 2009 to 2011.

1.    Countrywide Inappropriately Coupled its Volatile PayOption ARM Loan Product with Teaser Interest Rates, Prepayment Penalties, High LTVs and Reduced Documentation Underwriting

136.    The core features of an option ARM – multiple payment options, negative amortization and automatic recasting of loan terms – make the product much riskier than traditional mortgages.  But Countrywide typically did not sell its option ARM (typically called a PayOption ARM) with just these three features.  Instead, it proceeded to layer the product with features that made it exceptionally risky, placing borrowers at risk of losing equity in their homes or even their homes.  These features include: illusory teaser interest rates, prepayment penalties, high loan-to-value ratios and/or reduced documentation underwriting guidelines.  As one former Countrywide loan originator explained, Countrywide's "options ARMs were built to fail."

137.    Countrywide frequently combined its PayOption ARMs with illusory "teaser" interest rates.  These "teaser" interest rates could be as low as 1%, but were illusory in that they were generally only valid for the first month or first three months of the loan.

138.    After the illusory teaser interest rate expired, the interest rate on the loan would adjust to a true interest rate that typically had a cap of 9.95%.  After the initial interest rate adjustment, the interest rate on the loan would continue to adjust each month.  Therefore, the borrower would only have the benefit of the interest rate for one to three months of the 30 to 40 years of the life of the loan.

139.    An interest rate that was only in effect for one month conferred no real benefit to a borrower.  Thus, the marketing emphasis on the teaser interest rate of Countrywide's PayOption ARM was inherently misleading.

140.    Interviews with former Countrywide employees and brokers and an examination of Countrywide's advertisements confirmed that the teaser interest rate was used to mislead

37

borrowers and obfuscate the true interest rate of the loan. A former Countrywide Account Executive, who was assigned to work with brokers in selling Countrywide products, was encouraged to tell her brokers to sell the loan based on the low monthly payment. A former employee who worked at Countrywide's prime retail locations confirmed that loan originators sold the product by highlighting the low payment on the option ARM, although it was based on an illusory teaser interest rate.

141.    Countrywide's advertisements highlighted the teaser interest rate. For example, a television advertisement promoting the product emphasized "[a]nd 1 percent, you can't beat that. So pick up the phone, call Countrywide, or just visit your local branch today." Despite legal disclaimers, this emphasis on the teaser interest rate shows the company's intent to use the teaser to market the product.

142.    Countrywide also generally coupled its option ARM loans with a three year prepayment penalty. In order for a consumer to refinance an option ARM during the first three years of the loan, the consumer would be required to pay the equivalent of six months' interest on the loan. Consequently, even if borrowers became aware of the risky features of their mortgage, they were effectively trapped in a loan with a payment that could adjust upward and become unaffordable.

143.    Although prepayment penalties are touted by lenders as a bargaining tool for consumers, analysis has revealed that subprime borrowers generally received no appreciable benefit in exchange for accepting a loan with a prepayment penalty. At least one broker indicated that, although he was paid more for a loan with a prepayment penalty, there was no appreciable benefit to a prime consumer for taking a loan with a prepayment penalty. Therefore, the only point of this risky feature was to generate additional profit for Countrywide because investors would pay more for loans with prepayment penalties.

144.    Another risky feature that Countrywide layered onto its PayOption ARM allowed a borrower to mortgage 90-95% of a home's value with a PayOption ARM first mortgage for the bulk of the amount and a second mortgage for the remainder.

145.    According to a UBS survey conducted on behalf of The Wall Street Journal:

> Countrywide also allowed borrowers to put down as little as 5% of a home's price and offered "piggyback mortgages," which allow borrowers to finance more than 80% of a home's value without paying for private mortgage insurance. By 2006, nearly 29% of the option ARMs originated by Countrywide and packaged into mortgage securities had a combined loan-to-value of 90% or more, up from just 15% in 2004, according to UBS.

146.    Although higher loan-to-value ratios are inherently riskier than lower loan-to-value ratios, that risk is compounded when the underlying mortgage product is an option ARM. If a borrower has an option ARM mortgage with a high loan-to-value ratio or during a time when the housing market depreciates (or both), the borrower could easily end up owing more on a home than it was worth because of the possibility of negative amortization on this product.

147.    Finally, the vast majority of the PayOption ARMs sold by Countrywide were underwritten with reduced documentation requirements. Prudent underwriting is how borrowers are protected from the risk that they will be given a mortgage that they will not be able to repay. In the case of a PayOption ARM, Countrywide purportedly mitigated the risk that borrowers would not be able to repay their risky loans by requiring that its underwriters qualify borrowers at the full principal and interest payment for the option ARM. This process became a meaningless protection, however, when Countrywide failed to require full documentation for its underwriting.

148.    When Countrywide designed its mortgage products, it also determined what underwriting documentation requirements it would attach to the product. As discussed above, these

requirements could vary from full documentation to no documentation at all. Countrywide apparently decided that its underwriting for an option ARM did not require full documentation.

149.    This decision led to underwriting guidelines that allowed a borrower to mortgage 95% or more of the value of a home with a PayOption ARM underwritten with stated income and stated assets.

150.    Countrywide's decision to allow reduced documentation underwriting resulted in the vast majority of its PayOption ARMs being sold with less than full documentation. Of the option ARMs Countrywide sold in 2007, 82% were reduced documentation mortgages in which the borrower did not fully document income or assets.

151.    One former Countrywide manager noted that the loans were an easy sell because they could use stated income – presumably to ensure that the borrower's income (at least what was stated as the borrower's income) was sufficient to qualify for the mortgage.

152.    As discussed above, low or no documentation loans are likely to contain material misrepresentations and/or fraud that will result in increased default rates. Risk of default is compounded when a lessened underwriting standard is coupled with "nontraditional" mortgages such as option ARMs. Regulators and analysts have counseled against this type of risk layering.

> Banking regulators say that lenders are increasingly relying on unverified income to qualify borrowers for so-called nontraditional mortgage loans. Those products – such as pay-option adjustable-rate mortgages and interest-only loans – allow borrowers to defer payment of principal and sometimes interest. Many analysts see such a combination of nontraditional products and nontraditional underwriting processes as presenting another layer of risk to those who could be hurt by defaults, including consumers, shareholders in mortgage lenders and investors in securities backed by mortgage loans.

153.    Combining a PayOption ARM with any of the risk-layering features described above results in a product that is significantly increases a borrower's risk of loosing home equity or ending up in foreclosure.

154.   Delinquency reports support this conclusion.  Statistics show that consumers are becoming increasingly delinquent on option ARMs.  Countrywide securitized roughly three quarters of its option ARMs, but held the loans most likely to be high performing in its portfolio. Of the option ARMs that Countrywide held in its bank portfolio, 9.4% of the option ARMs were at least 90 days past due in April 2008, up from 5.7% at the end of December 2007 and 1% a year earlier.  As this input likely includes many option ARMs that have not recast, these delinquencies are particularly alarming as they show consumers are not even able to make the minimum payment on these loans.  In other words, borrowers somehow received option ARMs when they were unable to make even the minimum payments, much less the fully-amortizing payment.

155.   These numbers show that option ARMs are failing at a troubling rate, but that has not led Countrywide to stop layering the product with risky features.  In fact, an analysis of only those option ARMs that Countrywide held in its own portfolios (i.e., the least risky option ARMs) shows a steady decrease in loan quality.  For example, the loan-to-value ratio for the product increased from 73% in 2004 to 76% in 2007.  The average credit score, a general indicator of creditworthiness, dropped from 730 in December 2004 to 716 in September 2007.  Even though external indicators should have provided Countrywide with ample notice that it needed to tighten option ARM underwriting criteria, the company continued to relax its standards in selling increasingly risky loans.

156.   Former Countrywide employees and brokers who sold Countrywide products have stated that option ARMs are risky products.

157.   Some of Countrywide's own former employees found the product unsound for anyone. Brokers who sold the product opined that it should never be paired with either a prepayment

41

penalty or reduced documentation underwriting due to the dramatic increase in risk to the borrowers. Another broker referred to the product as a "ticking timebomb" and another former Countrywide employee referred to it as "dangerous."

> 2.    Countrywide Improperly Mass Marketed Its PayOption ARMs and Failed to Provide Borrowers with Adequate Disclosures About the Product's Risks

158.    Despite the structural unfairness of the PayOption ARM described above, Countrywide marketed the product indiscriminately to all borrowers, pushed its employees and brokers who sold Countrywide loans to sell the product inappropriately and failed to provide disclosures to ameliorate borrowers' confusion about the mortgage they were obtaining.

159.    With all of its risky features, the PayOption ARM should have been marketed cautiously – if at all. That was not, however, Countrywide's approach. For example, Countrywide sent direct mailers to consumers whose loans it serviced to market the product. In one such mailer, Countrywide advised the consumer that he had an "excellent payment record" and might now qualify for "our best 'A' level mortgage interest rates – such as our PayOption ARM."

160.    Likewise, Countrywide sent direct mailers to consumers advising them to call Countrywide for a one year anniversary loan check-up. The direct mailer also touted Countrywide's option ARM product.

161.    Countrywide provided its brokers with sample advertisements that they could use to entice borrowers to get option ARMs. One of these advertisement exemplars asks borrowers "[w]ho doesn't need more options?" The implication of the ad is that an option ARM is appropriate for anyone who would simply like "more options."

162.    The disclosures that Countrywide gave borrowers provided little help in explaining their actual mortgages because they were the epitome of "information overload." For example, in 2007, one disclosure entitled the "Home Loan Application Disclosure Handbook" (Handbook)

42

was 123 pages long and had 63 pages concerning all of the available Countrywide loan products, not just the products in which borrowers were interested.

163.    Regardless of whether borrowers applied for loans through a broker or a retail division, Countrywide sent borrowers various disclosures, such as this handbook, prior to closing loans. Often acknowledgment forms accompanied the disclosures. For some borrowers, Countrywide required consumers to sign acknowledgement forms prior to processing the loan application. At this point, what types of loans they could even afford. Without this information, it was difficult for borrowers to assess the various mortgage products and their options. For other borrowers, Countrywide required borrowers to sign acknowledgment forms at closings, along with many other closing documents.

164.    For borrowers wanting to learn about PayOption ARMs, in the Handbook, there were eight pages about different PayOption ARMs buried in the middle of other disclosures. Each of these had confusing titles such as "PayOption Adjustable Rate Mortgage Loan Program Disclosure Monthly Treasury Average ("MTA") Index-Payment Caps All States Except New York."

165.    Not only did this Handbook bury explanations of Countrywide PayOption ARMs and use confusing titles to describe them, it also failed to adequately warn borrowers about the possible pitfalls of negative amortization with option ARMs, like depreciation of home values. The Handbook defined negative amortization as ... "the interest shortage in a [consumer's] payment is automatically added to the loan balance and then interest may be charged on that amount). [The consumer] might therefore owe the lender more later in the loan…" It then stated, "However, an increase in the value of your home may make up for the increase in what you

43

owe." Yet, it never stated that if the market failed or the value of the homes depreciated, consumers would owe more than the value of their homes.

166.    By overloading borrowers with irrelevant information and using confusing language, Countrywide's disclosures hid the very information that they were supposed to disclose to consumers—the relevant details about their actual mortgages.

167.    Notably, a number of former Countrywide employees remarked that they did not feel comfortable selling the products because they either did not understand the product themselves or did not feel comfortable explaining it to someone else.

168.    Although Countrywide may have created training materials for the product, at least one former employee did not recall receiving any training on it at all – although she was authorized to sell option ARMs.  Brokers authorized to sell Countrywide products similarly recalled that the company failed to provide any training materials on option ARMs.

169.    With their risk and complexity, option ARMs should have been sold with discretion and only with proper disclosures of risks.  Countrywide knew from its own empirical evidence that its mass-marketing of this product would place many homeowners into unsustainable loans.

170.    When consumers made only the minimum payment, Countrywide carried the negative amortization that resulted on its books as uncollected "income."  In 2004, the accumulated negative amortization "income" was only $29 thousand.  For the year ending 2007, however, accumulated negative amortization from pay option ARMs that Countrywide was holding on its books had grown to $1.215 billion.  The negative amortization had steadily – and markedly – increased from $29 thousand to slightly over a billion dollars by rising to $74.7 million in 2005 and $654 million at year end 2006,.

44

171.    Despite all of these warning signs and the widespread acknowledgement among analysts and even its own former employees that this product is unsuitable for most borrowers, Countrywide is still promoting its option ARM products on its website to this day.

      3.    Countrywide Incentivized and Facilitated Improper Sales Techniques without Providing Adequate Guidelines for Selling its PayOption ARMs

172.    Countrywide further increased the risks associated with this product by incentivizing mortgage brokers to sell PayOption ARMs over more traditional mortgage products.  The company then failed to provide the brokers with sufficient parameters for selling the product, facilitated deceptive sales tactics and did not exercise sufficient oversight over brokers' conduct.

173.    As Angelo Mozilo stated during an April 26, 2005 investor conference call, the product was "a good product for both us, the lender, and for the mortgage broker."  Countrywide left consumers out of this analysis.

174.    As an initial matter, Countrywide provided financial incentives for brokers and its employees to inappropriately sell its PayOption ARMs.

175.    Brokers are compensated in two ways.  First, borrowers may compensate brokers directly through loan origination, underwriting, processing and other fees.  The second way that brokers are compensated, however, is through "yield spread premiums" ("YSPs").

176.    A yield spread premium is the cash rebate paid to a mortgage broker by a lender.  Typically, the YSP is based on a broker selling a borrower a loan with an interest rate above the wholesale par rate.  The par rate is the actual interest rate a borrower qualifies for with a given lender.  For example, a mortgage broker could earn a YSP for selling a borrower a loan with an interest rate of 6.25% when the borrower's par rate is 6%. This fee is paid by the lender directly to the broker as a "rebate."  Although the consumer is not charged the fee directly, the consumer

pays the fee indirectly by paying a higher interest rate. The YSP is typically a percentage of the loan amount, therefore, the larger the loan, the larger the fee that the broker earns.

177.    Countrywide structured the YSP for option ARMs in a manner that virtually guaranteed that brokers who were more concerned with getting the highest YSP possible than getting their borrowers the best loan possible would steer borrowers into these risky loans. Plainly put, it was easier to obtain higher commissions for option ARMs as opposed to other traditional Countrywide mortgage products.

178.    Ordinarily a broker would need to increase the interest rate over a borrower's par rate on a loan in order to receive a higher YSP. A borrower would notice, of course, that a broker was offering a loan with a higher interest rate.

179.    With option ARMs, the YSP was based on three factors which helped obscure the true cost of the loan: the amount of the teaser interest rate, the amount of the margin that was used to calculate the product's interest rate, and the existence of a prepayment penalty.

180.    First, the teaser rate was so low, borrowers would not notice a material difference between 1%, for example, and 1.25%.

181.    Second, as far as the margin, borrowers were unlikely to notice what the margin was and realize that they were able to negotiate this term. Once the one-month teaser rate has expired, the PayOption ARM's interest rate is calculated each month by adding a margin—e.g. 4%—on top of on an index (such as the monthly United States Treasury average yield). The margin remains the same throughout the life of the loan, while the index changes monthly. The higher the margin, the higher the borrower's interest rate would be from month to month after the one-month teaser rate expired. Both the standard used for the index and the margin amount could be negotiated by the borrower. But because brokers sold the low monthly payment and the teaser

46

interest rate, the fact that there were other features that could be adjusted – to the borrower's detriment – often went unnoticed and was buried in the midst of the voluminous disclosures that borrowers received. Thus, borrowers would not typically notice if their broker increased their loan's margin to the maximum sold by Countrywide (around 4%) in order to increase his YSP.

182.    Finally, brokers often added a three-year prepayment penalty to the loan. As discussed above, borrowers frequently did not receive any benefit for accepting a loan with a prepayment penalty – if they were even aware the loan had a prepayment penalty.

183.    By slightly increasing an already low "teaser" rate, increasing the margin, and adding a three-year prepayment penalty, brokers could maximize the YSP Countrywide paid them.

184.    Notably, because PayOption ARMs were considered "prime" loan products, borrowers who qualified for the loan would also have qualified for fixed rate and adjustable rate mortgages with favorably low interest rates. The true interest rate on a PayOption ARM was typically higher than the rates on either of these products. In other words, borrowers paid a premium for a product that most of them did not understand and that did not provide them with any benefits in return for this premium.

185.    Therefore, Countrywide provided brokers with a financial incentive to sell option ARMs with a high margin and the worst prepayment penalty possible. Although the possible fraud that this financial incentive would motivate should have been clear, Countrywide then failed to institute appropriate checks on its sale or to adequately oversee its brokers.

186.    A mortgage broker's primary contact within Countrywide was its assigned Account Executive, a Countrywide employee. Account Executives gave brokers selling tips on option ARMs to emphasize the meaningless one-month teaser rate. One former Countrywide Account

Executive was encouraged to tell her brokers to sell the loan based on the low monthly payment, since rising property values would offset negative amortization.

187.    Countrywide also gave its Account Executives materials, like flyers, which they could use to promote certain loan products to brokers or that they could give brokers to use to promote Countrywide products to borrowers. Almost all of the flyers that Account Executives gave to brokers highlighted that reduced documentation could be used to qualify borrowers for the product and also emphasized the illusory teaser interest rate for the product.

188.    Not surprisingly, after receiving materials emphasizing the illusory teaser interest rate, brokers used the rate to obfuscate the true cost and interest rates of an option ARM.

189.    One broker, for example, placed a full-page advertisement in the Chicago-Sun Times for a closed-end line of credit of $235,000.00 for a monthly payment amount of $656.05. The advertisement does not disclose that the interest rate upon which the payment is based is only applicable for the first month of the mortgage loan.

190.    Another example is a direct mailing that a broker used to advertise an option ARM product. The broker solicited consumers through a direct mailing for a closed-end line of credit of $681,182.00 for a monthly payment amount of $1,898.54. Again, the direct mailing does not disclose, in readily understandable terms, that the interest rate upon which the payment is based is only applicable for the first month of the mortgage loan.

191.    Countrywide also failed to create any checks on who received a Countrywide option ARM. Due to the complexity of the product and the likelihood of severe negative consequences to the borrower -- such as loss of home equity, this product was not appropriate for most borrowers. As described above, the option ARM was initially designed for sophisticated borrowers -- people who were investing in or building homes or properties for resale.

48

Countrywide took this niche product and mass marketed it to the general public, often through mortgage brokers, without instituting any parameters for its sale.

192.    Based on the materials that Account Executives gave brokers regarding the product, it would seem that the product was appropriate for any borrower who wanted "options," regardless of their actual financial circumstances.  This lack of rules enabled Countrywide's brokers to misuse the product and to sell this Countrywide product to unsuspecting borrowers looking for a good, long-term, sustainable loan.

193.    Given Countrywide's critical reliance upon mortgage brokers to sell option ARMs, the complexity of the product, and huge potential for borrower harm, Countrywide should have developed, employed and facilitated proper – not deceptive – sales techniques.  Countrywide also should have instituted parameters on what borrowers could receive this product. Countrywide did not.

    <u>4.</u>    <u>Countrywide's Relationship with One Source Mortgage, Inc.</u>

194.    Countrywide's use and abuse of the option ARM product is clearly illustrated by the relationship between the company and an Illinois broker who specialized in selling Countrywide PayOption ARM loans, One Source Mortgage, Inc. ("One Source").

195.    Countrywide should have been aware of potential issues with One Source Mortgage, Inc. when it first approved the broker to work as its business partner in Spring 2004.  At the time Charles Mangold, the owner of One Source, submitted the company's broker application to Countrywide, he had no fewer than five felony convictions in the State of Illinois.  Specifically, between 1989 and 2000, Mangold was convicted and sentenced to jail time for improperly communicating with a juror, multiple occurrences of felony possession and use of a weapon or firearm, and driving with a suspended or revoked license.

49

196.    In terms of actual conduct, One Source used the illusory one month teaser rate that Countrywide coupled with its option ARM exactly as one would expect – to commit fraud. For example, when describing the PayOption ARM to consumers, One Source told consumers the amount of only one payment – the minimum payment. One Source also did not adequately describe to consumers the distinctive characteristics of PayOption ARMS: the fact that the initial low interest rate was merely a one month teaser rate or that negative amortization would occur if the consumers pay only the minimum payment.

197.    One Source frequently did not disclose to consumers any interest rate for the mortgage loan at all or described only the illusory teaser rate.

198.    One Source told a consumer that his minimum payment of $700 covered all the interest on his loan. In reality, the consumer would have had to pay $1816 a month to make even an interest-only payment on his loan.

199.    To the extent that Countrywide or One Source provided disclosures to consumers, they were ineffectual. Consumers reported that they did not learn that One Source's representations about their mortgage loans were false until they began to receive statements from Countrywide.

200.    Countrywide handsomely compensated One Source for its fraudulent conduct. One Source received YSPs from Countrywide ranging from $4185 to $11,310 per loan in the month of March 2006. During that one month, One Source received a total of at least $100,000 from Countrywide in the form of yield spread premiums.

201.    One Source engaged in rampant fraud on borrowers' loan applications without the consumers' knowledge, and which Countrywide then completely failed to detect. Consumers typically told One Source their monthly income and even provided pay stubs and tax returns to verify their income. On some consumers' loan applications, however, their monthly income was

50

increased to sometimes even double the correct amount. Because Countrywide coupled PayOption ARMs with reduced documentation underwriting, the company failed to discover this fraud.

202.    For example, One Source listed one consumer's monthly income as $8000 on his mortgage loan application. In fact, this consumer earned only approximately $3400 to $4000 a month and provided pay stubs and tax returns to One Source to verify his income. This consumer was unaware that One Source listed his income as $8000.

203.    Countrywide's purported fraud detection programs failed to catch any of these issues. Along with this failure, Countrywide repeatedly bent the rules for One Source Mortgage. Although it was supposedly against company policy, Charles Mangold treated three Countrywide employees (his primary underwriter, the manager of the branch he dealt with, and the closer on his loans) to flowers and expensive gifts, such as Coach handbags.

204.    In addition, Countrywide's stated general policy is that broker files are assigned to underwriters randomly. This policy was not followed in the case of One Source Mortgage. One underwriter who worked in Countrywide's Lisle office was often assigned to underwrite One Source files and, in 2006, this underwriter was designated as One Source's primary underwriter.

205.    This underwriter was disciplined time and again for errors in her underwriting. Prior to being assigned to One Source, the underwriter had been counseled several times for, among other things, quality of work. Eventually, Countrywide terminated the underwriter. Despite the documented problems with One Source's primary underwriter, Countrywide failed to detect the systemic fraud in the One Source loan files.

206.    Countrywide did nothing to curb the rampant abuses inflicted by this broker. In fact, Countrywide did not even terminate its relationship with the broker until December 2007 – after

51

the Attorney General's Office sued the broker for fraud and served Countrywide with a subpoena seeking documents related to the broker's conduct.

207.    As the One Source example illustrates, Countrywide's inducements to brokers combined with its lack of loan parameters or any real oversight resulted in brokers steering borrowers to loans that were exceptionally risky and routinely qualifying borrowers for loans they could not actually afford.

208.    As a result of Countrywide's inappropriate marketing, selling and risk layering of its option ARM product, Illinois borrowers who thought they were refinancing into beneficial loan product are now facing the possibility of losing all the equity they had built up in their homes or losing their homes entirely.

B.      Countrywide Indiscriminately Sold Mortgages With High Loan-to-Value Ratios
        Regardless of the Loans' Risky Features

209.    In addition to risky products like option ARMs, Countrywide aggressively sold loans with very high loan-to-value ratios. In recent years, the loan-to-value ratio on many Countrywide loans – that is, the ratio of the home's appraised value to the amount of the loan – reached as high as 100%. Loans with 100% loan-to-value ("LTV") ratios were sold as a single loan, or separated into two concurrent loans: a first-lien loan paired with a simultaneously originated second-lien loan that, together, had a combined loan-to-value ratio of 100%.

210.    These simultaneous second-lien loans were often referred to as "piggyback" loans, and the combination of a first- and second-lien loan with a 100% loan-to-value ratio was commonly referred to as an "80/20" or "combo" loan.

211.    Countrywide regularly paired the first-lien loan in the 80/20 loans with a second-lien loan in the form of a product type known as a Home Equity Line of Credit, or "HELOC."

212.    The HELOC second-lien loans were sold as open-end revolving lines of credit. But, in order to avoid exorbitant add-on charges, borrowers were generally required to draw down the principal amount of the HELOCs fully at the time both the first and second-lien loans were originated, and Countrywide required HELOC borrowers to maintain a "minimum" average daily balance for several years thereafter to keep the "minimum" balance intact.

213.    This loan structure could be comprised of a first-lien loan for 80% LTV piggybacked with a simultaneous second-lien HELOC for 20% LTV.

214.    Countrywide could also achieve this 100% LTV structure with a simultaneously written second-lien fixed-rate loan. Countrywide boasted to its brokers that it has a "Greater variety of high LTV, low doc options for more borrowers: Enhanced 80/20 Options."

215.    This conduct was profitable. Countrywide applied a higher rate of interest to loans in the second lien position than the rate of interest applied to senior first-lien loans. This rate structure produced a correspondingly higher monthly payment (and income stream for investors) due to the higher interest rate applied to the outstanding principal balance on the junior second-lien loans.

216.    Countrywide's simultaneous second-lien HELOCs often came with some variation of an interest-only period. Many of Countrywide's HELOCs had a five-year interest-only period that could be extended for another five years – this was called the "draw" period – even if the loan was already fully drawn.

217.    For the interest-only period, the required payment would only cover interest. As a result, a borrower would neither pay down any of the loan principal nor increase the amount of equity in the home during this time. Even if the borrower stayed current on monthly payments in these loans, they could find themselves owing the entire original loan balance at the end of the interest-

53

only period of the loan term. In fact, Countrywide even had HELOCs that were interest only for the entire term of the loan.

218.   The length of loan term of the second-lien HELOC loans was generally shorter than the length of the loan term on the first-lien loans. Countrywide often paired junior second-lien HELOCs that contained abbreviated 15-25 year terms with senior first-lien loans containing 30-year terms.

219.   In these shorter-term HELOCs that had interest-only features, the loan "reset" after the interest-only period expired, five or ten years into the loan term. The loan then began to amortize. Because these loans also often had a balloon feature at the end of the loan term, however, they did not amortize fully. This meant that a borrower was set up to experience payment shock twice. First, the borrower would experience payment shock due to the reset to a partially amortizing payment amount. Next, the borrower would experience payment shock at the end of the loan term, when the balloon came due. Consequently, at the end of the term, the borrower was faced with paying the total outstanding unpaid principal amount of the junior loan, which came due before the end of the term of the underlying first-lien senior loan.

220.   To the uninitiated borrower, this balloon payment would arrive deep into the term of the first-lien loan and could undermine the borrower's ability to maintain payments on the underlying first-lien loan. This set-up was typical of Countrywide's 30/15 Balloon mortgage loan. A "30/15 Balloon" was available on second loans with 100% financing. Countrywide prompted its brokers to "Qualify more borrowers for 100% financing with our new 30/15 Balloon options on Seconds."

221.　All of these features of Countrywide HELOCs and piggyback loans, especially when paired with a loan with a combined LTV of 100%, had the potential to force borrowers into foreclosure or otherwise harm them.

222.　Loans with loan-to-value ratios of 100% combined with low introductory interest-only payments, or with a balloon feature, are very risky. These features increase the risk that borrowers cannot afford the loan payments at all or will be unlikely to build any equity in their homes when faced with stagnant or a slight reduction in home value. Such borrowers are at risk of losing their homes if they cannot make the increased payments or cannot refinance. In either case, borrowers will have little or no equity with which to work in order to refinance, and may have to pay out-of-pocket just to sell their homes.

223.　Not surprisingly, loans with piggyback second-lien loans are more likely to fail. Defaults on the riskier, higher-rate second lien loans expose the entire mortgage structure, both first and second lien loans, to failure. Standard & Poor's, the largest securities rating agency, analyzed over a half million first-lien mortgages sold with HELOCs or fixed rate seconds between 2002 and 2004 and found that borrowers were 43% more likely to default on those liens than comparable first mortgages without piggybacks.

224.　Lending at 100% LTV is particularly dangerous with subprime borrowers who, as demonstrated by their shaky credit history, are more likely to be without financial breathing room, with no budgetary margin of error or an adequate safety net to help them weather and get past even minor life events, like the need to replace a water heater or an unusually high energy bill. If they begin to miss payments and, as a consequence, have servicing penalties and late fees added to their mortgage payments, they get turned "upside down" on the equity in their property and quickly owe more on the Countrywide mortgage than their home is worth.

225.    This risk is magnified when paired with reduced documentation underwriting or other features that further increase the likelihood that the borrower will be unable to afford the loan.

226.    In 2005, Countrywide qualified borrowers with credit scores as low as 580 for single loans with loan-to-value ratios of 100% and for 80/20 piggyback loans.  On the first-lien loan in an 80/20 piggyback loan combination, borrowers could be sold an interest-only option, whereby the borrower would make payments only on the interest for a certain period of time.  During the period in which the borrower was paying only the interest, the principal balance on first-lien loan would remain the same – at 80% of fair market value. In 2007, a non-prime stated self-employed or salaried borrower could qualify for an 80/20 loan for as much as $850,000 with a minimum credit score of 640 and could qualify for a loan up to $1 million with a minimum credit score of 680. As Countrywide told its brokers in an ad, "Countrywide®, America's Wholesale Lender®, Specialty Lending Group delivers more options to your Non-Prime Stated Income borrowers!"

227.    A self-employed borrower with a minimum credit score of 640 could get a "100% 'One Loan' Stated" for up to $700,000.  A stated wage earner with a minimum credit score of 640 could also mortgage 100% of a home's value with an 80/20 loan.

228.    Countrywide told borrowers that there was "GOOD NEWS!  Now you can qualify for up to 100% financing without a recent bankruptcy affecting your FICO score."  Countrywide proclaimed "Low credit scores allowed" and "Hard to prove income acceptable."

229.    Countrywide also had 80/20 loan programs that could be paired with a hybrid ARM— even a hybrid ARM with an interest-only feature.

230.    Countrywide loans made at 100% loan-to-value were imprudently made and were unsound as written because they were unsustainable and unaffordable for borrowers, even borrowers in a stable housing market.

### Countrywide Utilized Unfair and Deceptive Advertising and Sales Pitches to Push Mortgages, While Hiding Costs and Risks to Consumers

231. To further its aggressive loan origination practices, Countrywide engaged in unfair and deceptive sales practices through telemarketing, direct mailings, newspaper advertisements, and television and radio commercials in Illinois. Countrywide generally lead consumers to believe that they could offer consumers the best loan at the lowest price. Countrywide's advertisements to consumers often hid or obscured the risks associated with different mortgage products and refinancing.

A.    Personalized Direct Mailings Pushed Consumers to Refinance into Risky Products

232. Countrywide sent direct mailings to consumers in an effort to push certain mortgage products and to induce current Countrywide borrowers to refinance within a short period of time after finalizing their loan. Often, the direct mailing appeared to be a personalized letter or email, including information about consumers' present loans, which deceptively compared present loans with new offers, and instructed consumers to contact Countrywide quickly.

233. For example, on or about April 15, 2005, Countrywide sent borrowers a direct mailing to refinance into a PayOption ARM and directed borrowers to contact Countrywide on Saturday, April 23, 2005. Next to the consumer's name and address was a highlighted box which stated the "estimated initial payment savings" as $15,132 assuming the consumer refinanced into a PayOption ARM.

234. This "estimated initial payment savings" was misleading because it was based on the consumer paying the initial rate of 1% for an entire year. But with a PayOption ARM, after the first month, merely paying the initial rate of 1% would not have covered the principal and interest of the mortgage, resulting in negative amortization. Thus, if a consumer opted to refinance into the advertised program, the consumer would not actually save any money on their

57

payments. To emphasize the "savings," Countrywide hid the method for calculating the estimated savings and the negative amortization that would result in a tiny font text after the signature of Countrywide's personal loan consultant at the bottom of the page.

235. The text of the mailing touted to consumers the benefits of a PayOption ARMs, such as "free up cash…, paying off high interest credit card debt, invest in income property, saving cash for the purpose of a new home and afford a larger home." However the mailing failed to disclose clearly and conspicuously the many risks and negative ramifications of a PayOption ARM product.

236. The promise of "afford a larger home" was deceptive because PayOption ARMs were not necessarily cheaper than fixed rate mortgages. While a consumer may have been able to obtain a larger mortgage with a PayOption ARM, it did not mean that she could afford to pay it off. An option ARM merely allowed a consumer to choose the amount of a monthly payment. Thus, some payments could be smaller than those with a fixed rate mortgage, but to prevent negative amortization, the consumer had to make much larger payments.

237. Another direct mailing about refinancing into PayOption ARMs emphasized the amount the consumer could cash-out if he refinanced from a 30-year fixed rate loan to a PayOption ARM. Again, next to the consumer's name and address was a highlighted box with "Up to $65,380" and then under it, "Please Call Now, 1-800-598-1129."

238. In the text, it promised that the consumer could access as much as $65,380 in home equity through refinancing into an option ARM with a 4.250% fully indexed interest rate. Further the mailer stated that this interest rate is lower than the rate of the borrower's current fixed-rate mortgage.

58

239.   This statement failed to clearly and conspicuously disclose the interest rate and how Countrywide calculated the consumer's home equity, whether it was based on a computer program or an actual appraisal.  Further, since the rate on this option ARM product would fluctuate monthly after the one-month teaser interest rate expired, the interest rate and payment could increase to more than the consumer's current mortgage rate and payment.  To sweeten the offering, Countrywide offered, "Fasttrack Cash-out Refinancing" which promised to "cut down on the amount of qualifying and application paperwork."

240.   Yet, this mailing did not clearly and conspicuously disclose the risks of refinancing into a PayOption ARM.  At the bottom of the mailing, after the signature of the personal loan consultant and in tiny font, the mailing made a reference to the introductory period.  It instructed the consumer to see another footnote on the second page for an explanation of that footnote.  By burying this information after the signature, using tiny font and referring the consumer to another footnote for an explanation, Countrywide obscured the significant risks of refinancing into a PayOption ARM.

B.   Emails Touting Complimentary Loan Reviews Deceptively Induced Consumers to Refinance

241.   Besides paper mailings, Countrywide also emailed personalized mailings to current customers on their loan anniversaries, which offered "free" or "complimentary" loan reviews.

242.   For example, in 2006, Countrywide sent emails to current Full Spectrum Lending Division consumers with the subject line "It's Your Anniversary!"  In the heading with large bold font, it stated "Happy Anniversary!  Enjoy your complimentary loan review" and then to the immediate right it had printed Countrywide's telephone number and "Click Here to Get Started," which linked the consumer to an on-line loan application.

59

243.    By placing the telephone number and the link immediately after the complimentary loan review, the email led the consumer to believe that contacting Countrywide would result in an informational review, not a sales pitch for refinancing.

244.    After the heading, the email congratulated the consumer for being a current customer. Then it proclaimed that "many home values skyrocketed over the past year. That means that you may have thousands of dollars of home equity to borrow from—at rates much lower than most credit cards." This statement led the customer to believe that the value in her home skyrocketed to allow her "thousands of dollars of home equity." Yet, the email failed to clearly and conspicuously disclose how Countrywide calculated the consumer's equity in her home.

245.    Then the email offered an "exclusive interest rate discount of 1/2 %" because the consumer was a current customer. At the end of the email, it emphasized that Countrywide wanted to provide the "right" home financing situations to meet the consumer's needs and stated "Call us now at 1-866-253-2352 or Click Here."

246.    If the consumer did not respond to this email, Countrywide sent a follow up "Your Anniversary Review Reminder" which stated "If you haven't called for your free Anniversary Loan Review yet, there is still time." The follow up email created a false sense of urgency, in which the consumer had to act fast to avoid losing a supposedly great deal.

C.    Television and Radio Commercials: Deceptively Advertise No Closing Cost Refinancing

247.    Besides direct mailings and newspaper ads, Countrywide also used deceptive television and radio commercials to induce consumers to purchase loans and refinance their mortgages or obtain home equity lines of credit.

248.    For example, in November 2005, Countrywide ran a television commercial called "Guess What A" which offered a "no closing cost debt consolidation loan." During the commercial, a

man informed consumers to "act fast" to consolidate their high interest credit cards while mortgage interest rates were low. Although a legal disclaimer disclosed that refinancing or taking a HELOC may increase the total number of payments and total amount paid, it did not disclose that consumers paid for the "no closing costs" through a higher interest rate. Rather, it just referred consumers to Countrywide's website for information on closing costs.

249.    Similarly, in July 2007, Countrywide ran a television commercial which again offered a "refinance with no closing costs." The man in the commercial stated "That's right. At closing you'll pay absolutely no closing costs. This means more cash for you."

250.    Again, the legal disclaimer obfuscated the truth that consumers paid for "no closing costs" through a higher interest rate. Rather, it stated that "borrowers who choose to pay lender fees and closing costs upfront may qualify for a lower rate."

251.    Countrywide engaged in similar confusing and deceptive advertising in its "Dueling Announcers" radio commercial. In that commercial, Countrywide offered a "no closing cost" refinance loan and again the legal disclaimer obfuscated the truth that consumers paid for no closing costs through a higher interest rate. At the end of the commercial, it said that borrowers who choose to pay lender fees upfront may qualify for a lower rate. Then it stated "recent trends show home values flattening or even declining in some areas." The commercial urged consumers "[s]o tap into your home's available equity now."

252.    In addition, this commercial emphasized the benefits of refinancing such as: cash from the equity, a lower fixed rate, and paying credit card bills. Yet, this commercial failed to disclose clearly and conspicuously the danger that by removing equity at a time when home values are stagnant or declining, consumers could owe more than the value of their homes.

D.    Countrywide Used Deceptive Sales Pitches to Push Risky Mortgages

253.    After receiving advertisements, many consumers contacted Countrywide account executives, who were trained to use deceptive sales scripts to originate mortgages for purchases and refinancing.

254.    According to an interview with a former account executive in Countrywide's retail division, Countrywide instructed employees to sell the "low" monthly payments of each product and to down play the total cost of the mortgage, the interest rate, adjustable rate, prepayment penalty or any other risks associated with the products.

255.    If consumers questioned the terms of the offered mortgage, account executives would offer to refinance consumers into better mortgages at later date, such as in loans with ARMs often before the rates adjusted. It was a deceptive promise because the account executives could not predict consumers' ability to refinance, which often depended on whether housing values continued to appreciate.

256.    According to an interview with a former account executive in the Full Spectrum Lending Division (Countrywide's subprime retail division), Countrywide used scripted telemarketing to solicit both new borrowers and current Countrywide borrowers for subprime mortgages.

257.    These potential consumers, or sales "leads," included prime borrowers who mistakenly called Full Spectrum, consumers with prime mortgages serviced by Countrywide but who were late in their payments at least 30 days, consumers who called Countrywide's prime retail lending division and whose credit scores were below a certain level, and current Countrywide subprime borrowers whose loans had adjustable rate mortgages, balloons or other variable terms.

258.    Countrywide required employees to memorize sales scripts, prior to attending intensive sales training in Illinois or California. Countrywide instructed account executives to use the

sales scripts for every conversation with consumers. In fact, the scripts covered the entire loan origination process, from intake to closing, for refinance, purchase and home equity mortgages.

259.    By using the sales scripts, Countrywide employees deceived and confused consumers so that consumers would not understand the true costs associated with the new loans.

260.    As described in the New York Times' article, *Inside the Countrywide Lending Spree*, Countrywide used a "seductive sales pitch" to convince consumers that Countrywide aspired to provide consumers with "the best loan possible." Rather than actually providing the best loan possible, Countrywide led consumers into "high-cost and sometimes unfavorable loans that resulted in richer commissions for Countrywide's smooth talking sales force."

261.    For example, according to one former Full Spectrum account executive, Countrywide's subprime divisions did not offer FHA loans to consumers who could have qualified for them and instead frequently offered costlier or riskier subprime loans.

262.    As compared to subprime loans, FHA loans have historically allowed lower income consumers to borrow money for the purchase of homes. FHA loans are insured by the Federal Housing Authority for consumers with "less than perfect credit" histories and allow for down payments as low as 3%. The majority of FHA loans are 30-year fixed rate loans, rather than ARMs.

263.    A former account executive provided the following comparison for a consumer with a down payment of 5% (or 95% LTV) seeking a $100,000 loan. With an FHA loan, the consumer could have received a fixed interest rate of 6% for 30 years (with an additional insurance fee of 1½ %). Yet, through Full Spectrum, the account executive sold the same consumer a subprime loan with 8-10% interest rate and layered with additional risks, such as a prepayment penalty.

63

264.    The deception of providing the best loan for the consumer started right from the beginning of the sales script with the first telephone call. In fact, according to an interview with a former Full Spectrum employee, the 2005 script prohibited employees who spoke with prime borrowers who were merely 30 days late from mentioning the purpose of their phone call, e.g., to refinance into more costly subprime mortgages.

265.    By misrepresenting the purpose of the call and obscuring consumers' possible weakened credit, Countrywide led consumers to believe that the call was to discuss servicing issues or even refinancing into a prime loan, rather than refinancing into a more expensive subprime mortgage.

266.    Even if consumers were uninterested in obtaining new mortgages, the sales script provided ways for sales representatives to persuade reluctant consumers. For example, if a consumer stated that she had paid off a first mortgage, the script advised the account executive to ask about a home equity loan. "Don't you want the equity in your home to work for you? You can use your equity for your advantage and pay bills or cash out. How does that sound?"

267.    Another method utilized in the scripts led consumers into believing that the account executives were their friends, interested in providing the best loans to consumers. This method is exemplified by the Full Spectrum sales script that instructed account executives to build an emotional connection known as the "Oasis of Rapport" with consumers before discussing rates, points and fees. The immediate objective was to get to know the consumer, "look for points of common interests, and to use first names to facilitate a friendly helpful tone."

268.    Countrywide also coached employees to ask questions about the consumer's financial situation, then lie that the account executive had another customer with the same problems and say that it was difficult for this other, similar, customer to get a loan from other lenders.

269.    By scripting an emotional connection with consumers, Countrywide led consumers to believe that account executives understood their financial situations and Countrywide would provide consumers with the best possible mortgages. As a result, consumers were more likely to accept refinancing, fees, points, higher interest rates, adjustable rate mortgages, and very risky products, such as option ARMs.

### Countrywide Home Loans Servicing LP Utilizes Unfair and Deceptive Practices in the Servicing of Borrowers' Residential Mortgage Loans

270    When consumers fall behind on their mortgage loan payments, they call Countrywide Home Loans Servicing LP ("Countrywide Servicing"), the Countrywide entity that services consumers' mortgages. Consumers who ask what can be done to avoid foreclosure proceedings are often shuffled from person to person and even department to department before reaching someone who can actually address their concerns.

271.    Countrywide Servicing generally demands an initial payment from the consumers prior to even discussing whether anything can be done to keep the consumers in their homes. Because Countrywide Servicing demands this payment prior to doing any analysis of the consumers' situations, this scheme often results in consumers paying money to Countrywide Servicing when there is no chance of negotiating a workable plan. The money used for "initial payments" could have been used by consumers to pay for moving expenses or finding new housing in the event that foreclosure was inevitable.

272.    Countrywide Servicing also requires consumers to send their initial payments via certified checks. If a consumer's check is not certified, Countrywide Servicing will refuse it without even attempting to verify whether there are sufficient funds to cover the check. This needless bureaucracy has led to Countrywide Servicing rejecting initial payments made on consumers' behalf by non-profits and state agencies.

273.    For example, one consumer fell behind on her mortgage payments when she was being treated for breast cancer. Trying to help the consumer, her church raised funds to make her delinquent payment. A check, drawn on the church's account, was sent to Countrywide Servicing. It was rejected.

274.    After receiving the initial payment, instead of doing an analysis on what would be necessary to allow consumers to stay in their homes, Countrywide Servicing's first offer to consumers is typically to put them on repayment plans. These repayment plans require consumers both to remain current on their existing mortgage loan payments and also pay an additional amount to cover any past due payments and fees the consumers have incurred.

275.    A repayment plan is often an unworkable and unaffordable solution to most consumers' mortgage payment problems. Plainly put, if consumers are having problems making their current payments, there is absolutely no reason to think that the consumers will be able to make even larger payments in the future.

276.    One consumer's experience illustrates the problem. The consumer's monthly mortgage payment was $1600. She fell behind and, in an attempt to salvage the situation, repeatedly called Countrywide Servicing to try to find a solution. Although the consumer was already having difficulty making her $1600 monthly payment, Countrywide Servicing's solution was to increase the consumer's payment to $2500 to cover both the existing payment and the past due payments and fees.

277.    Predictably, the consumer was unable to keep up with the repayment plan and fell even further behind on her mortgage. After trying to work with Countrywide Servicing for almost six months, the company demanded (and received) a payment of over $5000 from the consumer before it would complete an analysis and consider the file for loan modification.

278.    Even when Countrywide Servicing comes up with a loan modification plan, the company often fails to discuss the plan with the consumer to confirm it is affordable or to send timely documentation to the consumer regarding the specific details of the plan.

279.    For example, a consumer called Countrywide Servicing on five separate occasions seeking assistance with mortgage payments that she was having difficulty making.  The consumer had a loan with an initial teaser interest rate of 9.375% that had jumped to 12.625%.  During the fifth call, the consumer learned that Countrywide Servicing had decided to reduce the interest rate on her loan back to the teaser interest rate for an additional five years.  Although Countrywide Servicing attempted to provide relief to the consumer, it failed to actually discuss with the consumer whether this plan would be affordable.  The consumer had sent Countrywide Servicing financial documents, so it should have known that the plan was unaffordable.  Moreover, it took Countrywide Servicing an additional month to send the consumer documentation of her loan modification, resulting in the consumer making an incorrect mortgage payment based on what she had been told on the phone.

280.    Countrywide Servicing representatives have also been difficult to reach when consumers are trying to catch up on their mortgages.  For example, a consumer who fell behind in her mortgage sent Countrywide Servicing additional checks for 10 months with the designation that they were to be applied to her past due payments and fees.  When her statements did not appear to reflect the additional payments, the consumer repeatedly called Countrywide Servicing to deal with the problem.  She was put on hold and transferred from person to person when she called and was never able to talk to a Countrywide Servicing representative who could help her figure out the problems with her account.

67

281.    Consumers will sometimes try to refinance their Countrywide mortgages in an attempt to save their homes. Consumers have complained that Countrywide Servicing fails to send them the payoff statements necessary to complete the refinance in a timely manner. Because the refinance is delayed, the consumers end up falling even further behind on their Countrywide mortgages.

282.    On occasion, consumers who fall behind in their mortgages and other debt payments are forced to declare bankruptcy. Countrywide Servicing has been sued by United States Bankruptcy Trustees in four states over its practices with consumers in bankruptcy. These trustees allege, among other things, that Countrywide Servicing may have filed inaccurate proofs of claims, filed unwarranted motions for relief from the bankruptcy stay, inaccurately accounted for funds and made unfounded payment demands to consumers after the discharge of their bankruptcy.

283.    Countrywide Servicing has also acted illegally towards borrowers in foreclosure actions. In a particularly egregious case, a consumer whose Countrywide mortgage was in foreclosure returned home to find that Countrywide Servicing had changed her locks and boarded her home. At the time it boarded the owner-occupied property, Countrywide Servicing had filed a foreclosure complaint against the consumer, however, no judgment for foreclosure had been entered and no sale conducted. The consumer's attorney made numerous attempts to contact Countrywide Servicing to rectify the situation. It took a week and the intervention of the Attorney General's Office for the consumer to regain access to her home and possessions.

284.    There are also occasions when Countrywide Servicing acts inappropriately towards consumers who are not in foreclosure, but have a problem with the application of funds from an escrow account.

285.    In one situation, a consumer whose Countrywide mortgage included an escrow for real estate taxes mistakenly paid her tax bill herself, even though Countrywide Service also paid the bill. Once this error was discovered, the consumer's overpayment should have been refunded directly to her. Instead, Countrywide Servicing decided to keep a portion of the overpayment in the consumer's escrow account, purportedly as a "cushion." Countrywide Servicing had no authority to arbitrarily keep a portion of the consumer's overpayment and only returned the funds after mediation through the Attorney General's Office.

## STATUTORY PROVISIONS

286.    Section 2 of the Illinois Consumer Fraud and Deceptive Business Practices Act (815 ILCS 505/2) provides that:

> Unfair methods of competition and unfair or deceptive acts or practices, including but not limited to the use or employment of any deception, fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of any material fact, with intent that others rely upon concealment, suppression or omission of such material fact, or the use of employment of any practice described in Section 2 of the "Uniform Deceptive Trade Practices Act," approved August 5, 1965, in the conduct of any trade or commerce are hereby declared unlawful whether any person has in fact been misled, deceived or damaged thereby. In construing this section consideration shall be given to the interpretations of the Federal Trade Commission and the federal courts relating to Section 5(a) of the Federal Trade Commission Act.

287.    Section 7 of the Consumer Fraud Act, 815 ILCS 505/7, provides in relevant part:

> a.    Whenever the Attorney General has reason to believe that any person is using, has used, or is about to use any method, act or practice declared by the Act to be unlawful, and that proceedings would be in the public interest, he may bring an action in the name of the State against such person to restrain by preliminary or permanent injunction the use of such method, act or practice. The Court, in its discretion, may exercise all powers necessary, including but not limited to: injunction, revocation, forfeiture or suspension of any license, charter, franchise, certificate or other

69

evidence of authority of any person to do business in this State; appointment of a receiver; dissolution of domestic corporations or association suspension or termination of the right of foreign corporations or associations to do business in this State; and restitution.

b.      In addition to the remedies provided herein, the Attorney General may request and this Court may impose a civil penalty in a sum not to exceed $50,000 against any person found by the Court to have engaged in any method, act or practice declared unlawful under this Act. In the event the court finds the method, act or practice to have been entered into with intent to defraud, the court has the authority to impose a civil penalty in a sum not to exceed $50,000 per violation.

c.      In addition to any other civil penalty provided in this Section, if a person is found by the court to have engaged in any method, act, or practice declared unlawful under this Act, and the violation was committed against a person 65 years of age or older, the court may impose an additional civil penalty not to exceed $10,000 for each violation.

288.    Section 10 of the Consumer Fraud Act, 815 ILCS 505/10, provides that "[i]n any action brought under the provisions of this Act, the Attorney General is entitled to recover costs for the use of this State."

289.    Section 2 of the Illinois Fairness in Lending Act, 815 ILCS 120/2, provides that

(a)    "Financial institution" means any bank, credit union, insurance company, mortgage banking company, savings bank, savings and loan association, or other residential mortgage lender which operates or has a place of business in this State.

...

(d)    "Equity stripping" means to assist a person in obtaining a loan secured by the persons' principal residence for the primary purpose of receiving fees related to the financing when (i) the loan decreased the persons' equity in the principal residence and (ii) at the time the loan is made, the financial institution does not reasonably believe that the person will be able to make the scheduled payments to repay the loan. "Equity stripping" does not include reverse mortgages as defined in Section 5a of the Illinois Banking Act, Section 1-6a of the Illinois Savings and Loan Act of 1985, or subsection (3) of Section 46 of the Illinois Credit Union Act.

70

290.    Section 3 of the Illinois Fairness in Lending Act, 815 ILCS 120/3 provides in relevant part that:

> No financial institution, in connection with or in contemplation of any loan to any person, may:
>
> ...
>
> (e)    Engage in equity stripping or loan flipping.

291.    Section 5 of the Illinois Fairness in Lending Act, 815 ILCS 120/5(c), provides in relevant part that:

> An action to enjoin any person subject to this Act from engaging in activity in violation of this Act may be maintained in the name of the people of the State of Illinois by the Attorney General or by the State's Attorney of the county in which the action is brought. This remedy shall be in addition to other remedies provided for any violation of this Act.

## Count I

### Violations of Section 2 of the
### Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/2

292.    The allegations contained in Paragraphs 1 through 291 of the Complaint are re-alleged and incorporated herein by reference.

293.    As described above, Countrywide's conduct has contributed to the high number of foreclosures in Illinois and caused significant harm to the public, the market, and scores of Illinois borrowers and homeowners.

294.    Countrywide engaged in unfair and/or deceptive acts or practices by originating mortgage loans to borrowers who did not have the ability to repay their loans through practices such as, but not limited to:

> a.    Using reduced documentation underwriting guidelines to qualify borrowers who did not have sufficient income or assets to afford the Countrywide loans they were sold;

71

b.  Promoting the use of reduced documentation underwriting guidelines to qualify borrowers who did not have sufficient income and assets for the Countrywide loans they were sold;

c.  Inflating borrowers' income on loan applications to qualify the borrowers for Countrywide loans;

d.  During a certain period of time, qualifying subprime borrowers for hybrid ARM mortgage loans using less than the full- indexed rate;

e.  During a certain period of time, qualifying borrowers for mortgage loans that had an interest-only payment option using less than the fully-amortizing payment;

f.  Originating loans that were not designed for long term viability, but for short term refinancing, as employees and brokers frequently represented that borrowers could refinance the loan;

g.  Promoting serial refinancing without regard to the increased cost to the borrower or the affordability of the loan, and without disclosing that the ability to refinance relied on a perpetual increase in home valuation;

h.  Loosening certain underwriting guidelines over time, resulting in the sale of unaffordable loans;

i.  Originating loans with multiple layers of risk, resulting in the sale of unaffordable loans; and

j.  Allowing exceptions to underwriting guidelines, resulting in the sale of unaffordable loans.

295.    Countrywide engaged in unfair and/or deceptive acts or practices by originating mortgage loans that exposed borrowers to an unnecessarily high risk of foreclosure or loss of home equity through practices such as, but not limit to:

    a.    Originating option ARM mortgage loans with one or more of the following characteristics: illusory introductory teaser interest rates, prepayment penalties, high loan-to-value ratios, and reduced documentation underwriting;

    b.    Mass marketing and selling option ARM mortgage loans to the general public that were only beneficial to specific sophisticated segments of the borrower population;

    c.    Marketing and selling option ARM mortgage loans as a beneficial refinance loan product to current customers in good standing, when that was not the case; and

    d.    Originating mortgage loans with 100% loan-to-value or combined loan-to-value ratios that included other risky features.

296.    Countrywide engaged in unfair and/or deceptive acts or practices by originating unnecessarily more expensive mortgage loans to unknowing borrowers through practices such as, but not limited to:

    a.    Originating more expensive reduced documentation loans to borrowers who could have documented their income and assets, without informing borrowers of the increased cost; and

    b.    Attaching prepayment penalties to borrowers' loans, without ensuring that the borrowers actually received any benefit from the added risk of the penalty.

297.    Countrywide engaged in unfair and/or deceptive acts or practices by deceptively marketing and/or advertising its mortgage loans through practices such as, but not limited to:

73

a.  Leading consumers to believe that Countrywide would obtain for them the best possible loan terms, when, in fact, they did not;

b.  Avoiding discussing the interest rate or APR of a loan by shifting the focus to the monthly payment in an effort to confuse consumers about the true cost of the loan;

c.  Representing that refinancing into an option ARM could save the borrower money when, in fact, the claim of savings was false;

d.  Advertising the one-month teaser interest rates for an option ARM without clearly and conspicuously disclosing that the rate would increase dramatically the following month;

e.  Representing to consumers that option ARMs were beneficial for consumers in good standing on their current Countrywide loans when, in fact, refinancing into the product was not beneficial for most consumers;

f.  Failing to properly inform a borrower of the potential of owing more on his home than what it is worth due to negative amortization if the borrower's house did not continue appreciating or depreciated in value;

g.  Inflating borrowers' income information on their loan applications in order to qualify borrowers for Countrywide mortgages when their income would not have qualified them for the loan they received;

h.  Representing to borrowers that they should not worry about the interest rate of their Countrywide mortgage because the loans could be refinanced before they became unaffordable;

74

i. During a certain period of time, failing to disclose to subprime borrowers that they were qualified at less than the fully-indexed rate for hybrid ARM mortgage loans and not at a rate sufficient to repay the loan in its entirety;

j. During a certain period of time, failing to disclose to borrowers that they were qualified at less than a fully-amortizing payment for mortgage loans with an interest-only payment option and not at a rate sufficient to repay the loan in its entirety;

k. Advertising that a Countrywide mortgage had "no closing costs" when the closing costs were incorporated in the features of the loan;

l. Representing to current Countrywide borrowers that Countrywide offered "Complimentary" or "Free Loan" reviews when in fact, it was a sales pitch to refinance current subprime borrowers into other subprime mortgages;

m. Hiding the purpose of subprime sales calls to prime borrowers with late payments, which was, in actuality, to refinance borrowers into subprime loans; and

n. Advertising that because the housing market is stagnant or declining, borrowers should refinance their homes and take cash out or pay debts, without informing borrowers of the risk of owing more than the value of their homes.

298. Countrywide engaged in unfair and/or deceptive acts or practices by implementing a compensation structure that incentivized broker and employee misconduct and failed to exercise sufficient oversight to ensure that such misconduct did not occur through practices such as, but not limited to:

a.  Implementing a compensation structure that incentivized employees to maximize sales of loans without proper oversight, resulting in the sale of unaffordable and/or unnecessarily expensive loans;

b.  Failing to provide adequate parameters for the sale of option ARMs, resulting in the product being sold to inappropriate groups of borrowers;

c.  Failing to adequately supervise and/or underwrite brokers' use and sale of reduced documentation loans resulting in the sale of unaffordable or unnecessarily more expensive loans;

d.  Facilitating and/or instructing brokers' emphasis of the low teaser rate when selling option ARMs;

e.  Rewarding brokers for selling loans with certain risky loan features such as prepayment penalties without ensuring that borrowers received a benefit from the risky features; and

f.  Structuring the compensation for option ARMs in such a way that brokers were incentivized to sell a product that was riskier than necessary – to the exclusion of other products – in order to obtain the maximum yield spread premium possible.

299.    Countrywide Home Loans Servicing, LP engaged in unfair and/or deceptive acts or practices during the servicing of residential mortgage loans through practices such as, but not limited to:

a.  Inducing borrowers to pay Countrywide Servicing monies under the premise that Countrywide Servicing would be able to assist distressed borrowers, even though Countrywide Servicing has not done any analysis to determine whether assistance was feasible in light of the borrowers' particular factual circumstances;

76

    b.  Misleading borrowers into paying Countrywide Servicing additional monies under a repayment plan or loan modification plan that Countrywide Servicing knew or should have know was unaffordable; and

    c.  Recklessly facilitating the foreclosure of borrowers' homes by misleading borrowers or failing to respond to borrowers' requests for assistance.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully prays for the following relief:

    A.  A finding that Defendants have engaged in and are engaging in trade or commerce within the meaning of Section 2 of the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/2;

    B.  A finding that Defendants have engaged in and are engaging in acts or practices that constitute violations of Section 2 of the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/2;

    C.  An order preliminarily and permanently enjoining Defendants from the use of acts or practices that violate the Consumer Fraud and Deceptive Business Practices Act including, but not limited to, the unlawful acts and practices specified above;

    D.  An order rescinding, reforming or modifying all mortgage loans between Defendants and all Illinois consumers who were affected by the use of the above-mentioned unlawful acts and practices;

    E.  An order requiring Defendants to make restitution to all consumers who were affected by the use of the above-mentioned unlawful acts and practices in the origination of Countrywide residential mortgage loans whose homes were lost due to foreclosure on their Countrywide mortgage loans;

F.    An order requiring Defendants to make restitution to all consumers who were affected by the use of the above-mentioned unlawful acts and practices in the origination of Countrywide residential mortgage loans who refinanced their mortgage loans with Defendants or another residential mortgage lender;

G.    An order requiring Defendants to make restitution to all consumers who were affected by the use of the above-mentioned unlawful acts and practices in the origination of Countrywide residential mortgage loans who are unable to modify their Countrywide mortgages to a sustainable level and are forced to relinquish ownership of their homes;

H.    An order requiring Defendants to repurchase owner-occupied residential mortgage loans for all Illinois consumers who were affected by the use of the above-mentioned unlawful acts and practices that have been sold, transferred or assigned to investors and then to rescind, reform or modify any such mortgage loans;

I.    An order enjoining Defendants from:

    1)    further selling, transferring or assigning mortgage loans originated by Countrywide by the use of the above-mentioned unlawful acts and practices that are secured by owner-occupied residential properties in Illinois;

    2)    further selling, transferring or assigning any legal obligations to service Illinois owner-occupied residential mortgage loans originated by the use of the above-mentioned unlawful acts and practices; and

    3)    initiating or advancing a foreclosure, as an owner or servicer, on any owner-occupied residential mortgage loan originated by the use of the above-mentioned unlawful acts and practices and secured by an Illinois

property, without first providing the Attorney General a 90-day period to
review each such loan so that, upon the expiration of the 90 days, the
Attorney General may object to a foreclosure based upon unfair or
deceptive origination or servicing conduct by Countrywide and
Countrywide Home Loans Servicing, LP in order to provide the borrower
with a meaningful opportunity to avoid foreclosure. In the event of the
Attorney General's objection, no foreclosure sale shall go forward absent
court approval.

J.      An order requiring Defendants to establish a "Distressed Property Reserve" to
cover costs incurred by municipalities due to vacant foreclosed properties that secured owner-
occupied residential mortgage loans originated by Countrywide;

K.      An order imposing a civil penalty in a sum not to exceed $50,000 against any
Defendant found by the Court to have engaged in any method, act or practice declared unlawful
under this the Illinois Consumer Fraud and Deceptive Business Practices Act;

L.      An order imposing a civil penalty in a sum not to exceed $50,000 against any
Defendant found by the Court to have engaged in any method, act or practice declared unlawful
under the Illinois Consumer Fraud and Deceptive Business Practices Act committed with the
intent to defraud;

M.      An order imposing an additional civil penalty not to exceed $10,000 for each
violation of the Illinois Consumer Fraud and Deceptive Business Practices Act committed
against a person 65 years of age or older, as provided in Section 7(c) of the Consumer Fraud and
Deceptive Business Practices Act, 815 ILCS 505/7(c);

79

N.    An order requiring Defendants to pay the costs of this action and any costs related to the 90-day Attorney General review period described above; and

O.    An order granting such further relief as this Court deems just, necessary, and equitable in the premises.

## Count II

### Violation of the Illinois Fairness in Lending Act, 815 ILCS 120/4

300.    The allegations contained in Paragraphs 1 through 299 of the Complaint are re-alleged and incorporated herein by reference.

301.    Countrywide violated Section 3 of the Illinois Fairness in Lending Act, 815 ILCS 120/3 by engaging in equity stripping when refinancing consumers into mortgage loan products that Countrywide knew or should have known were unaffordable and that decreased the borrowers' equity in their homes, with the primary purpose of receiving fees for the refinancing.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully prays for the following relief:

A.    A finding that Defendants have violated the Illinois Fairness in Lending Act;

B.    An order preliminarily and permanently enjoining Defendants from the use of acts or practices that violate the Illinois Fairness in Lending Act including, but not limited to, the unlawful acts and practices specified above;

C.    An order requiring Defendants to make restitution to all consumers affected by the use of the above-mentioned unlawful acts and practices;

D.    An order rescinding or reforming all contracts, loan agreements, notes or other evidences of indebtedness between Defendants and all Illinois consumers who were affected by the use of the above-mentioned unlawful acts and practices;

E.    An order requiring Defendants to pay the costs of this action; and

F.    An order granting such further relief as this Court deems just, necessary, and equitable in the premises.

Respectfully submitted,

LISA MADIGAN, IN HER OFFICIAL CAPACITY AS ATTORNEY GENERAL OF ILLINOIS,

JAMES D. KOLE
Bureau Chief, Consumer Fraud

LISA MADIGAN
Attorney General of Illinois

DEBORAH HAGAN, Chief
Consumer Protection Division

JAMES D. KOLE, Chief
Consumer Fraud Bureau

THOMAS JAMES
SUSAN N. ELLIS
VERONICA L. SPICER
SHANTANU SINGH
JENNIFER FRANKLIN
MICHELLE GARCIA
CECILIA ABUNDIS
Assistant Attorneys General
Telephone: 312-814-3000

100 W. Randolph St., 12th Floor
Chicago, IL 60601

81

| 2120 - Served | 2121 - Served |
|---|---|
| 2220 - Not Served | 2221 - No Served |
| 2320 - Served by Mail | 2321 - Served by Mail |
| 2420 - Served by Publication | 2421 - Served by Publication |
| SUMMONS | ALIAS - SUMMONS |

(2-81) CCG-1

## IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
### COUNTY DEPARTMENT, CHANCERY DIVISION
(Name all parties)

PEOPLE OF THE STATE OF ILLINOIS,                    )
                                                    )
                         Plaintiff                  )
                                                    )
            vs.                                     )
                                                    )
COUNTRYWIDE FINANCIAL CORPORATION, a Dela-          )
ware corporation, COUNTRYWIDE HOME LOANS, INC.,     )
a New York corporation also d/b/a Full Spectrum     )
Lending, FULL SPECTRUM LENDING,                     )
a California corporation formerly doing business in )
Illinois, and COUNTRYWIDE HOME LOANS                )
SERVICING, LP, a Texas partnership, and             )
ANGELO R. MOZILO, individually and in his capacity as)
Chief Executive Officer of Defendant                )
                         Defendants                 )

# 08CH22994

See Attached Service List

### SUMMONS

To each defendant:

YOU ARE SUMMONED and required to file an answer in this case, or otherwise file your appearance in the office of the clerk of this court (located in the Richard J. Daley Center, Chancery-Division Room 802, Chicago, Illinois 60602), within 30 days after service of this summons, not counting the day of service. IF YOU FAIL TO DO SO, A JUDGMENT BY DEFAULT MAY BE TAKEN AGAINST YOU FOR THE RELIEF ASKED IN THE COMPLAINT, A COPY OF WHICH IS HERETO ATTACHED.

To the office:

This summons must be returned by the officer or other person to whom it was given for service, with indorsement of service and fees, if any, immediately after service. If service cannot be made, this summons shall be returned so indorsed. This summons may not be served later than 30 days after its date.

WITNESS    JUN 25 2008

, 20_____

DOROTHY BROWN
Clerk of the Court

| | |
|---|---|
| Atty No. | 99000 |
| Name | Veronica L. Spicer |
| Attorney for | Plaintiff |
| Address | 100 West Randolph - 12th Floor |
| City | Chicago, Illinois 60601 |
| Telephone | 312-814-8553 |

Date of Service: _____, 20_____
(To be inserted by officer on copy left with defendant or other person)

## DOROTHY BROWN, CLERK OF THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS

**SERVICE LIST**

**All of the following at 4500 Park Granada, Calabasas**

(1) Countrywide Financial Corporation, to any officer or agent

(2) Angelo Mozilo, individually

(3) Angelo Mozilo, as Chief Executive Officer of Countrywide Home Loans, Inc.

(4) PRENTICE HALL CORPORATION as Registered Agent for
    COUNTRYWIDE HOME LOANS, INC
    33 N. LaSalle St.
    Chicago, IL

(5) ILLINOIS CORPORATION SERVICE COMPANY as Registered Agent for
    COUNTRYWIDE HOME LOANS SERVICING, L.P.

(6) Angelo Mozilo
    2816 Ladbrook
    Montecido, CA 93108

(7) Angelo Mozilo as Chief Executive Officer of Defendant
    2816 Ladbrook
    Montecido, CA 93108

# EXHIBIT B

# IN THE CIRCUIT COURT OF COOK COUNTY, STATE OF ILLINOIS
## COUNTY DEPARTMENT - CHANCERY DIVISION

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 08CH22994 |
| | ) | |
| COUNTRYWIDE FINANCIAL CORPORATION, | ) | |
| a Delaware corporation; COUNTRYWIDE HOME | ) | |
| LOANS, INC., a New York corporation also | ) | |
| d/b/a Full Spectrum Lending; FULL SPECTRUM | ) | |
| LENDING, a California corporation formerly doing | ) | |
| business in Illinois; COUNTRYWIDE HOME LOANS | ) | |
| SERVICING, LP, a Texas partnership; and ANGELO | ) | |
| R. MOZILO, individually and in his capacity as Chief | ) | |
| Executive Officer of Defendant COUNTRYWIDE | ) | |
| FINANCIAL CORPORATION; | ) | |
| | ) | |
| Defendants. | ) | |

## NOTICE AND ACKNOWLEDGMENT OF RECEIPT OF SUMMONS AND COMPLAINT

### NOTICE

To:     Melanie Brody, Esq.
        K&L Gates
        1601 K Street, NW
        Washington, DC 20006

The enclosed summons and complaint are served pursuant to section 2-213 of the Code of Civil Procedure.

You must complete the acknowledgment part of this form and return one copy of the completed form to the sender within 30 days.

You must sign and date the acknowledgment. If you are served on behalf of a corporation, unincorporated association (including a partnership), or other entity, you must indicate under your signature your relationship to that entity. If you are served on behalf of another person and you are authorized to receive process, you must indicate under your signature your authority.

If you do not complete and return the form to the sender within 30 days, you (or the party on whose behalf you are being served) may be served a summons and complaint in any other manner permitted by law.

If you do complete and return this form, you (or the party on whose behalf you are being served) must answer the complaint within 60 days. If you fail to do so, judgment by default will be taken against you for the relief demanded in the complaint.

I declare, under penalty of perjury, that this notice and acknowledgment of receipt of summons and complaint will have been mailed on ___July 10, 2008___.

Signature _____

Date of Signature _____7/10/08_____

## ACKNOWLEDGMENT OF RECEIPT OF
## SUMMONS AND COMPLAINT

I declare, under penalty of perjury, that I received a copy of the summons and of the complaint in the above-captioned matter at K&L Gates, 1601 K Street, NW, Washington, DC 20006

Name _____

_____
Relationship to Entity/Authority to Receive Service of Process
(Not applicable if you are the named Defendant or Respondent)

Signature _____

Date of Signature _____

# EXHIBIT C

IN THE CIRCUIT COURT OF COOK COUNTY, STATE OF ILLINOIS
COUNTY DEPARTMENT - CHANCERY DIVISION

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 08CH22994 |
| | ) | |
| COUNTRYWIDE FINANCIAL CORPORATION, | ) | |
| a Delaware corporation; COUNTRYWIDE HOME | ) | |
| LOANS, INC., a New York corporation also | ) | |
| d/b/a Full Spectrum Lending; FULL SPECTRUM | ) | |
| LENDING, a California corporation formerly doing | ) | |
| business in Illinois; COUNTRYWIDE HOME LOANS | ) | |
| SERVICING, LP, a Texas partnership; and ANGELO | ) | |
| R. MOZILO, individually and in his capacity as Chief | ) | |
| Executive Officer of Defendant COUNTRYWIDE | ) | |
| FINANCIAL CORPORATION; | ) | |
| | ) | |
| Defendants. | ) | |

## NOTICE AND ACKNOWLEDGMENT OF RECEIPT OF SUMMONS AND COMPLAINT

### NOTICE

To:   Melanie Brody, Esq.
      K&L Gates
      1601 K Street, NW
      Washington, DC 20006

The enclosed summons and complaint are served pursuant to section 2-213 of the Code of Civil Procedure.

You must complete the acknowledgment part of this form and return one copy of the completed form to the sender within 30 days.

You must sign and date the acknowledgment. If you are served on behalf of a corporation, unincorporated association (including a partnership), or other entity, you must indicate under your signature your relationship to that entity. If you are served on behalf of another person and you are authorized to receive process, you must indicate under your signature your authority.

If you do not complete and return the form to the sender within 30 days, you (or the party on whose behalf you are being served) may be served a summons and complaint in any other manner permitted by law.

If you do complete and return this form, you (or the party on whose behalf you are being served) must answer the complaint within 60 days. If you fail to do so, judgment by default will be taken against you for the relief demanded in the complaint.

I declare, under penalty of perjury, that this notice and acknowledgment of receipt of summons and complaint will have been mailed on   July 10, 2008   .

Signature _____

Date of Signature _____7/10/08_____

## ACKNOWLEDGMENT OF RECEIPT OF
## SUMMONS AND COMPLAINT

I declare, under penalty of perjury, that I received a copy of the summons and of the complaint in the above-captioned matter at K&L Gates, 1601 K Street, NW, Washington, DC 20006

Name   Melanie Brody

_____attorney - agent authorized to accept service on behalf of all defendants

Relationship to Entity/Authority to Receive Service of Process
(Not applicable if you are the named Defendant or Respondent)

Signature _____

Date of Signature ____7-14-08____

# EXHIBIT D

IN THE CIRCUIT COURT OF COOK COUNTY, STATE OF ILLINOIS
COUNTY DEPARTMENT - CHANCERY DIVISION

THE PEOPLE OF THE STATE OF ILLINOIS,    )
                                  )
           Plaintiff,          )
                                  )
       v.                      )     08CH22994
                                  )
COUNTRYWIDE FINANCIAL CORPORATION,  )
a Delaware corporation; COUNTRYWIDE HOME  )
LOANS, INC., a New York corporation also    )
d/b/a Full Spectrum Lending; FULL SPECTRUM  )
LENDING, a California corporation formerly doing  )
business in Illinois; COUNTRYWIDE HOME LOANS  )
SERVICING, LP, a Texas partnership; and ANGELO  )
R. MOZILO, individually and in his capacity as Chief  )
Executive Officer of Defendant COUNTRYWIDE  )
FINANCIAL CORPORATION;              )
                                  )
          Defendants.      )

## NOTICE AND ACKNOWLEDGMENT OF RECEIPT OF SUMMONS AND COMPLAINT

### NOTICE

To:    Melanie Brody, Esq.
        K&L Gates
        1601 K Street, NW
        Washington, DC 20006

The enclosed summons and complaint are served pursuant to section 2-213 of the Code of Civil Procedure.

You must complete the acknowledgment part of this form and return one copy of the completed form to the sender within 30 days.

You must sign and date the acknowledgment. If you are served on behalf of a corporation, unincorporated association (including a partnership), or other entity, you must indicate under your signature your relationship to that entity. If you are served on behalf of another person and you are authorized to receive process, you must indicate under your signature your authority.

If you do not complete and return the form to the sender within 30 days, you (or the party on whose behalf you are being served) may be served a summons and complaint in any other manner permitted by law.

If you do complete and return this form, you (or the party on whose behalf you are being served) must answer the complaint within 60 days. If you fail to do so, judgment by default will be taken against you for the relief demanded in the complaint.

I declare, under penalty of perjury, that this notice and acknowledgment of receipt of summons and complaint will have been mailed on ___July 10, 2008___.

Signature _____

Date of Signature ___7/10/08___

## ACKNOWLEDGMENT OF RECEIPT OF SUMMONS AND COMPLAINT

I declare, under penalty of perjury, that I received a copy of the summons and of the complaint in the above-captioned matter at K&L Gates, 1601 K Street, NW, Washington, DC 20006

Name __Melanie Brody__

__attorney - agent authorized to accept service on behalf of all defendants__

Relationship to Entity/Authority to Receive Service of Process
(Not applicable if you are the named Defendant or Respondent)

Signature _____

Date of Signature ___7-14-08___