**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | |
| Plaintiff, | ) ) | **Case No. 08CV4210** |
| v. | ) ) | **JUDGE BUCKLO** |
| COUNTRYWIDE FINANCIAL CORPORATION, COUNTRYWIDE HOME LOANS, INC., FULL SPECTRUM LENDING, COUNTRYWIDE HOME LOANS SERVICING LP, and ANGELO MOZILO, | ) ) ) ) ) ) ) | |
| Defendants. | ) ) | |

**MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION TO STAY PENDING RESOLUTION OF MOTION BEFORE JUDICIAL PANEL ON MULTIDISTRICT LITIGATION TO TRANSFER AND COORDINATE OR CONSOLIDATE THIS AND RELATED CASES**

This case is one of at least six actions filed against one or more of the Defendants alleging that Defendant Countrywide Financial Corporation and/or its affiliates (individually or collectively, "Countrywide") originated and/or serviced residential mortgage loans in an unlawful, unfair, or deceptive fashion. The actions all allege violations of unfair competition laws based on the same core allegations. In an effort to bring order to the these parallel lawsuits, which are pending in three different federal courts (this Court and the Central and Southern Districts of California), Countrywide Financial Corporation, Countrywide Bank, FSB, Countrywide Home Loans, Inc., and Bank of America Corporation ("MDL Movants") filed a motion on July 24, 2008 with the Judicial Panel on Multidistrict Litigation ("MDL Panel")

seeking to transfer five of these cases to the Central District of California for coordinated or consolidated pretrial proceedings pursuant to 28 U.S.C. § 1407 ("MDL Motion").  On July 28, 2008, two business days after submitting the MDL Motion, the MDL Movants asked the MDL Panel to include a later-removed sixth action in any MDL proceeding.

Defendants respectfully submit that this Court should stay this case while the MDL Panel is considering the MDL Motion in order to avoid prejudice to Defendants, conserve judicial resources, and avoid conflicting rulings.

## FACTUAL BACKGROUND

Five cases are subject to the MDL Motion:  the instant case, brought by the Illinois Attorney General (the "Illinois AG Action"); a case brought by the California Attorney General (the "California AG Action"); and three private putative class actions.[1]  On July 28, 2008, Countrywide also identified a sixth action, brought by the San Diego City Attorney and removed on July 25, 2008, to be included in any MDL proceeding that results from the MDL Motion ("City of San Diego Action").  On July 30, 2008, the Panel issued a notice setting August 19, 2008 as the date by which any briefs responding to the MDL Motion are due, and on August 6, 2008 the Panel continued the response date to August 29, 2008.  (*See* Tab 7.)

All six complaints allege that in an effort to maximize its profits and its share of the consumer market for mortgage loans, Countrywide originated or serviced residential mortgage loans in an unlawful, unfair, or deceptive fashion by misrepresenting or concealing the terms, risks, or suitability of the loans, and/or by placing borrowers in loans that they could not afford.[2] Plaintiffs in all six cases allege that this conduct resulted in financial harm to borrowers in the

---

[1]     Attached hereto at Tabs 1-6 are copies of the operative complaint in each of the five actions originally included in the MDL Motion, as well as of the operative complaint in the City of San Diego Action.

form of concealed or inadequately disclosed principal, fees, penalties, and expenses, as well

foreclosure, loss of their homes, and damage to their credit and financial position.[3]

The claims for relief in the six cases also are similar.  Five out of the six complaints

allege violations of California's Unfair Competition Law ("Cal. UCL") and False Advertising

Law ("Cal. FAL") , and the remaining complaint (in the case at bar) alleges violations of the

Illinois Consumer Fraud and Deceptive Business Practices Act.[4]  The three private actions are

putative class actions seeking certification of significantly overlapping nationwide classes.[5]  The

state attorney general actions and the City of San Diego Action assert claims for relief based on

the same injuries allegedly sustained by many of the same borrowers otherwise covered by the

putative class actions.[6]  The following table identifies the names, numbers, courts, presiding

judges, and filing dates of the actions:

| Case name | Case Number (Court) (Judge) | Filing date |
| --- | --- | --- |
| *Sizemore v. Countrywide Financial Corp. et al.* | Case No. CV07-006094 (C.D. Cal.) (Hon. Stephen V. Wilson) | Filed September 19, 2007. |
| *People of the State of Illinois v. Countrywide Financial Corp. et al.* | Case No. 08CV4210 (N.D. Ill.) (Hon Elaine E. Bucklo) | Filed in state court June 25, 2008; removed July 24, 2008. |
| *People of the State of California v. Countrywide Financial Corp. et al.* (California AG Action) | Case No. CV 08-04861 (C.D. Cal.) (Hon. Stephen V. Wilson) | Filed in state court June 25, 2008; removed July 24, 2008. |
| *Hursh v. Countrywide* | Case No. 08-CV-1313 (S.D. Cal.) (Hon. | Filed in state court |

---

[2]    (*See, e.g.*, *Sizemore* Compl. ¶¶ 2-32; Illinois AG Action Compl. ¶¶ 72-171, 231-269; California AG Action Compl. ¶¶ 15-84, 119-135; *Hursh* Compl. ¶¶ 29-96; *Leyvas* Compl. ¶¶ 48-108; City of San Diego Action Compl. ¶¶ 1, 3-5, 33-66.)

[3]    (*See, e.g.*, *Sizemore* Compl. ¶ 32; Illinois AG Action Compl. ¶¶ 54-58, 80, 103-135, 294-299; California AG Action Compl. ¶¶ 49-53, 75-77, 83-84, 159-164, *Hursh* Compl. ¶¶ 64-67, 88-90, 95-96, 127-30; *Leyvas* Compl. ¶¶ 71-75, 99-101, 107-08; City of San Diego Action Compl. ¶¶ 1, 60, 62, 65.)

[4]    (*See Sizemore* Compl. ¶¶ 190-198 (Cal. UCL and Cal. FAL claims); Illinois AG Action Compl. ¶¶ 292-299 (Illinois Consumer Fraud and Deceptive Business Practices Act claim); California AG Action Compl. ¶¶ 165-169 (Cal. UCL and Cal. FAL claims); *Hursh* Compl. ¶¶ 131-135 (Cal. UCL and Cal. FAL claims); *Leyvas* Compl. ¶¶ 153-168 (Cal. UCL and FAL claims); City of San Diego Action Compl. ¶¶ 67-68 (Cal. UCL claim).)

[5]    (*See Sizemore* Compl. ¶ 161; *Hursh* Compl. ¶ 20; *Leyvas* Compl. ¶ 34.)

[6]    (*See* Illinois AG Action Compl. Preamble; *id.* ¶ 1; *id.* Count I, Prayer for Relief ¶¶ D-H, Count II, Prayer for Relief ¶¶ C and D; California AG Action Compl. ¶¶ 14, 166, 169; *id.* Prayer for Relief ¶ 3; City of San Diego Action Compl. Prayer for Relief ¶ 2.)

| *Financial Corp. et al.* | M. James Lorenz) | July 2, 2008; removed July 22, 2008. |
| *Leyvas v. Bank of America Corp. et al.* | Case No. CV08-787 (C.D. Cal.) (Hon. David O. Carter) | Filed July 17, 2008. |
| *People of the State of California v. Countrywide Financial Corp. et al.* (City of San Diego Action) | Case No. 08-CV-1348 (S.D. Cal.) (Hon. Janis L. Sammartino) | Filed in state court July 23, 2008; removed July 25, 2008. |

Thus, two of the six actions (*Sizemore* and the California AG Action) are pending before the Hon. Stephen V. Wilson of the Central District of California. The MDL Motion therefore requests the MDL Panel to transfer to the Central District all actions not already pending there so that all the actions can be coordinated or consolidated for pretrial proceedings before Judge Wilson. (*See* MDL Motion and Memorandum, attached hereto at Tab 8.)

## ARGUMENT

This Court should stay all proceedings in this case while the MDL Panel is considering the MDL Motion because a stay would help ensure consistent treatment of the six similar pending lawsuits, and conserve judicial and party resources.

This Court's "power to stay proceedings is incidental to the power inherent in every court to control the disposition of the causes on its docket with economy of time and effort for itself, for counsel, and for litigants." *Landis v. N. Am. Co.*, 299 U.S. 248, 254 (1936). A stay is particularly appropriate where, as here, a party has requested MDL transfer and coordination or consolidation. *See, e.g., Tench v. Jackson Nat'l Life Ins. Co.*, No. 99-C-5182, 1999 WL 1044923, at *1 (N.D. Ill. Nov. 12, 1999) (Bucklo, J.) (staying action pending MDL Panel's decision whether to add action to existing MDL proceeding; "The MDL Panel is likely to transfer the case at bar, since it involves a nearly identical set of facts and similar legal theories

as the cases previously consolidated" before the MDL transferee judge); *Rivers v. Walt Disney Co.*, 980 F. Supp. 1358, 1362 (C.D. Cal. 1997) (staying action pending MDL Panel's decision regarding whether to create an MDL proceeding; "it appears that a majority of courts have concluded that it is often appropriate to stay preliminary pretrial proceedings while a motion to transfer and consolidate is pending with the MDL Panel because of the judicial resources that are conserved"); *Good v. Prudential Ins. Co. of Am.*, 5 F. Supp. 2d 804, 809 (N.D. Cal. 1998) ("Courts frequently grant stays pending a decision by the MDL Panel regarding whether to transfer a case"); *Walker v. Merck & Co.*, No. 05-CV-360-DRH, 2005 WL 1565839, at *2 (S.D. Ill. June 22, 2005) (staying action pending transfer to existing MDL proceeding).

Where a motion to transfer has been filed with the MDL Panel, district courts generally apply three factors to decide whether to stay proceedings pending the Panel's decision:  "(1) potential prejudice to the non-moving party; (2) hardship and inequity to the moving party if the matter is not stayed; and (3) economy of judicial resources."  *Benge v. Eli Lilly and Co.*, 553 F. Supp. 2d 1049, 1050 (N.D. Ind. 2008) (staying action pending the MDL Panel's decision whether to transfer it as a "tagalong" action to an existing MDL proceeding where judicial economy favored a stay, and the defendant would be prejudiced by duplicative discovery absent a stay); *Azar v. Merck & Co.*, No. 3:06-cv-0579 AS, 2006 WL 3086943, at *1-2 (N.D. Ind. Oct. 27, 2006) (staying action pending MDL Panel's decision whether to transfer it as a "tagalong" action where defendant would be "unduly prejudiced and unnecessarily exposed to duplicative litigation" and plaintiffs would not be prejudiced).  A stay is warranted here based on these factors.

*First*, Plaintiff would suffer no prejudice if this action were stayed pending the MDL Panel's ruling.  This case is brand new.  Plaintiff has not filed any motions and has not served

any discovery.  Plaintiff will not suffer prejudice from a brief delay in this litigation while the
MDL Panel rules on the MDL Motion.  *See Good*, 5 F. Supp. 2d at 809 (staying action where,
*inter alia*, the opposing party had failed to indicate why the delay pending an MDL ruling would
prejudice him).  The MDL Panel has already set a briefing schedule for resolution for the MDL
Motion – with response briefs due August 29.  Hence, any delay in the preliminary proceedings
in this case will be brief, and will be more than offset by the benefits of coordinated discovery
and motion practice if the six substantially similar actions are transferred to a single court.  *See,*
*e.g.*, *Rivers*, 980 F. Supp. at 1362 (discounting any prejudice to the non-moving party in the time
between issuing the stay and the MDL Panel's consideration of the motion).

      ***Second***, Defendants would suffer prejudice if a stay were not granted because they would
be subject to duplicative discovery and motions practice before multiple courts.  Absent a stay, it
is likely that the plaintiffs in each case will seek to proceed independently as quickly as possible,
notwithstanding the resulting burden on Defendants, the inefficient use of judicial resources, and
the risk of inconsistent outcomes.  By contrast, coordinating the litigation would enable
Defendants to address discovery and motions practice in a comprehensive fashion without
having to duplicate efforts.  *See, e.g.*, *Azar*, 2006 WL 3086943, at * 1 (staying action where,
*inter alia*, defendant would be "unduly prejudiced and unnecessarily exposed to duplicative
litigation"); *Benge*, 553 F. Supp. 2d at 1050 (staying action where, *inter alia*, defendant would be
prejudiced by duplicative discovery absent a stay).

      Indeed, the six cases subject to the MDL Movants' request for an MDL proceeding are
based on the same core allegations, assert substantially overlapping putative classes or other
groups of borrowers on whose behalf relief is sought, and advance very similar claims for relief.
These are exactly the kinds of cases for which MDL proceedings are meant.  Permitting this

action to proceed before the MDL Panel has had an opportunity to rule would undercut the coordination and efficiencies for which MDL proceedings are designed. *Tench*, 1999 WL 1044923, at *1 ("The MDL Panel is likely to transfer the case at bar, since it involves a nearly identical set of facts and similar legal theories as the cases previously consolidated" before the MDL transferee judge).

 ***Third***, a stay is warranted to promote judicial economy. This Court should avoid "needlessly expend[ing] its energies familiarizing itself with the intricacies of a case that would be heard by another judge." *Rivers*, 980 F. Supp. at 1360. Yet that is exactly what would happen if this case were permitted to proceed, and the six actions were later transferred by the MDL Panel to the Central District of California, as the MDL Movants have requested. Indeed, if the cases at issue proceeded in transferor courts around the country pending the MDL Panel's transfer decision, those courts may duplicate each others' work and reach inconsistent rulings on overlapping motions. Thus, "it appears that a majority of courts have concluded that it is often appropriate to stay preliminary pretrial proceedings while a motion to transfer and consolidate is pending with the MDL Panel because of the judicial resources that are conserved." *Rivers*, 980 F. Supp. at 1362. *See also U.S. Bank, N.A. v. Royal Indem. Co.*, No. Civ. A 3:02-CV-0853-P, 2002 WL 31114069, at *2 (N.D. Tex. Sept. 23, 2002) ("by granting the stay, the Court will avoid the unnecessary waste of judicial resources if the MDL Motion is ultimately granted. If the MDL Motion is granted, all of the Court's time, energy, and acquired knowledge regarding this action and its pretrial procedures will be wasted."); *Kavalir v. Medtronic*, No. 07-C-0835, 2007 WL 1225358, at *4 (N.D. Ill. Apr. 19, 2007) ("the interests of judicial economy will be best served by staying the proceedings until [the action's] likely transfer to the MDL").

***Finally***, in addition to satisfying the three traditional criteria for granting a stay pending the MDL Panel's transfer decision, this case is appropriate for a stay notwithstanding that it was brought by the Attorney General and was removed to federal court. The MDL Panel has included Attorney General actions, along with other civil actions seeking relief for the same consumers, in MDL proceedings where the grounds for transfer were otherwise evident. *See, e.g.*, *In re Mid-Atlantic Toyota Antitrust Litig.*, 605 F. Supp. 440 (D. Md. 1984) (accepting proposed settlement in MDL involving various attorney general actions and private class actions); *In re Cardizem CD Antitrust Litig.*, 481 F.3d 355 (6th Cir. 2007) (reversing district court's award of costs in MDL involving 50 attorney general actions and 19 individual consumer actions); *In re Compact Disc Minimum Advertised Price Antitrust Litig.*, No. MDL 1361, 2001 WL 64775 (D. Me. Jan. 26, 2001) (denying in part and deferring in part a motion to disqualify counsel in MDL proceeding involving 42 attorney general suits and a private class action). District courts presiding over removed actions proposed for MDL consolidation have stayed proceedings notwithstanding the possibility of remand motions or pendency of such motions. *See, e.g.*, *Bd. of Tr. of Teachers' Ret. Sys. of Ill. v. WorldCom, Inc.*, 244 F. Supp. 2d 900, 905 (N.D. Ill. 2002) (granting stay pending transfer to an MDL court notwithstanding pendency of remand motion). In fact, "[t]he general rule is for federal courts to defer ruling on pending motions to remand in MDL litigation until after the JPMDL has transferred the case to the MDL panel" to allow coordinated consideration of any jurisdictional issues. *Jackson v. Johnson & Johnson, Inc.*, No. 01-2113 DA, 2001 WL 34048067, at *6 (W.D. Tenn. Apr. 3, 2001).

Here, the California AG Action and the City of San Diego Action, both of which are also actions proposed for MDL consolidation, were removed to federal court on the same federal question and bankruptcy grounds as here. As such, coordinated treatment will help ensure

consistent rulings on the federal question and bankruptcy jurisdictional issues in accord with the intent of 28 U.S.C. § 1407. *See Hardin v. Merck & Co.,* No. C 07-0070 SBA, 2007 WL 1056790, at *2 (N.D. Cal. Apr. 5, 2007) ("If a jurisdictional issue of a motion to remand is similar or identical to those in cases transferred or likely to be transferred to the MDL transferee court, the court should stay the action."); *Devers v. Merck & Co.,* No. CIV. S-06-617 LKK/PAN, 2006 WL 1377086, at *1 (E.D. Cal. May 18, 2006) ("In cases involving similar jurisdictional questions, deference to the MDL proceeding is often appropriate when 'the motion raises issues likely to arise in other actions pending in [the consolidated action].'") (citations omitted); *New Mexico State Inv. Council v. Alexander,* 317 B.R. 440, 443 (D.N.M. 2004) ("deference to the MDL court for resolution of a motion to remand provides the opportunity for the uniformity, consistency, and predictability in litigation that underlies the MDL system.").

## CONCLUSION

For the foregoing reasons, Defendants respectfully request that this Court stay all further proceedings in this action pending the MDL Panel's ruling on the MDL Motion.

Dated:  August 14, 2008

__/s/ Tyrone C. Fahner__
Tyrone C. Fahner
MAYER BROWN LLP
71 South Wacker Drive
Chicago, IL 60606-4637
(312) 782-0600 (telephone)
(312) 701-7711 (facsimile)

*Attorneys for Defendants Countrywide*
*Financial Corporation, Countrywide Home*
*Loans, Inc., Full Spectrum Lending,*
*Countrywide Home Loans Servicing, LP,*
*and Angelo Mozilo*

OF COUNSEL

John H. Beisner
Brian D. Boyle
O'MELVENY & MYERS LLP
1625 Eye Street, N.W.
Washington, D.C.  20006-4001
(202) 383-5300 (telephone)
(202) 383-5414 (facsimile)

# EXHIBIT 1



1  **GILBERT & SACKMAN,**
   **A Law Corporation**
2  Robert A. Cantore (Bar No. 127462)
3  Jay Smith (Bar No. 166105)
   Omar J. Shehabi (Bar No. 247827)
4  3699 Wilshire Boulevard, Suite 1200
   Los Angeles, CA 90010-2732
5  Tel.:  (323) 938-3000
   Fax:  (323) 937-9139
6  Email: js@gslaw.org
7
   **WHATLEY DRAKE & KALLAS, LLC**
8  Joe R. Whatley, Jr. (*pro hac vice*)
   Edith M. Kallas (*pro hac vice*)
9  Ilze C. Thielmann (*pro hac vice*)
   Lili R. Sabo (*pro hac vice*)
10 1540 Broadway, 37th Floor
   New York, NY  10036
11 Tel.:  (212) 447-7070
12 Fax:  (212) 447-7077
   E-mail:  jwhatley@wdklaw.com
13

14 *Counsel for Plaintiffs*
   [Additional counsel listed on signature page]
15

16                **UNITED STATES DISTRICT COURT**
                **FOR THE CENTRAL DISTRICT OF CALIFORNIA**
17                          **WESTERN DIVISION**

18 Francis G. Sizemore and Rebecca G.    )
   Sizemore, Edward Marini, Kimberly     )  Case No. CV07-06094 SVW (AJWx)
19 Menichetti and Philip D. Menichetti,  )
   and Sequesta L. Washington, on        )  **SECOND AMENDED CLASS**
20 behalf of themselves and all others   )  **ACTION COMPLAINT**
   similarly situated,                   )  RICO 18 U.S.C. §1962(c) and (d),
21                        Plaintiffs,     )  18 U.S.C. §2, Cal. Bus. & Prof. Code
         vs.                             )  §17200 *et seq.* and §17500 *et seq.*, Unjust
22                                        )  Enrichment
   Countrywide Financial Corp.,          )
23 Countrywide Bank, N.A.,               )  JURY TRIAL DEMANDED
   Countrywide Home Loans, Inc.,         )
24 Countrywide Tax Services Corp.,       )
   LandSafe, Inc., LandSafe Appraisal    )  Judge:  Hon. Stephen V. Wilson
25 Services, Inc., LandSafe Credit,      )
   Inc., and LandSafe Flood             )
26 Determination, Inc.,                  )
27                        Defendants.     )
                                         )
28                                        )

COPY

CLERK U.S. DISTRICT COURT
JUN 2 0 2008
2:04
CENTRAL DISTRICT OF CALIFORNIA
BY                    DEPUTY

1          Plaintiffs Francis G. Sizemore and Rebecca G. Sizemore, Edward Marini,

2   Kimberly Menichetti and Philip D. Menichetti, and Sequesta L. Washington

3   ("Plaintiffs"), on behalf of themselves and all others similarly situated, by their

4   undersigned attorneys, allege as follows:

5          1.          This is a class action brought by Plaintiffs, on behalf of themselves and

6   other similarly situated borrowers, against Countrywide Financial Corp., Countrywide

7   Bank, N.A., Countrywide Home Loans, Inc., Countrywide Tax Services Corp.,

8   LandSafe, Inc., LandSafe Appraisal Services, Inc., LandSafe Credit, Inc., and

9   LandSafe Flood Determination, Inc. (collectively "Countrywide" or "Defendants")

10  under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C.

11  §§ 1961, *et seq.*, and California law, including the California Unfair Competition Law,

12  Cal. Bus. & Prof. Code § 17200, *et seq.* ("UCL"), and the False Advertising Law, Cal.

13  Bus. & Prof. Code § 17500, *et seq.* ("FAL"), seeking redress for the illegal acts of the

14  Defendants which have resulted in a loss of their property, and for declaratory and

15  injunctive relief to end those practices and prevent further losses to the class and

16  future borrowers.

17                       **NATURE OF THE CASE**

18         2.          As described herein, Defendants and their network of authorized,

19  contracted brokers have defrauded countless borrowers across the nation in an

20  undisclosed, systematic scheme designed to steer borrowers into subprime mortgages

21  and loans irrespective of whether (i) the borrower would have qualified for a "prime

22  loan" or (ii) the borrower was unable to meet the financial terms of the subprime

23  mortgage.  Indeed, Defendants placed these borrowers in these mortgages without

24  performing an appropriate analysis of the suitability of such loans to the borrowers'

25  situation.     Unbeknownst to these borrowers, this was done to maximize

26  Countrywide's ability to make huge profits in the secondary market in which

27  subprime mortgages are bundled into securities and sold as investments. As set forth

28  in a recent decision by the Honorable Mariana R. Pfaelzer of this Court, in *In re*

SECOND AMENDED CLASS ACTION COMPLAINT

1    *Countrywide Financial Corp. Derivative Litigation*, Lead Case No. CV-07-06923,

2    2008 WL 2064977 (C.D. Cal. May 14, 2008)[1] (hereinafter the "Derivative Action

3    Order"), "The lowest level [Countrywide] employees report [in the Derivative Action

4    complaint] that the impetus to 'push' loans through came from above. . . . They also

5    allege that the compensation structure promoted these practices by rewarding

6    Company employees – from executives and management down to the underwriters –

7    for increasing loan volume, but not for generating quality loans." Derivative Action

8    Order, at *11.

9         3.       Defendants and their co-conspirators systematically steered borrowers

10   into inappropriate subprime loans with excess charges and inadequately disclosed

11   risks, including drastic and unexpected increases in required monthly payments, that

12   have caused a flood of foreclosures and financial woes among the class. Defendants

13   did so through a variety of fraudulent means, for the sole purpose of maximizing

14   Defendants' own profitability, and without any regard for the financial consequences

15   to the borrower.

16        4.       Countrywide and its co-conspirators developed and executed their

17   scheme because more subprime loans meant that Countrywide made higher profits in

18   interest rates, in origination fees and other fees, and in packaging the mortgage-backed

19   securities that are at the heart of the financial woes now plaguing our economy.

20   Countrywide steered many borrowers into subprime loans when they qualified for

21   conventional financing with lower rates. It provided incentives such as increased

22   commissions and all-expense-paid trips to Las Vegas for employees and brokers to

23   place borrowers into abusive subprime loans, and trained and instructed them to do so

24   without explaining the complex terms or disclosing the grave hidden risks of such

25   _____

26   [1] The foregoing decision is an "Order (1) Granting in Part and Denying in Part
     Nominal Defendant Countrywide's Motion To Dismiss; (2) Granting in Part and
27   Denying in Part Individual Defendants' Motion To Dismiss; and (3) Granting
     Defendant Dougherty's Motion To Dismiss."
28

1   loans. It pushed dangerous products such as "PayOption ARM" loans, wherein
2   borrowers could afford only to make what Countrywide called the "minimum
3   payment," which was actually *less* than the interest owed on the loans, thus *increasing*
4   their outstanding principal every month and triggering an automatic resetting of the
5   payments, resulting in the minimum monthly payments increasing dramatically after
6   only a short amount of time to a level that guaranteed the flood of foreclosures that we
7   are seeing today. Indeed, as of September of 2006, up to 80% of all option ARM
8   borrowers were making only the minimum payment each month, according to Fitch
9   Ratings. As one commentator noted, "Most of these borrowers aren't paying down
10  their loans; they're underpaying them up." *See* Mara Der Hovanesian, *Nightmare*
11  *Mortgages*, BusinessWeek, Sept. 11, 2006, available at www.businessweek.com/
12  magazine/content/06_37/b4000001.htm (last visited on June 13, 2008).

13        5.        Under Countrywide's PayOption ARM loan, a borrower is given three
14  different payment options to choose from each month. The top-tier option, "amortized
15  payment" encompasses payments of interest and a portion of the principal of the loan.
16  The middle option is the "interest only payment," which covers only the interest for
17  the month and does not decrease the principal amount of the loan. The third, and
18  lowest, payment option is what Countrywide calls the "minimum payment." When a
19  borrower makes the "minimum payment" on a PayOption ARM loan, he or she is in
20  fact paying *less* than the interest owed on the principal loan, and the unpaid interest is
21  added to the principal amount owed. Once the principal amount reaches 115% of the
22  original loan amount, the repayment structure resets to significantly higher monthly
23  payments.

24        6.        Thus, when a borrower receives his or her monthly statement from
25  Countrywide, it shows that the borrower has the option of paying the "amortized
26  payment," the "interest only payment," or the "minimum payment." Unbeknownst to
27  the borrower, by choosing to make the "minimum payment" each month – which is in
28  fact the only payment many borrowers who are placed in such loans can afford to pay

1  at the time they enter into the loan – the borrower is in fact being ground deeper into
2  debt by Countrywide.  Once loan payments reset, or "recast," to encompass the
3  increased principal amount, many borrowers face "payment shock" and can no longer
4  even afford the new "minimum payment," which is now significantly higher than at
5  the outset of the loan.  Borrowers are then faced with making significantly higher
6  monthly payments they cannot afford or going into foreclosure.  According to one
7  commentator, George McCarthy, a housing economist at New York's Ford
8  Foundation, the option ARM is "like the neutron bomb.  It's going to kill all the
9  people but leave the houses standing."  *See* Mara Der Hovanesian, *Nightmare*
10 *Mortgages*, BusinessWeek, available at www.businessweek.com/magazine/content/
11 06_37/b4000001.htm.

12        7.        Defendants and their co-conspirators established a scheme designed to
13 induce borrowers to enter into subprime loans by, *inter alia*, making false
14 representations to borrowers, as set forth in standardized sales scripts, that they were
15 offering the best loans available to the borrowers.  Indeed, the specific representations
16 made to a particular borrower prior to signing the loan documents, including (as
17 particularized below) the class representatives in this Action, consistently conveyed
18 that message.  Tellingly, Countrywide never disclosed to such borrowers its
19 overarching scheme to steer as many borrowers as possible into as many subprime
20 loans as possible, irrespective of their suitability to the borrowers' financial situation,
21 *i.e.*, their ability to make the monthly payments on the loan, or their ability to qualify
22 for a prime loan with better terms.  Indeed, Countrywide made countless subprime
23 loans without any regard for the suitability or unsuitability of the loans for such
24 borrowers.  Countrywide's failure to disclose its scheme and the resulting policy
25 of issuing dangerous subprime loans without any attempt to ascertain their
26 suitability to a given borrower is the underlying fraudulent conduct.

27        8.        Indeed, Judge Pfaelzer noted that the allegations of "numerous
28 confidential witnesses" contained in the complaint filed in that action "support a

- 4 -
SECOND AMENDED CLASS ACTION COMPLAINT

1  strong inference of a Company-wide culture that, at every level, emphasized

2  increasing loan origination volume in derogation of underwriting standards."

3  Derivative Action Order, 2008 WL 2064977, at *10.

4          9.         Specifically, in the Derivative Action Order, the court noted that

5  witnesses quoted in the complaint supported the plaintiffs' allegations that "in

6  practice, the origination of these 'riskier' loans often *violated the Company's own*

7  *loan underwriting policies.* The Complaint offers the accounts of numerous

8  confidential witnesses, who are mostly former employees such as underwriters

9  and loan officers, relating how Countrywide *departed from its strict underwriting*

10 *standards* by generating large numbers of loans *without proper regard for their*

11 *quality.* . . . The Complaint also provides the accounts of several former vice

12 presidents at Countrywide who similarly attest that *Countrywide was simply*

13 *pushing through loans without adherence to underwriting standards.*" *Id.* at *3

14 (emphasis added).  Said the Court, "Strikingly, [the witnesses] tell what is

15 essentially the same story – *a rampant disregard for underwriting standards* –

16 from markedly different angles." *Id.* at *10 (emphasis added).

17         10.       Notably, the Derivative Action Court stated that the plaintiffs had

18 presented a "cogent and compelling inference" that the defendant Countrywide

19 executives had misled the public about the "rigor of Countrywide's loan

20 origination process, the quality of its loans, and the Company's financial situation

21 – even as they realized that *Countrywide had virtually abandoned its own loan*

22 *underwriting practices.*" *Id.* at *9 (emphasis added).

23         11.       Just as the Countrywide executives concealed from the public their

24 scheme to place as many subprime loans as possible without any regard to the

25 normal standards used for determining the suitability of such loans, so too did

26 they conceal this scheme from the borrowers to whom they made such loans. This

27 material omission is at the heart of the fraudulent conduct here.  Irrespective of

28 any individual "disclosures" that may or may not have been made to any

1  individual borrower, what was never disclosed was that Countrywide was not
2  placing loans pursuant to any analysis of normal underwriting criteria, because
3  Countrywide had a larger goal in mind – maximizing the number of subprime
4  loans that were made.

5      12.    As one reporter noted, "There was plenty more going on behind the
6  scenes [subprime borrowers] didn't know about, either: that their broker was paid
7  more to sell option ARMs than other mortgages; that their lender is allowed to claim
8  the full monthly payment as revenue on its books even when borrowers choose to pay
9  much less; that the loan's interest rates and up-front fees might not have been set by
10 their bank but rather by a hedge fund; and that they'll soon be confronted with the
11 choice of coughing up higher payments or coughing up their home." *See* Mara Der
12 Hovanesian,    *Nightmare    Mortgages*,    BusinessWeek,    available    at
13 www.businessweek.com/magazine/content/06_37/b4000001.htm.

14     13.    Countrywide developed and used a number of different mechanisms
15 through which its scheme, policy and practice were implemented.  For example,
16 Countrywide used an automated, computerized underwriting program that was
17 designed to maximize the number of subprime loans that were issued, as described
18 below.

19     14.    Countrywide also directed and induced its authorized, contracted
20 brokers to direct borrowers into subprime loans even when borrowers were qualified
21 for loans on far more favorable terms. While a borrower with a credit score of 620 or
22 better is generally considered to be qualified to obtain a "prime" loan, borrowers with
23 credit scores well above 620 were nevertheless steered into subprime loans by
24 Countrywide and its brokers.

25     15.    In addition, as further described herein, Countrywide and its network
26 of brokers issued subprime mortgages to borrowers who were identifiable credit risks,
27 or at rates and loan amounts well beyond the borrowers' means for repayment (*e.g.*,
28 requiring monthly mortgage payments that left insufficient disposable income for

SECOND AMENDED CLASS ACTION COMPLAINT

1 │ borrowers and their families to live on). At the time the loans were entered into, it
2 │ was concealed from these borrowers that they were being placed in these loans not
3 │ because Countrywide had conducted any analysis of reasonable, objective criteria to
4 │ determine their appropriateness for the borrower, but because of an overarching
5 │ scheme whereby Countrywide had abandoned its underwriting criteria in favor of
6 │ pushing subprime loans on as many borrowers as possible. It was also not adequately
7 │ disclosed to these borrowers that their required monthly payments would suddenly
8 │ and unexpectedly increase to dangerously high amounts, or that their outstanding
9 │ principal could actually increase even if they made what Countrywide referred to as
10 │ the minimum monthly payments. Countrywide and its brokers intentionally failed to
11 │ adequately disclose and explain the complex terms and serious risks of the loans.

12 │       16.    Countrywide's scheme to indiscriminately push subprime loans on
13 │ borrowers was highly effective, as evidenced by the fact that the number of subprime
14 │ loans it issued more than doubled from 2003 to 2004 alone.

15 │       17.    Countrywide steered borrowers into unsuitable subprime loans because
16 │ subprime loans are far more profitable for Countrywide than prime loans. In addition
17 │ to having higher interest rates as well as dramatic and unexpected increases in
18 │ required monthly payments within a short amount of time, Countrywide's subprime
19 │ loans also contain numerous fees and penalties that produce significant amounts of
20 │ revenue to Countrywide.

21 │       18.    Moreover, as is described more fully below, Countrywide steered
22 │ borrowers into subprime loans in order to maximize the profits it would earn from the
23 │ securitization of these loans, as subprime mortgages command far higher prices than
24 │ prime loans in the lucrative secondary market, wherein investors purchase mortgage-
25 │ backed securities.

26 │       19.    Countrywide could not have reaped such huge rewards from the
27 │ securitization of its subprime loans without a network of brokers across the country
28 │ pushing borrowers into as many subprime loans as they could. A single broker or a

- 7 -
SECOND AMENDED CLASS ACTION COMPLAINT

1  few brokers could never have generated the volume of subprime loans needed to

2  bundle the loans into securities, which is where the real money lay for Countrywide.

3  Countrywide thus needed thousands of brokers to work with a single goal in mind – to

4  make as many subprime loans as possible, to bundle and sell on the secondary market,

5  irrespective of their suitability for the borrowers.    To accomplish this goal,

6  Countrywide entered into "Wholesale Broker Agreements" with brokers who

7  submitted a Mortgage Broker Application and then entered into a contract with

8  Countrywide.  Countrywide and its contracted brokers engaged in an undisclosed,

9  systematic scheme in which neither the brokers nor Countrywide adequately disclosed

10  the terms of these dangerous and destructive loans, and in which both Countrywide

11  and its brokers concealed Countrywide's goal of issuing as many subprime loans as

12  possible without regard to the appropriateness of such loans to the borrowers.

13       20.      Unlike traditional lenders – banks and thrifts – that finance their loans

14  with deposits and have an interest in taking pains to ensure that borrowers are able to

15  make the payments on their loans, most subprime lenders like Countrywide are

16  financed by investors on Wall Street who buy packages of loans called mortgage-

17  backed securities. Because Countrywide makes its money bundling and selling loans

18  to investors, any incentive to ensure that borrowers can repay their loans that might

19  otherwise exist is outweighed by the incentive to make as many subprime loans as

20  possible, to command a hefty price in the secondary market.

21       21.      Furthermore, under the old model of mortgage lending, banks used to

22  have a strong incentive to ensure that borrowers had the ability to repay the amounts

23  borrowed because the loans were kept by the bank.  Thus, lenders did a thorough

24  analysis to ensure that the loans offered actually were suitable to the borrower.

25  Borrowers could trust the supposedly superior expertise, judgment and experience of

26  the banks that were lending them the money, because they knew banks had an

27  incentive to ensure that the loan would be repaid.

28

SECOND AMENDED CLASS ACTION COMPLAINT

1    22.    However, the practice of bundling up loans into securities to be sold in

2    a secondary market reduced the incentive for lenders to ensure that borrowers could

3    repay their debts. Thus, Countrywide made loans to people they knew could not repay

4    it, because they knew they could make a huge profit selling the bundled mortgages as

5    securities.

6    23.    But while Countrywide and their brokers were operating under a whole

7    new set of rules, they concealed from unwary borrowers that they were employing

8    rules that would not determine the suitability of the loan, as well as their scheme to

9    cash in under those new rules. Not having been apprised that the game had changed,

10   borrowers continued to rely on the supposed expert opinions of Countrywide and its

11   brokers that they in fact qualified for a given mortgage, and that such mortgage was

12   the "best available" to the borrower, or "ideal" for that borrower. They did not know

13   that under the new regime, when Countrywide and its brokers said a borrower

14   qualified for a loan, it meant nothing except that Countrywide had found another mark

15   for its fraudulent scheme.

16   24.    Unfortunately for borrowers, many of the subprime loans Countrywide

17   and other subprime lenders push on them for the purposes of making a killing in the

18   secondary market are extremely complicated and loaded with hidden risks for the

19   borrowers. Indeed, one commentator said that loans like Countrywide's PayOption

20   ARM loan "might be the riskiest and most complicated home loan product ever

21   created." *See* Mara Der Hovanesian, *Nightmare Mortgages*, BusinessWeek, available

22   at   www.businessweek.com/magazine/content/06_37/b4000001.htm.    And   yet,

23   Countrywide and its contracted brokers steered countless borrowers into these

24   complex and risky loans without any analysis of any reasonable, objective criteria that

25   would have indicated whether the borrower could afford the loan, or whether the

26   borrower might have qualified for a less risky loan, all the while maximizing

27   Countrywide's and its broker's own profit and commissions.

28

- 9 -

25.     Countrywide and its co-conspirators intentionally concealed and misrepresented the risks of such loans, and foisted these loans onto borrowers irrespective of whether they were appropriate for the borrowers, all the while telling borrowers that the loans were not only an appropriate choice, they were the borrower's *best* choice.

26.     As a consequence of Countrywide's scheme to issue subprime loans that were entirely unsuitable to the borrower, many borrowers entered into loans in amounts far greater than what they could actually afford, and/or loans with very risky terms that had been concealed or inadequately explained to them. Furthermore, any purported disclosures of specific loan terms in the loan documents themselves does not undo the half-truths, misrepresentations, and false reassurances of the appropriateness of such loans that Countrywide and its brokers systematically used to push unwary borrowers into subprime loans. Countrywide never disclosed its scheme to push as many borrowers as possible into taking out as many subprime loans as possible, regardless of their suitability to borrowers. As a result, a significant percentage of borrowers from Countrywide have defaulted or are in default on their loans.

27.     Moreover, even as to those borrowers who have not defaulted on their loans, a huge percentage are in danger of doing so. As acknowledged by Countrywide in its corporate filings, as of June 30, 2007, approximately one quarter of all subprime loans serviced by Countrywide are delinquent.

28.     Borrowers who are steered into subprime loans when they are actually qualified for loans on better terms, such as prime mortgages, suffer losses to their property in the form of unnecessarily having to pay much higher interest rates and fees than they would otherwise pay on such loans.

29.     Borrowers who are steered into loans that they clearly cannot afford are placed in the precarious situation wherein they have to forgo other financial obligations in order to meet the ever-increasing burden of these high-interest loans.

- 10 -

SECOND AMENDED CLASS ACTION COMPLAINT

1    Were it not for Countrywide's false assurances that these borrowers could in fact

2    afford such large and risky loans, and its concealment of the dangerous terms

3    hidden in such loans, these borrowers would either borrow smaller amounts that

4    they could realistically afford, would take out loans with more appropriate terms

5    and fewer risks, or would take out no loans unless or until they could realistically

6    afford them.

7         30.     Instead, persuaded by Countrywide and its brokers that these loans

8    are appropriate and manageable, these borrowers take out loans in amounts and/or

9    with interest rates or other terms that they simply cannot afford, and find

10   themselves sinking deeper and deeper into debt every month.

11        31.     Furthermore, Countrywide and its brokers tell borrowers that they will

12   be able to refinance their loans when their loan payments increase.  However,

13   borrowers who later do seek to refinance their loans on more favorable terms are often

14   hindered or prevented from doing so by severe prepayment penalties that are built into

15   the loans.  Even when Countrywide admits to a borrower that the borrower has

16   entered into a loan that is unsuitable and was inadequately explained to the borrower,

17   Countrywide either refuses to waive the prepayment penalty or refuses altogether to

18   refinance the loan on better terms.  Accordingly, borrowers trying to refinance,

19   pursuant to the representations of Countrywide and their brokers, either suffer injury

20   by being forced to pay a substantial prepayment penalty that they would not otherwise

21   have to pay, or suffer injury by being forced to remain in an unsuitable loan and

22   continue to pay inflated interest rates and fees after being told they would be able to

23   avoid such inflated interest rates and fees by refinancing.

24        32.     All borrowers who are steered into loans whose complex terms have

25   been misrepresented or inadequately disclosed to them suffer injury in that they take

26   on financial burdens that they would not otherwise have taken on and suffer the

27   destructive impact on their financial well-being of having to make monthly payments

28   they cannot afford, sometimes leading to significant prepayment penalties when they

- 11 -

1   seek to refinance their mortgages at a more favorable rate, increases in the principal

2   owed under certain types of loans, defaults on their loans, loss of their homes,

3   destruction of their credit, bankruptcy, or financial ruin. Borrowers who experience

4   unanticipated, dramatic rate increases, as in the case of adjustable rate mortgages that

5   have a short fixed-rate period, or in the case of PayOption ARM loans, where the

6   borrower's minimum monthly payment inevitably causes the loan to "recast" to a

7   significantly higher monthly payment based on the negative amortization of the loan,

8   suffer harm from the unexpected and onerous burdens created by their suddenly

9   having to make monthly payments in amounts that greatly exceed what they

10  committed to and can afford. These borrowers are also injured when, as a result of

11  their inability to keep up with monthly payments that are far greater than what was

12  represented to them, they are charged late fees that they otherwise would not have

13  incurred. Additionally, all borrowers who are charged inflated loan costs and other

14  fees suffer injury in increased out-of-pocket costs over what they should have paid.

15  Borrowers who refinance from more traditional loans or take riskier loans than they

16  otherwise could have obtained elsewhere, in the false belief that they are obtaining a

17  loan on favorable terms, are injured by having to pay the difference between fees and

18  interest rates charged by Countrywide and those another lender would have charged.

19  Borrowers who are forced to pay large pre-payment penalties in order to extricate

20  themselves from the destructive and dangerous loans Countrywide has steered them

21  into are injured by the out-of-pocket costs of the penalties, which they would not

22  otherwise have had to pay.

23                          **JURISDICTION AND VENUE**

24         33.      This Court has jurisdiction over the subject matter of this action

25  pursuant to 18 U.S.C. §§1961, 1962 and 1964, 28 U.S.C. §§1331, 1332 and 1367, and

26  15 U.S.C. §15. This Court has personal jurisdiction over the Defendants pursuant to

27  18 U.S.C. §§1965(b) and (d). Diversity jurisdiction is also conferred over this class

28  action pursuant to the Class Action Fairness Act of 2005, Pub. L. 109-2, § 7, 119

                                    - 12 -

1  Stat. 13 ("CAFA").  The CAFA amended 28 U.S.C. §1332 to add subsection (d)

2  which, as here, confers diversity jurisdiction upon this Court because various

3  members of the Class are citizens from a state different from the Defendants'

4  states, and the aggregate amount in controversy exceeds five million dollars

5  ($5,000,000).  It is appropriate to apply the California UCL and FAL to protect a

6  class of nationwide borrowers because the wrongdoing alleged herein occurred in

7  significant part in California, and Defendants have their principal place of

8  business within the state.  The Court has personal jurisdiction over the Defendants

9  because they have their principal places of business within California, and the

10 conspiracy and misconduct occurred in significant part in California.

11      34.      Venue is proper in this district pursuant to 18 U.S.C. §1965(a), 28

12 U.S.C. §1391(b), 15 U.S.C. §22, and 28 U.S.C. §1391 because some of the

13 Defendants are found, do business or transact business within this district, and conduct

14 the interstate trade and commerce described below in substantial part within this

15 district.

16      35.      During all or part of the period in which the events described in this

17 Complaint occurred, each of the Defendants participated in a scheme to defraud

18 Plaintiffs and other members of the Class in a continuous and uninterrupted flow of

19 interstate commerce.

20      36.      The activities of Defendants and their co-conspirators, as described

21 herein, were within the flow of, and had a substantial effect on, interstate commerce.

22                              **PARTIES**

23      37.      Plaintiffs Francis G. Sizemore and Rebecca G. Sizemore ("the

24 Sizemores") are homeowners who reside at 26 Third Avenue, Bluffton, South

25 Carolina 29910. On May 19, 2006, the Sizemores received a subprime loan in the

26 form of a "PayOption" adjustable rate mortgage from Countrywide Home Loans,

27 Inc., in order to refinance the mortgage on their primary residence.  As set forth in

28 greater detail herein, at the time of the loan, Countrywide did not disclose to the

- 13 -

1  Sizemores that: (a) their monthly payments would increase soon after taking out
2  the loan; (b) if they made the "minimum payment," the principal amount of the
3  loan would actually *increase* each month (in what is referred to as "negative
4  amortization"); and (c) they would be charged a prepayment penalty if they
5  refinanced within the first three years of the loan, even if they refinanced with
6  Countrywide.   To the contrary, prior to agreeing to refinance their loan with
7  Countrywide, the Countrywide loan officer, Cortney Lanktree, told the Sizemores
8  the complete opposite: Ms. Lanktree told them that (a) their payment would be
9  $1,046 for three years (when, in fact, by January 1, 2007 – less than seven months
10 after completing the loan – the minimum monthly payment had already increased
11 to $1,250), (b) if the Sizemores paid the monthly minimum there would *not* be
12 charges added to the rear or the loan (when, in fact, since the start of their loan
13 with Countrywide, the amount of principal owed by the Sizemores has increased
14 by approximately $9,000.00, and is still increasing due to their inability to make
15 anything but the "minimum payment," which is less than the interest owed), (c)
16 their monthly payments were so low because the loan was spread out over forty
17 years, and (d) there would not be a prepayment penalty fee if they refinanced with
18 Countrywide within the first three years. The foregoing representations to the
19 Sizemores are all part of a larger, systematic scheme, encompassing
20 Countrywide's entire lending process, to steer borrowers into the loans that were
21 the most lucrative to Countrywide on the secondary market by representing to
22 borrowers that it was the best loan for the borrower, without having performed
23 any appropriate analysis that would have indicated the unsuitability of the loans
24 for such borrowers.   Countrywide's failure to disclose this scheme and the
25 resulting policy of issuing dangerous subprime loans without any attempt to
26 ascertain their suitability to a given borrower is the underlying fraudulent conduct.
27     38.     The Sizemores requested that the "no prepayment fee" term be put
28 in writing and Ms. Lanktree did so, in a letter dated April 25, 2006. When the

- 14 -
SECOND AMENDED CLASS ACTION COMPLAINT

1   Sizemores sought to refinance in July 2007, the Countrywide Loan Department
2   refused to honor Ms. Lanktree's letter, telling the Sizemores that the "rule" is that
3   they couldn't refinance or sell the house within three years or there would be a
4   prepayment penalty. Sometime between mid-August and mid-September 2007,
5   the Sizemores contacted the Office of the President at Countrywide, who offered
6   to honor the refinance letter; however, sometime in September 2007, the
7   Refinance Department said they would not honor it. Mrs. Sizemore called in to
8   Customer Service and became involved in a conference call between the
9   Refinance Department and the Office of the President; the two departments fought
10  over whether to honor the letter and told her they would get back to her.
11  However, no one has been in touch with her since that conversation. Each time
12  the Sizemores called Countrywide, if they were not specifically told that the call
13  was being recorded, they requested that Countrywide record the call.
14  Furthermore, the Sizemores have received a "Significant Payment Increase Alert"
15  letter from Countrywide dated June 5, 2007, indicating that the required monthly
16  payment on their mortgage will soon increase significantly, based on the negative
17  amortization of their loan.   That is because of an undisclosed acceleration
18  provision in the terms of the loan that provides, if the outstanding principal
19  amount ever grows to an amount greater than 115% of the original principal
20  amount through negative amortization, the Sizemores will be required to start
21  making payments on both the principal and the interest – as calculated based upon
22  the new, greatly increased principal amount – every month for the remainder of
23  the life of the loan. Ms. Lanktree did not inform the Sizemores that this provision
24  existed, let alone explain how it could work to their severe detriment.  Had the
25  Sizemores been informed that their principal would increase as a result of making
26  the "minimum payment" on their loan, and that as a result they would soon be
27  required to make payments significantly larger than what they were told would be
28  their minimum required payments, they never would have entered into the loan

SECOND AMENDED CLASS ACTION COMPLAINT

1 with Countrywide. The Sizemores have thereby suffered injury in the form of the
2 increase to the principal amount of their loan and the increases in the monthly
3 payments on their loan from the original low payments they were told they would
4 be making, as well as their payment of the difference between the fees and interest
5 rates charged by Countrywide and what another lender would have charged.

6     39.     Plaintiff Edward Marini ("Marini") is a homeowner who resides at
7 109 North Spinnaker Drive, Little Egg Harbor Township, New Jersey 08087. On
8 or about February 2005, Marini entered into a subprime loan with another lender
9 that was soon sold to Countrywide. Within a few months, Marini, a disabled
10 Vietnam veteran on a fixed income, was contacted by Countrywide via telephone
11 about refinancing his loan. Prior to agreeing to the loan refinancing, Marini was
12 told by Countrywide customer service representatives that it would be a fixed rate
13 for five years with an increase of one hundred dollars ($100) per month;
14 Countrywide representatives continuously reiterated to him that "he would be safe
15 for five years." The foregoing representations to Marini are all part of a larger,
16 systematic scheme, encompassing Countrywide's entire lending process, to steer
17 borrowers into the loans that were the most lucrative to Countrywide on the
18 secondary market by representing to borrowers that it was the best loan for the
19 borrower, without having performed any appropriate analysis that would have
20 indicated the unsuitability of the loans for such borrowers. Countrywide's failure
21 to disclose this scheme and the resulting policy of issuing dangerous subprime
22 loans without any attempt to ascertain their suitability to a given borrower is the
23 underlying fraudulent conduct.

24     40.     Marini refinanced his mortgage with Countrywide Home Loans,
25 Inc. in the form of a "PayOption" adjustable rate mortgage on his primary
26 residence. As set forth in greater detail herein, at the time of the loan,
27 Countrywide did not disclose to Marini that (a) his monthly payments would
28 increase soon after taking out the loan, and (b) if he made the monthly "minimum

SECOND AMENDED CLASS ACTION COMPLAINT

1  payment," the principal amount of the loan would actually *increase* each month.
2  Since he refinanced his loan with Countrywide, the amount of principal owed by
3  Marini has increased by approximately $17,000.00.  Furthermore, Marini has
4  received a "Significant Payment Increase Alert" letter from Countrywide dated
5  August 6, 2007, indicating that the minimum payment on his mortgage will soon
6  increase by more than double what he is currently paying, based on the negative
7  amortization of his loan.  This is due to the undisclosed acceleration provision in
8  his loan, which operates as described in paragraph 38, above.  Marini anticipates
9  that, as a result, he will need to file for bankruptcy, as he cannot make his monthly
10 payments.  Had Marini known that making his monthly "minimum payments"
11 would result in the principal of his loan increasing every month, and that he would
12 soon be required to make monthly payments significantly larger than what he was
13 told would be his minimum payments for the first five years of the loan, he never
14 would have entered into the loan with Countrywide.  Marini has thereby suffered
15 injury in the form of the increase to the principal amount of his loan and the
16 increases in the monthly payments on his loan from the original low payments he
17 was told he would be making, as well as his payment of the difference between
18 the fees and interest rates charged by Countrywide and what another lender would
19 have charged.

20      41.      Plaintiffs Kimberly Menichetti and Philip D. Menichetti ("the
21 Menichettis") are homeowners who reside at 66 Atlantic Avenue, Waretown, New
22 Jersey 08758.  On August 18, 2006, the Menichettis received a subprime loan in
23 the form of a "PayOption" adjustable rate mortgage from Countrywide Bank,
24 N.A., using a broker named Don Cutler at Mid Atlantic Capital ("Mid Atlantic")
25 who first contacted them by letter, in order to refinance the mortgage on their
26 primary residence.  As set forth with greater particularity herein, at the time of the
27 loan, neither Countrywide nor Mid Atlantic disclosed to the Menichettis that (a)
28 their monthly payments would increase soon after taking out the loan, and (b) if

SECOND AMENDED CLASS ACTION COMPLAINT

1  they made the monthly "minimum payment," the principal amount of the loan

2  would actually *increase* each month.   To the contrary, Mr. Cutler told the

3  Menichettis that he was providing a "good mortgage option" to their previous

4  thirty year fixed mortgage, and that the Menichettis would now only have to pay a

5  "low monthly payment"; Mr. Cutler told them it was "the best loan he could think

6  of."   The foregoing representations to the Menichettis are all part of a larger,

7  systematic scheme, encompassing Countrywide's entire lending process, to steer

8  borrowers into the loans that were the most lucrative to Countrywide on the

9  secondary market by representing to borrowers that it was the best loan for the

10  borrower, without having performed any appropriate analysis that would have

11  indicated the unsuitability of the loans for such borrowers. Countrywide's failure

12  to disclose this scheme and the resulting policy of issuing dangerous subprime

13  loans without any attempt to ascertain their suitability to a given borrower is the

14  underlying fraudulent conduct.

15      42.     Soon after the Menichettis began receiving their new monthly

16  statements, they saw that the principal balance, what they understood to be the

17  "cost of their house," was actually *increasing*. They immediately called

18  Countrywide seeking assistance in getting out from under the mortgage.

19  Countrywide made false offers to help, including billing the Menichettis an

20  additional $500.00 to "process an FHA loan" that would get them out of the

21  Countrywide loan, though that loan surprisingly never went through. In or around

22  November, 2006, when Mr. Menichetti called Countrywide representatives for

23  assistance, a Customer service representative told Mr. Menichetti that "many

24  people were calling in with complaints that they were not told about negative

25  amortization or what would happen if they just made the 'minimum payment.'"

26  When Countrywide began airing commercials advertising relief to customers with

27  loan problems, Mr. Menichetti called Countrywide again, seeking assistance with

28  his loan. Another customer service representative told him that the people referred

- 18 -
SECOND AMENDED CLASS ACTION COMPLAINT

1  to in the television ad were getting "special letters" to help them, but that Mr.
2  Menichetti's situation was not "bad enough *yet*" – he would need to wait
3  approximately a year before he was in a bad enough situation for Countrywide to
4  help him. Since the start of their loan with Countrywide, the amount of principal
5  owed by the Menichettis has increased by approximately $6,000.00. Had the
6  Menichettis known that their monthly "minimum payments" would cause their
7  principal to increase, they never would have entered into the loan with
8  Countrywide. The Menichettis have thereby suffered injury in the form of the
9  increase to the principal amount of their loan and the increases in the monthly
10 payments on their loan from the original low payments they were told they would
11 be making, as well as the difference of their payment of fees and interest rates
12 charged by Countrywide and what another lender would have charged.
13      43.    Plaintiff Sequesta L. Washington, née Robinson ("Washington") is
14 a homeowner who resides at 1566 Hunters Chapel Road, Bamberg, South
15 Carolina 29003. On November 20, 2004, Washington received a subprime
16 mortgage from Full Spectrum Lending, Inc., a former subsidiary of Countrywide
17 Financial Corp. that was merged into Countrywide Home Loans, Inc. at the end of
18 2004. As set forth in greater detail herein, at the time of the loan, Countrywide
19 did not disclose to Washington that her loan was only a fixed-interest loan for the
20 first three years, and would become an adjustable-rate loan in 2008. Furthermore,
21 at the time she was offered the loan, Washington expressed to Fred Aghili, her
22 Countrywide loan officer, doubts that she would be able to make the monthly
23 payments, but was simply told by Mr. Aghili that she could refinance at any time.
24 The foregoing representations to Washington are all part of a larger, systematic
25 scheme, encompassing Countrywide's entire lending process, to steer borrowers
26 into the loans that were the most lucrative to Countrywide on the secondary
27 market by representing to borrowers that it was the best loan for the borrower,
28 without having performed any appropriate analysis that would have indicated the

SECOND AMENDED CLASS ACTION COMPLAINT

1  unsuitability of the loans for such borrowers. Countrywide's failure to disclose
2  this scheme and the resulting policy of issuing dangerous subprime loans without
3  any attempt to ascertain their suitability to a given borrower is the underlying
4  fraudulent conduct.

5       44.    As she had feared, and as she had warned her loan officer, Mr.
6  Aghili, Washington indeed experienced difficulty in making her monthly
7  payments. When she tried to refinance, as she had been told she could if she
8  could not make her payments, she was first told that she could not refinance
9  because she did not yet have enough equity in her home. Later, when she had
10 established some equity and found herself still struggling to keep up with the
11 payments, she was told that she could not refinance because she was delinquent in
12 her payments. Had Washington been informed that her loan would have an
13 adjustable interest rate in 2008, or if she had not been assured that she could
14 refinance at any time if the payments became a problem, she never would have
15 entered into the loan with Countrywide. Washington has thereby suffered injury
16 in the form of the charges to her of late payment fees that she would not have
17 incurred had she been offered a loan she could afford to make payments on, as
18 well as her payment of the difference between the fees and interest rates charged
19 by Countrywide and what another lender would have charged.

20      45.    Defendant Countrywide Financial Corp. ("Countrywide Financial")
21 is a Delaware corporation headquartered at 4500 Park Granada, Calabasas,
22 California. Countrywide Financial is engaged in mortgage lending and other real
23 estate finance-related businesses, including mortgage banking, banking and
24 mortgage warehouse lending, dealing in securities and insurance underwriting.

25      46.    Defendant Countrywide Bank, N.A. ("Countrywide Bank") is a
26 national banking association headquartered at 1199 North Fairfax Street, Suite
27 500, Alexandria, Virginia 22314. Countrywide Bank is a subsidiary of

28

SECOND AMENDED CLASS ACTION COMPLAINT

1  Countrywide Financial, and funds loans for Countrywide Financial's mortgage
2  banking segment.

3      47.    Defendant Countrywide Home Loans, Inc. ("Countrywide Home
4  Loans") is a New York corporation headquartered at 4500 Park Granada Blvd.,
5  Calabasas, CA 91302. Countrywide Home Loans is a subsidiary of Countrywide
6  Financial, and engages in the business of originating mortgage loans.

7      48.    Defendant Countrywide Tax Services Corp. ("Countrywide Tax")
8  is a California corporation headquartered at 4500 Park Granada Blvd., Calabasas,
9  CA 91302.  Countrywide Tax is a subsidiary of Countrywide Financial, and
10 provides tax services in connection with mortgage loan closings.

11     49.    Defendant LandSafe, Inc. ("LandSafe") is a Delaware corporation
12 headquartered at 4500 Park Granada Blvd., Calabasas, CA 91302. LandSafe is a
13 subsidiary of Countrywide Financial, and provides loan closing products and
14 services such as credit reports, appraisals, property valuation services and flood
15 determinations.

16     50.    Defendant LandSafe Appraisal Services, Inc. ("LandSafe
17 Appraisal") is a California corporation headquartered at 4500 Park Granada Blvd.,
18 Calabasas, CA 91302.  LandSafe Appraisal is a subsidiary of Countrywide
19 Financial, and offers appraisal services in connection with mortgage loan closings.

20     51.    Defendant LandSafe Credit, Inc. ("LandSafe Credit") is a
21 California corporation headquartered at 4500 Park Granada Blvd., Calabasas, CA
22 91302. LandSafe Credit is a subsidiary of Countrywide Financial, and provides
23 credit reports in connection with mortgage loan closings.

24     52.    Defendant LandSafe Flood Determination, Inc. ("LandSafe Flood")
25 is a California corporation headquartered at 4500 Park Granada Blvd., Calabasas,
26 CA 91302.  LandSafe Flood is a subsidiary of Countrywide Financial, and
27 provides flood determination services in connection with mortgage loan closings.

28

1                           **FACTUAL ALLEGATIONS**

2       53.     Plaintiffs and other Class members have been steered into subprime

3   loans issued by Countrywide, through misrepresentations from standardized sales

4   scripts, standardized training of brokers and loan officers, an incentive program –

5   which included perks like all-expense-paid trips to Las Vegas – that induced brokers

6   and loan officers to push subprime loans as a matter of standard policy and practice

7   without determining the suitability or unsuitability of the loan for the borrower, as

8   well as standardized omissions of crucial information necessary for borrowers to make

9   informed financial choices, and other systemic, standardized practices employed by

10  Defendants.

11      54.     According to Judge Mariana R. Pfaelzer of this Court, who recently

12  issued the Derivative Action Order discussed above, "The lowest level [Countrywide]

13  employees report [in the Derivative Action complaint] that the impetus to 'push' loans

14  through came from above. . . . They also allege that the compensation structure

15  promoted these practices by rewarding Company employees – from executives and

16  management down to the underwriters – for increasing loan volume, but not for

17  generating quality loans." Derivative Action Order, 2008 WL 2064977, at *11. As

18  the Derivative Action Order also noted, Countrywide executives concealed this

19  scheme to increase loan volume irrespective of the suitability of the loans to the

20  borrowers. *Id.* at *9.

21      55.     As a result of Defendants' fraudulent scheme, and in reliance on and as

22  a result of Defendants' fraudulent misrepresentations and omissions, Plaintiffs and

23  other Class members have been injured in a variety of ways.  Borrowers who are

24  steered into subprime loans when they are actually qualified for loans on better terms,

25  such as prime mortgages, suffer losses to their property in the form of having to pay

26  much higher interest rates than they would otherwise pay on loans, which also

27  sometimes leads to significant prepayment penalties when they seek to refinance their

28  mortgage at a more favorable rate.  All borrowers who are steered into loans – whose

1  complex terms have been misrepresented to them or inadequately disclosed – suffer
2  injury in that they take on financial burdens that they would not otherwise have taken
3  on and suffer the destructive impact on their financial well-being of having to make
4  monthly payments they cannot afford, sometimes leading to significant prepayment
5  penalties when they seek to refinance their mortgages at a more favorable rate,
6  increases in the principal owed under certain types of loans, defaults on their loans,
7  losses of their homes, destruction of their credit, bankruptcy, or financial ruin. These
8  borrowers are also injured when, as a result of their inability to keep up with far
9  greater monthly payments than what was represented to them, they are charged late
10 fees that they otherwise would not have incurred. Additionally, all borrowers who are
11 charged inflated loan costs and other fees suffer injury in increased out-of-pocket
12 costs over what they should have paid. Borrowers who refinance from more
13 traditional loans or take riskier loans than they otherwise could have obtained
14 elsewhere, in the false belief that they are obtaining a loan on favorable terms, are
15 injured by having to pay the difference between fees and interest rates charged by
16 Countrywide and those another lender would have charged. Borrowers who are
17 forced to pay large pre-payment penalties in order to extricate themselves from the
18 destructive and dangerous loans Countrywide has steered them into are injured by the
19 out-of-pocket costs of the penalties, which they would not otherwise have had to pay.
20      56.      Defendants' scheme was created in order to induce as many borrowers
21 as possible into expensive and dangerous subprime loans, because such loans are the
22 most lucrative for Countrywide in a number of ways. Countrywide's contracted
23 network of brokers also gain from the scheme because of valuable incentives that
24 Countrywide pays to them to direct borrowers into the subprime loans – such as
25 increased commissions, and even perks like all-expense-paid trips to places like Las
26 Vegas.
27
28

SECOND AMENDED CLASS ACTION COMPLAINT

## Countrywide and Its Network of Brokers

57.     Countrywide is one of the largest mortgage-lending companies in the United States. Countrywide is also one of the largest originators of subprime loans and services more subprime loans than any other institution in the United States.

58.     In 2004, Countrywide became the largest home mortgage lender in the United States, built on years of primarily offering customary fixed-rate mortgage loans to borrowers. By that time, Countrywide, led by its CEO and founder Angelo Mozilo, was intent on elbowing out competing lenders that tried to horn in on Countrywide's marketshare by originating more exotic mortgage loans. As a result, Countrywide's mortgage portfolio – and lending standards – changed dramatically.

59.     Whereas in 2003, adjustable rate mortgages ("ARMs") made up 18 percent of Countrywide's portfolio, by 2004, the number of ARM loans increased dramatically, to 49 percent of all loans. Subprime loans rose from 4.6 percent to 11 percent of all loans during the same period. By offering these loans, and other non-traditional loans like interest-only loans and reduced documentation, Countrywide was not only able to maintain its marketshare, it was also earning significant profit off of the higher commissions that borrowers paid, and the higher prices investors were willing to pay for these loans as securitized assets on the secondary market.

60.     Countrywide publicly promotes its home financing expertise by means of nationwide advertising campaigns and through telemarketing. In its advertisements and telemarketing, Countrywide solicits persons to apply for financing or refinancing with Countrywide, either in one of its offices or through one of the mortgage brokers whom Countrywide has authorized to accept applications on its behalf pursuant to a contract.

61.     Countrywide also makes home-mortgage loans that are arranged by its network of mortgage brokers. Brokers become authorized to become an approved Countrywide broker by submitting a Mortgage Broker Application and entering into a "Wholesale Broker Agreement" with Countrywide. These contracted brokers are

- 24 -

1    provided access to Countrywide's CLUES™ computer system, which is designed to
2    allow the mortgage broker to submit loan information and receive a qualified
3    underwriting decision within minutes. The CLUES™ computer system automates the
4    process of placing loans, and is pre-programmed to push as many borrowers as
5    possible into risky subprime loans, irrespective of reasonable objective criteria that
6    would indicate the appropriateness of such loans for a particular borrower.

7        62.    Countrywide incentivizes its brokers to push subprime loans by
8    offering larger commissions on subprime loans than on prime loans, and by offering
9    special perks such as all-expense-paid trips to Las Vegas to brokers who successfully
10   push a large number of subprime loans onto borrowers.  Countrywide's mortgage
11   brokers induce borrowers to enter into loans via telemarketing and other sales efforts
12   that are carefully directed by Countrywide.  Those loans are made in reliance on
13   Countrywide's credit-granting policies and with the participation of Countrywide.

14       63.    As described below, Countrywide and its network of authorized
15   brokers together have engaged in a scheme whereby they direct borrowers into
16   subprime mortgages purely for the benefit of Defendants and its brokers, at the
17   borrowers' expense.

18       64.    Countrywide needed its network of authorized brokers to accomplish
19   its scheme, as Countrywide could not have reaped huge rewards from the
20   securitization of its subprime loans without a network of brokers across the country
21   pushing borrowers into as many subprime loans as they could.  For instance, a single
22   broker could never have generated the volume of subprime loans needed to bundle the
23   loans into securities, which is where the real money lay for Countrywide.
24   Countrywide needed thousands of brokers to work with a single goal in mind – to
25   make as many subprime loans as possible, to bundle and sell on the secondary market,
26   irrespective of their suitability for the borrowers.  Together, Countrywide and its
27   brokers engaged in an undisclosed, systematic scheme that had the effect of deceiving
28

- 25 -

1 | borrowers, both about the terms of these dangerous and destructive loans and about
2 | Countrywide's own goals and practices.

3 |      65.     These wrongful practices by Countrywide and its brokers have come
4 | under great scrutiny recently. For instance, one such broker, One Source Mortgage,
5 | Inc., has been sued by the Illinois Attorney General's office, for misleading borrowers
6 | into obtaining PayOption ARM loans with Countrywide without disclosing that their
7 | payments would increase dramatically after the loan starts, or that unpaid interest
8 | would be added to the principal of their loan.

9 | **Defendants' Standardized Misrepresentations and Omissions**

10 |      66.     Defendants and their co-conspirators have established a scheme
11 | designed to induce borrowers to enter into subprime loans by, *inter alia,* making false
12 | representations (as set forth in standardized sales scripts and as otherwise dictated
13 | from above by Countrywide) to borrowers, including the standardized
14 | misrepresentation that they were offering the best loans available to the borrowers.
15 | Regardless of the specific representations made to a particular borrower prior to
16 | signing the loan documents, it was a strictly uniform practice that Countrywide and its
17 | contracted brokers never disclosed to borrowers its overarching scheme to steer as
18 | many borrowers as possible into as many subprime loans as possible, irrespective of
19 | their suitability to the borrowers' financial situation, *i.e.,* their ability to make the
20 | monthly payments on the loan, or their ability to qualify for a prime loan with better
21 | terms. Indeed, Countrywide made countless subprime loans without any objective
22 | analysis that would have indicated the unsuitability of the loans for such
23 | borrowers. Countrywide's failure to disclose its scheme and the resulting policy
24 | of issuing dangerous subprime loans without any attempt to ascertain their
25 | suitability to a given borrower is the underlying fraudulent conduct. Defendants
26 | also concealed that their contracted brokers were paid more to sell subprime loans
27 | than other mortgages and received other incentives that induced brokers to push
28 | subprime loans over other loans. Defendants also concealed that their contracted

SECOND AMENDED CLASS ACTION COMPLAINT

1   brokers used the automated CLUES™ computer system to make "underwriting"

2   decisions on an automated basis without regard to any reasonable, objective criteria

3   that would indicate the appropriateness of the loans in question to a given borrower,

4   and that the CLUES™ system was pre-programmed to push borrowers into subprime

5   loans.

6        67.    Defendants systematically make standardized misrepresentations and

7   omissions to push unsuspecting homeowners into subprime loans. For example,

8   Countrywide's sales force use standardized sales scripts in their sales pitches to

9   homeowners and prospective homeowners.

10        68.    Countrywide encourages its sales force to solicit customers over the

11   telephone with a standardized sales pitch – "I want to be sure you are getting the best

12   loan possible."

13        69.    This sales pitch is reinforced on Countrywide's website regarding

14   home purchase loans, where the potential borrower is assured that "Countrywide can

15   help you obtain the best possible rate..." *See* http://www.countrywide.com/

16   purchase/r_today.asp (last visited on June 13, 2008).

17        70.    Members of Countrywide's sales force are required to adhere to the

18   carefully prepared scripts in their telemarketing efforts. First, sales representatives are

19   instructed in their sales manual to build rapport with the client by finding "points of

20   common interest." In one example, the loan officer for the Sizemores, Cortney

21   Lanktree, told them that she personally has the type of loan offered to the Sizemores,

22   as do all her neighbors.

23        71.    These scripts also set forth aggressive techniques for persuading

24   homeowners to take on loans. For example, one marketing manual provided a script

25   in which marketers were instructed, if a homeowner indicated that their mortgage was

26   already paid off, to try to push a home equity loan. The script provided verbatim lines

27   to be used in such sales pitches, including "Don't you want the equity in your home to

28

SECOND AMENDED CLASS ACTION COMPLAINT

1    work for you?" and "You can use your equity for your advantage and pay bills or get

2    cash out. How does that sound?"

3         72.     The hard sell is not limited to Countrywide's own sales force;

4    Countrywide's commission structure and other incentives induce its contracted

5    brokers to use deceptive practices, the inherently confusing and complex nature of

6    the products they are pushing, and the automated CLUES™ computer system, to

7    implement the overarching scheme of steering as many borrowers as possible into

8    subprime loans without regard to any reasonable, objective criteria that would indicate

9    the appropriateness of such loans to a given borrower. As one observer noted, "The

10   problem, of course, is that many brokers care more about commissions than

11   customers. They use aggressive sales tactics, harping on the minimum payment

12   on an option ARM and neglecting to mention the future implications. Some even

13   imply verbally that temporary teaser rates of 1% to 2% are permanent, even

14   though the fine print says otherwise. It's easy to confuse borrowers with option

15   ARM numbers.  A recent Federal Reserve study showed that one in four

16   homeowners is mystified by basic adjustable-rate loans. Add multiple payment

17   options into the mix, and the mortgage game can be utterly baffling." *See* Mara

18   Der   Hovanesian,   *Nightmare   Mortgages*,   BusinessWeek,   available   at

19   www.businessweek.com/magazine/content/06_37/b4000001.htm.

20        73.     Thus, rather than offering borrowers the "best loan possible,"

21   Defendants' scheme was designed to maneuver as many borrowers as possible into

22   subprime loans, irrespective of whether borrowers qualified for loans on better terms,

23   or whether borrowers were able to afford the monthly payments.  Moreover, rather

24   than offering loans that worked to the borrowers' advantage, the loans worked to the

25   advantage of Countrywide and its brokers, and injured Plaintiffs and other Class

26   members. Very often these loans are wholly unsuitable for the borrowers, and indeed,

27   Countrywide and its brokers do not even bother to do an objective analysis of their

28

1  suitability, but borrowers are nevertheless assured that these loans are not only
2  suitable, they are ideal.

3       74.    By the admission of Countrywide's own employees, Countrywide and
4  its brokers sell loan products that are extremely complicated and difficult to
5  understand, and intentionally fail to explain the true nature of the loans to
6  unsuspecting borrowers.   Specifically, on October 23, 2007, John Buckner, a
7  Countrywide Customer Service Representative, told the Sizemores, *after* they had
8  entered into their loan and their payments began to go up, "This loan is complicated,
9  and if you don't understand it in and out, we are not going explain it to you." Buckner
10  went on to tell the Sizemores that they were "lucky" that they had discovered the
11  negative amortization aspect of their loan so early because he "constantly received
12  calls" from numerous people who didn't understand the loan until their mortgage
13  principal had increased by thirty to forty thousand dollars. Also by the admission of
14  Countrywide's own employees, Countrywide trains its loan officers only on what they
15  need to know to "get the loan done."

16       75.    Countrywide and its brokers tout their various products as being great
17  opportunities to cut monthly payments and otherwise improve borrowers' financial
18  situations. What Countrywide and its brokers actively conceal are the true nature of
19  the loans and the consequences of entering into such loans. For example, they conceal
20  the fact that making the monthly minimum payment on PayOption loans will actually
21  *increase* the amount of the principal of the loan; the fact that monthly payments can
22  and will increase significantly without warning; and the fact that large pre-payment
23  penalties apply. Moreover, they falsely represent that borrowers can refinance at any
24  time, leading borrowers to believe that if and when the loan payments become too
25  onerous, they will be able to easily switch to a loan with more favorable terms.

26       76.    Plaintiffs received similar misrepresentations from Countrywide
27  loan officers and mortgage brokers. For instance, the Menichettis were told by
28  their broker at Mid Atlantic Capital, Don Cutler, that he has "a good mortgage for

SECOND AMENDED CLASS ACTION COMPLAINT

1   you.  You just pay a low monthly payment."  Likewise, Marini was told by his
2   Countrywide loan officer that he was getting an "interest only" loan, misleading
3   Marini into believing that the minimum payment amount quoted to him was the
4   monthly interest amount.  The Countrywide representative never informed Marini
5   that the minimum payment was actually *less* than the monthly interest owed, and
6   that by making the minimum payment Marini would fall deeper and deeper into
7   debt each month.  The Countrywide representative never explained to Marini the
8   concept of "negative amortization" or the adjustable rate of his PayOption ARM
9   loan.  Instead, Marini was told that the loan was "ideal" for him for the first five
10  years, based on his income, because the monthly payment would be fixed with an
11  annual increase of only $100, and that he could refinance after the first five years.
12  Marini noticed soon after he began receiving statements that the monthly
13  payments were increasing at a far greater rate than $100 annually.  When he called
14  Countrywide for assistance, Countrywide representatives told him that it was "a
15  terrible loan to be in," but were never able to assist him in improving his situation.

### The Truth About Countrywide's Loans Are Only
### Revealed to the Borrower After the Fact

18      77.      Only after the borrower has entered into a loan with Countrywide and
19  discovers that he has not, in fact, received "the best loan possible," does Countrywide
20  admit that they have not been acting in the borrower's best interest.

21      78.      Oftentimes, borrowers will call Countrywide customer service when
22  they realize their monthly payments or their principal amounts are increasing.  Only
23  then are they told that they were not given the complete picture when they signed on
24  for their loan.

25      79.      For instance, when the Sizemores called customer service about their
26  PayOption ARM loan, they were told that "this loan is complicated, and if you don't
27  understand it in and out, we are not going explain it to you."  Significantly, the
28  Sizemores were also told by customer service that Countrywide trains its loan officers

1   only on what they need to know to "get the loan done." After the fact, the Sizemores'

2   loan officer, Cortney Lanktree, confessed that she obviously had not explained the

3   terms of the loan well.

4        80.      In fact, when the Sizemores took out their loan, they had specifically

5   asked Ms. Lanktree whether there would be any charges added to the rear of the loan

6   if they made only the minimum payments.  Ms. Lanktree repeatedly told the

7   Sizemores that there would not be.

8        81.      When the Sizemores expressed the belief that this loan "sounds too

9   good to be true," they were told by Ms. Lanktree that the payments were so low

10  because their loan was spread out over 40 years.  Indeed, she never referred to their

11  loan as a "PayOption ARM" loan, only as a "40-year loan." Moreover, the adjustable

12  rate was never explained by Ms. Lanktree, nor even discussed with the Sizemores.

13  They were only told that their payments would adjust on the fourth year of their loan

14  In fact, no other types of loans were ever offered to the Sizemores.

15       82.      The Sizemores were also told by Ms. Lanktree on April 25, 2006, in

16  writing, that they would not need to pay any prepayment penalty if they refinanced

17  with Countrywide.  However, when the Sizemores attempted to refinance with

18  Countrywide, they were told a prepayment penalty would indeed apply.  When they

19  explained that they had a written representation that they would not have to pay a

20  prepayment penalty, the Countrywide loan department flatly refused to honor that

21  promise.  Even when the Office of the President at Countrywide stated that

22  Countrywide would honor that promise and waive the penalty, the loan department

23  still refused to refinance without a penalty.

24       83.      Similarly, when Marini called Countrywide after his monthly

25  payments on his PayOption ARM loan started increasing, he was told by numerous

26  people that it was a "horrible" loan, or that it was a bad loan for him, and that he

27  needed to get out of it. However, after repeated attempts at refinancing, Countrywide

28

1   has not improved Marini's financial condition, and he anticipates he will need to file

2   for bankruptcy.

3       84.     In fact, when Marini had first applied for the loan, he was always told

4   by Countrywide that this was an "interest only" loan – they never mentioned the

5   "minimum payment" or that payment of the "minimum payment" would result in

6   negative amortization. He was told that the loan was "ideal" for him for the first five

7   years, based on his income. Indeed, Marini, who is a disabled Vietnam veteran on a

8   fixed income, thought he was "safe" for at least the first five years of the loan, and

9   would not have entered into the loan had he understood the ramifications of the

10   "minimum payment."

11       85.     Tellingly, on one of several calls the Menichettis made to customer

12   service after they had obtained their loan, they were told that Countrywide "has a lot

13   of people complaining that the loan wasn't explained."

### Countrywide's Inducement of Brokers To Direct
### Borrowers Towards Subprime Loans

16       86.     Unbeknownst to borrowers, Countrywide's brokers and sales

17   representatives are being rewarded for making as many risky, high-cost loans as

18   possible, pursuant to the Company's commission structure.

19       87.     Even where borrowers qualify for prime loans, Countrywide

20   improperly incentivizes and encourages its brokers, through financial incentives, to

21   move them into the subprime category. For example, Countrywide has paid

22   commissions on a subprime loan of .50% of the loan's value, while the commission on

23   loans in the next highest category would be a mere .20% of the loan's value.

24       88.     In addition, mortgage brokers' commissions would vary on loans in

25   which the interest rate would increase after a short period with a low teaser rate; the

26   higher the reset interest rate, the greater the commission earned.

27       89.     The addition of penalties to the terms of a loan was also strongly

28   encouraged and incentivized by Countrywide. For example, on information and

1  belief, adding a three-year prepayment penalty to a loan would generate an extra 1%

2  of the loan's value in a commission to the salesperson. Nowhere was this disclosed to

3  prospective loan applicants.

4        90.     Moreover, if a broker convinced a borrower to add a home equity line

5  of credit to their loan, the broker would earn an extra 0.25% commission.

6        91.     A broker's inducing borrowers to take out subprime loans was even

7  rewarded in some instances by perks such as all-expense-paid trips to places like Las

8  Vegas.

9        92.     In addition to the foregoing, Countrywide utilized computer software

10  which prevented sales representatives from inputting a borrower's cash reserves when

11  calculating the type of loan the borrower is eligible for, which resulted in the sales

12  representative pitching a higher cost loan. Countrywide utilized this software in order

13  to increase its own profit on such loans, since a borrower who has more assets would

14  normally be able to obtain a lower interest rate on their loan.

15        **Subprime Loans Are More Lucrative to Countrywide**

16        93.     Subprime loans are significantly more profitable for Countrywide than

17  higher-quality prime loans. As set forth in Countrywide's 2006 regulatory filings, the

18  company's profit margin on its sales to investors of subprime loans versus prime loans

19  was 1.84% versus 1.07%, respectively. Two years earlier, in 2004, the profitability of

20  sales of subprime mortgages versus prime mortgages was even greater, at a rate of

21  3.64% versus 0.93%, respectively.

22        94.     One reason subprime loans are more lucrative for Countrywide is that

23  investors who bought publicly traded securities backed by mortgages were willing to

24  pay more for loans with prepayment penalties and interest rates that were going to

25  reset at higher levels, because such pools of subprime loans were likely to generate a

26  larger cash flow than prime loans that carried lower fixed rates.

27        95.     Indeed, as explained in Countrywide's regulatory filings, the Company

28  relies substantially on the secondary mortgage market as a source of long-term capital

- 33 -

SECOND AMENDED CLASS ACTION COMPLAINT

1    to support its mortgage banking operations.   Most of the mortgage loans that
2    Countrywide produces are sold in the secondary mortgage market, primarily in the
3    form of mortgage-backed securities and asset-backed securities. A mortgage-backed
4    security is an asset-backed security whose cash flows are backed by the principal and
5    interest payments of a set of mortgage loans.   Investors are willing to pay higher
6    prices for securities backed by subprime loans because the prepayment penalties on
7    these loans locked in the borrower and guaranteed the investor predictable income
8    streams from the higher interest rates charged in these loans.   At Countrywide,
9    subprime loans are generally pooled into private-label asset-backed securities. During
10   2006, Countrywide securitized $47.7 billion in subprime mortgage and prime home
11   equity loans.

12        96.        In addition to higher interest rates on subprime loans and the potential
13   for greater profits in the secondary mortgage market, subprime loans are more
14   profitable to Countrywide because of a number of undisclosed features built into the
15   structure of such loans, such as penalties and fees.

16        97.        For example, when a borrower tries to reduce his or her debt on such
17   loans, he or she must pay a large prepayment penalty.   Last year, Countrywide
18   enjoyed $268 million in revenues from prepayment penalties.

19        98.        Moreover, late charges imposed on borrowers who had trouble making
20   their payments also provide significant revenues for Countrywide.   Revenues from
21   late charges totaled approximately $285 million in 2006. Clearly, these payments are
22   used by Countrywide as a profit-center to increase its bottom line while causing its
23   customers to pay increased and improper payments to it.

24        99.        Countrywide also makes money from inflated fees that are charged at
25   loan closings.   Borrowers pay fees for things such as flood and tax certifications,
26   appraisals, and document preparation at rates that far exceed what other lenders
27   charge. For example, Countrywide's credit checks cost twice what others charge, and
28   Countrywide charges $26 for a flood certification, where others charge only $12 to

- 34 -
SECOND AMENDED CLASS ACTION COMPLAINT

1  $14.  Countrywide charges as much as $100 just to e-mail documents and $45 for

2  sending documents via Federal Express.  Many of these fees go to Countrywide's loan

3  closing services subsidiary, LandSafe, Inc.

4       100.  Countrywide's subprime unit has also avoided offering borrowers the

5  less risky Federal Housing Administration ("F.H.A.") loans, which are backed by the

6  U.S. Government.  These loans are well suited to low-income or first-time buyers, but

7  were not offered because they do not generate the high fees subprime loans do.

8                **Defendants' Lending to Borrowers Who**

9                **<u>Cannot Afford the Loan Payments</u>**

10      101.  Countrywide has written policies providing that it will make loans to

11  borrowers even where the monthly loan payment will leave very little disposable

12  income for the borrower to live on.

13      102.  For example, one Countrywide manual states that a borrower with a

14  family of four may obtain a loan even if the monthly mortgage payment left the family

15  with only $1000 to live on for the month.  A single borrower could obtain a loan

16  whose payment left him only $550 for food, clothing and other expenses for the entire

17  month.

18      103.  Sales representatives for Countrywide were even permitted to lend

19  $500,000 to borrowers with a credit score of 500, even if the borrower made late

20  payments on a mortgage in the prior year, had filed for bankruptcy or had been in risk

21  of foreclosure, so long as the loan-to-property-value ratio was no more than 70

22  percent.

23      104.  An example of the kind of risky and inappropriate loans Countrywide

24  offers is one of its most commonly issued products, the "Option ARM Loan" or a

25  "PayOption ARM."

26      105.  Borrowers with bad credit can easily obtain a PayOption ARM Loan

27  for as much as 45% of their gross annual income.

28

1    106.    As is described above, borrowers are given three payment options to
2  choose from each month under the PayOption Arm Loan arrangement, as is reflected
3  on their monthly statement from Countrywide: (1) they can make what Countrywide
4  calls the "minimum" monthly payment, which is actually less than the amount of
5  interest owed on the loan; (2) they can make a middle-tier payment called the "interest
6  only payment" in which they pay only the interest due for that month; or (3) they can
7  make the highest-tier payment, the "amortized payment," which encompasses both the
8  interest due and a portion of the principal of the loan.

9    107.    Because they are paying less than the amount of interest they owed on
10  their loans, borrowers who opt each month to make the minimum monthly payment
11  actually see the principal amount of their loan *increase* over time, even though they
12  are making what Countrywide expressly tells them is the "minimum" monthly
13  payment required on the loan.    This is known as "negative amortization."
14  Countrywide and its brokers do not explain this to borrowers before they enter into
15  these loans, but rather just tell them that they are only required to make a low monthly
16  minimum payment on their loan.  Borrowers enter into these loans believing that they
17  are "interest only" loans or that the payments are low for other reasons.    Thus
18  borrowers enter into loans that are, in fact, fundamentally different from what they are
19  told, in the belief that they are getting a good bargain.

20    108.    Further, built into the PayOption ARM Loan is an obligation that, if
21  the amount owed ever increases to an amount equaling 115% of the original loan
22  amount, the entire amount becomes "recast" and resets the monthly payments to a
23  significantly higher amount, allowing for full repayment of the principal and interest
24  within the time remaining on the loan. Since the minimum payment was less than the
25  interest due, and since Countrywide's underwriting criteria provide for minimum
26  payments at such a high percentage of gross income, the amount owed was certain to
27  increase for borrowers, and the recast percentage was likely to be hit.  Accordingly,
28  many borrowers have defaulted on their PayOption ARM Loans.

SECOND AMENDED CLASS ACTION COMPLAINT

1       109.    Countrywide actively promoted the PayOption ARM loan to
2 borrowers, regardless of their income or credit ratings, as evidenced by an internal
3 Countrywide sales document explaining what type of borrower would benefit from
4 such a loan – "Anyone who wants the lowest possible payment!" In other words,
5 Countrywide pushed the PayOption ARM loan on everyone they could, irrespective of
6 whether it was actually a favorable alternative over other types of loans for a given
7 borrower. Countrywide's marketing strategy had the desired effect. Between 2004
8 and 2005, Countrywide's origination of PayOption ARM loans rose from 6 percent to
9 19 percent of all loans originated by the Company. In 2006, Countrywide was the
10 leading originator of PayOption ARM loans, originating $70 billion in PayOption
11 ARM loans – nearly double of that of its closest competitors. Countrywide earned
12 gross profit margins over 4 percent on PayOption ARM loans, as opposed to 2 percent
13 on FHA-backed loans.

14       110.    The Sizemores, Marini, and the Menichettis, all obtained such
15 PayOption ARM loans. These loans were inappropriate for and unsuitable to these
16 borrowers.

17       111.    At the time they obtained their loan from Countrywide, Francis
18 Sizemore had a credit score of 700, and Rebecca Sizemore had a credit score of 690.
19 Their combined monthly income was approximately $4,000 to $5,000 a month.
20 Accordingly, while the Sizemores qualified for a prime loan, they were steered into a
21 risky PayOption ARM loan that was unsuitable to their circumstances.

22       112.    Although Marini had a high credit rating of 725 at the time of his loan,
23 he is a disabled Vietnam veteran, living on a fixed income of $3,250 a month, and was
24 nonetheless given a PayOption ARM loan without any explanation of the payment
25 options.

26       113.    The Menichettis also obtained a PayOption ARM loan in the amount
27 of $183,000, despite the fact that Philip Menichetti was on workers' compensation at
28

SECOND AMENDED CLASS ACTION COMPLAINT

1  the time of the loan, and Kimberly Menichetti only worked three days a week, earning

2  $119 a week.

3      114.    In addition to PayOption ARM loans, Countrywide also offered, until

4  just recently, "piggyback" loans, which called for no money down by the borrower,

5  and loans for amounts greater than 95% of the appraised value of the home without

6  any proof of the borrower's income.

7  **Governmental Actions Relating to Countrywide's Practices**

8      115.    Within the past several months, Countrywide and its officers have

9  come under increased scrutiny for the practices alleged in this Complaint.

10     116.    On or about October 18, 2007, the U.S. Securities & Exchange

11 Commission began informally investigating the insider stock sales of Countrywide's

12 Chief Executive Officer, Angelo Mozilo.  Mr. Mozilo – who was paid $142 million

13 last year and was the seventh highest paid CEO in the United States – has sold nearly

14 $300 million in Countrywide shares since 2005 pursuant to the Company's

15 prearranged selling program.  However, since October 2006, when Mr. Mozilo put a

16 new selling program in place at Countrywide, he has since raised the number of shares

17 executives could sell, from 350,000 shares in October 2006, to 580,000 shares in

18 February 2007, when shares were at a high of $45.03 per share.  By November 26,

19 2007, Countrywide shares had closed at low of $8.64 per share, and have not

20 increased in value more than a few dollars since.  These stock programs provided an

21 incentive for the Defendants, and the top officials of Countrywide, to develop and

22 implement the scheme alleged in this Amended Complaint.

23     117.    On October 24, 2007, in response to criticism from regulators and

24 advocacy groups, Countrywide announced that it would assist certain borrowers to

25 restructure their loans to avoid foreclosure.  In fact, this publicized offset will benefit

26 only a small percentage of the class.

27

28

- 38 -

SECOND AMENDED CLASS ACTION COMPLAINT

1    118.    On or about late October 2007, the United States Trustee issued

2    subpoenas to Countrywide regarding false and inaccurate claims filed by Countrywide

3    in two foreclosure proceedings in bankruptcy court.

4    119.    On November 20, 2007, the Governor of California announced that

5    Countrywide and certain other lenders had agreed to allow potentially distressed

6    California borrowers to continue paying their loans at the initial rate if they live in

7    their homes and make timely payments but are unlikely to afford higher payments

8    when their mortgage interest rates reset.

9    120.    On or about December 13, 2007, the Attorney General for the State of

10    Illinois issued a subpoena on Countrywide for documents relating to its loan

11    origination practices, following the AG's investigation and lawsuit against a Chicago

12    mortgage broker, One Source Mortgage, who sold Countrywide loans. A subpoena

13    was also issued by the Attorney General of the State of California, on or about the

14    same time.

15    121.    On or about January 31, 2008, the Attorney General of the State of

16    Florida, Bill McCollum, issued a subpoena on Countrywide seeking information on

17    how Countrywide handles borrower payments as well as materials related to sales

18    practices and standards for making loans. Attorney General McCollum is concerned

19    that Countrywide may have put borrowers "into mortgages that in the first place they

20    couldn't afford or loans with rates that were not what they were advertising or that

21    were misleading."

22    122.    Indeed, the Federal Reserve recently moved to impose new restrictions

23    intended to curb unfair and deceptive home-lending practices such as those engaged in

24    by Countrywide and its co-conspirators. As described in *The New York Times*, "the

25    rules are meant to deter unscrupulous lenders from persuading people that they can

26    afford loans that ought to be out of their reach." *See* "Fed Approves Plan to Curb

27    Risky Lending," *The New York Times*, December 18, 2007. One Federal Reserve

28    governor, Randall S. Kroszner, was quoted in the *Times* article as saying, "Unfair and

1  deceptive practices have harmed consumers and the integrity of the home mortgage
2  market." *Id.*

3      123.      As is noted above, the Derivative Action that was brought against
4  Countrywide in this Court, in which it was alleged that Countrywide essentially
5  abandoned its underwriting standards, recently survived a motion to dismiss, in an
6  opinion in which Judge Mariana R. Pfaelzer found a "strong inference of a Company-
7  wide culture that, at every level, emphasized increasing loan origination volume in
8  derogation of underwriting standards."  Derivative Action Order, 2008 WL 2064977,
9  at *10.  The Court noted that numerous confidential witnesses, mostly former
10  employees of Countrywide, who had been quoted in the complaint presented a
11  "striking[]" story of "rampant disregard for underwriting standards" at Countrywide in
12  the interest of pushing through as many loans as possible.  *Id.*  This scheme of pushing
13  quantity over quality, including a lack of any analysis of reasonable criteria to
14  ascertain the appropriateness of the loans Countrywide issued to its borrowers, was
15  uniformly concealed from borrowers, just as it was concealed from the public.  *Id.* at
16  *9 (holding that plaintiffs had presented a "cogent and compelling inference" that the
17  defendant Countrywide executives had misled the public about the "rigor of
18  Countrywide's loan origination process, the quality of its loans, and the Company's
19  financial situation – even as they realized that *Countrywide had virtually abandoned*
20  *its own loan underwriting practices*.") (emphasis added).

21                          **CONSPIRACY**

22      124.      Defendants have not undertaken the above practices and activities in
23  isolation, but instead have done so as part of a common scheme and conspiracy, which
24  includes not only the Defendants but other mortgage brokers as well.

25      125.      All of the practices described herein are the component parts of
26  Defendants' larger scheme designed to maximize Defendants' profits, both from the
27  loans themselves and from the secondary market for mortgage-backed securities.

28

1       126.     Each Defendant and all members of the conspiracy, with knowledge

2 and intent, agreed to the overall objective of the conspiracy, agreed to commit acts of

3 fraud to wrongfully obtain money from Plaintiffs and members of the Class, and

4 actually committed such acts.

5       127.     Indeed, for the fraudulent scheme described above to be successful,

6 each Defendant and other members of the conspiracy had to agree to enact and utilize

7 the same devices and fraudulent tactics against Plaintiffs and members of the Class.

8       128.     Numerous common facts and similar activities, which reflect the above

9 reality and imply the existence of a conspiracy, exist among all of the Defendants and

10 other members of the conspiracy, including: (a) statements made to borrowers by

11 Countrywide brokers and other mortgage brokers authorized by Countrywide to sell

12 its loan products, that they will obtain the "best loan" for the borrower, (b) the

13 utilization of standardized sales manuals by Countrywide's brokers, (c) the utilization

14 of a commission structure, instituted by Countrywide, for the determination of

15 commission rates paid to Countrywide's brokers and other authorized brokers which

16 resulted in borrowers being driven to subprime loans when they were qualified to

17 receive loans on better terms, (d) the inclusion by Countrywide brokers and authorized

18 brokers of certain closing fees payable to Countrywide's LandSafe subsidiaries, which

19 were significantly higher than those charged by other companies, (e) Countrywide's

20 failure to provide Form 1099s to the Internal Revenue Service for income paid to its

21 authorized brokers, and (f) the utilization by Countrywide brokers and other

22 authorized brokers of Countrywide's CLUES™ computer system, which is designed

23 to allow the mortgage broker to submit loan information and receive a qualified

24 underwriting decision within minutes.

25       129.     During the past four years the conspiracy was conducted through, and

26 implemented by, Defendants and independent mortgage brokers authorized to sell

27 Countrywide mortgage loans.

28

SECOND AMENDED CLASS ACTION COMPLAINT

## RICO ALLEGATIONS

### The Countrywide Broker Enterprise

130.    Plaintiffs, the Class members and Defendants are all "persons" within the meaning of 18 U.S.C. § 1961(3).

131.    Based upon Plaintiffs' current knowledge, the following persons constitute a group of individuals associated in fact that will be referred to herein as the "Countrywide Broker Enterprise": (1) Countrywide, including its LandSafe loan closing services subsidiaries, and (2) Mid Atlantic Capital, One Source Mortgage, and other mortgage brokers not named as defendants herein who have contracts with Countrywide pursuant to which they sell, arrange, promote, or otherwise assist Countrywide in directing borrowers into loans issued by Countrywide.

132.    The Countrywide Broker Enterprise is an ongoing organization that engages in, and whose activities affect, interstate commerce.

133.    While all Defendants participate in and are members and part of the Countrywide Broker Enterprise, they also have an existence separate and distinct from the enterprise.

134.    In order to successfully steer as many borrowers as possible into inappropriate subprime loans, Defendants need a system that allows them to effectively promote these loans.  The Countrywide Broker Enterprise provides Defendants with that system and ability, and their control of and participation in it is necessary for the successful operation of their scheme. Furthermore, the participation by the LandSafe subsidiaries in the Countrywide Broker Enterprise allowed the enterprise to function more effectively, given that many of the functions provided by these entities, such as appraisals, would normally be conducted by independent entities.  LandSafe's participation in the enterprise allowed the normal checks and balances within the mortgage process to be eliminated, permitting Defendants to advance their scheme and conceal the fraudulent activity they were engaging in.

SECOND AMENDED CLASS ACTION COMPLAINT

1       135.    The Defendants control and operate the Countrywide Broker

2  Enterprise as follows: (a) Defendants issue the standardized sales manual to be

3  followed by all Countrywide loan officers when soliciting a borrower to obtain a

4  Countrywide mortgage loan, (b) Defendants determine the commission structure to be

5  paid to all Countrywide brokers and authorized brokers, rewarding and incentivizing

6  them (with increased commissions, and rewards such as all-expense-paid trips to Las

7  Vegas) to offer borrowers loans with less favorable terms than they would otherwise

8  qualify for, (c) Defendants provide Countrywide brokers and authorized brokers

9  access to its CLUES™ system, which was utilized to steer borrowers to more costly

10  loans, and (d) Defendants encourage Countrywide brokers and authorized brokers to

11  utilize Countrywide's LandSafe subsidiaries for certain closing costs associated with

12  the loan.

13       136.    The Countrywide Broker Enterprise has an ascertainable structure

14  separate and apart from the pattern of racketeering activity in which the Defendants

15  engage.

16
17                **Alternative Enterprise Allegations:**
                    **The Countrywide Enterprise**

18       137.    Plaintiffs, the Class members and Defendants are all "persons" within

19  the meaning of 18 U.S.C. § 1961(3).

20       138.    Based upon Plaintiffs' current knowledge, the following persons

21  constitute a group of individuals associated in fact that will be referred to herein as the

22  "Countrywide Enterprise": (1) Countrywide and (2) Countrywide's subsidiaries,

23  including its LandSafe loan closing services subsidiaries.

24       139.    The Countrywide Enterprise is an ongoing organization that engages

25  in, and whose activities affect, interstate commerce.

26       140.    While all Defendants participate in and are members and part of the

27  Countrywide Enterprise, they also have an existence separate and distinct from the

28  enterprise.

SECOND AMENDED CLASS ACTION COMPLAINT

1    141.    In order to successfully steer as many borrowers as possible into
2    inappropriate subprime loans, Defendants need a system that allows them to
3    effectively promote these loans. The Countrywide Enterprise provides Defendants
4    with that system and ability, and their control of and participation in it is necessary for
5    the successful operation of their scheme. Furthermore, the participation by the
6    LandSafe subsidiaries in the Countrywide Enterprise allowed the enterprise to
7    function more effectively, given that many of the functions provided by these entities,
8    such as appraisals, would normally be conducted by independent entities. LandSafe's
9    participation in the enterprise allowed the normal checks and balances within the
10   mortgage process to be eliminated, permitting Defendants to advance their scheme
11   and conceal the fraudulent activity they were engaging in.

12    142.    The Defendants control and operate the Countrywide Enterprise as
13   follows: (a) Defendants issue the standardized sales manual to be followed by all
14   Countrywide loan officers when soliciting a borrower to obtain a Countrywide
15   mortgage loan, (b) Defendants determine the commission structure to be paid to all
16   Countrywide loan officers, rewarding and incentivizing them (with increased
17   commissions, and rewards such as all-expense-paid trips to Las Vegas) to offer
18   borrowers loans with less favorable terms than they would otherwise qualify for, (c)
19   Defendants provide Countrywide loan officers access to its CLUES™ system, which
20   was utilized to steer borrowers to more costly loans, and (d) Defendants encourage
21   Countrywide loan officers to utilize Countrywide's LandSafe subsidiaries for certain
22   closing costs associated with the loan.

23    143.    The Countrywide Enterprise has an ascertainable structure separate and
24   apart from the pattern of racketeering activity in which the Defendants engage.

25                              **PREDICATE ACTS**

26    144.    Section 1961(1) of RICO provides that "racketeering activity" includes
27   any act indictable under 18 U.S.C. § 1341 (relating to mail fraud) and 18 U.S.C. §
28

1  1343 (relating to wire fraud). As set forth below, Defendants have engaged, and
2  continue to engage, in conduct violating each of these laws to effectuate their scheme.

3      145.    Additionally, in order to make their scheme effective, each of the
4  Defendants sought to and did aid and abet the others in violating the above laws
5  within the meaning of 18 U.S.C. § 2. As a result, their conduct is indictable under 18
6  U.S.C. § 1341 and 18 U.S.C. § 1343, on this additional basis.

7          **VIOLATIONS OF 18 U.S.C. § 1341 and 18 U.S.C. § 1343**

8      146.    For the purpose of executing and/or attempting to execute the above
9  described scheme to defraud or obtain money by means of false pretenses,
10  representations or promises, the Defendants, in violation of 18 U.S.C. § 1341, placed
11  in post offices and/or in authorized repositories matter and things to be sent or
12  delivered by the Postal Service, caused matter and things to be delivered by
13  commercial interstate carriers, and received matter and things from the Postal Service
14  or commercial interstate carriers, including but not limited to promotional materials,
15  applications, agreements, manuals, and correspondence.

16      147.    For the purpose of executing and/or attempting to execute the above
17  described scheme to defraud or obtain money by means of false pretenses,
18  representations or promises, the Defendants, in violation of 18 U.S.C. § 1343,
19  transmitted and received by wire, matter and things, including but not limited to
20  promotional materials, applications, agreements, manuals, and correspondence, and
21  made or caused to be made false statements over the telephone, electronic mail, and
22  internet.

23      148.    The matter and things sent by Defendants via the Postal Service,
24  commercial carrier, wire, or other interstate electronic media included, *inter alia:*
25  promotional materials, applications, agreements, manuals, correspondence, progress
26  reports, loan application disclosures.

27      149.    Other matter and things sent through or received via the Postal Service,
28  commercial carrier, wire, or other interstate electronic media by Defendants included

- 45 -
SECOND AMENDED CLASS ACTION COMPLAINT

1 information or communications in furtherance of or necessary to effectuate the

2 scheme.

3      150.    Defendants' misrepresentations, acts of concealment and failures to

4 disclose were knowing and intentional, and made for the purpose of deceiving

5 Plaintiffs and the members of the Class and obtaining their property for Defendants'

6 gain.

7      151.    Defendants either knew or recklessly disregarded the fact that the

8 misrepresentations and omissions described above were material, and Plaintiffs and

9 the Class relied upon the misrepresentations and omissions as set forth above.

10      152.    As a result, Defendants have obtained money and property belonging

11 to the Plaintiffs and Class members, and Plaintiffs and the Class have been injured in

12 their business or property by the Defendants' overt acts of mail and wire fraud, and by

13 their aiding and abetting each other's acts of mail and wire fraud.

14                    **PATTERN OF RACKETEERING ACTIVITY**

15      153.    The Defendants have engaged in a "pattern of racketeering activity," as

16 defined by 18 U.S.C. § 1961(5), by committing or aiding and abetting in the

17 commission of at least two acts of racketeering activity, *i.e.,* indictable violations of

18 18 U.S.C. §§ 1341 and 1343 as described above, within the past four years. In fact,

19 each of the Defendants has committed or aided and abetted in the commission of

20 thousands of acts of racketeering activity.  Each act of racketeering activity was

21 related, had a similar purpose, involved the same or similar participants and method of

22 commission, had similar results and impacted similar victims, including Plaintiffs and

23 Class members.

24      154.    The multiple acts of racketeering activity that Defendants committed

25 and/or conspired to commit, or aided and abetted in the commission of, were related to

26 each other, and amount to and pose a threat of continued racketeering activity, and

27 therefore constitute a "pattern of racketeering activity" as defined in 18 U.S.C. §

28 1961(5).

SECOND AMENDED CLASS ACTION COMPLAINT

## RICO VIOLATIONS

155.    Section 1962(c) of RICO provides that it "shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity ..."

156.    Through the patterns of racketeering activities outlined above, the Defendants have also conducted and participated in the affairs of the Countrywide Broker Enterprise, or in the alternative, the Countrywide Enterprise.

157.    Section 1962(d) of RICO makes it unlawful "for any person to conspire to violate any of the provisions of subsection (a), (b) or (c), of this section.

158.    Defendants' conspiracy to secure money from Plaintiffs and Class members for their own use through the fraudulent scheme described above violates 18 U.S.C. §1962(d).

159.    Each of the Defendants agreed to participate, directly or indirectly, in the conduct of the affairs of the Countrywide Broker Enterprise, or in the alternative, the Countrywide Enterprise, through a pattern of racketeering activity comprised of numerous acts of mail fraud and wire fraud, and each Defendant so participated in violation of 18 U.S.C. § 1962(c).

## CLASS ALLEGATIONS

160.    Plaintiffs repeat and re-allege every allegation above as if set forth herein in full.

161.    Plaintiffs sue on their own behalf and on behalf of a Class of persons under Rules 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure, as a Class action on behalf of a nationwide Class defined as all persons who, from September 19, 2003 to the date of Class certification, obtained a subprime loan issued by Countrywide.

SECOND AMENDED CLASS ACTION COMPLAINT

1      162.    Plaintiffs do not know the exact size or identities of the proposed

2 Class, since such information is in the exclusive control of Defendants. Plaintiffs

3 believe that the Class encompasses many thousands or tens of thousands of

4 individuals who are geographically dispersed throughout the United States. Therefore,

5 the proposed Class is so numerous that joinder of all members is impracticable.

6      163.    All members of the Class have been subject to and affected by the

7 same practices and policies described herein. There are questions of law and fact that

8 are common to the Class, and predominate over any questions affecting only

9 individual members of the Class. These questions include, but are not limited to the

10 following:

11         • The nature, scope and operations of Defendants' wrongful

12           policies;

13         • Whether Defendants conspired and/or aided and abetted each

14           other in furtherance of the unlawful acts alleged herein;

15         • Whether Defendants have engaged in mail and wire fraud;

16         • Whether Defendants engaged in a pattern of racketeering activity;

17         • Whether the Countrywide Broker Enterprise, or in the alternative,

18           the Countrywide Enterprise, is an enterprise within the meaning of

19           18 U.S.C. § 1961(4);

20         • Whether Defendants conducted or participated in the affairs of the

21           Countrywide Broker Enterprise, or in the alternative, the

22           Countrywide Enterprise, through a pattern of racketeering activity

23           in violation of 18 U.S.C. § 1962(c);

24         • Whether Defendants' overt and/or predicate acts in furtherance of

25           the conspiracy and/or aiding and abetting and/or direct acts in

26           violation of 18 U.S.C. §§ 1962(c) proximately caused injury to the

27           Plaintiffs' and Class members' business or property;

28

SECOND AMENDED CLASS ACTION COMPLAINT

- Whether Countrywide had a policy and practice of inducing its authorized brokers and sales staff to push borrowers into subprime loans, irrespective of their appropriateness to the borrower;

- Whether Countrywide's brokers had a policy and practice of pushing borrowers into subprime loans, irrespective of their appropriateness to the borrower;

- Whether Defendants fraudulently concealed their scheme;

- Whether the Court can enter declaratory and injunctive relief; and

- The proper measure of damages.

164.    The claims of the named Plaintiffs are typical of the claims of the Class and do not conflict with the interests of any other members of the Class in that both the Plaintiffs and the other members of the Class were subject to the same wrongful policies and practices by Defendants.

165.    The individual named Plaintiffs will fairly and adequately represent the interests of the Class. They are committed to the vigorous prosecution of the Class' claims and have retained attorneys who are qualified to pursue this litigation and have experience in Class actions – in particular, RICO actions.

166.    The prosecution of separate actions by individual members of the Class would create a risk of adjudications with respect to individual members of the Class which would, as a practical matter, be dispositive of the interests of other members of the Class who are not parties to the action, or could substantially impair or impede their ability to protect their interests.

167.    The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications with respect to individual members of the Class, which would establish incompatible standards of conduct for the parties opposing the Class.  Such incompatible standards and inconsistent or varying adjudications, on what would necessarily be the same essential facts, proof

SECOND AMENDED CLASS ACTION COMPLAINT

1  and legal theories, would also create and allow to exist inconsistent and incompatible
2  rights within the plaintiff Class.

3        168.     The Defendants have acted or refused to act on grounds generally
4  applicable to the Class, making final declaratory or injunctive relief appropriate.

5        169.     The questions of law and fact common to members of the Class
6  predominate over any questions affecting only individual members.

7        170.     A Class action is superior to other available methods for the fair and
8  efficient adjudication of the controversies herein in that:

9              • Individual claims by the Class members are impractical as the
10               costs of pursuit far exceed what any one individual Plaintiff or
11               Class member has at stake.

12             • As a result, individual members of the Class have no interest in
13               prosecuting and controlling separate actions.

14             • It is desirable to concentrate litigation of the claims herein in this
15               forum.

16             • The proposed Class action is manageable.

17                          **FRAUDULENT CONCEALMENT**

18        171.     Although, pursuant to Countrywide's policies and practices, borrowers
19  are pushed into subprime loans irrespective of their appropriateness to the borrower,
20  Countrywide's advertisements, marketing materials, telemarketing scripts and
21  financing documents universally create and foster the image that Countrywide offers
22  the "best possible" loans available to borrowers based upon credit-risk and other
23  objective factors.

24        172.     Despite spending millions of dollars annually on advertising,
25  marketing materials, and the creation and distribution of Countrywide financing
26  documents that falsely create and foster the image that Countrywide offers the best
27  possible loans available to borrowers at competitive rates that are objectively set based
28  upon credit-risk and other objective standards, Countrywide never discloses the truth

SECOND AMENDED CLASS ACTION COMPLAINT

1   to its credit applicants that it has authorized and provided a financial incentive to its

2   loan officers, authorized brokers and correspondent lenders to direct homeowners who

3   are qualified for more favorable loans into subprime loans and other far less favorable

4   loan products.

5       173.    Countrywide's customers, due to the inherent nature of Countrywide's

6   undisclosed system and due to Countrywide's deception and concealment, have no

7   way of knowing or suspecting (a) the existence of Countrywide's wrongful practices;

8   and (b) that they received a loan that is far less favorable than that which they were

9   qualified to receive.

10                          **COUNT I**

11              **VIOLATION OF RICO 18 U.S.C. § 1962(C)**

12      174.    Plaintiffs and Class members incorporate and reallege paragraphs 1

13   through 173 above as if fully set out herein.

14      175.    This claim for relief arises under 18 U.S.C. § 1964(c).

15      176.    As set forth above, Defendants have violated 18 U.S.C. § 1962(c) by

16   conducting, or participating directly or indirectly in the conduct of, the affairs of the

17   Countrywide Broker Enterprise, or in the alternative, the Countrywide Enterprise,

18   through a pattern of racketeering.

19      177.    As a direct and proximate result, Plaintiffs and Class members have

20   been injured in their business or property by the predicate acts which make up the

21   Defendants' patterns of racketeering activity.

22      178.    Specifically, Plaintiffs and Class members have been injured in their

23   business or property in a variety of ways, including the following: All borrowers who

24   are steered into loans whose complex terms have been misrepresented or inadequately

25   disclosed to them suffer injury in that they take on financial burdens that they would

26   not otherwise have taken on and suffer the destructive impact on their financial well-

27   being of having to make monthly payments they cannot afford, sometimes leading to

28   significant prepayment penalties when they seek to refinance their mortgages at a

1   more favorable rate, increases in the principal owed under certain types of loans,

2   defaults on their loans, loss of their homes, destruction of their credit, bankruptcy, or

3   financial ruin. Borrowers who experience unanticipated, dramatic rate increases, as in

4   the case of adjustable rate mortgages that have a short fixed-rate period, or in the case

5   of PayOption ARM loans, where the borrower's minimum monthly payment

6   inevitably causes the loan to "recast" to a significantly higher monthly payment based

7   on the negative amortization of the loan, suffer harm from the unexpected and onerous

8   burdens created by their suddenly having to make monthly payments in amounts that

9   greatly exceed what they committed to and can afford. These borrowers are also

10  injured when, as a result of their inability to keep up with monthly payments that are

11  far greater than what was represented to them, they are charged late fees that they

12  otherwise would not have incurred. Additionally, all borrowers who are charged

13  inflated loan costs and other fees suffer injury in increased out-of-pocket costs over

14  what they should have paid. Borrowers who refinance from more traditional loans or

15  take riskier loans than they otherwise could have obtained elsewhere, in the false

16  belief that they are obtaining a loan on favorable terms, are injured by having to pay

17  the difference between fees and interest rates charged by Countrywide and those

18  another lender would have charged. Borrowers who are forced to pay large pre-

19  payment penalties in order to extricate themselves from the destructive and dangerous

20  loans Countrywide has steered them into are injured by the out-of-pocket costs of the

21  penalties, which they would not otherwise have had to pay.

### COUNT II

### VIOLATION OF RICO 18 U.S.C. § 1962(D) BY CONSPIRING TO VIOLATE 18 U.S.C. § 1962 (C)

179.    Plaintiffs and Class members incorporate and reallege paragraphs 1 through 173 above as if fully set out herein.

180.    This claim for relief arises under 18 U.S.C. § 1964(c).

- 52 -

1    181.    In violation of 18 U.S.C. § 1962(d), Defendants have, as set forth

2  above, conspired to violate 18 U.S.C. § 1962(c) by conducting, or participating

3  directly or indirectly in the conduct of the affairs of the Countrywide Broker

4  Enterprise, or in the alternative, the Countrywide Enterprise, through a pattern of

5  racketeering.

6    182.    As a direct and proximate result, Plaintiffs and Class members have

7  been injured in their business or property by the predicate acts which make up the

8  Defendants' patterns of racketeering.

9    183.    Specifically, Plaintiffs and Class members have been injured in their

10  business or property in a variety of ways, including the following: All borrowers who

11  are steered into loans whose complex terms have been misrepresented or inadequately

12  disclosed to them suffer injury in that they take on financial burdens that they would

13  not otherwise have taken on and suffer the destructive impact on their financial well-

14  being of having to make monthly payments they cannot afford, sometimes leading to

15  significant prepayment penalties when they seek to refinance their mortgages at a

16  more favorable rate, increases in the principal owed under certain types of loans,

17  defaults on their loans, loss of their homes, destruction of their credit, bankruptcy, or

18  financial ruin. Borrowers who experience unanticipated, dramatic rate increases, as in

19  the case of adjustable rate mortgages that have a short fixed-rate period, or in the case

20  of PayOption ARM loans, where the borrower's minimum monthly payment

21  inevitably causes the loan to "recast" to a significantly higher monthly payment based

22  on the negative amortization of the loan, suffer harm from the unexpected and onerous

23  burdens created by their suddenly having to make monthly payments in amounts that

24  greatly exceed what they committed to and can afford.  These borrowers are also

25  injured when, as a result of their inability to keep up with monthly payments that are

26  far greater than what was represented to them, they are charged late fees that they

27  otherwise would not have incurred.  Additionally, all borrowers who are charged

28  inflated loan costs and other fees suffer injury in increased out-of-pocket costs over

- 53 -
SECOND AMENDED CLASS ACTION COMPLAINT

1  what they should have paid.  Borrowers who refinance from more traditional loans or

2  take riskier loans than they otherwise could have obtained elsewhere, in the false

3  belief that they are obtaining a loan on favorable terms, are injured by having to pay

4  the difference between fees and interest rates charged by Countrywide and those

5  another lender would have charged.  Borrowers who are forced to pay large pre-

6  payment penalties in order to extricate themselves from the destructive and dangerous

7  loans Countrywide has steered them into are injured by the out-of-pocket costs of the

8  penalties, which they would not otherwise have had to pay.

9                                           **COUNT III**

10              **VIOLATION OF 18 U.S.C. § 2 BY SEEKING TO AND
      AIDING AND ABETTING IN THE VIOLATION OF 18 U.S.C. § 1962(C)**

11

12         184.     Plaintiffs and Class members incorporate and reallege paragraphs 1

13  through 173 above as if fully set out herein.

14         185.     This claim arises under 18 U.S.C. § 1964(c).

15         186.     As set forth above, Defendants knowingly, and with shared intent,

16  sought to, and have, aided and abetted each of the other Defendants in the commission

17  of predicate acts, in engaging in a pattern of racketeering activity, and in violation of

18  U.S.C. § 1962(c) as described in paragraphs 174-178 above.

19         187.     As a result, under 18 U.S.C. § 2, the RICO violations of each

20  Defendant are those of the others as if they had been committed directly by them.

21         188.     As a direct and proximate result of the fact that each Defendant aided

22  and abetted the others in violating 18 U.S.C. § 1962 (c), Plaintiffs and Class members

23  have been injured in their business or property by the predicate acts which make up

24  the Defendants' patterns of racketeering.

25         189.     Specifically, Plaintiffs and Class members have been injured in their

26  business or property in a variety of ways, including the following: All borrowers who

27  are steered into loans whose complex terms have been misrepresented or inadequately

28  disclosed to them suffer injury in that they take on financial burdens that they would

1  not otherwise have taken on and suffer the destructive impact on their financial well-
2  being of having to make monthly payments they cannot afford, sometimes leading to
3  significant prepayment penalties when they seek to refinance their mortgages at a
4  more favorable rate, increases in the principal owed under certain types of loans,
5  defaults on their loans, loss of their homes, destruction of their credit, bankruptcy, or
6  financial ruin. Borrowers who experience unanticipated, dramatic rate increases, as in
7  the case of adjustable rate mortgages that have a short fixed-rate period, or in the case
8  of PayOption ARM loans, where the borrower's minimum monthly payment
9  inevitably causes the loan to "recast" to a significantly higher monthly payment based
10  on the negative amortization of the loan, suffer harm from the unexpected and onerous
11  burdens created by their suddenly having to make monthly payments in amounts that
12  greatly exceed what they committed to and can afford.  These borrowers are also
13  injured when, as a result of their inability to keep up with monthly payments that are
14  far greater than what was represented to them, they are charged late fees that they
15  otherwise would not have incurred.  Additionally, all borrowers who are charged
16  inflated loan costs and other fees suffer injury in increased out-of-pocket costs over
17  what they should have paid. Borrowers who refinance from more traditional loans or
18  take riskier loans than they otherwise could have obtained elsewhere, in the false
19  belief that they are obtaining a loan on favorable terms, are injured by having to pay
20  the difference between fees and interest rates charged by Countrywide and those
21  another lender would have charged.  Borrowers who are forced to pay large pre-
22  payment penalties in order to extricate themselves from the destructive and dangerous
23  loans Countrywide has steered them into are injured by the out-of-pocket costs of the
24  penalties, which they would not otherwise have had to pay.
25
26
27
28

SECOND AMENDED CLASS ACTION COMPLAINT

**COUNT IV**

**VIOLATION OF THE CALIFORNIA UCL, BUSINESS & PROFESSIONS CODE §17200, *ET SEQ.***

190.    Plaintiffs and Class members incorporate and reallege paragraphs 1 through 173 above as if fully set out herein.

191.    Defendants' scheme included making false and misleading representations to borrowers, occurring in significant part in California, which constitutes unlawful, unfair and fraudulent business practices under the UCL. In particular, because Defendants' scheme for steering borrowers into subprime loans was devised, implemented and directed from Countrywide's headquarters in California, including Countrywide's training of loan officers and the creation of the incentive structures for payment of its mortgage brokers, the UCL applies to a class of borrowers, both within and outside of California, who have been harmed as a result. Moreover, California has a substantial interest in preventing fraudulent practices within the State which may have an effect both in California and throughout the rest of the country.

192.    Specifically, Plaintiffs and Class members have been injured in their business or property in a variety of ways, including the following: All borrowers who are steered into loans whose complex terms have been misrepresented or inadequately disclosed to them suffer injury in that they take on financial burdens that they would not otherwise have taken on and suffer the destructive impact on their financial well-being of having to make monthly payments they cannot afford, sometimes leading to significant prepayment penalties when they seek to refinance their mortgages at a more favorable rate, increases in the principal owed under certain types of loans, defaults on their loans, loss of their homes, destruction of their credit, bankruptcy, or financial ruin. Borrowers who experience unanticipated, dramatic rate increases, as in the case of adjustable rate mortgages that have a short fixed-rate period, or in the case of PayOption ARM loans, where the borrower's minimum monthly payment

SECOND AMENDED CLASS ACTION COMPLAINT

1    inevitably causes the loan to "recast" to a significantly higher monthly payment based

2    on the negative amortization of the loan, suffer harm from the unexpected and onerous

3    burdens created by their suddenly having to make monthly payments in amounts that

4    greatly exceed what they committed to and can afford.  These borrowers are also

5    injured when, as a result of their inability to keep up with monthly payments that are

6    far greater than what was represented to them, they are charged late fees that they

7    otherwise would not have incurred.  Additionally, all borrowers who are charged

8    inflated loan costs and other fees suffer injury in increased out-of-pocket costs over

9    what they should have paid.  Borrowers who refinance from more traditional loans or

10    take riskier loans than they otherwise could have obtained elsewhere, in the false

11    belief that they are obtaining a loan on favorable terms, are injured by having to pay

12    the difference between fees and interest rates charged by Countrywide and those

13    another lender would have charged.  Borrowers who are forced to pay large pre-

14    payment penalties in order to extricate themselves from the destructive and dangerous

15    loans Countrywide has steered them into are injured by the out-of-pocket costs of the

16    penalties, which they would not otherwise have had to pay.

17        193.      Plaintiffs' claims involve questions of common and general interest as

18    provided under Cal. Code. Civ. P. § 382.

19        194.      Plaintiffs have suffered losses of money as a result of Defendants'

20    unlawful, deceptive and unfair business practices. As a result of Defendants'

21    violations of the UCL, Plaintiffs and members of the Class named in this Count are

22    entitled to bring this claim for disgorgement and to recover restitution, reasonable

23    attorneys' fees, and costs and other injunctive or declaratory relief as may be

24    available.

25

26

27

28

SECOND AMENDED CLASS ACTION COMPLAINT

**COUNT V**

**VIOLATION OF THE CALIFORNIA FAL, BUSINESS AND PROFESSIONS CODE §17500, *ET SEQ.***

195.    Plaintiffs and Class members incorporate and reallege paragraphs 1 through 173 above as if fully set out herein.

196.    Defendants violated California's false advertising laws because their scheme involved deceptive, untrue and misleading advertising. In particular, because Defendants' scheme for steering borrowers into subprime loans was devised, implemented and directed from Countrywide's headquarters in California, including Countrywide's training of loan officers and the creation of the incentive structures for payment of its mortgage brokers, the FAL applies to a class of borrowers, both within and outside of California, who have been harmed as a result. Moreover, California has a substantial interest in preventing fraudulent practices within the State which may have an effect both in California and throughout the rest of the country.

197.    Specifically, Plaintiffs and Class members have been injured in their business or property in a variety of ways, including the following: All borrowers who are steered into loans whose complex terms have been misrepresented or inadequately disclosed to them suffer injury in that they take on financial burdens that they would not otherwise have taken on and suffer the destructive impact on their financial well-being of having to make monthly payments they cannot afford, sometimes leading to significant prepayment penalties when they seek to refinance their mortgages at a more favorable rate, increases in the principal owed under certain types of loans, defaults on their loans, loss of their homes, destruction of their credit, bankruptcy, or financial ruin. Borrowers who experience unanticipated, dramatic rate increases, as in the case of adjustable rate mortgages that have a short fixed-rate period, or in the case of PayOption ARM loans, where the borrower's minimum monthly payment inevitably causes the loan to "recast" to a significantly higher monthly payment based on the negative amortization of the loan, suffer harm from the unexpected and onerous

SECOND AMENDED CLASS ACTION COMPLAINT

1  burdens created by their suddenly having to make monthly payments in amounts that

2  greatly exceed what they committed to and can afford. These borrowers are also

3  injured when, as a result of their inability to keep up with monthly payments that are

4  far greater than what was represented to them, they are charged late fees that they

5  otherwise would not have incurred. Additionally, all borrowers who are charged

6  inflated loan costs and other fees suffer injury in increased out-of-pocket costs over

7  what they should have paid. Borrowers who refinance from more traditional loans or

8  take riskier loans than they otherwise could have obtained elsewhere, in the false

9  belief that they are obtaining a loan on favorable terms, are injured by having to pay

10  the difference between fees and interest rates charged by Countrywide and those

11  another lender would have charged. Borrowers who are forced to pay large pre-

12  payment penalties in order to extricate themselves from the destructive and dangerous

13  loans Countrywide has steered them into are injured by the out-of-pocket costs of the

14  penalties, which they would not otherwise have had to pay.

15    198.    Defendants should be ordered to disgorge and make restitution to

16  Plaintiffs and Class members from the excessive payments and profits obtained at

17  their expense.

## COUNT VI

## UNJUST ENRICHMENT

20    199.    Plaintiffs and Class members incorporate and reallege paragraphs 1

21  through 173 above as if fully set out herein.

22    200.    Defendants' deceptive scheme unjustly enriched Defendants, to the

23  detriment of the Class, by causing Defendants to receive excessive monetary

24  payments from Plaintiffs and the Class.

25    201.    Specifically, Plaintiffs and Class members have been injured in their

26  business or property in a variety of ways, including the following: All borrowers who

27  are lured into loans whose complex terms have been misrepresented or inadequately

28  disclosed to them suffer injury in that they take on financial burdens that they would

- 59 -

SECOND AMENDED CLASS ACTION COMPLAINT

1   not otherwise have taken on and suffer the destructive impact on their financial well-

2   being of having to make monthly payments they cannot afford, sometimes leading to

3   significant prepayment penalties when they seek to refinance their mortgages at a

4   more favorable rate, increases in the principal owed under certain types of loans,

5   defaults on their loans, loss of their homes, destruction of their credit, bankruptcy, or

6   financial ruin. Borrowers who experience unanticipated, dramatic rate increases, as in

7   the case of adjustable rate mortgages that have a short fixed-rate period, or in the case

8   of PayOption ARM loans, where the borrower's minimum monthly payment

9   inevitably causes the loan to "recast" to a significantly higher monthly payment based

10  on the negative amortization of the loan, suffer harm from the unexpected and onerous

11  burdens created by their suddenly having to make monthly payments in amounts that

12  greatly exceed what they committed to and can afford. These borrowers are also

13  injured when, as a result of their inability to keep up with monthly payments that are

14  far greater than what was represented to them, they are charged late fees that they

15  otherwise would not have incurred. Additionally, all borrowers who are charged

16  inflated loan costs and other fees suffer injury in increased out-of-pocket costs over

17  what they should have paid. Borrowers who refinance from more traditional loans or

18  take riskier loans than they otherwise could have obtained elsewhere, in the false

19  belief that they are obtaining a loan on favorable terms, are injured by having to pay

20  the difference between fees and interest rates charged by Countrywide and those

21  another lender would have charged. Borrowers who are forced to pay large pre-

22  payment penalties in order to extricate themselves from the destructive and dangerous

23  loans Countrywide has lured them into are injured by the out-of-pocket costs of the

24  penalties, which they would not otherwise have had to pay.

25       202.    Defendants' retention of funds paid by Plaintiffs and Class members

26  violates the fundamental principles of justice, equity, and good conscience.

27       203.    Accordingly, Defendants should be ordered to return any funds

28  obtained as a result of their deceptive scheme to the Class.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs demand judgment against Defendants as follows:

(a)    Certification of the Class pursuant to Rule 23 of the Federal Rules of Civil Procedure, certifying Plaintiffs as the representatives of the Class, and designating their counsel as counsel for the Class;

(b)    A declaration that Defendants have committed the violations alleged herein;

(c)    An award of treble the amount of damages suffered by Plaintiffs and members of the Class as proven at trial plus interest and attorneys' fees and expenses pursuant to 18 U.S.C. § 1962(c) and (d);

(d)    Ordering Defendants to disgorge the payments and profits they wrongfully obtained at the expense of Plaintiffs and Class members;

(e)    Ordering that restitution be made to Plaintiffs and Class members for Defendants' unjust enrichment;

(f)    Ordering that an accounting be made by Defendants of their wrongfully obtained payments and profits;

(g)    An injunction preventing Defendants from engaging in future fraudulent practices, to the extent allowed by law;

(h)    Costs of this action, including reasonable attorneys fees and expenses; and

(i)    Any such other and further relief as this Court deems just and proper.

SECOND AMENDED CLASS ACTION COMPLAINT

1

## JURY DEMAND

2    Plaintiffs demand a trial by jury on all claims so triable as a matter of right.

3  DATED:    June 13, 2008

4                                        Respectfully submitted,

5

6                                        *Edith M. Kallas*

7    **WHATLEY DRAKE**
      **& KALLAS, LLC**

8    Joe R. Whatley, Jr. (*pro hac vice*)
      Edith M. Kallas (*pro hac vice*)

9    Ilze C. Thielmann (*pro hac vice*)
      Lili R. Sabo (*pro hac vice*)

10   1540 Broadway, 37th Floor
      New York, NY 10036

11   Telephone: (212) 447-7070
      Facsimile: (212) 447-7077

12

13   **GILBERT & SACKMAN,**
      A Law Corporation

14   Robert A. Cantore (Bar No. 127462)
      Jay Smith (Bar No. 166105)

15   Omar J. Shehabi (Bar No. 247827)
      3699 Wilshire Boulevard, Suite 1200

16   Los Angeles, CA 90010-2732
      Telephone: (323) 938-3000

17   Facsimile: (323) 937-9139

18

19   **EYSTER KEY TUBB ROTH**
        **MIDDLETON & ADAMS, LLP**

20   Nicholas B. Roth
      P.O. Box 1607

21   Decatur, AL 35602
      Telephone: (256) 353-6761

22   Facsimile: (256) 353-6767

23   **STROM LAW FIRM, L.L.C.**
      J. Preston "Pete" Strom, Jr.

24   Mario A. Pacella

25   2110 N. Beltline Boulevard, Suite A
      Columbia, SC 29204

26   Telephone: (803) 252-4800
      Facsimile: (803) 252-4801

27

28                      ***Counsel for Plaintiffs***

SECOND AMENDED CLASS ACTION COMPLAINT

**DECLARATION OF SERVICE BY MAIL**

STATE OF CALIFORNIA )
                     ) ss.
COUNTY OF LOS ANGELES )

I, the undersigned, am a citizen of the United States and a resident of the County of Los Angeles, over the age of eighteen years and not a party to the within proceeding; my business address is **GILBERT & SACKMAN**, A Law Corporation, 3699 Wilshire Boulevard, Suite 1200, Los Angeles, California 90010-2732. On June 20, 2008, I served the within *SUMMONS AND SECOND AMENDED CLASS ACTION COMPLAINT*, by depositing a true and correct copy thereof, enclosed in a sealed envelope with postage fully prepaid, in a mailbox regularly maintained by the government of the United States at Los Angeles, California, addressed as follows:

Brooks R. Brown, Esq.
Jung W. Han, Esq.
Robert B. Bader, Esq.
GOODWIN PROCTER
10250 Constellation Blvd., 21st Fl.
Los Angeles, CA 90067-6221

Thomas M. Hefferon, Esq.
GOODWIN PROCTER
901 New York Avenue NW
Washington, D.C. 20001

I declare under penalty of perjury that the foregoing is true and correct and was executed by me on June 20, 2008, at Los Angeles, California.

_Aimee Don-Jordan_
**Aimee Don-Jordon**, Declarant

# EXHIBIT 2
# (PART 1)

Atty. No. 99000

**IN THE CIRCUIT COURT OF COOK COUNTY, STATE OF ILLINOIS**
**COUNTY DEPARTMENT, CHANCERY DIVISION**

FILED 2
2008 JUN 25  AM 10: 18
CIRCUIT COURT OF COOK
COUNTY, ILLINOIS
CHANCERY DIV.
DOROTHY BROWN — CLERK

THE PEOPLE OF THE STATE OF
ILLINOIS,

       Plaintiff,

v.

COUNTRYWIDE FINANCIAL
CORPORATION, a Delaware
corporation; COUNTRYWIDE HOME
LOANS, INC., a New York
corporation also d/b/a Full Spectrum
Lending; FULL SPECTRUM
LENDING, a California corporation
formerly doing business in Illinois;
COUNTRYWIDE HOME LOANS
SERVICING, LP, a Texas partnership;
and ANGELO R. MOZILO,
individually and in his capacity as
Chief Executive Officer of Defendant
COUNTRYWIDE FINANCIAL
CORPORATION;

       Defendants.

```
(
(
(
(
(
(
(
(
(
(
(
(
(
(
(
(
(
(
(
(
(
(
```

**08CH22994**

## **COMPLAINT FOR INJUNCTIVE AND OTHER RELIEF**

NOW COMES the Plaintiff, THE PEOPLE OF THE STATE OF ILLINOIS, by LISA

MADIGAN, Attorney General of the State of Illinois, and complains of Defendants

COUNTRYWIDE FINANCIAL CORPORATION, a Delaware corporation, COUNTRYWIDE

HOME LOANS, INC., a New York corporation also doing business as Full Spectrum Lending,

FULL SPECTRUM LENDING, a California corporation formerly doing business in Illinois,

COUNTRYWIDE HOME LOANS SERVICING LP, a Texas partnership, and ANGELO R.

MOZILO, individually and in his capacity as Chief Executive Officer of Defendant
COUNTRYWIDE FINANCIAL CORPORATION.

Countrywide, in pursuit of market share, engaged in unfair and deceptive practices
including the loosening of underwriting standards, structuring unfair loan products with risky
features, engaging in misleading marketing and sales techniques, and incentivizing employees
and brokers to sell more and more loans with risky features. Countrywide's business practices
resulted in unaffordable mortgage loans and increased delinquencies and foreclosures for Illinois
homeowners.

Countrywide's explosive growth was paralleled by the demand for loans with non-
traditional risky features on the secondary market. Through the securitization process,
Countrywide shifted the risk of the failure of these non-traditional loans to investors. Moreover,
securitization allowed Countrywide to gain much needed capital to fuel the origination process
and reach its goal of capturing more and more market share. As the risky Countrywide loans
began to fail, it was forced to repurchase or replace the failing loans in the investor pools. This
created further pressure to increase the volume of loan origination.

To facilitate the increase in loan origination volume, Countrywide relaxed its
underwriting standards and sold unaffordable and unnecessarily expensive loans. Reduced
documentation underwriting guidelines were heavily used to qualify many borrowers for
unaffordable loans. Countrywide created so-called "affordability" loan products, such as
adjustable rate mortgages and interest-only loan products, that only required qualifying
borrowers at less than the full interest rate for the loan products. Countrywide pushed products
that containing layers of unduly risky features, such as pay option ARMs and mortgage loans for
100% of the value of borrowers' homes. Unfair and deceptive advertising, marketing and sales

2

practices were utilized to push mortgages, while hiding the real costs and risks to borrowers. These practices included enticing borrowers with low teaser rates, low monthly payments and "no closing cost" loans that failed to make clear and conspicuous disclosures of the products' risks. Finally, Countrywide engaged in unfair and deceptive acts and practices while servicing borrowers' loans, such as requiring borrowers to make initial payments without regard to whether a loan repayment plan or loan modification was even possible.

## JURISDICTION AND VENUE

1.      This action is brought for and on behalf of THE PEOPLE OF THE STATE OF ILLINOIS, by LISA MADIGAN, Attorney General of the State of Illinois, pursuant to the provisions of the Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/1 *et seq.*, the Illinois Fairness in Lending Act, 815 ILCS 120/1 *et seq.*, and her common law authority as Attorney General to represent the People of the State of Illinois.

2.      Venue for this action properly lies in Cook County, Illinois, pursuant to Section 2-101 of the Illinois Code of Civil Procedure, 735 ILCS 5/2-101, in that the Defendants are doing business in Cook County, Illinois.

## PARTIES

3.      Plaintiff, THE PEOPLE OF THE STATE OF ILLINOIS, by LISA MADIGAN, Attorney General of the State of Illinois, is charged, *inter alia,* with the enforcement of the Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/1 *et seq.* and the Illinois Fairness in Lending Act, 815 ILCS 120/1 *et seq.*

4.      Defendant ANGELO R. MOZILO is a co-founder of Defendant COUNTRYWIDE FINANCIAL CORPORATION, which was formed as Countrywide Credit Industries in 1969.

3

5.      Defendant MOZILO participates in, manages, controls, and has knowledge of the day-to-day activities of Defendant COUNTRYWIDE FINANCIAL CORPORATION.  He has been the Chairman of Defendant COUNTRYWIDE FINANCIAL CORPORATION'S Board since March 1999 and Chief Executive Officer of the company since February 1998.  Defendant MOZILO was also President of the company from March 2000 through December 2003 and has served in other executive capacities since the company's formation.

6.      Defendant MOZILO has stated that he has "devoted [his] life to building from the ground up a mortgage banking company focused on providing homeownership opportunities to all Americans" for the last four decades.

7.      Although Defendant MOZILO resides in California, his companies conduct business in Illinois and, on at least two occasions, he has engaged in purposeful activity to further the interests of Defendant COUNTRYWIDE FINANCIAL CORPORATION (and its subsidiaries) while in the State of Illinois.

8.      Specifically, during an April 27, 2006 earnings conference call, Defendant MOZILO reported that he had just finished a tour of the offices of the subsidiary that handles the securitization of mortgage loans originated by Defendant COUNTRYWIDE FINANCIAL CORPORATION.  As he reported, one of those offices was in Chicago.

9.      In addition, during October 1998, Defendant MOZILO appeared at the Mortgage Banker's Association of America's annual convention in Chicago.  At this appearance, Defendant MOZILO discussed the turbulence in the mortgage business and stated that only big firms with adequate resources to maintain access to bank lenders and the capital markets would survive.  He predicted that Defendant COUNTRYWIDE FINANCIAL CORPORATION would be a beneficiary of the market turbulence.

4

10.    Defendant COUNTRYWIDE FINANCIAL CORPORATION is a thrift holding company. It has numerous subsidiaries that originate, purchase, securitize, sell and service residential and commercial loans; provide loan closing services such as credit reports, appraisals and flood determinations; conduct fixed income securities underwriting and trading activities; provide property, life and casualty insurance; and manage a captive mortgage reinsurance company.

11.    Since December 23, 1980, Defendant COUNTRYWIDE HOME LOANS, INC., a wholly-owned subsidiary of Defendant COUNTRYWIDE FINANCIAL CORPORATION, has been a registered foreign corporation in the State of Illinois. Defendant COUNTRYWIDE HOME LOANS, INC. is a licensed Illinois mortgage bank, holding mortgage banker license MB.0000139, which is issued by the Illinois Department of Financial and Professional Regulations, Division of Banking. Since 2004, Defendant COUNTRYWIDE HOME LOANS, INC. has also done business in Illinois as Full Spectrum Lending.

12.    Defendant FULL SPECTRUM LENDING, INC., was a registered foreign corporation in the State of Illinois from October 3, 1996 through April 25, 2005. FULL SPECTRUM LENDING, INC. was a licensed Illinois mortgage bank, holding mortgage banker license MB.0004910, which was issued by the Illinois Department of Professional Regulations, Division of Banking. Defendant FULL SPECTRUM LENDING, INC. became a division of Defendant COUNTRYWIDE HOME LOANS, INC. in 2004. In April 2005, FULL SPECTRUM LENDING, INC. withdrew as a registered foreign corporation and began operating in Illinois as Full Spectrum Lending, a division of COUNTRYWIDE HOME LOANS, INC.

13.    In its annual reports from 1999 to 2006, Defendant COUNTRYWIDE FINANCIAL CORPORATION emphasized that mortgage banking, which has historically been conducted

5

through Defendant COUNTRYWIDE HOME LOANS, INC. for prime loan originations and

Defendant FULL SPECTRUM LENDING, INC. for subprime loan originations, was its core

business. Defendant COUNTRYWIDE FINANCIAL CORPORATION has stated that the

company is engaged primarily in residential mortgage lending and that Defendant

COUNTRYWIDE HOME LOANS, INC. is its primary subsidiary.

14.     During the entire time period from 1999 to 2006, there was a significant identity in the

corporate governance and managing directors of Defendant COUNTRYWIDE FINANCIAL

CORPORATION and Defendant COUNTRYWIDE HOME LOANS, INC. For example,

between 1999 and 2005, Stanford Kurland was the Chief Executive Officer for Defendant

COUNTRYWIDE HOME LOANS, INC. and he was also the Chief Operating Officer for

Defendant COUNTRYWIDE FINANCIAL CORPORATION. In 2006, David Sambol became

Chairman of the Board and Chief Executive Officer for Defendant COUNTRYWIDE HOME

LOANS, INC. and President and Chief Operating Officer of Defendant COUNTRYWIDE

FINANCIAL CORPORATION.

15.     There was also overlap between the management of Defendant FULL SPECTRUM

LENDING, INC., when it was a separate company, and Defendant COUNTRYWIDE

FINANCIAL CORPORATION. Specifically, Gregory Lumsden has been the President and

Chief Executive Officer for Defendant FULL SPECTRUM LENDING, INC. from 2001, when it

was a separate company, to the present day, when it is a division of Defendant

COUNTRYWIDE HOME LOANS, INC. He has been and is currently a managing director for

Defendant COUNTRYWIDE FINANCIAL CORPORATION.

16.     Defendant COUNTRYWIDE FINANCIAL CORPORATION issues consolidated annual

reports and SEC filings with Defendant COUNTRYWIDE HOME LOANS, INC. Additionally,

Defendant COUNTRYWIDE FINANCIAL CORPORATION files a consolidated federal income tax return and a combined state income tax return in California with Defendant COUNTRYWIDE HOME LOANS, INC. and Defendant FULL SPECTRUM LENDING, INC. Defendant COUNTRYWIDE FINANCIAL CORPORATION also issued consolidated earnings statements and balance sheets for itself, Defendant COUNTRYWIDE HOME LOANS, INC. and Defendant FULL SPECTRUM LENDING, INC.

17.    Defendant COUNTRYWIDE FINANCIAL CORPORATION controls the policies and operations and profits from the activities of Defendant COUNTRYWIDE HOME LOANS, INC. and Defendant FULL SPECTRUM LENDING, INC. Defendant COUNTRYWIDE FINANCIAL CORPORATION arranged and profited from the securitization and/or sale of loans originated and serviced by Defendant COUNTRYWIDE HOME LOANS, INC. and Defendant FULL SPECTRUM LENDING, INC.

18.    Because they acted cooperatively in carrying out the conduct alleged in this Complaint, Defendants ANGELO R. MOZILO,  COUNTRYWIDE FINANCIAL CORPORATION, COUNTRYWIDE HOME LOANS, INC. and FULL SPECTRUM LENDING, INC. are collectively referred to as "Countrywide," unless otherwise specified, and each is responsible for the unlawful conduct alleged herein.

19.    Defendant COUNTRYWIDE HOME LOANS SERVICING, LP is a licensed mortgage bank, holding mortgage banker license MB.0006041, which was issued by the Illinois Department of Financial and Professional Regulation, Division of Banking. Defendant COUNTRYWIDE HOME LOANS SERVICING, LP is a Texas limited partnership directly owned by two wholly-owned subsidiaries of Defendant COUNTRYWIDE HOME LOANS, INC. Defendant COUNTRYWIDE HOME LOANS SERVICING, LP services loans originated

7

by Defendant COUNTRYWIDE HOME LOANS, INC., the Federal National Mortgage

Association (Fannie Mae), the Federal Home Loan Mortgage Corporation (Freddie Mac), the

Government National Mortgage Association (Ginnie Mae), the United States Department of

Housing and Urban Development, and the United States Veterans Administration.

20.     Any allegation about any acts of Defendants COUNTRYWIDE HOME LOANS, INC.,

COUNTRYWIDE FINANCIAL CORPORATION, FULL SPECTRUM LENDING, INC. or

COUNTRYWIDE HOME LOANS SERVICING, LP, means that the entities did the acts alleged

through their officers, directors, employees, agents and/or representatives while they were acting

within the actual or ostensible scope of their authority.

## COMMERCE

21.     Section 1(f) of the Consumer Fraud and Deceptive Business Practices Act, 815 ILCS

505/1(f), defines "trade" and "commerce" as follows:

> The terms 'trade' and 'commerce' mean the advertising, offering for sale, sale, or distribution of any services and any property, tangible or intangible, real, personal, or mixed, and any other article, commodity, or thing of value wherever situated, and shall include any trade or commerce directly or indirectly affecting the people of this State.

22.     Defendants are and were, at all relevant times hereto, engaged in trade and commerce in

the State of Illinois, in that they offered mortgage lending services to the general public of the

State of Illinois.

23.     The Attorney General's Office has received over 200 complaints related to Countrywide

since 2005.

8

## COUNTRYWIDE'S BUSINESS PRACTICES RESULTED IN UNAFFORDABLE MORTGAGE LOANS AND INCREASED FORECLOSURES IN ILLINOIS

Countrywide's Domination of the Mortgage Industry

24.    Both Countrywide Financial Corporation ("CFC") and Countrywide Home Loans, Inc. are based in Calabasas, California.  CFC was formed by David Loeb and Angelo Mozilo as Countrywide Credit Industries in 1969. The company went public shortly thereafter.  Loeb retired in 2000.  The company restructured in 2001 and assumed its current name in 2002.

25.    Through its numerous subsidiaries, CFC is involved in virtually every segment of the residential mortgage industry.  The company sells, purchases, securitizes and services residential and commercial loans; provides loan closing services such as credit reports, appraisals and flood determinations; conducts fixed income securities underwriting and trading activities; provides property, life and casualty insurance; and manages a captive mortgage reinsurance company.

26.    CFC's primary subsidiary, Countrywide Home Loans, Inc., offers loans to consumers through three production channels.  The first channel is comprised of Countrywide's prime consumer-direct (retail) lending locations, referred to as the Consumer Markets Division, and nonprime consumer-direct (retail) lending locations, referred to as Full Spectrum Lending.  The second channel is wholesale lending through a network of mortgage loan brokers and other financial intermediaries.  The third channel is correspondent lending through which Countrywide provides lines of credit to financial institutions such as independent mortgage companies, commercial banks, savings and loans and credit unions, purchases the mortgages made pursuant to the lines of credit, and then arranges for the securitization of these loans.

27.    Today, Countrywide is America's largest mortgage lender.  In the first quarter of 2008, the company originated $73 billion dollars nationally in mortgage loans.  Countrywide has also been a significant originator of subprime mortgages.  By the first quarter of 2007, Countrywide

9

had become the largest originator of subprime loans, with a total subprime loan volume of roughly $ 7,881,000,000.

28.    Countrywide is also the nation's largest loan servicer.  The company administers $1.5 trillion in loans made by both it and other institutions.  Countrywide's servicing operation generated $1.4 billion in revenue in the first quarter of 2008.

29.    Countrywide has a significant presence in Illinois.  At the peak of its presence in Illinois, Countrywide operated approximately 100 retail branch offices and its mortgage loan products were offered by numerous mortgage brokers licensed to do business in Illinois.  Countrywide also purchased loans through a network of some 2,100 correspondent lenders.

30.    Countrywide was the largest lender in Illinois in 2004, 2005, and 2006.  During these years, Countrywide sold approximately 94,000 loans to Illinois consumers.

31.    In addition, Countrywide is the largest lender in the Chicago area.  In 2006, for example, Countrywide made over 21,000 loans to consumers in the seven county Chicago area.

The Explosive Growth of a Market for Loans with Non-Traditional Risky Features

32.    Countrywide's growth paralleled and was fueled by the rise of private-label securitization in the mortgage industry.

33.    Securitization of mortgage loans is a relatively recent phenomenon.  Historically, mortgages were long-term, fixed rate, amortizing products sold by depository institutions.  From the post-World War II era to 1973, savings and loan institutions held the majority of all mortgages.

34.    The privatization of the Federal National Mortgage Association (Fannie Mae) in 1968 and the creation of the Federal Home Loan Mortgage Corporation (Freddie Mac) in 1970 laid the groundwork for securitization of mortgages and the secondary market's role in the mortgage

industry. Fannie Mae and Freddie Mac, also known as government-sponsored entities ("GSEs"),

began purchasing loans from financial institutions. These financial institutions were required to

make limited representations and warranties regarding the quality of the loans. Any remaining

risk passed on to the GSEs.

35.     After purchase, the GSEs bundled the mortgages into pools in order to sell the income

stream to investors. An asset-backed or mortgage-backed security is ultimately created from

such a pool of loans. The entire process is generally referred to as securitization. As used by the

GSEs, the primary purpose of securitization was to create liquidity for funding more residential

mortgage loans.

36.     There are limits on the types of loans that Fannie Mae and Freddie Mac purchase. The

loans they purchase are subject to certain standards regarding loan amount and credit risk, which

generally must be demonstrated through written documents showing the borrower's credit score,

income, assets and liabilities and the value of the home securing the loan. Loans that meet the

underwriting standards are referred to in the mortgage industry as "conforming loans." Like

other mortgage lenders, Countrywide marketed and sold conforming loans to borrowers and then

sold these loans to the GSEs.

37.     Until the early 1990s, "non-conforming loans," or loans that did not meet the GSEs'

underwriting standards, were rare and expensive. Borrowers who were considered subprime

(due to credit profiles riskier than the minimum required for conforming loans) or were unable to

document income and assets, or who wanted loan amounts in excess of the GSEs' underwriting

guidelines had few options. This situation would soon change.

38.     In the early 1990s, banking regulators adopted new rules at a time when banks were

under considerable financial stress from the 1991 recession. For the first time, the new rules

measured bank health through the use of a capital to asset ratio. Unable to raise new capital to

increase the ratio, banks found it easier to reduce assets instead, and securitization proved

particularly useful for that task.  These assets included mortgage loans.

39.    Once banks had an incentive to divest assets, and with securitization enabling them to

pass at least part of the risk of a loan's failure to investors, financial institutions became less

wary of making riskier non-conforming loans.  Securitization was no longer just a tool to create

liquidity in the conforming mortgage industry.  Instead, mortgage originators could employ it as

a way of shedding much of the credit risk associated with non-conforming loans that they

originated.

40.    Wall Street became aware of the potential cash flow from the securities backed by non-

conforming mortgage loans.  Investors were attracted to these securities because they assumed

that non-conforming mortgage-backed securities would share the same stable performance of the

conforming mortgage-backed securities issued by the GSEs.  The favorable investment grade

ratings given to the securities by the various ratings agencies – which allowed institutional

investors such as state pension funds to buy the products – seemed to corroborate this

assumption.

41.    In addition, the yields on the non-conforming loan securities were attractive.  While

subprime loans – a type of non-conforming loan – carry greater risks, they also produce higher

returns.  For a time, the large returns on subprime mortgage-backed securities outpaced (and

concealed) high failure rates of loans in securitization pools.

42.    Investors paid a premium for certain types of loans and certain loan features, such as

loans with high interest rates (i.e., subprime loans) or loans with prepayment penalties.  Indeed,

investors' growing appetite for mortgage-backed securities fueled a surge in the origination of

subprime mortgage lending. Between 1994 and 2005, subprime mortgage lending grew from $35 billion to $625 billion. By the first quarter of 2007, subprime mortgage-backed securities were being sold at a rate of $100 billion per quarter. The explosive growth in subprime mortgage lending also marked a shifting away from traditional underwriting standards.

43.    Lenders, such as Countrywide, were aware of the types of loans and loan features for which investors would pay a premium. Investor demand and secondary market valuation, therefore, became the primary concern when determining what types of loans to market and sell and at what price, rather than the consumers' ability to repay the loans. Countrywide sought to place greater numbers of borrowers into loans laden with these premium-enhancing features.

44.    Countrywide had already established a small presence in the subprime lending field in the late 1990s, when it formed its retail subprime lending unit, Full Spectrum Lending. Following David Loeb's retirement in 2000, Countrywide became more aggressive in growing its business in an effort to be the nation's largest mortgage lender. Countrywide expanded the range of non-conforming loan products that it offered to consumers and began to concentrate more on subprime lending and exotic mortgage products. For example, in 2002, Countrywide originated roughly $9 billion in subprime loans. In 2005, that number shot up to over $44 billion.

45.    Countrywide also changed its corporate strategy to focus on increasing loan volume, which would in turn generate more loan origination fees for the company. Instead of focusing on fixed rate loans to creditworthy borrowers, the company began to emphasize reduced documentation loans and adjustable rate products. For example, in 2003, only 18% of the loans originated by Countrywide had adjustable interest rates. In 2004, however, that number had grown to 49%.

46.     By 2005, Countrywide's growth in both revenue and number of loans originated was fueled by the company's origination of a menu of risky loan products, such as reduced documentation loans, option ARMs, and loans for 100% of a home's value.

<u>Record Numbers of Foreclosures Nationally and in Illinois</u>

47.     For many years, rising home prices concealed the consequences of Countrywide's increased drive to sell loans regardless of the borrower's credit risk and ability to repay the loan. Borrowers were often lured into expensive home loans with the promise that they could refinance if the loan became unaffordable. As long as housing prices continued to rise and credit remained available, many borrowers followed this strategy. Predictably, with the collapse of the mortgage market and concomitant drop in housing prices, the days when borrowers could refinance out of an unaffordable mortgage ended, and, as has been widely documented, defaults and foreclosures nationwide are rapidly rising.

48.     In the third quarter of 2007, 24% of all outstanding subprime loans and 30% of subprime ARMs were either delinquent or in foreclosure. The Center for Responsible Lending has projected that 2.2 million homeowners nationwide will lose their homes as a result of failed subprime home loans originated from 1998 through 2006. This number could very well grow larger, as the projection was made before subprime default rates skyrocketed in 2007.

49.     In the Chicago area, the foreclosure crisis resulting from subprime loan origination will likely linger longer than in other parts of the country. In 2006, the Chicago metropolitan area had more "high-cost" (i.e., subprime) mortgages than any other metropolitan area in the country, according to a *Chicago Reporter* study. This marked the third year in a row that the Chicago metro area claimed the nation's top spot for high-cost mortgages. Countrywide led the way with high-cost loans in Chicago – in 2006 it was the leader in high-cost lending.

14

50.    Ultimately, although homeownership for subprime borrowers increased during recent years, it appears that there will be a net loss in homeownership nationwide. With the number of completed subprime foreclosures from 1998 to 2006 exceeding the number of homebuyers who used a subprime loan to enter the marketplace, the Center for Responsible Lending estimates that subprime mortgage lending has resulted in a net loss in homeownership of 900,000 homes nationwide. According to federal government figures, in 2007 homeownership suffered the biggest one-year drop on record.

51.    The failure of subprime loans explains only part of the homeownership crisis. Risky loan origination practices used in the prime mortgage market, such as volatile loan products like option ARMs and lax underwriting standards, also contributed to the current situation. Nationally, roughly 243,000 homes were in some stage of the foreclosure process in April 2008. This is up 65% from April 2007. The nationwide delinquency rate on mortgage payments grew to 6.35% in the first quarter of 2008, the highest since 1979.

52.    Illinois' home foreclosure rates have ranked among the highest in the nation for more than a year. Illinois experienced a 46% increase in the number of unique properties in foreclosure from 2006 to 2007 – 64,310 properties in 2007 as compared with 44,047 the year before. Lenders filed 9,670 foreclosures in May of this year alone, placing the state eighth in the number of new foreclosures filed. This represents a 41.71% increase from May 2007.

53.    The external costs of the mortgage collapse, in terms of declining property values and shrinking tax bases, are estimated to run over $200 billion nationally, with urban centers hit hardest. In Illinois, the loss is projected to be $15 billion, with $13 billion in Chicago.

Countrywide's Role in the Foreclosure Crisis Nationally and in Illinois

54.     The delinquency rate on the mortgage loans of America's biggest mortgage lender and

servicer, Countrywide, was 9.27% by the end of March 2008.  The company originated $7

billion nationally in mortgage loans in *one quarter* of 2008.  The March 2008 9.27% delinquency

rate was an increase from 5.02% at the end of 2006 and 3.68% in March 2006.

55.     The incidence of "seriously delinquent" loans – loans that are 90 days or more past due or

in foreclosure – is also increasing.  Countrywide's latest financial filing says that 4.81% of the

loans it services were seriously delinquent as of the end of March 2008.  This serious

delinquency rate was up almost four times from 1.70% at the same time in 2007.

56.     In terms of actual foreclosures, the percentage of Countrywide loans in foreclosure at the

end of March 2008, 1.28%, had almost doubled from 0.69% at the end of March 2007.

57.     Countrywide's subprime loans have failed even more frequently.  By the end of the first

quarter of 2008, 35.88% of the subprime loans serviced by Countrywide were delinquent, up

from 19.62% in the first quarter of 2007.  Slightly over 21% of all Countrywide subprime loans

serviced by the company were seriously delinquent by the end of March 2008, up from 7.82% in

March 2007.

58.     The number of Countrywide foreclosure filings in Illinois is troubling.  From 2006 to

2007, all foreclosure complaint filings in Cook Country increased by 46%.  For this same period,

however, Countrywide Home Loans, Inc.'s foreclosure complaint filings increased by 117%.

From January 2004 through June 2008, Countrywide Home Loans, Inc. has foreclosed upon at

least 2,534 Cook County homeowners.  Note that this number does not include foreclosures filed

by Full Spectrum Lending or any other Countrywide entity.

Securitization Sleight of Hand Masked Countrywide's Systemic Loan Origination Issues

59.    Countrywide's delinquency and foreclosure numbers show that there were systemic problems with the company's loan origination standards.  These loosened loan origination standards came into place due to Countrywide's securitization practices.

60.    Countrywide's quest for domination in the mortgage lending industry is well-documented.  During a May 24, 2005 investor conference, Defendant and Countrywide CEO Angelo Mozilo stated: "I am going to – little question – it's a question of dominance, you have heard this before we – we have [no] intention to structure the company to be at second place or third place."  This sentiment was echoed by then-Countrywide President and Chief Operating Officer Stanley Kurland, who stated:  "In the past, we talked about origination market share reaching 30% by 2008 and, as we've noted, this was intended to be a stretch goal as it is part of our culture, part of our nature to set aggressive targets."  Ultimately, this quest for market domination created a self-perpetuating cycle in which Countrywide raced against time to originate loans of decreasing quality to cover up the failure of its prior loan originations.

61.    This cycle began with Countrywide's attempt to gain market share.  The company had to acquire capital to fund loans and find borrowers to buy the loans.  To find borrowers, Countrywide both expanded its menu of nonconforming mortgage products and loosened the standards for selling its products to reach untapped consumers.  To gain capital, Countrywide relied on securitizing the loans that it made from its menu of nonconforming mortgage products and loosened loan origination standards.

62.    Securitization allowed Countrywide to generate capital using one of two methods.  In one method, Countrywide sold the loans it made to third parties who then aggregated the loans into pools and sold the income streams from the pooled loans to investors.  In this arrangement, a

17

party other than a Countrywide-controlled entity had an opportunity to evaluate the quality of the loans being aggregated. This party was able to enforce any representations and warranties that Countrywide made when selling the mortgage loans.

63.     In the other method, Countrywide eliminated the third-party intermediaries and completed the securitization process by itself. Countrywide Financial Corporation created numerous subsidiaries for this exact purpose. These subsidiaries purchased loans from Countrywide entities, pooled them, and issued securities that were later sold through a brokerage house. Securitization done through affiliated entities reduced any potential for delay in the process.

64.     This second method allowed Countrywide to control the entire origination and securitization process. In other words, Countrywide sold the loans itself, purchased and aggregated the loans itself, and issued the securities itself.[1] The same corporate executive could even sign off on securitization contracts as both the originator of the underlying mortgage loans and the purchaser of the same loans.

65.     Countrywide had strong incentives to securitize its loans quickly. In order for an asset-backed security to meet the Securities and Exchange Commission's requirements, it may not have non-performing loans and delinquent loans may not constitute 50% or more of the pool on the date the pool is readied for sale.[2]

66.     The securitization process was beneficial for Countrywide because it both generated capital and allowed Countrywide to shed "credit risk" from the possible failure of the underlying

_____

[1] In this self-dealing method, it is unclear how the required representations and warranties regarding the quality of the underlying loans would be enforced. Moreover, the Bank for International Settlements issued a 1992 report noting that "[t]here is at least a potential conflict of interest if a bank originates, sells, services and underwrites the same issue of securities." BIS is an international organization established in 1930 which fosters international monetary and financial cooperation and serves as a bank for central banks.

[2] Under this analysis, pay-option ARMs would have been among the most desirable products to satisfy this element since, with their very low teaser rate and option to make less than full interest payments for a certain period, they are unlikely to experience early payment defaults.

mortgage loans. Credit risk is the potential for financial loss resulting from the failure of a borrower to pay on a mortgage loan. As CFC noted in its annual regulatory filing for 2003, it managed "mortgage credit risk principally by securitizing substantially all mortgage loans that we produce, and by only retaining high credit quality mortgages in our loan portfolio." In comments to federal regulators, Countrywide advised that any guidance on nontraditional mortgage products "contain explicit acknowledgement that the risk profile of a lender who *effectively transfers the economic risks of a loan to the secondary market* is lower than that of a portfolio lender" (emphasis added).

67.    By selling loans onto the secondary market, Countrywide created loan pooling agreements through which it sought to limit its responsibility for the performance of the loans. For instance, Countrywide is required to repurchase the loan from investors under these agreements only in the event of documentation errors, underwriting errors, fraud, or early payment defaults (i.e., the borrower defaults within one or two months after the loan sale).

68.    Although Countrywide attempted to shed the risk of originating loans of lower quality, it retained some credit risk due to the representations and warranties that it is required to make when selling mortgage loans to either third parties or itself for securitization. As a result, investors still have some level of recourse against the company for defective loans.

69.    This recourse generally takes one of two forms. In some cases, these agreements required Countrywide to indemnify the investors for the defective loans. In other cases, however, Countrywide could simply swap in new loans for the defective loans through the "removal of accounts provisions" included in some of its securitization agreements. Swapping loans was preferable to lenders because it does not them to actually give investors cash.

19

70.    Under this approach, a lender, like Countrywide, needed to generate more loans if it both

wanted to continue securitizing and needed to replace the defaulting loans removed from the

securitized pools.  In addition, the lender, who is not able to transfer the defaulted loans it takes

back from the pools to anyone else, will want to hold more good loans on its balance sheet to

offset the increasing numbers of bad loans it is holding.  The lender must originate more loans to

hold on its books – in the hope that a sufficient number of the new loans will not default – to

offset the bad loans.  Countrywide admitted that it did as much in its December 31, 2005 10-K

filing, in which the company disclosed that "[t]he impact in the increase of the allowance for

[delinquent option] loan losses will be partially mitigated by the addition of new loans to our

portfolio."

71.    As Countrywide well knew or should have known, the loans that underpinned

Countrywide's securitizations were unstable.  In fact, the loans began to fail at a precipitous rate.

As the company observed in 2007, the volume of claims for breaches of its representations and

warranties grew due to the deterioration in credit performance of its loans.  Thus, Countrywide

had to accelerate origination to satisfy increased investor claims at precisely the time when it was

already increasing origination to simply obtain capital to maintain its market position.

Defendants' Unfair and Deceptive Underwriting Standards, Loan Products, Sales Techniques
and Servicing Practices

72.    Countrywide's need to accelerate loan originations compelled the company to develop a

business model that, beginning in at least 2003 or 2004 and lasting into 2007, reflected the

company's  indifference to whether homeowners could afford its loans.  As part of this model,

Countrywide: (a) originated mortgage loans to borrowers who did not have the ability to repay

the loan; (b) originated mortgage loans with multiple layers of risk that exposed borrowers to an

unnecessarily high risk of foreclosure or loss of home equity; (c) originated unnecessarily more

20

expensive mortgage loans to unknowing borrowers; and (d) engaged in unfair and/or deceptive marketing and advertising acts or practices.

73.    Also, Countrywide implemented a compensation structure that incentivized broker and employee misconduct without exercising sufficient oversight to ensure that misconduct did not occur due to:

      a.    Implementing a compensation structure that incentivized employees to maximize loan sales without proper oversight, resulting in the sale of unaffordable and/or unnecessarily expensive loans;

      b.    Failing to adequately supervise and/or implement proper underwriting guidelines to see whether brokers used and sold reduced documentation loans to avoid revealing borrowers' true income and assets;

      c.    Rewarding brokers for selling loans with certain risky loan features such as prepayment penalties without ensuring that borrowers received a benefit from the risky features; and

      d.    Structuring the compensation for option ARMs in such a way that brokers were incentivized to sell this riskier loan product – to the exclusion of other products – in order to obtain the maximum yield spread premium possible.

74.    Countrywide's servicing division, Countrywide Home Loans Servicing, LP, unfairly and deceptively required borrowers to make additional payments just to consider whether they would qualify for a loan repayment or modification plan – regardless of the potential feasibility or affordability of such a plan.

75.    Former employees commented on Countrywide's increasing disregard for a borrower's ability to repay a mortgage loan.  For example, a former Full Spectrum Lending Division

21

employee stated that the division (which was Countrywide's subprime lending arm) had underwriting guidelines that would approve virtually any loan. Likewise, an underwriter in Countrywide's Wholesale Lending Division said that her supervisor would approve most of the loans that she herself did not feel comfortable approving.

76.     Even though former employees noted that Countrywide had loose underwriting standards, the company also had a system to grant exceptions to those standards. A Countrywide wholesale account executive said that in the beginning of 2006, Countrywide became very aggressive in granting exceptions to their underwriting criteria – further diluting borrower protections.

77.     This employee also explained that she was pushed to sell more "Expanded Criteria" loans. Another wholesale account executive remarked that Countrywide paid its employees more to sell "Expanded Criteria" loans. Expanded Criteria loans included loans with reduced documentation underwriting, higher loan-to-value ratios and other risky loan features.

78.     Countrywide itself observed in its first quarter 2008 10-Q the consequences of this expansion into risky products and practices. It disclosed that, since 2007, it had "observed a marked decline in credit performance (as adjusted for age) for recent vintages, especially those loans with higher risk characteristics, including reduced documentation, high loan to value ratios or low credit scores."

79.     As described, Countrywide's expansion into riskier products and practices became apparent in a number of ways.

    Countrywide Sold Unaffordable and More Expensive Loans to Borrowers Due to its Lax
    Underwriting Standards

80.     For the reasons described above, Countrywide relaxed its underwriting standards in recent years. These relaxed underwriting standards allowed the mass selling of reduced

documentation loans and the failure to ensure borrowers had sufficient capacity to repay the mortgages Countrywide sold them.

A.    Countrywide Inappropriately Sold Reduced Documentation Loans

81.    Countrywide's relaxation of traditional underwriting standards is evident in its increased reliance on reduced documentation loans. From 2005 through the first half of 2007, a majority of the Countrywide mortgages sold in Illinois were reduced documentation loans, often called "stated-income" or "liar's loans." Countrywide underwrote these loans with less documentation and, consequently, less verification, of borrowers' income and assets than traditional mortgages.

82.    The four types of reduced documentation loans sold by Countrywide from at least 2004 through the first half of 2007 are described as follows:

a.    The "Stated Income Verified Assets" loan, often referred to as a "SIVA," required the disclosure of employment, income and assets on the loan application. Employment and assets were verified, but income was not verified by Countrywide. A debt-to-income ratio was calculated based on the stated income and it typically had to meet certain requirements. This product was the most commonly sold reduced documentation loan. In addition to the SIVA product, Countrywide sold a product known as the "Fast 'n' Easy" that had similar underwriting criteria. Borrowers whose credit score exceeded a certain threshold could qualify for the Fast 'n' Easy as opposed to the SIVA product.

b.    The "No Ratio" loan, often called a "NIVA," required the disclosure of employment and assets on the loan application, both of which were verified. However, income could not be disclosed on the loan application, and

23

Countrywide did not calculate debt-to-income ratios in qualifying borrowers for these loans.

c.  A "Stated Income Stated Assets" loan, or "SISA," required that employment be disclosed and verified, but neither income nor assets were verified by Countrywide.

d.  A "No Income No Assets No Employment" loan, also called a "No Doc" or "NINA" loan, prohibited disclosure of employment, income and assets on the loan application. No debt-to-income ratio was calculated to qualify the borrower.

83.    The various types of reduced documentation loans sold by Countrywide are collectively referred to in this Complaint as "reduced documentation" or "stated income" loans.

84.    Countrywide sold reduced documentation loans to prime borrowers and some types of reduced documentation loans to subprime borrowers.   Over time, Countrywide actually lowered the minimum credit score for which it would approve a reduced documentation loan to include a broader set of borrowers.  Countrywide also lessened underwriting standards for reduced documentation loans sold to subprime borrowers, increasing the numbers of subprime borrowers who were eligible to receive these loans.   In fact, during recent years, a significant percentage of the subprime loans Countrywide sold to Illinois borrowers were reduced documentation loans.

85.    Because a majority of the loans sold in Illinois in recent years were reduced documentation loans, Countrywide employees and brokers clearly sold reduced documentation loans to borrowers regardless of the borrowers' ability of the borrower to document income and assets.  In fact, Countrywide sold some of its reduced documentation loans to salaried borrowers who received W-2's from their employment.   Countrywide had no rules restricting the sale of reduced documentation loans to borrowers who had difficulty documenting their income.

Rather, they could be sold to borrowers regardless of the ease or difficulty of documenting their income, employment or assets.

86.     Countrywide had very few safeguards on the use and underwriting of reduced documentation loans.  The only check on fraudulent income was a reasonableness standard allegedly used by Countrywide.  Early on, Countrywide employees merely used their judgment in deciding whether or not a stated income loan seemed reasonable.  In or around 2005 or 2006, Countrywide required its employees to use salary.com – a website that provides a salary range for a given job title or profession in a certain zip code – to determine whether the income stated on the loan application appeared reasonable.  However, if the stated income fell outside of the range provided by salary.com, Countrywide underwriters could still approve the loan.

87.     In addition to a lack of controls on these risky underwriting guidelines, Countrywide pushed their sales employees, both retail and wholesale, and their underwriters to sell and close large volumes of loans without due regard for the risk to borrowers as quickly as possible. Countrywide fired employees for low production when they failed to originate and close sufficient numbers of loans.

88.     To encourage the fast origination of loans, Countrywide compensated its sales employees, at least in part, on the volume of loans sold.  The more loans its employees sold, the more money Countrywide paid them.  Countrywide sales employees were paid on a tiered bonus system that compensated them more for each tier of sales volume they reached during the month. Once an employee sold enough loans to put him in the next tier for that month, he would earn more on *each* loan he had sold during that month.  A substantial portion of the salary of Countrywide sales employees, both retail and wholesale, was based on sales volume.  In fact, wholesale account executives—Countrywide employees who dealt with brokers—were paid only

on commission, they had no base salary. Countrywide employees, therefore, had incentives to sell as many loans as possible – regardless of credit risk.

89.    Countrywide's underwriters were also compensated based on the number of loans they underwrote. They were paid a base salary, but a large percentage of their total salary was a bonus payment based on the number of loans underwritten. In addition, the goal for underwriters who reviewed broker files was to approve and process purchase files in 24 hours and refinance files in 48-72 hours. One underwriter stated that, for a period of time, she was required to underwrite 25 loan files a day during the week and 25-35 loan application files over the weekend. Thus, Countrywide underwriters also had a large incentive to underwrite as many loans as possible as quickly as possible, and Countrywide pushed them to do so.

90.    In addition to these compensation incentives for its own employees, Countrywide enticed its mortgage brokers to sell reduced documentation loans with advertisements proclaiming

> Expanded Criteria: More ways to say yes! Qualify more of your borrowers with Expanded Criteria programs from Countrywide®, America's Wholesale Lender®. Countrywide offers some of the most flexible documentation guidelines in the industry. Our extensive Expanded Criteria programs provide you with solutions that help you close more loans. You'll see that when it comes to lower documentation loans; no one delivers like Countrywide.

91.    Countrywide also enticed brokers with advertisements that said "Designed to deliver Low Doc and No Doc solutions to meet the needs of virtually every type of borrower," "NO INCOME NO ASSETS DOC OPTIONS," "Reduced Doc – Simplified and Enhanced!," and "Low down payment, low documentation solutions."

92.    The lack of rules and oversight on stated income loans, and the push for employees to sell more loans and to close loans quickly, facilitated rampant fraud in the sales of reduced documentation loans. Countrywide sales employees and brokers used reduced documentation loans as a way to qualify borrowers for loans they could not afford. One former Countrywide

employee has estimated that approximately 90% of all reduced documentation loans sold out of the branch where he worked in Chicago had inflated incomes.

93.    As noted in a Chicago Tribune article, the Mortgage Asset Research Institute reviewed 100 stated income loans, comparing the income on the loan documents with the borrowers' tax documents. The review found that almost 60% of the income amounts were inflated by more than 50%, and that 90% of the loans had inflated income of at least 5%.

94.    Countrywide sales employees sometimes received income documentation (e.g. W-2's or tax returns) and determined that the borrower could not qualify for the loan based on their real income.  The employee would then submit the loan as a stated income loan, inflating the borrower's income to qualify him for the loan.  Countrywide "stretch[ed] the income" on reduced documentation loans as far as possible.

95.    In the review of one Illinois mortgage broker's sales of Countrywide loans, the vast majority of the loans had inflated income, almost all without the borrowers' knowledge.

96.    Many Countrywide borrowers were not aware they were receiving a reduced documentation loan, and did not realize they were being sold a loan they could not afford and were not qualified to receive.

97.    In addition to a lack of rules concerning what borrowers were appropriate for reduced documentation loans, Countrywide failed to have sufficient controls concerning what loan programs could be sold as reduced documentation loans.  Many of the riskier exotic and "affordability" products offered by Countrywide were sold with reduced documentation.  For example, Countrywide's option ARM and interest-only products could be sold with reduced documentation underwriting.  Countrywide also sold loans with very high loan-to-value ratios with reduced documentation underwriting.

98.     Countrywide pushed these products in advertisements to its mortgage brokers like:

"Check Out Countrywide's Expanded Criteria 80/20 Loans with Reduced Documentation!";

"Low down payment, low documentation solutions. Qualify more borrowers with high LTVs and

low doc options from Countrywide®, America's Wholesale Lender®;" "Stated Income Program

Enhancements.  Up to 100% LTV;" and "The PayOption ARM from Countrywide®, America's

Wholesale Lender® offers your qualified borrowers reduced paperwork with the Stated

Income/Stated Assets (SISA) documentation option."

99.     Not surprisingly, reduced documentation loans have higher delinquency rates than full

documentation loans, further suggesting the prevalence of fraud in these loans.

100.    Countrywide acknowledged the existence of higher default rates for reduced

documentation loans in its 10-Q filing for the first quarter of 2008:

> We attribute the overall increase in delinquencies in our servicing portfolio from
> March, 31, 2007 to March 31, 2008, to increased production of loans in recent
> years with higher loan-to-value ratios and reduced documentation requirements,
> combined with a weakening housing market and significant tightening of
> available credit and to portfolio seasoning.

101.    Even if income was not inflated, Countrywide charged many borrowers more for reduced

documentation loans.  Countrywide employees used reduced documentation loans because they

were faster, easier to sell, and to underwrite.  It took as little as 30 minutes to underwrite some

reduced documentation loans, and some loans closed the same day the application was taken

from the borrower.  This scheme enabled Countrywide employees to sell more loans and make

more money.  So, some borrowers who could easily have documented their income were sold

more expensive reduced documentation loans by Countrywide employees and brokers.

102.    In short, Countrywide's sale of reduced documentation loans put many Illinois borrowers into unnecessarily riskier and more costly loans and, for many borrowers, loans that they could not afford.

B.    Countrywide Inappropriately Qualified Borrowers For Adjustable Rate and Interest-Only Mortgages Based on Less than a Fully-Indexed Rate or Less Than Fully-Amortizing Payments

103.    In addition to increased sales of reduced documentation loans, in recent years Countrywide also increased its sale of "affordability" products. These loans allowed borrowers to obtain a loan with low initial payments that would not continue for the life of the loan. Countrywide qualified borrowers at this initial low payment knowing that they would not be able to repay the loan in its entirety.

104.    One affordability product Countrywide sold was an interest-only loan. An interest-only loan allows borrowers to make payments covering only the interest on their loan during the first years of the loan, usually the first 3, 5, 7 or 10 years. After this initial period, borrowers must make fully-amortizing payments to pay off their principal balance plus interest over the remaining life of the loan. The interest-only payments at the beginning of the loan are much lower than the later fully-amortizing payments.

105.    According to an article by the New York Times published on November 11, 2007, Countrywide was the second leading originator of interest-only loans from 2006 through the second quarter of 2007.

106.    Countrywide sold interest-only loans to prime and subprime borrowers as stated income loans. In 2005 and 2006, Countrywide's interest-only loan was sold to a borrower with a credit score as low as 560 , and as a stated income loan to a borrower with a credit score as low as 620.

107.    In 2007, Countrywide qualified non-prime borrowers to receive interest-only loans for up to $1 million with a minimum credit score of 600 and up to $850,000 with a minimum credit score of 580.  Interest-only loans in lesser amounts were also available to non-prime borrowers as stated income loans.  One Countrywide ad to brokers touts "Interest-Only loans from Countrywide®, America's Wholesale Lender® offer low monthly payments for the initial loan period, possibly helping your non-prime customers qualify for a bigger loan amount."

108.    During at least part of the time from 2003 through 2007, Countrywide qualified its borrowers at less than fully-amortized payments on its interest-only products.  According to comments Countrywide provided to federal regulators concerning the proposed Interagency Guidance on Nontraditional Mortgage Products, Countrywide stated that "[i]nterest-only loans are designed to be an affordability product, allowing borrowers to qualify at the 'minimum' or lower non-amortizing interest only payment for a fixed and extended term.  We [Countrywide] believe that it is appropriate to qualify borrowers based on the interest only payment."

109.    Countrywide advertised these loose underwriting standards to its brokers in ads like "Maximize your borrower's cash flow with Interest-Only loans.  Qualify based on the Interest-Only payment."

110.    The practice of qualifying borrowers at low interest-only payments, which, under the terms of the mortgage, can only be paid during a certain period of the loan and then a higher, fully amortizing payment will be required, places borrowers into loans that they ultimately may not be able to afford.  Such a practice implicitly relies on borrowers either changing their financial circumstances or being able to sell their home or refinance their loan.

30

111.    Moreover, these interest-only loans could be given using the loose standards of a Stated Income; No Ratio; Stated Income, Stated Asset; and a No Income, No Assets or Employment (No Doc) loan, creating even more risk that the borrower would not be able to afford the loan.

112.    Countrywide advertised its "flexible qualifying criteria" even to brokers selling this product to subprime borrowers.  In one ad to brokers titled "Interest Only Now Available for Non-Prime Stated Wage Earners," Countrywide told its brokers that their "Interest Only loan options give Stated Wage Earners more flexible qualifying criteria."  Countrywide went on to entice brokers to "learn more about how our Non-Prime Interest Only loan programs can help you increase your business and qualify more borrowers for their dream home . . .".  This interest-only product could be sold as a stated income loan to a borrower with a credit score as low as 620.

113.    The interest-only loan advertised above could also be a hybrid ARM.  Borrowers who took out this loan as a hybrid adjustable rate mortgage ("ARM") received a loan that (1) allowed them to pay only the interest portion of their full payment for the first years of the loan, and (2) came with a discounted interest rate that would likely increase after the first few years.  Such borrowers were set up for a payment shock once the discounted fixed rate term and interest-only portion of their loan was over.

114.    Countrywide used these products to entice unsuspecting borrowers with low monthly payments and to qualify more borrowers for loans – often loans that they might not be able to afford long-term.

115.    Another affordability product sold by Countrywide was the hybrid ARM.  These loans typically have a two-or three- year fixed rate followed by 28 or 27 years of a variable rate, and are often referred to as a 2/28 and 3/27.  These loans usually came with low, discounted interest

rates during the short fixed-rate period. After the fixed-rate period ended, the rate would adjust—but could only adjust up, not down—every six months to a year, based on an index plus a margin. Countrywide sold these loans to prime and subprime borrowers.

116.    Countrywide also qualified its borrowers at less than fully-indexed rates on its 2/28's and 3/27's, meaning that Countrywide qualified the borrowers based on low rates that would adjust upward in two or three years without regard to whether the borrowers could afford the higher rates. This scheme forced borrowers into unaffordable payments once the fixed rate period of their loans terminated because they were not qualified at these higher payments.

117.    One Illinois consumer's experience provides an example of Countrywide's business practice of placing borrowers in unaffordable hybrid ARM loans. Countrywide was the servicer for a 64 year-old widow's mortgage loan. This widow lived on a fixed income. At the time Countrywide purchased the servicing rights for her loan, the widow had a 30-year fixed-rate mortgage with a monthly payment of approximately $300. In January 2005, Countrywide refinanced this 64 year-old borrower into a 3/27 interest-only loan with a fixed rate for only the first three years of the loan. The consumer's monthly payment more than doubled to approximately $800 a month. Even before this consumer's loan reset, however, she was unable to afford her mortgage payment – showing that Countrywide refinanced her into an unaffordable adjustable rate mortgage.

118.    Countrywide acknowledged in a May 7, 2007 letter to the Office of Thrift Supervision commenting on a proposed federal Statement on Subprime Mortgage Lending that: "Specifically looking at originations in the fourth quarter of 2006, we know that almost 60% of the borrowers who obtained subprime hybrid ARMs [from Countrywide] would not have qualified at the fully indexed rate." Countrywide also acknowledged that "almost 25% of the borrowers would not

32

have qualified for any other [Countrywide] product." Even removing the added risk layers of reduced documentation and high loan-to-value ratios, Countrywide knew that a majority of the borrowers who received their hybrid ARMs, at least during this period, were likely unable to afford the loans unless they refinanced by the time the introductory fixed period expired.

119.　　Countrywide did not inform its borrowers who were qualified at less than a fully-indexed rate or less than a fully-amortizing payment, that they were not qualified at the higher payments after the loans reset.

120.　　Countrywide made loans to borrowers that they ultimately would not be able to afford, relying on the premise that borrowers would be able to continue to refinance out of their unaffordable loans into new loans – and without making clear to borrowers the costs and risks of such loans.

### Countrywide Pursued Market Share With Products That Layered Borrowers' Loans with Unnecessary Additional Risk

121.　　Even as it was relaxing its underwriting standards to increase loan origination, Countrywide also sought to increase its market share by offering new products packed with features that compounded risk to the borrower. These included option ARM mortgage products and loans for all or close to all of a homeowner's equity in a home.

122.　　The New York Times aptly described Countrywide's increasing origination of exotic products during the period from 2005 into 2007 with a quote from a former Countrywide executive that: "To the extent that more than 5 percent of the market was originating a particular product, any new alternative mortgage product, then Countrywide would originate it."

A.    Countrywide's Combined its PayOption ARM with Unnecessary Layers of Risk, Improper Marketing, Confusing Disclosures, Inappropriate Sales Incentives and Inadequate Oversight

123.    Countrywide's marketing and selling of option ARM mortgage loans exemplifies the company's increasing reliance on unfair and deceptive loan products and sales techniques to increase its market share.

124.    From their inception, option ARMs were intended to be "a niche product aimed at sophisticated and well-heeled borrowers who wanted flexibility." Starting in 2003, however, option ARM origination grew beyond this narrow market, particularly at Countrywide.

125.    Option ARMs, frequently referred to as "exotic" mortgage products, have three core features that sharply contrast with traditional mortgage loan products.

126.    First, for a certain period of time, borrowers have four options as to which payment to make each month. These payment options are (1) a minimum payment that covers none of the principal and only part of the interest normally due each month; (2) an interest-only payment; (3) a payment that is amortized to pay off the loan in 30 years; and (4) a payment that is amortized to pay off the loan in 15 years.

127.    Second, an option ARM may result in negative amortization – meaning that the amount owed increases over time. The amount of accrued interest that is not paid each month is added onto the borrower's loan balance. Therefore, the balance of the borrower's loan will actually increase by the amount of the unpaid interest if the borrower makes only minimum payments.

128.    Traditionally, failure to pay the amount of accrued interest on a loan each month results in default and, ultimately, foreclosure. This outcome is a negative event for both the borrower and the lender. With option ARMs, however, Countrywide was able to neutralize this negative

event – at least for itself. Countrywide simply added this uncollected interest to the borrower's loan as additional principal and calculated the interest on this new, higher amount of principal.

129.    There was, however, a cap to the amount of unpaid interest growing from negative amortization that could be added to the principal of the loan. Once the loan balance hit a certain ceiling – typically 115% of the loan's value – the minimum and interest-only payment options were removed and the borrower had to make fully-amortizing principal and interest payments. This "recasting" of the loan is the third core feature of a option ARM.

130.    The fully-amortizing payments that borrowers must make after recast are far more than the minimum payment that the borrowers had been previously making. Taking one consumer's loan as an example, the monthly minimum payment was $751, but the fully amortizing payment was $1834. The payment shock experienced by option ARM borrowers when the interest rate on their adjustable rate mortgage fluctuated was small compared to the payment shock from a loan recasting to require the fully-amortizing payment. Assuming steady interest rates, recasting for consumers who consistently make the minimum required payment will occur approximately three to four years after origination of the loan.

131.    Countrywide quickly became a leader in this profitable and growing part of the mortgage market. Option ARMs increased from approximately 3% of the company's loan production during the quarter ended June 30, 2004, to approximately 21% of its production during the quarter ended June 30, 2005.

132.    The reason for Countrywide's increasing origination of option ARMs is clear: profit. An investigation by the New York Times revealed that option ARMs "were especially lucrative. Internal company documents from March [2007] show that Countrywide made gross profit

35

margins of more than 4 percent on such loans, compared with 2 percent margins earned on loans backed by the Federal Housing Administration."

133.     At the same time that Countrywide touted the profitability of these loans, it also acknowledged that they were riskier for borrowers.  The company said in its June 30, 2005 10-Q filing, "[w]hen the monthly payments for pay-option loans eventually increase, borrowers may be less likely to pay the increased amounts and, therefore, more likely to default on the loan, than a borrower using a normal amortizing loan."  Angelo Mozilo even acknowledged that "it isn't clear how successful borrowers ultimately will be in paying off their option ARMs."

134.     As discussed below, it is now clear that many borrowers will not only fail to pay off their option ARMs, but will lose equity in their homes and perhaps the ownership of their homes altogether.  The full breadth of the problem has yet to emerge, but the numbers show that borrowers are losing ground.  During the nine months ended September 30, 2007, 76% of borrowers elected to make less than full interest payments – much less than a payment that would cover any amount of the outstanding loan principal.  This represents a 10% increase over the number of borrowers making less than full interest payments during the same period in 2006.

135.     While attention is now focused on the meltdown in the subprime mortgage industry, option ARMs – which are classified as "prime" loan products – are ticking time bombs contained in lenders' prime loan portfolios and in securitized loan pools.  According to Moody's Economy.com, monthly payments on roughly $229 billion of option ARMs will recast to include market-rate interest and principal from 2009 to 2011.

36

1.   Countrywide Inappropriately Coupled its Volatile PayOption ARM Loan Product
     with Teaser Interest Rates, Prepayment Penalties, High LTVs and Reduced
     Documentation Underwriting

136.   The core features of an option ARM – multiple payment options, negative amortization and automatic recasting of loan terms – make the product much riskier than traditional mortgages.  But Countrywide typically did not sell its option ARM (typically called a PayOption ARM) with just these three features.  Instead, it proceeded to layer the product with features that made it exceptionally risky, placing borrowers at risk of losing equity in their homes or even their homes.  These features include: illusory teaser interest rates, prepayment penalties, high loan-to-value ratios and/or reduced documentation underwriting guidelines.  As one former Countrywide loan originator explained, Countrywide's "options ARMs were built to fail."

137.   Countrywide frequently combined its PayOption ARMs with illusory "teaser" interest rates.  These "teaser" interest rates could be as low as 1%, but were illusory in that they were generally only valid for the first month or first three months of the loan.

138.   After the illusory teaser interest rate expired, the interest rate on the loan would adjust to a true interest rate that typically had a cap of 9.95%.  After the initial interest rate adjustment, the interest rate on the loan would continue to adjust each month.  Therefore, the borrower would only have the benefit of the interest rate for one to three months of the 30 to 40 years of the life of the loan.

139.   An interest rate that was only in effect for one month conferred no real benefit to a borrower.  Thus, the marketing emphasis on the teaser interest rate of Countrywide's PayOption ARM was inherently misleading.

140.   Interviews with former Countrywide employees and brokers and an examination of Countrywide's advertisements confirmed that the teaser interest rate was used to mislead

37

borrowers and obfuscate the true interest rate of the loan. A former Countrywide Account
Executive, who was assigned to work with brokers in selling Countrywide products, was
encouraged to tell her brokers to sell the loan based on the low monthly payment. A former
employee who worked at Countrywide's prime retail locations confirmed that loan originators
sold the product by highlighting the low payment on the option ARM, although it was based on
an illusory teaser interest rate.

141.    Countrywide's advertisements highlighted the teaser interest rate. For example, a
television advertisement promoting the product emphasized "[a]nd 1 percent, you can't beat that.
So pick up the phone, call Countrywide, or just visit your local branch today." Despite legal
disclaimers, this emphasis on the teaser interest rate shows the company's intent to use the teaser
to market the product.

142.    Countrywide also generally coupled its option ARM loans with a three year prepayment
penalty. In order for a consumer to refinance an option ARM during the first three years of the
loan, the consumer would be required to pay the equivalent of six months' interest on the loan.
Consequently, even if borrowers became aware of the risky features of their mortgage, they were
effectively trapped in a loan with a payment that could adjust upward and become unaffordable.

143.    Although prepayment penalties are touted by lenders as a bargaining tool for consumers,
analysis has revealed that subprime borrowers generally received no appreciable benefit in
exchange for accepting a loan with a prepayment penalty. At least one broker indicated that,
although he was paid more for a loan with a prepayment penalty, there was no appreciable
benefit to a prime consumer for taking a loan with a prepayment penalty. Therefore, the only
point of this risky feature was to generate additional profit for Countrywide because investors
would pay more for loans with prepayment penalties.

144.    Another risky feature that Countrywide layered onto its PayOption ARM allowed a

borrower to mortgage 90-95% of a home's value with a PayOption ARM first mortgage for the

bulk of the amount and a second mortgage for the remainder.

145.    According to a UBS survey conducted on behalf of The Wall Street Journal:

> Countrywide also allowed borrowers to put down as little as 5% of a home's price and
> offered "piggyback mortgages," which allow borrowers to finance more than 80% of a
> home's value without paying for private mortgage insurance. By 2006, nearly 29% of the
> option ARMs originated by Countrywide and packaged into mortgage securities had a
> combined loan-to-value of 90% or more, up from just 15% in 2004, according to UBS.

146.    Although higher loan-to-value ratios are inherently riskier than lower loan-to-value

ratios, that risk is compounded when the underlying mortgage product is an option ARM.  If a

borrower has an option ARM mortgage with a high loan-to-value ratio or during a time when the

housing market depreciates (or both), the borrower could easily end up owing more on a home

than it was worth because of the possibility of negative amortization on this product.

147.    Finally, the vast majority of the PayOption ARMs sold by Countrywide were

underwritten with reduced documentation requirements.  Prudent underwriting is how borrowers

are protected from the risk that they will be given a mortgage that they will not be able to repay.

In the case of a PayOption ARM, Countrywide purportedly mitigated the risk that borrowers

would not be able to repay their risky loans by requiring that its underwriters qualify borrowers

at the full principal and interest payment for the option ARM.  This process became a

meaningless protection, however, when Countrywide failed to require full documentation for its

underwriting.

148.    When Countrywide designed its mortgage products, it also determined what underwriting

documentation requirements it would attach to the product.  As discussed above, these

requirements could vary from full documentation to no documentation at all. Countrywide

apparently decided that its underwriting for an option ARM did not require full documentation.

149.    This decision led to underwriting guidelines that allowed a borrower to mortgage 95% or

more of the value of a home with a PayOption ARM underwritten with stated income and stated

assets.

150.    Countrywide's decision to allow reduced documentation underwriting resulted in the vast

majority of its PayOption ARMs being sold with less than full documentation. Of the option

ARMs Countrywide sold in 2007, 82% were reduced documentation mortgages in which the

borrower did not fully document income or assets.

151.    One former Countrywide manager noted that the loans were an easy sell because they

could use stated income – presumably to ensure that the borrower's income (at least what was

stated as the borrower's income) was sufficient to qualify for the mortgage.

152.    As discussed above, low or no documentation loans are likely to contain material

misrepresentations and/or fraud that will result in increased default rates. Risk of default is

compounded when a lessened underwriting standard is coupled with "nontraditional" mortgages

such as option ARMs. Regulators and analysts have counseled against this type of risk layering.

> Banking regulators say that lenders are increasingly relying on unverified income to
> qualify borrowers for so-called nontraditional mortgage loans. Those products – such as
> pay-option adjustable-rate mortgages and interest-only loans – allow borrowers to defer
> payment of principal and sometimes interest. Many analysts see such a combination of
> nontraditional products and nontraditional underwriting processes as presenting another
> layer of risk to those who could be hurt by defaults, including consumers, shareholders in
> mortgage lenders and investors in securities backed by mortgage loans.

153.    Combining a PayOption ARM with any of the risk-layering features described above

results in a product that is significantly increases a borrower's risk of loosing home equity or

ending up in foreclosure.

154.    Delinquency reports support this conclusion. Statistics show that consumers are becoming increasingly delinquent on option ARMs. Countrywide securitized roughly three quarters of its option ARMs, but held the loans most likely to be high performing in its portfolio. Of the option ARMs that Countrywide held in its bank portfolio, 9.4% of the option ARMs were at least 90 days past due in April 2008, up from 5.7% at the end of December 2007 and 1% a year earlier. As this input likely includes many option ARMs that have not recast, these delinquencies are particularly alarming as they show consumers are not even able to make the minimum payment on these loans. In other words, borrowers somehow received option ARMs when they were unable to make even the minimum payments, much less the fully-amortizing payment.

155.    These numbers show that option ARMs are failing at a troubling rate, but that has not led Countrywide to stop layering the product with risky features. In fact, an analysis of only those option ARMs that Countrywide held in its own portfolios (i.e., the least risky option ARMs) shows a steady decrease in loan quality. For example, the loan-to-value ratio for the product increased from 73% in 2004 to 76% in 2007. The average credit score, a general indicator of creditworthiness, dropped from 730 in December 2004 to 716 in September 2007. Even though external indicators should have provided Countrywide with ample notice that it needed to tighten option ARM underwriting criteria, the company continued to relax its standards in selling increasingly risky loans.

156.    Former Countrywide employees and brokers who sold Countrywide products have stated that option ARMs are risky products.

157.    Some of Countrywide's own former employees found the product unsound for anyone. Brokers who sold the product opined that it should never be paired with either a prepayment

penalty or reduced documentation underwriting due to the dramatic increase in risk to the borrowers.  Another broker referred to the product as a "ticking timebomb" and another former Countrywide employee referred to it as "dangerous."

> 2.    Countrywide Improperly Mass Marketed Its PayOption ARMs and Failed to Provide Borrowers with Adequate Disclosures About the Product's Risks

158.    Despite the structural unfairness of the PayOption ARM described above, Countrywide marketed the product indiscriminately to all borrowers, pushed its employees and brokers who sold Countrywide loans to sell the product inappropriately and failed to provide disclosures to ameliorate borrowers' confusion about the mortgage they were obtaining.

159.    With all of its risky features, the PayOption ARM should have been marketed cautiously – if at all.  That was not, however, Countrywide's approach.  For example, Countrywide sent direct mailers to consumers whose loans it serviced to market the product.  In one such mailer, Countrywide advised the consumer that he had an "excellent payment record" and might now qualify for "our best 'A' level mortgage interest rates – such as our PayOption ARM."

160.    Likewise, Countrywide sent direct mailers to consumers advising them to call Countrywide for a one year anniversary loan check-up.  The direct mailer also touted Countrywide's option ARM product.

161.    Countrywide provided its brokers with sample advertisements that they could use to entice borrowers to get option ARMs.  One of these advertisement exemplars asks borrowers "[w]ho doesn't need more options?"  The implication of the ad is that an option ARM is appropriate for anyone who would simply like "more options."

162.    The disclosures that Countrywide gave borrowers provided little help in explaining their actual mortgages because they were the epitome of "information overload."  For example, in 2007, one disclosure entitled the "Home Loan Application Disclosure Handbook" (Handbook)

was 123 pages long and had 63 pages concerning all of the available Countrywide loan products, not just the products in which borrowers were interested.

163.    Regardless of whether borrowers applied for loans through a broker or a retail division, Countrywide sent borrowers various disclosures, such as this handbook, prior to closing loans. Often acknowledgment forms accompanied the disclosures. For some borrowers, Countrywide required consumers to sign acknowledgement forms prior to processing the loan application. At this point, what types of loans they could even afford. Without this information, it was difficult for borrowers to assess the various mortgage products and their options. For other borrowers, Countrywide required borrowers to sign acknowledgment forms at closings, along with many other closing documents.

164.    For borrowers wanting to learn about PayOption ARMs, in the Handbook, there were eight pages about different PayOption ARMs buried in the middle of other disclosures. Each of these had confusing titles such as "PayOption Adjustable Rate Mortgage Loan Program Disclosure Monthly Treasury Average ("MTA") Index-Payment Caps All States Except New York."

165.    Not only did this Handbook bury explanations of Countrywide PayOption ARMs and use confusing titles to describe them, it also failed to adequately warn borrowers about the possible pitfalls of negative amortization with option ARMs, like depreciation of home values. The Handbook defined negative amortization as ... "the interest shortage in a [consumer's] payment is automatically added to the loan balance and then interest may be charged on that amount). [The consumer] might therefore owe the lender more later in the loan..." It then stated, "However, an increase in the value of your home may make up for the increase in what you

43

owe." Yet, it never stated that if the market failed or the value of the homes depreciated, consumers would owe more than the value of their homes.

166.    By overloading borrowers with irrelevant information and using confusing language, Countrywide's disclosures hid the very information that they were supposed to disclose to consumers—the relevant details about their actual mortgages.

167.    Notably, a number of former Countrywide employees remarked that they did not feel comfortable selling the products because they either did not understand the product themselves or did not feel comfortable explaining it to someone else.

168.    Although Countrywide may have created training materials for the product, at least one former employee did not recall receiving any training on it at all – although she was authorized to sell option ARMs. Brokers authorized to sell Countrywide products similarly recalled that the company failed to provide any training materials on option ARMs.

169.    With their risk and complexity, option ARMs should have been sold with discretion and only with proper disclosures of risks. Countrywide knew from its own empirical evidence that its mass-marketing of this product would place many homeowners into unsustainable loans.

170.    When consumers made only the minimum payment, Countrywide carried the negative amortization that resulted on its books as uncollected "income." In 2004, the accumulated negative amortization "income" was only $29 thousand. For the year ending 2007, however, accumulated negative amortization from pay option ARMs that Countrywide was holding on its books had grown to $1.215 billion. The negative amortization had steadily – and markedly – increased from $29 thousand to slightly over a billion dollars by rising to $74.7 million in 2005 and $654 million at year end 2006,.

44

171.    Despite all of these warning signs and the widespread acknowledgement among analysts and even its own former employees that this product is unsuitable for most borrowers, Countrywide is still promoting its option ARM products on its website to this day.

      3.      Countrywide Incentivized and Facilitated Improper Sales Techniques without Providing Adequate Guidelines for Selling its PayOption ARMs

172.    Countrywide further increased the risks associated with this product by incentivizing mortgage brokers to sell PayOption ARMs over more traditional mortgage products.  The company then failed to provide the brokers with sufficient parameters for selling the product, facilitated deceptive sales tactics and did not exercise sufficient oversight over brokers' conduct.

173.    As Angelo Mozilo stated during an April 26, 2005 investor conference call, the product was "a good product for both us, the lender, and for the mortgage broker."  Countrywide left consumers out of this analysis.

174.    As an initial matter, Countrywide provided financial incentives for brokers and its employees to inappropriately sell its PayOption ARMs.

175.    Brokers are compensated in two ways.  First, borrowers may compensate brokers directly through loan origination, underwriting, processing and other fees.  The second way that brokers are compensated, however, is through "yield spread premiums" ("YSPs").

176.    A yield spread premium is the cash rebate paid to a mortgage broker by a lender. Typically, the YSP is based on a broker selling a borrower a loan with an interest rate above the wholesale par rate.   The par rate is the actual interest rate a borrower qualifies for with a given lender.  For example, a mortgage broker could earn a YSP for selling a borrower a loan with an interest rate of 6.25% when the borrower's par rate is 6%. This fee is paid by the lender directly to the broker as a "rebate."  Although the consumer is not charged the fee directly, the consumer

# EXHIBIT 2
# (PART 2)

pays the fee indirectly by paying a higher interest rate.  The YSP is typically a percentage of the loan amount, therefore, the larger the loan, the larger the fee that the broker earns.

177.    Countrywide structured the YSP for option ARMs in a manner that virtually guaranteed that brokers who were more concerned with getting the highest YSP possible than getting their borrowers the best loan possible would steer borrowers into these risky loans.  Plainly put, it was easier to obtain higher commissions for option ARMs as opposed to other traditional Countrywide mortgage products.

178.    Ordinarily a broker would need to increase the interest rate over a borrower's par rate on a loan in order to receive a higher YSP.  A borrower would notice, of course, that a broker was offering a loan with a higher interest rate.

179.    With option ARMs, the YSP was based on three factors which helped obscure the true cost of the loan: the amount of the teaser interest rate, the amount of the margin that was used to calculate the product's interest rate, and the existence of a prepayment penalty.

180.    First, the teaser rate was so low, borrowers would not notice a material difference between 1%, for example, and 1.25%.

181.    Second, as far as the margin, borrowers were unlikely to notice what the margin was and realize that they were able to negotiate this term.  Once the one-month teaser rate has expired, the PayOption ARM's interest rate is calculated each month by adding a margin—e.g. 4%—on top of on an index (such as the monthly United States Treasury average yield).  The margin remains the same throughout the life of the loan, while the index changes monthly.  The higher the margin, the higher the borrower's interest rate would be from month to month after the one-month teaser rate expired.  Both the standard used for the index and the margin amount could be negotiated by the borrower.  But because brokers sold the low monthly payment and the teaser

46

interest rate, the fact that there were other features that could be adjusted – to the borrower's detriment – often went unnoticed and was buried in the midst of the voluminous disclosures that borrowers received. Thus, borrowers would not typically notice if their broker increased their loan's margin to the maximum sold by Countrywide (around 4%) in order to increase his YSP.

182.    Finally, brokers often added a three-year prepayment penalty to the loan. As discussed above, borrowers frequently did not receive any benefit for accepting a loan with a prepayment penalty – if they were even aware the loan had a prepayment penalty.

183.    By slightly increasing an already low "teaser" rate, increasing the margin, and adding a three-year prepayment penalty, brokers could maximize the YSP Countrywide paid them.

184.    Notably, because PayOption ARMs were considered "prime" loan products, borrowers who qualified for the loan would also have qualified for fixed rate and adjustable rate mortgages with favorably low interest rates. The true interest rate on a PayOption ARM was typically higher than the rates on either of these products. In other words, borrowers paid a premium for a product that most of them did not understand and that did not provide them with any benefits in return for this premium.

185.    Therefore, Countrywide provided brokers with a financial incentive to sell option ARMs with a high margin and the worst prepayment penalty possible. Although the possible fraud that this financial incentive would motivate should have been clear, Countrywide then failed to institute appropriate checks on its sale or to adequately oversee its brokers.

186.    A mortgage broker's primary contact within Countrywide was its assigned Account Executive, a Countrywide employee. Account Executives gave brokers selling tips on option ARMs to emphasize the meaningless one-month teaser rate. One former Countrywide Account

47

Executive was encouraged to tell her brokers to sell the loan based on the low monthly payment, since rising property values would offset negative amortization.

187.    Countrywide also gave its Account Executives materials, like flyers, which they could use to promote certain loan products to brokers or that they could give brokers to use to promote Countrywide products to borrowers.  Almost all of the flyers that Account Executives gave to brokers highlighted that reduced documentation could be used to qualify borrowers for the product and also emphasized the illusory teaser interest rate for the product.

188.    Not surprisingly, after receiving materials emphasizing the illusory teaser interest rate, brokers used the rate to obfuscate the true cost and interest rates of an option ARM.

189.    One broker, for example, placed a full-page advertisement in the Chicago-Sun Times for a closed-end line of credit of $235,000.00 for a monthly payment amount of $656.05.  The advertisement does not disclose that the interest rate upon which the payment is based is only applicable for the first month of the mortgage loan.

190.    Another example is a direct mailing that a broker used to advertise an option ARM product.  The broker solicited consumers through a direct mailing for a closed-end line of credit of $681,182.00 for a monthly payment amount of $1,898.54.  Again, the direct mailing does not disclose, in readily understandable terms, that the interest rate upon which the payment is based is only applicable for the first month of the mortgage loan.

191.    Countrywide also failed to create any checks on who received a Countrywide option ARM.  Due to the complexity of the product and the likelihood of severe negative consequences to the borrower – such as loss of home equity, this product was not appropriate for most borrowers.  As described above, the option ARM was initially designed for sophisticated borrowers – people who were investing in or building homes or properties for resale.

Countrywide took this niche product and mass marketed it to the general public, often through mortgage brokers, without instituting any parameters for its sale.

192.    Based on the materials that Account Executives gave brokers regarding the product, it would seem that the product was appropriate for any borrower who wanted "options," regardless of their actual financial circumstances. This lack of rules enabled Countrywide's brokers to misuse the product and to sell this Countrywide product to unsuspecting borrowers looking for a good, long-term, sustainable loan.

193.    Given Countrywide's critical reliance upon mortgage brokers to sell option ARMs, the complexity of the product, and huge potential for borrower harm, Countrywide should have developed, employed and facilitated proper – not deceptive – sales techniques. Countrywide also should have instituted parameters on what borrowers could receive this product. Countrywide did not.

     <u>4.</u>    <u>Countrywide's Relationship with One Source Mortgage, Inc.</u>

194.    Countrywide's use and abuse of the option ARM product is clearly illustrated by the relationship between the company and an Illinois broker who specialized in selling Countrywide PayOption ARM loans, One Source Mortgage, Inc. ("One Source").

195.    Countrywide should have been aware of potential issues with One Source Mortgage, Inc. when it first approved the broker to work as its business partner in Spring 2004. At the time Charles Mangold, the owner of One Source, submitted the company's broker application to Countrywide, he had no fewer than five felony convictions in the State of Illinois. Specifically, between 1989 and 2000, Mangold was convicted and sentenced to jail time for improperly communicating with a juror, multiple occurrences of felony possession and use of a weapon or firearm, and driving with a suspended or revoked license.

196.    In terms of actual conduct, One Source used the illusory one month teaser rate that Countrywide coupled with its option ARM exactly as one would expect – to commit fraud. For example, when describing the PayOption ARM to consumers, One Source told consumers the amount of only one payment – the minimum payment. One Source also did not adequately describe to consumers the distinctive characteristics of PayOption ARMS: the fact that the initial low interest rate was merely a one month teaser rate or that negative amortization would occur if the consumers pay only the minimum payment.

197.    One Source frequently did not disclose to consumers any interest rate for the mortgage loan at all or described only the illusory teaser rate.

198.    One Source told a consumer that his minimum payment of $700 covered all the interest on his loan. In reality, the consumer would have had to pay $1816 a month to make even an interest-only payment on his loan.

199.    To the extent that Countrywide or One Source provided disclosures to consumers, they were ineffectual. Consumers reported that they did not learn that One Source's representations about their mortgage loans were false until they began to receive statements from Countrywide.

200.    Countrywide handsomely compensated One Source for its fraudulent conduct. One Source received YSPs from Countrywide ranging from $4185 to $11,310 per loan in the month of March 2006. During that one month, One Source received a total of at least $100,000 from Countrywide in the form of yield spread premiums.

201.    One Source engaged in rampant fraud on borrowers' loan applications without the consumers' knowledge, and which Countrywide then completely failed to detect. Consumers typically told One Source their monthly income and even provided pay stubs and tax returns to verify their income. On some consumers' loan applications, however, their monthly income was

50

increased to sometimes even double the correct amount. Because Countrywide coupled PayOption ARMs with reduced documentation underwriting, the company failed to discover this fraud.

202.    For example, One Source listed one consumer's monthly income as $8000 on his mortgage loan application. In fact, this consumer earned only approximately $3400 to $4000 a month and provided pay stubs and tax returns to One Source to verify his income. This consumer was unaware that One Source listed his income as $8000.

203.    Countrywide's purported fraud detection programs failed to catch any of these issues. Along with this failure, Countrywide repeatedly bent the rules for One Source Mortgage. Although it was supposedly against company policy, Charles Mangold treated three Countrywide employees (his primary underwriter, the manager of the branch he dealt with, and the closer on his loans) to flowers and expensive gifts, such as Coach handbags.

204.    In addition, Countrywide's stated general policy is that broker files are assigned to underwriters randomly. This policy was not followed in the case of One Source Mortgage. One underwriter who worked in Countrywide's Lisle office was often assigned to underwrite One Source files and, in 2006, this underwriter was designated as One Source's primary underwriter.

205.    This underwriter was disciplined time and again for errors in her underwriting. Prior to being assigned to One Source, the underwriter had been counseled several times for, among other things, quality of work. Eventually, Countrywide terminated the underwriter. Despite the documented problems with One Source's primary underwriter, Countrywide failed to detect the systemic fraud in the One Source loan files.

206.    Countrywide did nothing to curb the rampant abuses inflicted by this broker. In fact, Countrywide did not even terminate its relationship with the broker until December 2007 – after

51

the Attorney General's Office sued the broker for fraud and served Countrywide with a subpoena

seeking documents related to the broker's conduct.

207.    As the One Source example illustrates, Countrywide's inducements to brokers combined

with its lack of loan parameters or any real oversight resulted in brokers steering borrowers to

loans that were exceptionally risky and routinely qualifying borrowers for loans they could not

actually afford.

208.    As a result of Countrywide's inappropriate marketing, selling and risk layering of its

option ARM product, Illinois borrowers who thought they were refinancing into beneficial loan

product are now facing the possibility of losing all the equity they had built up in their homes or

losing their homes entirely.

B.    Countrywide Indiscriminately Sold Mortgages With High Loan-to-Value Ratios
      Regardless of the Loans' Risky Features

209.    In addition to risky products like option ARMs, Countrywide aggressively sold loans

with very high loan-to-value ratios. In recent years, the loan-to-value ratio on many Countrywide

loans – that is, the ratio of the home's appraised value to the amount of the loan – reached as

high as 100%.  Loans with 100% loan-to-value ("LTV") ratios were sold as a single loan, or

separated into two concurrent loans: a first-lien loan paired with a simultaneously originated

second-lien loan that, together, had a combined loan-to-value ratio of 100%.

210.    These simultaneous second-lien loans were often referred to as "piggyback" loans, and

the combination of a first- and second-lien loan with a 100% loan-to-value ratio was commonly

referred to as an "80/20" or "combo" loan.

211.    Countrywide regularly paired the first-lien loan in the 80/20 loans with a second-lien loan

in the form of a product type known as a Home Equity Line of Credit, or "HELOC."

212.    The HELOC second-lien loans were sold as open-end revolving lines of credit. But, in order to avoid exorbitant add-on charges, borrowers were generally required to draw down the principal amount of the HELOCs fully at the time both the first and second-lien loans were originated, and Countrywide required HELOC borrowers to maintain a "minimum" average daily balance for several years thereafter to keep the "minimum" balance intact.

213.    This loan structure could be comprised of a first-lien loan for 80% LTV piggybacked with a simultaneous second-lien HELOC for 20% LTV.

214.    Countrywide could also achieve this 100% LTV structure with a simultaneously written second-lien fixed-rate loan. Countrywide boasted to its brokers that it has a "Greater variety of high LTV, low doc options for more borrowers: Enhanced 80/20 Options."

215.    This conduct was profitable.  Countrywide applied a higher rate of interest to loans in the second lien position than the rate of interest applied to senior first-lien loans. This rate structure produced a correspondingly higher monthly payment (and income stream for investors) due to the higher interest rate applied to the outstanding principal balance on the junior second-lien loans.

216.    Countrywide's simultaneous second-lien HELOCs often came with some variation of an interest-only period.  Many of Countrywide's HELOCs had a five-year interest-only period that could be extended for another five years – this was called the "draw" period – even if the loan was already fully drawn.

217.    For the interest-only period, the required payment would only cover interest.  As a result, a borrower would neither pay down any of the loan principal nor increase the amount of equity in the home during this time.  Even if the borrower stayed current on monthly payments in these loans, they could find themselves owing the entire original loan balance at the end of the interest-

53

only period of the loan term. In fact, Countrywide even had HELOCs that were interest only for the entire term of the loan.

218.   The length of loan term of the second-lien HELOC loans was generally shorter than the length of the loan term on the first-lien loans. Countrywide often paired junior second-lien HELOCs that contained abbreviated 15-25 year terms with senior first-lien loans containing 30-year terms.

219.   In these shorter-term HELOCs that had interest-only features, the loan "reset" after the interest-only period expired, five or ten years into the loan term. The loan then began to amortize. Because these loans also often had a balloon feature at the end of the loan term, however, they did not amortize fully. This meant that a borrower was set up to experience payment shock twice. First, the borrower would experience payment shock due to the reset to a partially amortizing payment amount. Next, the borrower would experience payment shock at the end of the loan term, when the balloon came due. Consequently, at the end of the term, the borrower was faced with paying the total outstanding unpaid principal amount of the junior loan, which came due before the end of the term of the underlying first-lien senior loan.

220.   To the uninitiated borrower, this balloon payment would arrive deep into the term of the first-lien loan and could undermine the borrower's ability to maintain payments on the underlying first-lien loan. This set-up was typical of Countrywide's 30/15 Balloon mortgage loan. A "30/15 Balloon" was available on second loans with 100% financing. Countrywide prompted its brokers to "Qualify more borrowers for 100% financing with our new 30/15 Balloon options on Seconds."

221.    All of these features of Countrywide HELOCs and piggyback loans, especially when paired with a loan with a combined LTV of 100%, had the potential to force borrowers into foreclosure or otherwise harm them.

222.    Loans with loan-to-value ratios of 100% combined with low introductory interest-only payments, or with a balloon feature, are very risky.  These features increase the risk that borrowers cannot afford the loan payments at all or will be unlikely to build any equity in their homes when faced with stagnant or a slight reduction in home value.  Such borrowers are at risk of losing their homes if they cannot make the increased payments or cannot refinance. In either case, borrowers will have little or no equity with which to work in order to refinance, and may have to pay out-of-pocket just to sell their homes.

223.    Not surprisingly, loans with piggyback second-lien loans are more likely to fail.  Defaults on the riskier, higher-rate second lien loans expose the entire mortgage structure, both first and second lien loans, to failure.  Standard & Poor's, the largest securities rating agency, analyzed over a half million first-lien mortgages sold with HELOCs or fixed rate seconds between 2002 and 2004 and found that borrowers were 43% more likely to default on those liens than comparable first mortgages without piggybacks.

224.    Lending at 100% LTV is particularly dangerous with subprime borrowers who, as demonstrated by their shaky credit history, are more likely to be without financial breathing room, with no budgetary margin of error or an adequate safety net to help them weather and get past even minor life events, like the need to replace a water heater or an unusually high energy bill.  If they begin to miss payments and, as a consequence, have servicing penalties and late fees added to their mortgage payments, they get turned "upside down" on the equity in their property and quickly owe more on the Countrywide mortgage than their home is worth.

225.    This risk is magnified when paired with reduced documentation underwriting or other features that further increase the likelihood that the borrower will be unable to afford the loan.

226.    In 2005, Countrywide qualified borrowers with credit scores as low as 580 for single loans with loan-to-value ratios of 100% and for 80/20 piggyback loans. On the first-lien loan in an 80/20 piggyback loan combination, borrowers could be sold an interest-only option, whereby the borrower would make payments only on the interest for a certain period of time. During the period in which the borrower was paying only the interest, the principal balance on first-lien loan would remain the same – at 80% of fair market value. In 2007, a non-prime stated self-employed or salaried borrower could qualify for an 80/20 loan for as much as $850,000 with a minimum credit score of 640 and could qualify for a loan up to $1 million with a minimum credit score of 680. As Countrywide told its brokers in an ad, "Countrywide®, America's Wholesale Lender®, Specialty Lending Group delivers more options to your Non-Prime Stated Income borrowers!"

227.    A self-employed borrower with a minimum credit score of 640 could get a "100% 'One Loan' Stated" for up to $700,000. A stated wage earner with a minimum credit score of 640 could also mortgage 100% of a home's value with an 80/20 loan.

228.    Countrywide told borrowers that there was "GOOD NEWS! Now you can qualify for up to 100% financing without a recent bankruptcy affecting your FICO score." Countrywide proclaimed "Low credit scores allowed" and "Hard to prove income acceptable."

229.    Countrywide also had 80/20 loan programs that could be paired with a hybrid ARM— even a hybrid ARM with an interest-only feature.

230.    Countrywide loans made at 100% loan-to-value were imprudently made and were unsound as written because they were unsustainable and unaffordable for borrowers, even borrowers in a stable housing market.

<u>Countrywide Utilized Unfair and Deceptive Advertising and Sales Pitches to Push
Mortgages, While Hiding Costs and Risks to Consumers</u>

231.    To further its aggressive loan origination practices, Countrywide engaged in unfair and

deceptive sales practices through telemarketing, direct mailings, newspaper advertisements, and

television and radio commercials in Illinois.  Countrywide generally lead consumers to believe

that they could offer consumers the best loan at the lowest price.  Countrywide's advertisements

to consumers often hid or obscured the risks associated with different mortgage products and

refinancing.

<u>A.</u>    <u>Personalized Direct Mailings Pushed Consumers to Refinance into Risky Products</u>

232.    Countrywide sent direct mailings to consumers in an effort to push certain mortgage

products and to induce current Countrywide borrowers to refinance within a short period of time

after finalizing their loan. Often, the direct mailing appeared to be a personalized letter or email,

including information about consumers' present loans, which deceptively compared present

loans with new offers, and instructed consumers to contact Countrywide quickly.

233.    For example, on or about April 15, 2005, Countrywide sent borrowers a direct mailing to

refinance into a PayOption ARM and directed borrowers to contact Countrywide on Saturday,

April 23, 2005.  Next to the consumer's name and address was a highlighted box which stated

the "estimated initial payment savings" as $15,132 assuming the consumer refinanced into a

PayOption ARM.

234.    This "estimated initial payment savings" was misleading because it was based on the

consumer paying the initial rate of 1% for an entire year.  But with a PayOption ARM, after the

first month, merely paying the initial rate of 1% would not have covered the principal and

interest of the mortgage, resulting in negative amortization.  Thus, if a consumer opted to

refinance into the advertised program, the consumer would not actually save any money on their

payments. To emphasize the "savings," Countrywide hid the method for calculating the estimated savings and the negative amortization that would result in a tiny font text after the signature of Countrywide's personal loan consultant at the bottom of the page.

235.    The text of the mailing touted to consumers the benefits of a PayOption ARMs, such as "free up cash…, paying off high interest credit card debt, invest in income property, saving cash for the purpose of a new home and afford a larger home." However the mailing failed to disclose clearly and conspicuously the many risks and negative ramifications of a PayOption ARM product.

236.    The promise of "afford a larger home" was deceptive because PayOption ARMs were not necessarily cheaper than fixed rate mortgages. While a consumer may have been able to obtain a larger mortgage with a PayOption ARM, it did not mean that she could afford to pay it off. An option ARM merely allowed a consumer to choose the amount of a monthly payment. Thus, some payments could be smaller than those with a fixed rate mortgage, but to prevent negative amortization, the consumer had to make much larger payments.

237.    Another direct mailing about refinancing into PayOption ARMs emphasized the amount the consumer could cash-out if he refinanced from a 30-year fixed rate loan to a PayOption ARM. Again, next to the consumer's name and address was a highlighted box with "Up to $65,380" and then under it, "Please Call Now, 1-800-598-1129."

238.    In the text; it promised that the consumer could access as much as $65,380 in home equity through refinancing into an option ARM with a 4.250% fully indexed interest rate. Further the mailer stated that this interest rate is lower than the rate of the borrower's current fixed-rate mortgage.

239.    This statement failed to clearly and conspicuously disclose the interest rate and how Countrywide calculated the consumer's home equity, whether it was based on a computer program or an actual appraisal. Further, since the rate on this option ARM product would fluctuate monthly after the one-month teaser interest rate expired, the interest rate and payment could increase to more than the consumer's current mortgage rate and payment. To sweeten the offering, Countrywide offered, "Fasttrack Cash-out Refinancing" which promised to "cut down on the amount of qualifying and application paperwork."

240.    Yet, this mailing did not clearly and conspicuously disclose the risks of refinancing into a PayOption ARM. At the bottom of the mailing, after the signature of the personal loan consultant and in tiny font, the mailing made a reference to the introductory period. It instructed the consumer to see another footnote on the second page for an explanation of that footnote. By burying this information after the signature, using tiny font and referring the consumer to another footnote for an explanation, Countrywide obscured the significant risks of refinancing into a PayOption ARM.

**B.    Emails Touting Complimentary Loan Reviews Deceptively Induced Consumers to Refinance**

241.    Besides paper mailings, Countrywide also emailed personalized mailings to current customers on their loan anniversaries, which offered "free" or "complimentary" loan reviews.

242.    For example, in 2006, Countrywide sent emails to current Full Spectrum Lending Division consumers with the subject line "It's Your Anniversary!" In the heading with large bold font, it stated "Happy Anniversary! Enjoy your complimentary loan review" and then to the immediate right it had printed Countrywide's telephone number and "Click Here to Get Started," which linked the consumer to an on-line loan application.

243.    By placing the telephone number and the link immediately after the complimentary loan review, the email led the consumer to believe that contacting Countrywide would result in an informational review, not a sales pitch for refinancing.

244.    After the heading, the email congratulated the consumer for being a current customer. Then it proclaimed that "many home values skyrocketed over the past year.  That means that you may have thousands of dollars of home equity to borrow from—at rates much lower than most credit cards." This statement led the customer to believe that the value in her home skyrocketed to allow her "thousands of dollars of home equity."  Yet, the email failed to clearly and conspicuously disclose how Countrywide calculated the consumer's equity in her home.

245.    Then the email offered an "exclusive interest rate discount of 1/2 %" because the consumer was a current customer.  At the end of the email, it emphasized that Countrywide wanted to provide the "right" home financing situations to meet the consumer's needs and stated "Call us now at 1-866-253-2352 or Click Here."

246.    If the consumer did not respond to this email, Countrywide sent a follow up "Your Anniversary Review Reminder" which stated "If you haven't called for your free Anniversary Loan Review yet, there is still time."  The follow up email created a false sense of urgency, in which the consumer had to act fast to avoid losing a supposedly great deal.

C.    Television and Radio Commercials: Deceptively Advertise No Closing Cost Refinancing

247.    Besides direct mailings and newspaper ads, Countrywide also used deceptive television and radio commercials to induce consumers to purchase loans and refinance their mortgages or obtain home equity lines of credit.

248.    For example, in November 2005, Countrywide ran a television commercial called "Guess What A" which offered a "no closing cost debt consolidation loan."  During the commercial, a

60

man informed consumers to "act fast" to consolidate their high interest credit cards while mortgage interest rates were low. Although a legal disclaimer disclosed that refinancing or taking a HELOC may increase the total number of payments and total amount paid, it did not disclose that consumers paid for the "no closing costs" through a higher interest rate. Rather, it just referred consumers to Countrywide's website for information on closing costs.

249.    Similarly, in July 2007, Countrywide ran a television commercial which again offered a "refinance with no closing costs." The man in the commercial stated "That's right. At closing you'll pay absolutely no closing costs. This means more cash for you."

250.    Again, the legal disclaimer obfuscated the truth that consumers paid for "no closing costs" through a higher interest rate. Rather, it stated that "borrowers who choose to pay lender fees and closing costs upfront may qualify for a lower rate."

251.    Countrywide engaged in similar confusing and deceptive advertising in its "Dueling Announcers" radio commercial. In that commercial, Countrywide offered a "no closing cost" refinance loan and again the legal disclaimer obfuscated the truth that consumers paid for no closing costs through a higher interest rate. At the end of the commercial, it said that borrowers who choose to pay lender fees upfront may qualify for a lower rate. Then it stated "recent trends show home values flattening or even declining in some areas." The commercial urged consumers "[s]o tap into your home's available equity now."

252.    In addition, this commercial emphasized the benefits of refinancing such as: cash from the equity, a lower fixed rate, and paying credit card bills. Yet, this commercial failed to disclose clearly and conspicuously the danger that by removing equity at a time when home values are stagnant or declining, consumers could owe more than the value of their homes.

D.    Countrywide Used Deceptive Sales Pitches to Push Risky Mortgages

61

253.    After receiving advertisements, many consumers contacted Countrywide account executives, who were trained to use deceptive sales scripts to originate mortgages for purchases and refinancing.

254.    According to an interview with a former account executive in Countrywide's retail division, Countrywide instructed employees to sell the "low" monthly payments of each product and to down play the total cost of the mortgage, the interest rate, adjustable rate, prepayment penalty or any other risks associated with the products.

255.    If consumers questioned the terms of the offered mortgage, account executives would offer to refinance consumers into better mortgages at later date, such as in loans with ARMs often before the rates adjusted.  It was a deceptive promise because the account executives could not predict consumers' ability to refinance, which often depended on whether housing values continued to appreciate.

256.    According to an interview with a former account executive in the Full Spectrum Lending Division (Countrywide's subprime retail division), Countrywide used scripted telemarketing to solicit both new borrowers and current Countrywide borrowers for subprime mortgages.

257.    These potential consumers, or sales "leads," included prime borrowers who mistakenly called Full Spectrum, consumers with prime mortgages serviced by Countrywide but who were late in their payments at least 30 days, consumers who called Countrywide's prime retail lending division and whose credit scores were below a certain level, and current Countrywide subprime borrowers whose loans had adjustable rate mortgages, balloons or other variable terms.

258.    Countrywide required employees to memorize sales scripts, prior to attending intensive sales training in Illinois or California.  Countrywide instructed account executives to use the

62

sales scripts for every conversation with consumers. In fact, the scripts covered the entire loan origination process, from intake to closing, for refinance, purchase and home equity mortgages.

259.    By using the sales scripts, Countrywide employees deceived and confused consumers so that consumers would not understand the true costs associated with the new loans.

260.    As described in the New York Times' article, *Inside the Countrywide Lending Spree*, Countrywide used a "seductive sales pitch" to convince consumers that Countrywide aspired to provide consumers with "the best loan possible." Rather than actually providing the best loan possible, Countrywide led consumers into "high-cost and sometimes unfavorable loans that resulted in richer commissions for Countrywide's smooth talking sales force."

261.    For example, according to one former Full Spectrum account executive, Countrywide's subprime divisions did not offer FHA loans to consumers who could have qualified for them and instead frequently offered costlier or riskier subprime loans.

262.    As compared to subprime loans, FHA loans have historically allowed lower income consumers to borrow money for the purchase of homes. FHA loans are insured by the Federal Housing Authority for consumers with "less than perfect credit" histories and allow for down payments as low as 3%. The majority of FHA loans are 30-year fixed rate loans, rather than ARMs.

263.    A former account executive provided the following comparison for a consumer with a down payment of 5% (or 95% LTV) seeking a $100,000 loan. With an FHA loan, the consumer could have received a fixed interest rate of 6% for 30 years (with an additional insurance fee of 1½ %). Yet, through Full Spectrum, the account executive sold the same consumer a subprime loan with 8-10% interest rate and layered with additional risks, such as a prepayment penalty.

63

264.    The deception of providing the best loan for the consumer started right from the beginning of the sales script with the first telephone call. In fact, according to an interview with a former Full Spectrum employee, the 2005 script prohibited employees who spoke with prime borrowers who were merely 30 days late from mentioning the purpose of their phone call, e.g., to refinance into more costly subprime mortgages.

265.    By misrepresenting the purpose of the call and obscuring consumers' possible weakened credit, Countrywide led consumers to believe that the call was to discuss servicing issues or even refinancing into a prime loan, rather than refinancing into a more expensive subprime mortgage.

266.    Even if consumers were uninterested in obtaining new mortgages, the sales script provided ways for sales representatives to persuade reluctant consumers. For example, if a consumer stated that she had paid off a first mortgage, the script advised the account executive to ask about a home equity loan. "Don't you want the equity in your home to work for you? You can use your equity for your advantage and pay bills or cash out. How does that sound?"

267.    Another method utilized in the scripts led consumers into believing that the account executives were their friends, interested in providing the best loans to consumers. This method is exemplified by the Full Spectrum sales script that instructed account executives to build an emotional connection known as the "Oasis of Rapport" with consumers before discussing rates, points and fees. The immediate objective was to get to know the consumer, "look for points of common interests, and to use first names to facilitate a friendly helpful tone."

268.    Countrywide also coached employees to ask questions about the consumer's financial situation, then lie that the account executive had another customer with the same problems and say that it was difficult for this other, similar, customer to get a loan from other lenders.

64

269.    By scripting an emotional connection with consumers, Countrywide led consumers to

believe that account executives understood their financial situations and Countrywide would

provide consumers with the best possible mortgages.  As a result, consumers were more likely to

accept refinancing, fees, points, higher interest rates, adjustable rate mortgages, and very risky

products, such as option ARMs.

> Countrywide Home Loans Servicing LP Utilizes Unfair and Deceptive Practices in the
> Servicing of Borrowers' Residential Mortgage Loans

270.    When consumers fall behind on their mortgage loan payments, they call Countrywide

Home Loans Servicing LP ("Countrywide Servicing"), the Countrywide entity that services

consumers' mortgages.  Consumers who ask what can be done to avoid foreclosure proceedings

are often shuffled from person to person and even department to department before reaching

someone who can actually address their concerns.

271.    Countrywide Servicing generally demands an initial payment from the consumers prior to

even discussing whether anything can be done to keep the consumers in their homes.  Because

Countrywide Servicing demands this payment prior to doing any analysis of the consumers'

situations, this scheme often results in consumers paying money to Countrywide Servicing when

there is no chance of negotiating a workable plan.  The money used for "initial payments" could

have been used by consumers to pay for moving expenses or finding new housing in the event

that foreclosure was inevitable.

272.    Countrywide Servicing also requires consumers to send their initial payments via

certified checks.  If a consumer's check is not certified, Countrywide Servicing will refuse it

without even attempting to verify whether there are sufficient funds to cover the check.  This

needless bureaucracy has led to Countrywide Servicing rejecting initial payments made on

consumers' behalf by non-profits and state agencies.

273.    For example, one consumer fell behind on her mortgage payments when she was being treated for breast cancer. Trying to help the consumer, her church raised funds to make her delinquent payment. A check, drawn on the church's account, was sent to Countrywide Servicing. It was rejected.

274.    After receiving the initial payment, instead of doing an analysis on what would be necessary to allow consumers to stay in their homes, Countrywide Servicing's first offer to consumers is typically to put them on repayment plans. These repayment plans require consumers both to remain current on their existing mortgage loan payments and also pay an additional amount to cover any past due payments and fees the consumers have incurred.

275.    A repayment plan is often an unworkable and unaffordable solution to most consumers' mortgage payment problems. Plainly put, if consumers are having problems making their current payments, there is absolutely no reason to think that the consumers will be able to make even larger payments in the future.

276.    One consumer's experience illustrates the problem. The consumer's monthly mortgage payment was $1600. She fell behind and, in an attempt to salvage the situation, repeatedly called Countrywide Servicing to try to find a solution. Although the consumer was already having difficulty making her $1600 monthly payment, Countrywide Servicing's solution was to increase the consumer's payment to $2500 to cover both the existing payment and the past due payments and fees.

277.    Predictably, the consumer was unable to keep up with the repayment plan and fell even further behind on her mortgage. After trying to work with Countrywide Servicing for almost six months, the company demanded (and received) a payment of over $5000 from the consumer before it would complete an analysis and consider the file for loan modification.

66

278.    Even when Countrywide Servicing comes up with a loan modification plan, the company often fails to discuss the plan with the consumer to confirm it is affordable or to send timely documentation to the consumer regarding the specific details of the plan.

279.    For example, a consumer called Countrywide Servicing on five separate occasions seeking assistance with mortgage payments that she was having difficulty making. The consumer had a loan with an initial teaser interest rate of 9.375% that had jumped to 12.625%. During the fifth call, the consumer learned that Countrywide Servicing had decided to reduce the interest rate on her loan back to the teaser interest rate for an additional five years. Although Countrywide Servicing attempted to provide relief to the consumer, it failed to actually discuss with the consumer whether this plan would be affordable. The consumer had sent Countrywide Servicing financial documents, so it should have known that the plan was unaffordable. Moreover, it took Countrywide Servicing an additional month to send the consumer documentation of her loan modification, resulting in the consumer making an incorrect mortgage payment based on what she had been told on the phone.

280.    Countrywide Servicing representatives have also been difficult to reach when consumers are trying to catch up on their mortgages. For example, a consumer who fell behind in her mortgage sent Countrywide Servicing additional checks for 10 months with the designation that they were to be applied to her past due payments and fees. When her statements did not appear to reflect the additional payments, the consumer repeatedly called Countrywide Servicing to deal with the problem. She was put on hold and transferred from person to person when she called and was never able to talk to a Countrywide Servicing representative who could help her figure out the problems with her account.

281.    Consumers will sometimes try to refinance their Countrywide mortgages in an attempt to save their homes.  Consumers have complained that Countrywide Servicing fails to send them the payoff statements necessary to complete the refinance in a timely manner.  Because the refinance is delayed, the consumers end up falling even further behind on their Countrywide mortgages.

282.    On occasion, consumers who fall behind in their mortgages and other debt payments are forced to declare bankruptcy.  Countrywide Servicing has been sued by United States Bankruptcy Trustees in four states over its practices with consumers in bankruptcy.  These trustees allege, among other things, that Countrywide Servicing may have filed inaccurate proofs of claims, filed unwarranted motions for relief from the bankruptcy stay, inaccurately accounted for funds and made unfounded payment demands to consumers after the discharge of their bankruptcy.

283.    Countrywide Servicing has also acted illegally towards borrowers in foreclosure actions. In a particularly egregious case, a consumer whose Countrywide mortgage was in foreclosure returned home to find that Countrywide Servicing had changed her locks and boarded her home. At the time it boarded the owner-occupied property, Countrywide Servicing had filed a foreclosure complaint against the consumer, however, no judgment for foreclosure had been entered and no sale conducted.   The consumer's attorney made numerous attempts to contact Countrywide Servicing to rectify the situation.  It took a week and the intervention of the Attorney General's Office for the consumer to regain access to her home and possessions.

284.    There are also occasions when Countrywide Servicing acts inappropriately towards consumers who are not in foreclosure, but have a problem with the application of funds from an escrow account.

68

285.   In one situation, a consumer whose Countrywide mortgage included an escrow for real estate taxes mistakenly paid her tax bill herself, even though Countrywide Service also paid the bill. Once this error was discovered, the consumer's overpayment should have been refunded directly to her. Instead, Countrywide Servicing decided to keep a portion of the overpayment in the consumer's escrow account, purportedly as a "cushion." Countrywide Servicing had no authority to arbitrarily keep a portion of the consumer's overpayment and only returned the funds after mediation through the Attorney General's Office.

## STATUTORY PROVISIONS

286.   Section 2 of the Illinois Consumer Fraud and Deceptive Business Practices Act (815 ILCS 505/2) provides that:

> Unfair methods of competition and unfair or deceptive acts or practices, including but not limited to the use or employment of any deception, fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of any material fact, with intent that others rely upon concealment, suppression or omission of such material fact, or the use of employment of any practice described in Section 2 of the "Uniform Deceptive Trade Practices Act," approved August 5, 1965, in the conduct of any trade or commerce are hereby declared unlawful whether any person has in fact been misled, deceived or damaged thereby. In construing this section consideration shall be given to the interpretations of the Federal Trade Commission and the federal courts relating to Section 5(a) of the Federal Trade Commission Act.

287.   Section 7 of the Consumer Fraud Act, 815 ILCS 505/7, provides in relevant part:

> a.   Whenever the Attorney General has reason to believe that any person is using, has used, or is about to use any method, act or practice declared by the Act to be unlawful, and that proceedings would be in the public interest, he may bring an action in the name of the State against such person to restrain by preliminary or permanent injunction the use of such method, act or practice. The Court, in its discretion, may exercise all powers necessary, including but not limited to: injunction, revocation, forfeiture or suspension of any license, charter, franchise, certificate or other

69

evidence of authority of any person to do business in this State; appointment of a receiver; dissolution of domestic corporations or association suspension or termination of the right of foreign corporations or associations to do business in this State; and restitution.

b.      In addition to the remedies provided herein, the Attorney General may request and this Court may impose a civil penalty in a sum not to exceed $50,000 against any person found by the Court to have engaged in any method, act or practice declared unlawful under this Act.  In the event the court finds the method, act or practice to have been entered into with intent to defraud, the court has the authority to impose a civil penalty in a sum not to exceed $50,000 per violation.

c.      In addition to any other civil penalty provided in this Section, if a person is found by the court to have engaged in any method, act, or practice declared unlawful under this Act, and the violation was committed against a person 65 years of age or older, the court may impose an additional civil penalty not to exceed $10,000 for each violation.

288.    Section 10 of the Consumer Fraud Act, 815 ILCS 505/10, provides that "[i]n any action brought under the provisions of this Act, the Attorney General is entitled to recover costs for the use of this State."

289.    Section 2 of the Illinois Fairness in Lending Act, 815 ILCS 120/2, provides that

(a)    "Financial institution" means any bank, credit union, insurance company, mortgage banking company, savings bank, savings and loan association, or other residential mortgage lender which operates or has a place of business in this State.

                                    …

(d)    "Equity stripping" means to assist a person in obtaining a loan secured by the persons' principal residence for the primary purpose of receiving fees related to the financing when (i) the loan decreased the persons' equity in the principal residence and (ii) at the time the loan is made, the financial institution does not reasonably believe that the person will be able to make the scheduled payments to repay the loan.  "Equity stripping" does not include reverse mortgages as defined in Section 5a of the Illinois Banking Act, Section 1-6a of the Illinois Savings and Loan Act of 1985, or subsection (3) of Section 46 of the Illinois Credit Union Act.

70

290.    Section 3 of the Illinois Fairness in Lending Act, 815 ILCS 120/3 provides in

relevant part that:

> No financial institution, in connection with or in contemplation of any loan to any
> person, may:
> …
> (e)    Engage in equity stripping or loan flipping.

291.    Section 5 of the Illinois Fairness in Lending Act, 815 ILCS 120/5(c), provides in

relevant part that:

> An action to enjoin any person subject to this Act from engaging in activity in
> violation of this Act may be maintained in the name of the people of the State of
> Illinois by the Attorney General or by the State's Attorney of the county in which
> the action is brought. This remedy shall be in addition to other remedies provided
> for any violation of this Act.

## Count I

### Violations of Section 2 of the
### Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/2

292.    The allegations contained in Paragraphs 1 through 291 of the Complaint are re-alleged

and incorporated herein by reference.

293.    As described above, Countrywide's conduct has contributed to the high number of

foreclosures in Illinois and caused significant harm to the public, the market, and scores of

Illinois borrowers and homeowners.

294.    Countrywide engaged in unfair and/or deceptive acts or practices by originating mortgage

loans to borrowers who did not have the ability to repay their loans through practices such as, but

not limited to:

> a.    Using reduced documentation underwriting guidelines to qualify borrowers who
>
>       did not have sufficient income or assets to afford the Countrywide loans they
>
>       were sold;

71

b.  Promoting the use of reduced documentation underwriting guidelines to qualify borrowers who did not have sufficient income and assets for the Countrywide loans they were sold;

c.  Inflating borrowers' income on loan applications to qualify the borrowers for Countrywide loans;

d.  During a certain period of time, qualifying subprime borrowers for hybrid ARM mortgage loans using less than the full- indexed rate;

e.  During a certain period of time, qualifying borrowers for mortgage loans that had an interest-only payment option using less than the fully-amortizing payment;

f.  Originating loans that were not designed for long term viability, but for short term refinancing, as employees and brokers frequently represented that borrowers could refinance the loan;

g.  Promoting serial refinancing without regard to the increased cost to the borrower or the affordability of the loan, and without disclosing that the ability to refinance relied on a perpetual increase in home valuation;

h.  Loosening certain underwriting guidelines over time, resulting in the sale of unaffordable loans;

i.  Originating loans with multiple layers of risk, resulting in the sale of unaffordable loans; and

j.  Allowing exceptions to underwriting guidelines, resulting in the sale of unaffordable loans.

295.    Countrywide engaged in unfair and/or deceptive acts or practices by originating mortgage loans that exposed borrowers to an unnecessarily high risk of foreclosure or loss of home equity through practices such as, but not limit to:

    a.  Originating option ARM mortgage loans with one or more of the following characteristics: illusory introductory teaser interest rates, prepayment penalties, high loan-to-value ratios, and reduced documentation underwriting;

    b.  Mass marketing and selling option ARM mortgage loans to the general public that were only beneficial to specific sophisticated segments of the borrower population;

    c.  Marketing and selling option ARM mortgage loans as a beneficial refinance loan product to current customers in good standing, when that was not the case; and

    d.  Originating mortgage loans with 100% loan-to-value or combined loan-to-value ratios that included other risky features.

296.    Countrywide engaged in unfair and/or deceptive acts or practices by originating unnecessarily more expensive mortgage loans to unknowing borrowers through practices such as, but not limited to:

    a.  Originating more expensive reduced documentation loans to borrowers who could have documented their income and assets, without informing borrowers of the increased cost; and

    b.  Attaching prepayment penalties to borrowers' loans, without ensuring that the borrowers actually received any benefit from the added risk of the penalty.

297.    Countrywide engaged in unfair and/or deceptive acts or practices by deceptively marketing and/or advertising its mortgage loans through practices such as, but not limited to:

73

a.  Leading consumers to believe that Countrywide would obtain for them the best possible loan terms, when, in fact, they did not;

b.  Avoiding discussing the interest rate or APR of a loan by shifting the focus to the monthly payment in an effort to confuse consumers about the true cost of the loan;

c.  Representing that refinancing into an option ARM could save the borrower money when, in fact, the claim of savings was false;

d.  Advertising the one-month teaser interest rates for an option ARM without clearly and conspicuously disclosing that the rate would increase dramatically the following month;

e.  Representing to consumers that option ARMs were beneficial for consumers in good standing on their current Countrywide loans when, in fact, refinancing into the product was not beneficial for most consumers;

f.  Failing to properly inform a borrower of the potential of owing more on his home than what it is worth due to negative amortization if the borrower's house did not continue appreciating or depreciated in value;

g.  Inflating borrowers' income information on their loan applications in order to qualify borrowers for Countrywide mortgages when their income would not have qualified them for the loan they received;

h.  Representing to borrowers that they should not worry about the interest rate of their Countrywide mortgage because the loans could be refinanced before they became unaffordable;

74

i.   During a certain period of time, failing to disclose to subprime borrowers that they were qualified at less than the fully-indexed rate for hybrid ARM mortgage loans and not at a rate sufficient to repay the loan in its entirety;

j.   During a certain period of time, failing to disclose to borrowers that they were qualified at less than a fully-amortizing payment for mortgage loans with an interest-only payment option and not at a rate sufficient to repay the loan in its entirety;

k.   Advertising that a Countrywide mortgage had "no closing costs" when the closing costs were incorporated in the features of the loan;

l.   Representing to current Countrywide borrowers that Countrywide offered "Complimentary" or "Free Loan" reviews when in fact, it was a sales pitch to refinance current subprime borrowers into other subprime mortgages;

m.   Hiding the purpose of subprime sales calls to prime borrowers with late payments, which was, in actuality, to refinance borrowers into subprime loans; and

n.   Advertising that because the housing market is stagnant or declining, borrowers should refinance their homes and take cash out or pay debts, without informing borrowers of the risk of owing more than the value of their homes.

298.   Countrywide engaged in unfair and/or deceptive acts or practices by implementing a compensation structure that incentivized broker and employee misconduct and failed to exercise sufficient oversight to ensure that such misconduct did not occur through practices such as, but not limited to:

75

a.  Implementing a compensation structure that incentivized employees to maximize sales of loans without proper oversight, resulting in the sale of unaffordable and/or unnecessarily expensive loans;

b.  Failing to provide adequate parameters for the sale of option ARMs, resulting in the product being sold to inappropriate groups of borrowers;

c.  Failing to adequately supervise and/or underwrite brokers' use and sale of reduced documentation loans resulting in the sale of unaffordable or unnecessarily more expensive loans;

d.  Facilitating and/or instructing brokers' emphasis of the low teaser rate when selling option ARMs;

e.  Rewarding brokers for selling loans with certain risky loan features such as prepayment penalties without ensuring that borrowers received a benefit from the risky features; and

f.  Structuring the compensation for option ARMs in such a way that brokers were incentivized to sell a product that was riskier than necessary – to the exclusion of other products – in order to obtain the maximum yield spread premium possible.

299.    Countrywide Home Loans Servicing, LP engaged in unfair and/or deceptive acts or practices during the servicing of residential mortgage loans through practices such as, but not limited to:

a.  Inducing borrowers to pay Countrywide Servicing monies under the premise that Countrywide Servicing would be able to assist distressed borrowers, even though Countrywide Servicing has not done any analysis to determine whether assistance was feasible in light of the borrowers' particular factual circumstances;

b.  Misleading borrowers into paying Countrywide Servicing additional monies
under a repayment plan or loan modification plan that Countrywide Servicing
knew or should have know was unaffordable; and

c.  Recklessly facilitating the foreclosure of borrowers' homes by misleading
borrowers or failing to respond to borrowers' requests for assistance.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully prays for the following relief:

A.  A finding that Defendants have engaged in and are engaging in trade or
commerce within the meaning of Section 2 of the Illinois Consumer Fraud and Deceptive
Business Practices Act, 815 ILCS 505/2;

B.  A finding that Defendants have engaged in and are engaging in acts or practices
that constitute violations of Section 2 of the Illinois Consumer Fraud and Deceptive Business
Practices Act, 815 ILCS 505/2;

C.  An order preliminarily and permanently enjoining Defendants from the use of acts
or practices that violate the Consumer Fraud and Deceptive Business Practices Act including, but
not limited to, the unlawful acts and practices specified above;

D.  An order rescinding, reforming or modifying all mortgage loans between
Defendants and all Illinois consumers who were affected by the use of the above-mentioned
unlawful acts and practices;

E.  An order requiring Defendants to make restitution to all consumers who were
affected by the use of the above-mentioned unlawful acts and practices in the origination of
Countrywide residential mortgage loans whose homes were lost due to foreclosure on their
Countrywide mortgage loans;

77

F.     An order requiring Defendants to make restitution to all consumers who were affected by the use of the above-mentioned unlawful acts and practices in the origination of Countrywide residential mortgage loans who refinanced their mortgage loans with Defendants or another residential mortgage lender;

G.     An order requiring Defendants to make restitution to all consumers who were affected by the use of the above-mentioned unlawful acts and practices in the origination of Countrywide residential mortgage loans who are unable to modify their Countrywide mortgages to a sustainable level and are forced to relinquish ownership of their homes;

H.     An order requiring Defendants to repurchase owner-occupied residential mortgage loans for all Illinois consumers who were affected by the use of the above-mentioned unlawful acts and practices that have been sold, transferred or assigned to investors and then to rescind, reform or modify any such mortgage loans;

I.     An order enjoining Defendants from:

    1)    further selling, transferring or assigning mortgage loans originated by Countrywide by the use of the above-mentioned unlawful acts and practices that are secured by owner-occupied residential properties in Illinois;

    2)    further selling, transferring or assigning any legal obligations to service Illinois owner-occupied residential mortgage loans originated by the use of the above-mentioned unlawful acts and practices; and

    3)    initiating or advancing a foreclosure, as an owner or servicer, on any owner-occupied residential mortgage loan originated by the use of the above-mentioned unlawful acts and practices and secured by an Illinois

property, without first providing the Attorney General a 90-day period to review each such loan so that, upon the expiration of the 90 days, the Attorney General may object to a foreclosure based upon unfair or deceptive origination or servicing conduct by Countrywide and Countrywide Home Loans Servicing, LP in order to provide the borrower with a meaningful opportunity to avoid foreclosure. In the event of the Attorney General's objection, no foreclosure sale shall go forward absent court approval.

J.     An order requiring Defendants to establish a "Distressed Property Reserve" to cover costs incurred by municipalities due to vacant foreclosed properties that secured owner-occupied residential mortgage loans originated by Countrywide;

K.     An order imposing a civil penalty in a sum not to exceed $50,000 against any Defendant found by the Court to have engaged in any method, act or practice declared unlawful under this the Illinois Consumer Fraud and Deceptive Business Practices Act;

L.     An order imposing a civil penalty in a sum not to exceed $50,000 against any Defendant found by the Court to have engaged in any method, act or practice declared unlawful under the Illinois Consumer Fraud and Deceptive Business Practices Act committed with the intent to defraud;

M.     An order imposing an additional civil penalty not to exceed $10,000 for each violation of the Illinois Consumer Fraud and Deceptive Business Practices Act committed against a person 65 years of age or older, as provided in Section 7(c) of the Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/7(c);

79

N.     An order requiring Defendants to pay the costs of this action and any costs related to the 90-day Attorney General review period described above; and

O.     An order granting such further relief as this Court deems just, necessary, and equitable in the premises.

## Count II

### Violation of the Illinois Fairness in Lending Act, 815 ILCS 120/4

300.   The allegations contained in Paragraphs 1 through 299 of the Complaint are re-alleged and incorporated herein by reference.

301.   Countrywide violated Section 3 of the Illinois Fairness in Lending Act, 815 ILCS 120/3 by engaging in equity stripping when refinancing consumers into mortgage loan products that Countrywide knew or should have known were unaffordable and that decreased the borrowers' equity in their homes, with the primary purpose of receiving fees for the refinancing.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully prays for the following relief:

A.     A finding that Defendants have violated the Illinois Fairness in Lending Act;

B.     An order preliminarily and permanently enjoining Defendants from the use of acts or practices that violate the Illinois Fairness in Lending Act including, but not limited to, the unlawful acts and practices specified above;

C.     An order requiring Defendants to make restitution to all consumers affected by the use of the above-mentioned unlawful acts and practices;

D.     An order rescinding or reforming all contracts, loan agreements, notes or other evidences of indebtedness between Defendants and all Illinois consumers who were affected by the use of the above-mentioned unlawful acts and practices;

E.    An order requiring Defendants to pay the costs of this action; and

F.    An order granting such further relief as this Court deems just, necessary, and

equitable in the premises.

Respectfully submitted,

LISA MADIGAN, IN HER OFFICIAL
CAPACITY AS ATTORNEY GENERAL OF
ILLINOIS,

JAMES D. KOLE
Bureau Chief, Consumer Fraud

LISA MADIGAN
Attorney General of Illinois

DEBORAH HAGAN, Chief
Consumer Protection Division

JAMES D. KOLE, Chief
Consumer Fraud Bureau

THOMAS JAMES
SUSAN N. ELLIS
VERONICA L. SPICER
SHANTANU SINGH
JENNIFER FRANKLIN
MICHELLE GARCIA
CECILIA ABUNDIS
Assistant Attorneys General
Telephone: 312-814-3000

100 W. Randolph St., 12th Floor
Chicago, IL 60601

81

# EXHIBIT 3

1    EDMUND G. BROWN JR.,
       Attorney General of the State of California
2    ALBERT NORMAN SHELDEN
       Senior Assistant Attorney General
3    RONALD REITER
       Supervising Deputy Attorney General
4    KATHRIN SEARS (Bar No. 146684)
     ROBYN SMITH (Bar No. 165446)
5    BENJAMIN G. DIEHL (Bar No. 192984)
     LINDA HOOS (Bar No. 217620)
6      Deputy Attorneys General
     300 S. Spring Street, Suite 1702
7    Los Angeles, CA  90013
     Telephone: (213) 897-5548
8    Facsimile: (213) 897-4951

9    Attorneys for Plaintiff,
     the People of the State of California

10

                    [EXEMPT FROM FILING FEES
                    UNDER GOVT. CODE SEC. 6103]

11                  **SUPERIOR COURT OF THE STATE OF CALIFORNIA**

12                  **FOR THE COUNTY OF LOS ANGELES COUNTY**

13                  **NORTHWEST DISTRICT**

14

15   THE PEOPLE OF THE STATE OF
     CALIFORNIA,

16                          Plaintiff,

17          v.

18   COUNTRYWIDE FINANCIAL
19   CORPORATION, a Delaware corporation;
     COUNTRYWIDE HOME LOANS, INC., a
20   New York corporation; FULL SPECTRUM
     LENDING, INC., a California Corporation;
21   ANGELO MOZILO, an individual; DAVID
     SAMBOL, an individual; and DOES 1-100,
22   inclusive,

23                          Defendants.

24

25   ///

26   ///

27   ///

28   ///

Case No.:  **LC081846**

**FIRST AMENDED COMPLAINT FOR
RESTITUTION, INJUNCTIVE
RELIEF, OTHER EQUITABLE
RELIEF, AND CIVIL PENALTIES**

**COMPLAINT**

Plaintiff, the People of the State of California, by and through Edmund G. Brown Jr.,
Attorney General of the State of California, alleges the following, on information and belief:

I.    **DEFENDANTS AND VENUE**

1.    At all relevant times, defendant Countrywide Financial Corporation ("CFC"), a
Delaware corporation, has transacted and continues to transact business throughout the State of
California, including in Los Angeles County.

2.    At all relevant times, defendant Countrywide Home Loans, Inc. ("CHL"), a New
York corporation, has transacted and continues to transact business throughout the State of
California, including in Los Angeles County.  CHL is a subsidiary of CFC.

3.    At all relevant times, until on or about December 15, 2004, Full Spectrum
Lending, Inc. ("Full Spectrum"), was a California corporation that transacted business throughout
the State of California, including in Los Angeles County, and was a subsidiary of CFC.  On or
about December 15, 2004, Full Spectrum was merged into and became a division of CHL.  For
all conduct that occurred on or after December 15, 2004, any reference in this complaint to CHL
includes reference to its Full Spectrum division.

4.    Defendants CFC, CHL, and Full Spectrum are referred to collectively herein as
"Countrywide" or "the Countrywide Defendants."

5.    At all times pertinent hereto, defendant Angelo Mozilo ("Mozilo") was Chairman
and Chief Executive Officer of CFC.  Defendant Mozilo directed, authorized, and ratified the
conduct of the Countrywide Defendants set forth herein.

6.    At all times pertinent hereto, defendant David Sambol ("Sambol") is and was the
President of CHL and, since approximately September, 2006, has served as the President and
Chief Operating Officer of CFC.  Sambol directed, authorized and ratified the conduct of CHL,
and after, September, 2006, the Countrywide Defendants, as set forth herein.  Defendant Sambol
is a resident of Los Angeles County.

7.    Plaintiff is not aware of the true names and capacities of the defendants sued as
Does 1 through 100, inclusive, and therefore sues these defendants by such fictitious names.

2
**FIRST AMENDED COMPLAINT**

Each of these fictitiously named defendants is responsible in some manner for the activities alleged in this Complaint. Plaintiff will amend this Complaint to add the true names of the fictitiously named defendants once they are discovered.

8.      The defendants identified in paragraphs 1 through 7, above, shall be referred to collectively as "Defendants."

9.      Whenever reference is made in this Complaint to any act of any defendant(s), that allegation shall mean that each defendant acted individually and jointly with the other defendants.

10.     Any allegation about acts of any corporate or other business defendant means that the corporation or other business did the acts alleged through its officers, directors, employees, agents and/or representatives while they were acting within the actual or ostensible scope of their authority.

11.     At all relevant times, each defendant committed the acts, caused or directed others to commit the acts, or permitted others to commit the acts alleged in this Complaint. Additionally, some or all of the defendants acted as the agent of the other defendants, and all of the defendants acted within the scope of their agency if acting as an agent of another.

12.     At all relevant times, each defendant knew or realized that the other defendants were engaging in or planned to engage in the violations of law alleged in this Complaint. Knowing or realizing that other defendants were engaging in or planning to engage in unlawful conduct, each defendant nevertheless facilitated the commission of those unlawful acts. Each defendant intended to and did encourage, facilitate, or assist in the commission of the unlawful acts, and thereby aided and abetted the other defendants in the unlawful conduct.

13.     At all relevant times, Defendants have engaged in a conspiracy, common enterprise, and common course of conduct, the purpose of which is and was to engage in the violations of law alleged in this Complaint. This conspiracy, common enterprise, and common course of conduct continues to the present.

14.     The violations of law alleged in this Complaint occurred in Los Angeles County and elsewhere throughout California and the United States.

**FIRST AMENDED COMPLAINT**

1  II.   **DEFENDANTS' BUSINESS ACTS AND PRACTICES**

2       15.    This action is brought against Defendants, who engaged in false advertising and

3  unfair competition in the origination of residential mortgage loans and home equity lines of

4  credit ("HELOCs").

5       16.    Countrywide originated mortgage loans and HELOCs through several channels,

6  including a wholesale origination channel and a retail origination channel. The Countrywide

7  employees who marketed, sold or negotiated the terms of mortgage loans and HELOCs in any of

8  its origination channels, either directly to consumers or indirectly by working with mortgage

9  brokers, are referred to herein as "loan officers."

10      17.    In Countrywide's wholesale channel, loan officers in its Wholesale Lending

11 Division ("WLD") and Specialty Lending Group ("SLG") (now merged into the WLD) worked

12 closely with a nationwide network of mortgage brokers to originate loans. In its wholesale

13 channel, Countrywide often did business as "America's Wholesale Lender," a fictitious business

14 name owned by CHL. In Countrywide's retail channel, loan officers employed by Countrywide

15 in its Consumer Markets Division ("CMD") sold loans directly to consumers. In addition, loan

16 officers employed by Full Spectrum up until December 14, 2004, and thereafter by

17 Countrywide's Full Spectrum Lending Division ("FSLD"), sold loans directly to consumers as

18 part of Countrywide's retail channel.

19      18.    Countrywide maintained sophisticated electronic databases by means of which

20 corporate management, including but not limited to defendants Mozilo and Sambol, could obtain

21 information regarding Countrywide's loan production status, including the types of loan

22 products, the number and dollar volume of loans, the underwriting analysis for individual loans,

23 and the number of loans which were approved via underwriting exceptions. Defendants used this

24 information, together with data they received regarding secondary market trends, to develop and

25 modify the loan products that Countrywide offered and the underwriting standards that

26 Countrywide applied.

27      19.    The mortgage market changed in recent years from one in which lenders

28 originated mortgages for retention in their own portfolios to one in which lenders attempted to

4
**FIRST AMENDED COMPLAINT**

1    generate as many mortgage loans as possible for resale on the secondary mortgage market. The

2    goal for lenders such as Countrywide was not only to originate high mortgage loan volumes but

3    also to originate loans with above-market interest rates and other terms which would attract

4    premium prices on the secondary market.

5        20.    In 2004, in an effort to maximize Countrywide's profits, Defendants set out to

6    double Countrywide's share of the national mortgage market to 30% through a deceptive scheme

7    to mass produce loans for sale on the secondary market. Defendants viewed borrowers as

8    nothing more than the means for producing more loans, originating loans with little or no regard

9    to borrowers' long-term ability to afford them and to sustain homeownership. This scheme was

10   created and maintained with the knowledge, approval and ratification of defendants Mozilo and

11   Sambol.

12       21.    Defendants implemented this deceptive scheme through misleading marketing

13   practices designed to sell risky and costly loans to homeowners, the terms and dangers of which

14   they did not understand, including by (a) advertising that it was the nation's largest lender and

15   could be trusted by consumers; (b) encouraging borrowers to refinance or obtain purchase money

16   financing with complicated mortgage instruments like hybrid adjustable rate mortgages or

17   payment option adjustable rate mortgages that were difficult for consumers to understand; (c)

18   marketing these complex loan products to consumers by emphasizing the very low initial

19   "teaser" or "fixed" rates while obfuscating or misrepresenting the later steep monthly payments

20   and interest rate increases or risk of negative amortization; and (d) routinely soliciting borrowers

21   to refinance only a few months after Countywide or the loan brokers with whom it had "business

22   partnerships" had sold them loans.

23       22.    Defendants also employed various lending policies to further their deceptive

24   scheme and to sell ever-increasing numbers of loans, including (a) the dramatic easing of

25   Countrywide's underwriting standards; (b) the increased use of low- or no-documentation loans

26   which allowed for no verification of stated income or stated assets or both, or no request for

27   income or asset information at all; (c) urging borrowers to encumber their homes up to 100% (or

28

1   more) of the assessed value; and (d) placing borrowers in "piggyback" second mortgages in the

2   form of higher interest rate HELOCs while obscuring their total monthly payment obligations.

3       23.    Also to further the deceptive scheme, Defendants created a high-pressure sales

4   environment that propelled its branch managers and loan officers to meet high production goals

5   and close as many loans as they could without regard to borrower ability to repay.  Defendants'

6   high-pressure sales environment also propelled loan officers to sell the riskiest types of loans,

7   such as payment option and hybrid adjustable rate mortgages, because loan officers could easily

8   sell them by deceptively focusing borrowers' attention on the low initial monthly payments or

9   interest rates.  Defendants also made arrangements with a large network of mortgage brokers to

10  procure loans for Countrywide and, through its loan pricing structure, encouraged these brokers

11  to place homeowners in loans with interest rates higher than those for which they qualified, as

12  well as prepayment penalty obligations.  This system of compensation aided and abetted brokers

13  in breaching their fiduciary duties to borrowers by inducing borrowers to accept unfavorable loan

14  terms without full disclosure of the borrowers' options and also compensated brokers beyond the

15  reasonable value of the brokerage services they rendered.

16      24.    Countrywide received numerous complaints from borrowers claiming that they

17  did not understand their loan terms.  Despite these complaints, Defendants turned a blind eye to

18  the ongoing deceptive practices engaged in by Countrywide's loan officers and loan broker

19  "business partners," as well as to the hardships created for borrowers by its loose underwriting

20  practices.  Defendants cared only about selling increasing numbers of loans at any cost, in order

21  to maximize Countrywide's profits on the secondary market.

22  **III.    THE PRIMARY PURPOSE OF DEFENDANTS' DECEPTIVE BUSINESS**
    **PRACTICES WAS TO MAXIMIZE PROFITS FROM THE SALE OF LOANS TO**
23  **THE SECONDARY MARKET**

24      25.    Defendants' deceptive scheme had one primary goal – to supply the secondary

25  market with as many loans as possible, ideally loans that would earn the highest premiums.  Over

26  a period of several years, Defendants constantly expanded Countrywide's share of the consumer

27  market for mortgage loans through a wide variety of deceptive practices, undertaken with the

28

1    direction, authorization, and ratification of defendants Sambol and Mozilo, in order to maximize

2    its profits from the sale of those loans to the secondary market.

3    26.    While Countrywide retained ownership of some of the loans it originated, it sold

4    the vast majority of its loans on the secondary market, either as mortgage-backed securities or as

5    pools of whole loans.

6    27.    In the typical securitization transaction involving mortgage-backed securities,

7    loans were "pooled" together and transferred to a trust controlled by the securitizer, such as

8    Countrywide.  The trust then created and sold securities backed by the loans in the pool.  Holders

9    of the securities received the right to a portion of the monthly payment stream from the pooled

10   loans, although they were not  typically entitled to the entire payment stream.  Rather, the holders

11   received some portion of the monthly payments.  The securitizer or the trust it controlled often

12   retained an interest in any remaining payment streams not sold to security holders.  These

13   securitizations could involve the pooling of hundreds or thousands of loans, and the sale of many

14   thousands of shares.

15   28.    Countrywide generated massive revenues through these loan securitizations.  Its

16   reported securities trading volume grew from 647 billion dollars in 2000, to 2.9 trillion dollars in

17   2003, 3.1 trillion dollars in 2004, 3.6 trillion dollars in 2005, and 3.8 trillion dollars in 2006.

18   (These figures relate to the ostensible values given to the securities by Countrywide or investors,

19   and include securities backed by loans made by other lenders and purchased by Countrywide.)

20   29.    For the sale of whole (i.e., unsecuritized) loans, Countrywide pooled loans and

21   sold them in bulk to third-party investors, often (but not exclusively) Wall Street firms.  The sale

22   of whole loans generated additional revenues for Countrywide.  Countrywide often sold the

23   whole loans at a premium, meaning that the purchaser paid Countrywide a price in excess of

24   100% of the total principal amount of the loans included in the loan pool.

25   30.    The price paid by purchasers of securities or pools of whole loans varied based on

26   the demand for the particular types of loans included in the securitization or sale of whole loans.

27   The characteristics of the loans, such as whether the loans are prime or subprime, whether the

28

1    loans have an adjustable or fixed interest rate, or whether the loans include a prepayment penalty,

2    all influenced the price.

3        31.     Various types of loans and loan terms earned greater prices, or "premiums," in the

4    secondary market. For example, investors in mortgages and mortgage backed securities have

5    been willing to pay higher premiums for loans with prepayment penalties. Because the

6    prepayment penalty deters borrowers from refinancing early in the life of the loan, it essentially

7    ensures that the income stream from the loan will continue while the prepayment penalty is in

8    effect. Lenders, such as Countrywide, typically sought to market loans that earned it higher

9    premiums, including loans with prepayment penalties.

10       32.     In order to maximize the profits earned by the sale of its loans to the secondary

11    market, Countrywide's business model increasingly focused on finding ways to generate an ever

12    larger volume of the types of loans most demanded by investors. For example, Countrywide

13    developed and modified loan products by discussing with investors the prices they would be

14    willing to pay for loans with particular characteristics (or for securities backed by loans with

15    particular characteristics), and also would receive requests from investors for pools of certain

16    types of loans, or loans with particular characteristics. This enabled Countrywide to determine

17    which loans were most likely to be sold on the secondary market for the highest premiums.

18       33.     Further, rather than waiting to sell loans until after they were made, Countrywide

19    would sell loans "forward" before loans were funded. In order to determine what loans it could

20    sell forward, Countrywide would both examine loans in various stages of production and

21    examine its projected volume of production over the next several months.

22       34.     Loans that were sold forward were sold subject to a set of stipulations between

23    Countrywide and the purchaser. For example, in a sale of whole loans, Countrywide might agree

24    on October 1 that on December 1 it would deliver 2000 adjustable rate mortgage loans with an

25    average interest rate of 6.0%, half of which would be subject to a prepayment penalty, among

26    other characteristics. (None of these loans would have been made as of October 1.) Based on

27    these stipulations regarding the characteristics of the loans to be included in the pool, an investor

28    might agree to pay a price totaling 102.25% of the total face value of the loans. In other words,

**FIRST AMENDED COMPLAINT**

the purchaser agreed in advance to pay a premium of 2.25%. Then, if the loans actually delivered on December 1 had a slightly higher or lower average interest rate, the terms of the stipulation would specify how much the final price would be adjusted.

35.    The information regarding the premiums that particular loan products and terms could earn on the secondary market was forwarded to Countrywide's production department, which was responsible for setting the prices at which loans were marketed to consumers.

36.    Countrywide originated as many loans as possible not only to maximize its profits on the secondary market, but to earn greater profits from servicing the mortgages it sold. Countrywide often retained the right to service the loans it securitized and sold as pools of whole loans. The terms of the securitizations and sales agreements for pools of whole loans authorized Countrywide to charge the purchasers a monthly fee for servicing the loans, typically a percentage of the payment stream on the loan.

37.    Tantalized by the huge profits earned by selling loans to the secondary market, Defendants constantly sought to increase Countrywide's market share: the greater the number and percentage of loans it originated, the greater the revenue it could earn on the secondary market. Countrywide executives, including defendant Mozilo, publicly stated that they sought to increase Countrywide's market share to 30% of all mortgage loans made and HELOCs extended in the country.

38.    In its 2006 annual report, Countrywide trumpeted the fact that "[w]hile the overall residential loan production market in the United States has tripled in size since 2000, from $1.0 trillion to $2.9 trillion at the end of 2006, Countrywide has grown nearly three times faster, going from $62 billion in loan originations in 2000 to $463 billion in 2006."

39.    In addition, Countrywide directly and indirectly motivated its branch managers, loan officers and brokers to market the loans that would earn the highest premiums on the secondary market without regard to borrower ability to repay. For example, the value on the secondary market of the loans generated by a Countrywide branch was an important factor in determining the branch's profitability and, in turn, branch manager compensation. Managers were highly motivated to pressure their loan officers to sell loans that would earn Countrywide

**FIRST AMENDED COMPLAINT**

1    the highest premium on the secondary market, which resulted in aggressive marketing of such

2    loans to consumers.

3         40.     The secondary market affected Countrywide's pricing of products and, in order to

4    sell more loans on the secondary market, Countrywide relaxed its underwriting standards and

5    liberally granted exceptions to those standards. Countrywide managers and executives, including

6    but not limited to defendants Mozilo and Sambol, had access to information that provided

7    transparency and a seamless connection between secondary market transactions, the loan

8    production process, and managerial and sales incentives.

9    **IV.**    **COUNTRYWIDE ENGAGED IN DECEPTIVE PRACTICES IN THE SALE OF**
10         **COMPLEX AND RISKY LOANS TO CONSUMERS**

11         41.     Countrywide offered a variety of loan products that were both financially risky

12    and difficult for borrowers to understand, including in particular payment option and hybrid

13    adjustable rate mortgages and second loans in the form of home equity lines of credit.

14         **A.**     **The Pay Option ARM**

15         42.     Particularly after 2003, Countrywide aggressively marketed its payment option

16    adjustable rate mortgage ("Pay Option ARM") under the direction, authorization and ratification

17    of defendants Mozilo and Sambol. The Pay Option ARM, which Countrywide classified as a

18    "prime" product, is a complicated mortgage product which entices consumers by offering a very

19    low "teaser" rate – often as low as 1% – for an introductory period of one or three months. At

20    the end of the introductory period, the interest rate increases dramatically. Despite the short

21    duration of the low initial interest rate, Countrywide's Pay Option ARMs often include a one,

22    two or three-year prepayment penalty.

23         43.     When the teaser rate on a Pay Option ARM expires, the loan immediately

24    becomes an adjustable rate loan. Unlike most adjustable rate loans, where the rate can only

25    change once every year or every six months, the interest rate on a Pay Option ARM can change

26    every month (if there is a change in the index used to compute the rate).

27         44.     Countrywide's Pay Option ARMs were typically tied to either the "MTA,"

28    "LIBOR" or "COFI" index. The MTA index is the 12-month average of the annual yields on

1  actively traded United States Treasury Securities adjusted to a constant maturity of one year as

2  published by the Federal Reserve Board.  The LIBOR (London Interbank Offered Rate) index is

3  based on rates that contributor banks in London offer each other for inter-bank deposits. Separate

4  LIBOR indices are kept for one month, six-month, and one-year periods, based on the duration of

5  the deposit.  For example, the one-year LIBOR index reported for June 2008 is the rate for a

6  twelve-month deposit in U.S. dollars as of the last business day of the previous month.  The

7  COFI (11th District Cost of Funds Index) is the monthly weighted average of the interest rates

8  paid on checking and savings accounts offered by financial institutions operating in the states of

9  Arizona, California and Nevada.

10      45.    Although the interest rate increases immediately after the expiration of the short

11  period of time during which the teaser rate is in effect, a borrower with a Pay Option ARM has

12  the option of making monthly payments as though the interest rate had not changed.  Borrowers

13  with Pay Option ARMs typically have four different payment options during the first five years

14  of the loan.  The first option is a "minimum" payment that is based on the introductory interest

15  rate.  The minimum payment, which Countrywide marketed as the "payment rate," is the lowest

16  of the payment options presented to the borrower.  Most of Countrywide's borrowers choose to

17  make the minimum payment.

18      46.    The minimum payment on a Pay Option ARM usually is less than the interest

19  accruing on the loan.  The unpaid interest is added to the principal amount of the loan, resulting

20  in negative amortization.  The minimum payment remains the same for one year and then

21  increases by 7.5% each year for the next four years.  At the fifth year, the payment will be

22  "recast" to be fully amortizing, causing a substantial jump in the payment amount often called

23  "payment shock."

24      47.    However, the loan balance on a Pay Option ARM also has a negative amortization

25  cap, typically 115% of the original principal of the loan.  If the balance hits the cap, the monthly

26  payment is immediately raised to the fully amortizing level (i.e., all payments after the date the

27  cap is reached must be sufficient to pay off the new balance over the remaining life of the loan).

28  When that happens, the borrower experiences significant payment shock.  A borrower with a

1   Countrywide Pay Option ARM with a 1% teaser rate, who is making the minimum payment, is

2   very likely to hit the negative amortization cap and suffer payment shock well before the standard

3   5-year recast date.

4          48.     Instead of making the minimum payment, the borrower has the option of making

5   an interest-only payment for five years.  The borrower then experiences payment shock when the

6   payment recasts to cover both principal and interest for the remaining term of the loan.

7   Alternatively, the borrower can choose to make a fully amortizing principal and interest payment

8   based on either a 15-year or a 30-year term.

9          49.     The ever-increasing monthly payments and payment shock characteristic of Pay

10  Option ARMs are illustrated by the following example of a Countrywide loan.  The loan had an

11  initial principal balance of $460,000.00, a teaser rate of 1%, and a margin of 2.9% (such that

12  after the one-month teaser rate expired, the interest would be the 1-month LIBOR index plus

13  2.9%, rounded to the nearest 1/8th percent).  After the teaser rate expired, based on the 1-month

14  LIBOR rate as of the date the borrower obtained the loan, the interest rate would increase to

15  7.00%.  Assuming the 7.00% interest rate remained in place, and the borrower chose to make the

16  minimum payment for as long as possible, the payment schedule would be approximately as

17  follows:

18          a.     $1,479.54 per month for the first year;

19          b.     $1,590.51 per month for the second year;

20          c.     $1,709.80 per month for the third year;

21          d.     $1,838.04 per month for the fourth year;

22          e.     $1,975.89 per month for the first nine months of the fifth year; and

23          f.     approximately $3747.83 per month for the remaining twenty-five years

24                 and three months on the loan.

25         50.     Once the payments reach $3747.83, this Pay Option ARM will have negatively

26  amortized such that the balance of the loan will have increased to approximately $523,792.33.

27  At that point, the borrower will be faced with a payment more than two-and-a-half times greater

28  than the initial payment and likely will be unable to refinance unless his or her home has

**FIRST AMENDED COMPLAINT**

1   increased in value at least commensurately with the increased loan balance.  In addition,

2   increases in the LIBOR rate could cause the borrower to hit the negative amortization cap earlier,

3   and also could result in even higher payments.  If the interest rate reached 8%, just 1% higher, the

4   negative amortization cap would be reached sooner and payments could reach $4,000.00 per

5   month, or higher.

6          51.     During the underwriting process, Countrywide did not consider whether

7   borrowers would be able to afford such payment shock.  Further, depending on the state of the

8   his or her finances, even the interim increases in the minimum payment may well have caused

9   dramatic hardship for the borrower.

10         52.     Even if the borrower elects to make interest-only payments, he or she still will

11  experience payment shock.  Again assuming the interest rate stays constant at 7.00% over the life

12  of the loan, the borrower's initial payments would be approximately $2,683.33 for five years.

13  Thereafter, the payment will increase to approximately $3,251.18 per month, an increase of over

14  20%.

15         53.     Nearly all Countrywide's Pay Option ARM borrowers will experience payment

16  shock such as that illustrated in paragraphs 49 through 52 above.  As of December 31, 2006,

17  almost 88% of the Pay Option ARM portfolio held by Defendants consisted of loans that had

18  experienced some negative amortization.   This percentage increased to 91% as of December 31,

19  2007.

20         54.     Countrywide sold thousands of Pay Option ARMs, either through its branches or

21  through brokers.   For example, on a national basis, approximately 19% of the loans originated

22  by Countrywide in 2005 were Pay Option ARMs.  Countrywide made many of these loans in

23  California.

24         55.     These loans were highly profitable.  Countrywide had a gross profit margin of

25  approximately 4% on Pay Option ARMs, compared to 2% on mortgages guaranteed by the

26  Federal Housing Administration.

27         56.     Countrywide retained ownership of a number of loans for investment purposes,

28  including thousands of Pay Option ARMs.  Countrywide reported the negative amortization

13
**FIRST AMENDED COMPLAINT**

1   amounts on these Pay Option ARMs (i.e., the amount by which the balances on those loans

2   increased) as income on its financial statements.  The negative amortization "income" earned by

3   Countrywide totaled 1.2 billion dollars by the end of of 2007.

4        57.     Moreover, Pay Option ARMs with higher margins could be sold for a higher

5   premium on the secondary market, because the higher margins would produce a greater interest

6   rate and therefore a larger income stream.  To insure an abundant stream of such loans,

7   Countrywide pushed its loan officers to sell Pay Option ARMs and paid loan brokers greater

8   compensation for selling a Pay Option ARM with a higher margin, or above-par rate, thus

9   encouraging them to put consumers into higher cost loans.  Countrywide also used a variety of

10  deceptive marketing techniques to sell its Pay Option ARMs to consumers.

11       58.     Countrywide deceptively marketed the Pay Option ARM by aggressively

12  promoting the teaser rate.  Television commercials emphasized that the payment rate could be as

13  low as 1% and print advertisements lauded the extra cash available to borrowers because of the

14  low minimum payment on the loan.  Television advertisements did not effectively distinguish

15  between the "payment rate" and the interest rate on the loans, and any warnings about potential

16  negative amortization in Countrywide's print advertisements were buried in densely written small

17  type.

18       59.     Borrowers, enticed by the low teaser rate, were easily distracted from the fine

19  print in the loan documents and did not fully understand the terms or the financial implications of

20  Countrywide's Pay Option ARMs.

21       60.     When a borrower obtained a Pay Option ARM from Countrywide, the only initial

22  monthly payment amount that appeared anywhere in his or her loan documents was the minimum

23  payment amount.  In other words, documents provided to the borrower assumed he or she would

24  make only the minimum payment. Thus, a borrower would not know the monthly payment

25  necessary to make a payment that would, for example, cover accruing interest, until he or she

26  received the first statement after the expiration of the teaser rate, well after all loan documents

27  were signed.

28

14<br>**FIRST AMENDED COMPLAINT**

61.     Countrywide and the brokers it accepted as its "business partners" misrepresented or obfuscated the true terms of the Pay Option ARMs offered by Countrywide, including but not limited to misrepresenting or obfuscating the amount of time that the interest rate would be fixed for the loan, misrepresenting or obfuscating the risk of negative amortization and the fact that the payment rate was not the interest rate, and misrepresenting or obfuscating that the minimum payment would not apply for the life of the loan.

62.     Countrywide and its business partner brokers also misrepresented or obfuscated how difficult it might be for borrowers to refinance a Pay Option ARM loan.  In fact, after making only the minimum payment, because of negative amortization the borrower likely would not be able to refinance a Pay Option ARM loan unless the home serving as security for the mortgage had increased in value.  This is particularly true in cases for borrowers whose loans have a very high loan-to-value ratio.

63.     Countrywide and its business partner brokers often misrepresented or obfuscated the fact that a particular Pay Option ARM included a prepayment penalty and failed to explain the effect that making only the minimum payment would have on the amount of the prepayment penalty.  If a borrower seeks to refinance after having made the minimum payment for an extended period, but while a prepayment penalty is still in effect, the negative amortization can cause the amount of the prepayment penalty to increase.  Prepayment penalties typically equal six months worth of accrued interest.   As negative amortization causes the loan principal to increase, it also causes an increase in the amount of interest that accrues that each month, thereby increasing the prepayment penalty.

64.     Countrywide and its business partner brokers also represented that the prepayment penalty could be waived if the borrower refinanced with Countrywide.  However, Countrywide sells most of the loans it originates, and Countrywide has at most limited authority to waive prepayment penalties on loans it does not own, even when it controls the servicing (and is often required to pay the prepayment penalties on loans it does not own in the instances where it is not able to collect the penalty from the borrower).

**B.    Hybrid ARM Loans**

65.    In addition to the Pay Option ARMs, Countrywide offered "Hybrid" ARM loans. Hybrid ARMs have a fixed interest rate for a period of 2, 3, 5, 7, or 10 years, and then an adjustable interest rate for the remaining loan term.  The products described below were offered with the approval, direction and ratification of defendants Sambol and Mozilo.

**(1)    2/28 and 3/27 ARMs**

66.    Countrywide typically offered "2/28" Hybrid ARMs through its Full Spectrum Lending Division.  These 2/28 ARM loans have low, fixed interest rates for the first two years (the "2" in "2/28").  The loans often only required interest-only payments during the period the initial rate was in effect, or sometimes for the first five years of the loan.

67.    After the initial rate expires, the interest rate can adjust once every six months for the next 28 years (the "28" in "2/28").  During this period, the interest rate typically is determined by adding a margin to the one-year LIBOR index, except that the amount the interest rate can increase at one time may be limited to 1.5%.  Because the initial rate is set independent of the index, the payment increase can be dramatic, particularly if the loan called for interest-only payments for the first two or five years.

68.    Countrywide also offered "3/27" ARMs, which operate similarly to 2/28 ARMs, except that the low initial rate is fixed for three rather than two years, and the interest rate then adjusts for 27 rather than 28 years.

69.    Countrywide underwrote 2/28 and 3/27 ARMs based on the payment required while the initial rate was in effect, without regard to whether the borrower could afford the loan thereafter.  And, like Pay Option ARMs, Countrywide's 2/28 and 3/27 ARMs typically contain prepayment penalties.

70.    A borrower with a 2/28 ARM, like a borrower with a Pay Option ARM, is subjected to steadily increasing monthly payments as well as payment shock.  For example, a Countrywide borrower obtained a 2/28 ARM for $570,000, with an initial rate of 8.95% for the first two years.  Thereafter, the interest rate was to be calculated by adding a margin of 7.95% to the six-month LIBOR index.  The promissory note for this 2/28 ARM provides that the interest

1    rate can never be lower 8.95% and can go as high as 15.95%. Based on the LIBOR rate that

2    applied at the time the borrower received the loan and the terms of the note governing interest

3    rate (and therefore payment) increases, the anticipated payment schedule was:

4                a.    $4,565.86 per month for two years;

5                b.    $5,141.98 per month for six months;

6                c.    $5,765.48 per month for six months; and

7                d.    payments of $6,403.01 per month or more thereafter.

8          71.    This borrower's monthly payments on this 2/28 ARM will thus increase by

9    approximately 40% just during the 12 months between the end of the second year and beginning

10   of the fourth year of the loan.

11                    **(2)    5/1, 7/1, and 10/1 ARMs**

12         72.    Countrywide also offered 5/1, 7/1, and 10/1 "interest-only" loans. Marketed as

13   having "fixed" or "fixed period" interest rates, these loans carried a fixed interest rate for the first

14   5, 7, or 10 years respectively. These loans were underwritten based on the initial fixed, interest-

15   only payment until at least the end of 2005. However, when the fixed rate period expires, the

16   interest rate adjusts once per year and is determined by adding a margin to an index. The

17   monthly payments dramatically increase after the interest-only period, because payments over the

18   remaining 25, 23, or 20 years are fully amortized to cover both principal and interest.

19         73.    For example, if a borrower had a 5/1 loan for $500,000 that remained constant at

20   7.5% for the life of the loan, the monthly payments during the five year interest-only period

21   would be $3,125.00. The monthly payment would increase to approximately $3,694.96 for the

22   remaining 25 years of the loan. If the interest rate increased to 8% over the remaining 25 years,

23   the payment would jump to $3,859.08 per month.

24         74.    Collectively, 2/28, 3/27, 5/1, 7/1, and 10/1 ARMs will be referred to herein as

25   "Hybrid ARMs."

26                    **(3)    Countrywide's Deceptive Marketing of its Hybrid ARMs**

27         75.    Countrywide marketed Hybrid ARMs by emphasizing the low monthly payment

28   and low "fixed" initial interest rate. Countrywide and its business partner brokers misrepresented

17
**FIRST AMENDED COMPLAINT**

1    or obfuscated the true terms of these loans, including but not limited to misrepresenting or

2    obfuscating the amount of time that the fixed rate would be in effect, misrepresenting or

3    obfuscating the fact that the interest rates on the loans are adjustable rather than fixed, and

4    obfuscating or misrepresenting the amount by which payments could increase once the initial

5    fixed rate expired.

6        76.     Countrywide and its business partner brokers also often misrepresented or

7    obfuscated the fact that Hybrid ARMs, particularly 2/28 and 3/27 ARMs, included prepayment

8    penalties, or represented that the prepayment penalties could be waived when the borrowers

9    refinanced with Countrywide. However, most loans originated by Countrywide are sold on the

10   secondary market and, as described in paragraph 64, above, Countrywide generally cannot waive

11   the terms of loans it does not own, even when it controls the servicing.

12       77.     Countrywide and its brokers also misrepresented or obfuscated how difficult it

13   might be for borrowers to refinance Hybrid ARMs. Although borrowers often were assured that

14   they would be able to refinance, those seeking to refinance Hybrid ARMs after the expiration of

15   the initial interest-only period likely would not be able to do so unless the home serving as

16   security for the mortgage had maintained or increased its value. This was particularly true for

17   borrowers whose loans have very high loan-to-value ratios, as there would be no new equity in

18   the borrowers' homes to help them pay fees and costs associated with the refinances (as well as

19   any prepayment penalties that may still apply).

20       **C.**      **Home Equity Lines of Credit**

21       78.     Countrywide also aggressively marketed HELOCs, particularly to borrowers who

22   had previously obtained or were in the process of obtaining a first mortgage loan from

23   Countrywide. Defendants referred to such HELOCs as "piggies" or "piggyback loans," and

24   referred to simultaneously funded first loans and HELOCs as "combo loans." The first loan

25   typically covered 80% of the appraised value of the home securing the mortgage, while the

26   HELOC covered any of the home's remaining value up to (and sometimes exceeding) 20%.

27   Thus, the HELOC and the first loan together often encumbered 100% or more of a home's

28   appraised value.

79.     Under the terms of the piggyback HELOCs, borrowers received monthly bills for interest-only payments for the first five years of the loan term (which could be extended to ten years at Countrywide's option), during which time they could also tap any unused amount of the equity line.  This was called the "draw period."

80.     Because Countrywide offered HELOCs as piggybacks to Pay Option and Hybrid ARMs, 100% or more of a property's appraised value could be encumbered with loans that required interest-only payments or allowed for negative amortization.

81.     Countrywide typically urged borrowers to draw down the full line of credit when HELOCs initially funded.  This allowed Countrywide to earn as much interest as possible on the HELOCs it kept in its portfolio, and helped generate the promised payment streams for HELOCs sold on the secondary market.  For the borrower, however, drawing down the full line of credit at funding meant that there effectively was no "equity line" available during the draw period, as the borrower would be making interest-only payments for five years.

82.     Upon the end of the draw period, the HELOC notes generally require borrowers to repay the principal and interest in fully amortizing payments over a fifteen year period.  A fully drawn HELOC was therefore functionally a 20- or 25-year closed-end mortgage.  However, Countrywide did not provide borrowers with any documents or other materials to help them calculate the principal and interest payments that would be due after the draw, or interest-only, period.

83.     Countrywide HELOCs were underwritten not to the fully amortizing payment, but to the interest-only payments due during the draw period.  Countrywide typically charged an early termination fee for HELOCs closed before three years, and sometimes would charge a monthly fee for HELOCs where the balance fell below a specified amount.

84.     A borrower with an interest-only or a negatively amortizing loan faces even greater payment shock if he or she also has a fully drawn HELOC.  For example, a borrower with a fully drawn $100,000 HELOC at a 7.00% interest rate will have monthly interest-only payments of approximately $583.33.  At the end of the draw period, the payment will increase to $898.83.  This payment increase is in addition to whatever payment increase the borrower is

1  experiencing on his or her first mortgage. This potential dual payment shock is typically

2  obfuscated from or not explained to borrowers. Moreover, a borrower with a piggyback HELOC,

3  particularly a borrower whose first mortgage negatively amortized or allowed interest-only

4  payments, is even less likely to be able to refinance at the time of his or her payment shock

5  unless his or her home has increased in value.

6  **V.    COUNTRYWIDE EASED AND DISREGARDED UNDERWRITING
         STANDARDS IN ORDER TO INCREASE ITS MARKET SHARE**

7

8    85.    Driven by its push for market share, Countrywide did whatever it took to sell

9  more loans, faster – including by easing its underwriting criteria and disregarding the minimal

10  underwriting criteria it claimed to require. By easing and disregarding its underwriting criteria,

11  Countrywide increased the risk that borrowers would lose their homes. Defendants Mozilo and

12  Sambol actively pushed for easing Countrywide's underwriting standards and documentation

13  requirements, allowed the liberal granting of exceptions to those already eased standards and

14  requirements, and received reports detailing the actual underwriting characteristics and

15  performance of the loans Countrywide funded.

16    **A.    Countrywide's Low- and No-Documentation Loans**

17    86.    Traditionally, lenders required borrowers seeking mortgage loans to document

18  their income, for example by providing W-2s or tax returns, as well as assets. Countrywide,

19  however, disregarded such documentation requirements with respect to its riskiest loan products

20  and introduced a variety of reduced or no documentation loan programs that eased and

21  quickened the loan origination process. The vast majority of the Hybrid ARMs and nearly all of

22  the Pay Option ARMs originated by Countrywide were reduced or no documentation loans.

23    87.    As an example of one of its widespread no documentation programs, Countrywide

24  made Pay Option ARMs, Hybrid ARMs, and piggyback HELOCs, among other loans, pursuant

25  to its "Stated Income Stated Assets," or "SISA," program. The borrower's income and assets

26  were stated but not verified. Employment was verbally confirmed and income was supposed to

27  be roughly consistent with incomes earned in the type of job in which the borrower was

28  employed. Reduced documentation loans, in turn, allowed borrowers to document their income

through the provision of information that was less reliable then the information required of full documentation loans, such bank statements or verbal verification of employment.

88.    These low- and no-documentation programs, such as SISA, enabled Countrywide to process loans more quickly and therefore to make more loans.  Stated income loans also encouraged the overstating of income – loan brokers and officers either overstated the borrower's income without his or her knowledge, or led the borrower into overstating his or her income without explaining the risk of default that the borrower would face with a loan he or she could not actually afford.  According to a former Countrywide loan officer, for example, a loan officer might say, "with your credit score of X, for this house, and to make X payment, X is the income you need to make."  Many borrowers responded by agreeing that they made X amount in income.

89.    For stated income loans, it became standard practice for loan processors and underwriters to check www.salary.com to see if a stated income was within a reasonable range, with more tolerance on the upside for California salaries.   Because loan officers knew about this practice, they too would look at salary.com to figure out the parameters ahead of time and know by how much they could overstate (or fabricate) income.

**B.    Countrywide's Easing of Underwriting Standards**

90.    Countrywide also relaxed, and often disregarded, the traditional underwriting standards used to separate acceptable from unacceptable risk in order to produce more loans for the secondary market.  Initially, for example, a borrower had to have a credit score of 720 for a stated income loan.  As the secondary market's appetite for loans increased, Countrywide relaxed its guidelines so that a borrower with a credit score of 580 could get a stated income loan with 100% financing.

91.    Underwriting standards which Countrywide relaxed included qualifying interest rates (the rate used to determine whether borrowers can afford loans), loan-to-value ratios (the amount of the loan(s) compared to lower of the appraised value or sale price of the property), and debt-to-income ratios (the amount of borrowers' monthly income compared to their monthly indebtedness).

92.    With respect to qualifying rates, while Countrywide offered loans with initial low payments that would increase, loans were underwritten without regard to borrowers' long-term financial circumstances.   Until at least the end of 2005, Countrywide underwrote and approved its Hybrid ARMs based on the fixed interest rate applicable during the initial period of the loan, without taking into account whether the borrowers would be able to afford the dramatically higher payments that would inevitably be required during the remaining term of the loan.

93.    In addition, Countrywide's approach to underwriting and marketing Pay Option ARMs diverged.  Countrywide underwrote Pay Option ARMs based on the assumption that borrowers would make a fully amortizing payment, rather than the minimum payment, and therefore not experience negative amortization.  In contrast, Countrywide marketed Pay Option ARMs by emphasizing the minimum payments.  Countrywide continued this underwriting practice even though it knew that many of its Pay Option ARM borrowers would choose to make only the minimum monthly payment and that a high percentage of such borrowers had experienced negative amortization on their homes, as described in paragraph 53, above.

94.    Countrywide also underwrote and approved HELOCs based on the borrower's ability to afford the interest-only payments during the initial period of the loan, not based on the borrower's ability to afford the subsequent, fully amortized principal and interest payments.

95.    Countrywide eased other basic underwriting standards.  Starting in 2003, as Defendants pushed to expand market share, underwriting standards and verification requirements became more flexible to enable underwriters to approve loans faster.  Countrywide, for example, allowed higher and higher loan-to-value ("LTV") and combined loan-to-value ("CLTV") ratios – the higher the ratio, the greater the risk that a borrower will default and will be unable to refinance in order to avoid default.   Similarly, Countrywide approved loans with higher and higher debt-to-income ("DTI") ratios – the higher ratio, the greater the risk the borrower will have cash-flow problems and miss mortgage payments.

C.    **Countrywide's "Exception" Underwriting Compromised Standards**

96.    Countrywide approved loans that it knew to be high risk, and therefore highly likely to end up in default, by ignoring its own minimal underwriting guidelines.  Based on the

proposed loan terms and the borrower's financial and credit information, Countrywide's computerized underwriting system ("CLUES") issued a loan analysis report that rated the consumer's credit and ability to repay the loan, and also indicated whether a proposed loan was in compliance with Countrywide's underwriting guidelines. Based on this analysis, the CLUES report would recommend that the loan be approved, the loan be declined, or that the loan be "referred" to manual underwriting. CLUES, for example, might flag a "rule violation" if the borrower's LTV, CLTV or credit score fell outside the guidelines for a given loan product. In such instances, CLUES would make a recommendation to "refer" the loan for further analysis by a Countrywide underwriter.

97. The CLUES result was only a recommendation, not a final decision. The role of the underwriter was basically to verify information and ultimately decide whether to approve a loan based on Countrywide's underwriting criteria. Underwriters could overcome potential rule violations or other underwriting issues flagged by CLUES by adding on "compensating factors," such as letters from the borrower that addressed a low FICO score or provided explanations regarding a bankruptcy, judgment lien, or other issues affecting credit status.

98. Underwriters were under intense pressure to process and fund as many loans as possible. They were expected to process 60 to 70 loans per day, making careful consideration of borrowers' financial circumstances and the suitability of the loan product for them nearly impossible.

99. As the pressure to produce loans increased, underwriters, their superiors, branch managers, and regional vice presidents were given the authority to grant exceptions to Countrywide's minimal underwriting standards and to change the terms of a loan suggested by CLUES. Even if CLUES had recommended denying a loan, the underwriter could override that denial if he or she obtained approval from his or her supervisor.

100. Because of the intense pressure to produce loans, underwriters increasingly had to justify why they were not approving a loan or granting an exception for unmet underwriting criteria to their supervisors, as well as to dissatisfied loan officers and branch managers who earned commissions based on loan volume. Any number of Countrywide managerial employees

1  could override an underwriter's decision to decline a loan and request an exception to an

2  underwriting standard.  Countrywide employees also could submit a request for an exception to

3  Countrywide's Structured Loan Desk in Plano, Texas, a department specifically set up by

4  Countrywide, at the direction of defendants Mozilo and Sambol, to grant underwriting

5  exceptions.  According to a former employee, in 2006, 15,000 to 20,000 loans a month were

6  processed through the Structured Loan Desk.

7       101.    Countrywide granted exceptions liberally, further diluting its already minimal

8  underwriting standards for making loans.  Countrywide granted exception requests in a variety of

9  circumstances where one or more basic underwriting criteria of the borrower did not meet loan

10  product guidelines, including, for example, LTV or CLTV, loan amount and credit score.

11  Countrywide placed borrowers in risky loans such as Hybrid and Pay Option ARMs, based on

12  stated but not verified income and assets, and then overlooked its few remaining underwriting

13  indicia of risk.

14       102.    To attract more business Countrywide promoted its relaxed underwriting

15  standards and ready grant of exceptions to brokers.  For example, Countrywide promoted

16  "Unsurpassed Product Choices and Flexible Guidelines," including (a) "100% financing for

17  purchase or refinancing" loans; (b) "80/20 combo loans for stated Self-Employed and Non Self-

18  Employed;" (c) "Stated Self-Employed and Non Self-Employed loan programs with as low as a

19  500 credit score."  Countrywide stated that its "Specialty Lending Group's experienced and

20  knowledgeable loan experts are empowered to review all loan packages, make sound credit

21  decisions and provide quality lending solutions - yes, even for 'hard to close' loans."

22       **D.    Countrywide's Risk-Layering and Pressure to Sell "Piggyback" Loans
            Further Loosened Underwriting Practices**

23

24       103.    Countrywide compromised its underwriting standards even further by risk

25  layering, i.e., combining high risk loans with one or more relaxed underwriting standards.

26  Countrywide was well aware that layered risk created a greater likelihood that borrowers would

27  lose their homes.

28       104.    As early as January 2005, Countrywide identified the following borrower/loan

1  characteristics as having a negative impact on the underwriting evaluation process: (a) income or

2  debt ratios that exceed individual program guidelines; (b) loans with potential for payment

3  changes (e.g. ARM loans); (c) borrowers with a low credit score (usually below 660); and (d)

4  minimal down payment from the borrower's own funds.

5      105.    Nonetheless, Countrywide combined these very risk factors in the loans it

6  promoted to borrowers.  Countrywide introduced, for example, loan programs that allowed for

7  higher LTVs/CLTVs, less documentation and lower credit scores.  A high risk loan such as a Pay

8  Option ARM could be sold to borrowers with increasingly lower credit scores.  In addition, by

9  accepting higher DTI ratios and combining Pay Option ARMs with second mortgages that

10  allowed borrowers to finance a down payment, Countrywide would qualify borrowers with fewer

11  financial resources, and hence a higher likelihood of default.

12      106.    With a second or "piggyback" mortgage, the borrower could get a first loan for

13  80% of the purchase price (i.e., an 80% LTV) and a second loan for 20% of the purchase price (a

14  20% LTV), for a combined loan-to-value ratio of 100%.  This allowed the borrower to finance a

15  down payment and also avoid paying mortgage insurance (which typically is required if the LTV

16  on a first loan exceeds 80%).  Such loans obviously were risky as the borrower had contributed

17  no funds whatsoever to the loan and, if the loan required no documentation, had only stated his or

18  her income and assets.

19      107.    The following examples describe risk layering and underwriting exceptions

20  granted to several California borrowers to whom Countrywide sold Hybrid or Pay Option ARMs.

21  These examples represent only a small percentage of the large number of California residents

22  who are likely facing foreclosure due to Countrywide's widespread practice of risk-layering.

23          a.    A Countrywide loan officer convinced a borrower to take a Pay

24      Option ARM with a 1-month teaser rate and a 3-year prepayment penalty, plus a

25      full-draw piggyback HELOC, based on the loan officer's representation that the value of

26      the borrower's home would continue to rise and he would have no problem refinancing.

27      The borrower's DTI was 47% and FICO was 663. An exception was granted for a 95%

28      CLTV, which exceeded Countrywide's regular maximum allowed CLTV, even though

1    both the CLUES report for the loan and an underwriter review indicated strong doubts

2    about the borrower''s ability to repay the loan and identified multiple layered risks. The

3    loan closed in January 2006, and a Notice of Default issued in June 2007.

4              b.      The CLUES report issued for a loan applicant in February 2005

5    stated that the DTI ratio was too high for the loan program requested and identified

6    several elements of risk:  the loan had a risk grade, the borrower had too low of a credit

7    score, and the proposed LTV was too high.  The CLUES report for the loan therefore

8    raised doubts about the borrower's ability to repay the loan.  Nonetheless, Countrywide

9    approved a 3/27 ARM with a 3-year prepayment penalty, to an 85-year old disabled

10   veteran with a 509 FICO score, a 59.90 DTI and 69.30 CLTV.  The loan closed in

11   February 2005, and a Notice of Default issued in July 2005.

12             c.      The CLUES report for a proposed loan identified multiple layered

13   risks that created doubts about the borrower's ability to make the required payments,

14   including a high CLTV, low borrower reserves and the fact that a borrower had an open

15   collection account.  However, in January 2006, Countrywide granted exceptions for each

16   of these risks, to approve a reduced documentation Pay Option ARM loan with a 3-month

17   teaser rate and a 3-year prepayment penalty, as well as a Piggyback HELOC.  The Pay

18   Option ARM was for $352,000, and the Piggyback HELOC was for $22,000.  The

19   borrower's credit score was 645, the DTI was 48.22 and the CLTV was 85%.  The loan

20   closed in January 2006, and a Notice of Default issued in October 2006.

21   **VI.   COUNTRYWIDE ENGAGED IN DECEPTIVE MARKETING PRACTICES TO**
     **SELL INCREASING NUMBERS OF LOANS**
22

23             108.    Driven by its push for market share, Countrywide did whatever it took to sell

24   more loans, faster – including by engaging in a number of deceptive marketing practices under

25   the direction and with the ratification of defendants Mozilo and Sambol.

26

27

28

**A.** **Countrywide Deceptively Lulled Borrowers Into Believing That it Was a "Trusted Advisor" Looking Out for the Borrowers' Best Interests**

109.    Countrywide sought to induce borrowers into believing that it was looking out for their best interest through various types of solicitations. Countrywide published television, radio, and print advertisements, for example, touting itself as "the company you can trust" and urging consumers to "join the millions of homeowners who have trusted Countrywide." Countrywide capitalized on its status as the "number one mortgage lender" and claimed that it was a mortgage loan expert capable of advising customers. For example, Countrywide claimed that it "had years to perfect [its] craft" and offered "industry leading expertise" and that "[w]ith over 35 years of service and one of the widest selections of loan programs, [it] is an expert at finding solutions for all kinds of situations." As another example, Countrywide offered "consultation[s] with our home loan experts" and claimed it "would go the distance with you to help secure a loan program to fit your financial needs and goals."

110.    Countrywide also engaged in extensive solicitation campaigns aimed at those borrowers it was easiest for it to find -- existing Countrywide customers. Countrywide targeted existing customers with tailored letters and e-mail solicitations, creating the impression that it was a mortgage expert that advised its borrowers, at no cost, regarding the financial mortgage options that were in their best interest. For example, Countrywide took advantage of Pay Option ARM customers' worries regarding potential future "steep payment adjustments," by sending them a "special invitation" to talk with "specially-trained consultants" regarding "your current financial situation, at no charge, to see if refinancing may help put you in a better financial position."

111.    Countrywide also created an annual "anniversary" campaign, by sending letters and e-mails to existing customers offering a "free Anniversary Loan Review," which it touted as a "home loan analysis" with an "experienced Loan Consultant." Countrywide advertised itself in these solicitations as, for example, an "expert at finding solutions" and "smart financial options" that would best suit borrowers' financial needs.

112.    Countrywide operated an extensive telemarketing operation, aimed both at new potential customers and existing Countrywide customers, in which it touted its expertise and claimed to find the best financial options for its customers.  For example, Countrywide instructed its Full Spectrum loan officers to memorize a script that instructed them to "build rapport" and "gain trust" in conversations with potential customers, and to do so with existing customers by "positioning" telephone calls, the true purpose of which was to sell refinance loans, as "Customer Service loan check-up[s]." On these calls, loan officers were instructed to tout both their own and Countrywide's special mortgage loan expertise, and to position themselves as "trusted advisor[s]" with the "long term financial goals" of the borrower in mind.  Countrywide instructed FSLD loan officers to state, for example, "I'm an experienced mortgage lending professional specializing in helping people improve their financial situation."  Countrywide even instructed loan officers to offer to provide advice on other lender's mortgage loans and to tell potential customers, that "even if you're working with someone else and just want a second opinion – mortgages can be very complicated.  I'm here for that."

113.    In addition, when handling initial calls from prospective customers, for example, Countrywide instructed its FSLD loan officers to (a) defer discussing interest rates, (b) "overcome objections" regarding potential rates, costs, and "equity drain," and (c) build a rapport by "paint[ing] a picture of a better future" and focusing on the "emotional reasons" each individual customer may want or need a new home loan.  Contrary to the kinds of representations described in this paragraph and paragraphs 109 through 112, above, Countrywide often did not sell borrowers loans that were in their best interest.

**B.    <u>Countrywide Encouraged Serial Refinancing</u>**

114.    In order to constantly produce more loans for sale to the secondary market, Countrywide aggressively marketed refinance loans to those homeowners it had no trouble finding -- Countrywide customers.  Countrywide misled these borrowers regarding the benefits of refinancing, including by using the deceptive marketing practices described in paragraphs 119 through 128 below.  In addition, Countrywide created a perpetual market for its refinance loans by selling Pay Option and Hybrid ARMs that borrowers would have to refinance because they

1  couldn't afford their current loans.  Countrywide knew that borrowers who could not afford the

2  inevitable payment increase on such loans and who were unable to refinance would be at great

3  risk of losing their homes.

4       115.  Countrywide provided lists of existing customers to its loan officers responsible

5  for outbound marketing.  Defendants' loan officers hounded Countrywide customers by phone,

6  mail, and electronic mail with refinance loan offers.  For example, FSLD created "highly

7  targeted, national direct mail campaigns on a weekly basis" directed at existing Countrywide

8  customers.  FSLD "leads" – telephone numbers for existing, eligible customers – were uploaded

9  into a telemarketing database on a weekly basis.

10       116.  Countrywide even solicited customers who were having trouble making payments

11  or facing foreclosure, without regard to the risk that the customer would default on Pay Option

12  and Hybrid ARM refinance loans.  FSLD solicited existing prime customers who had "recurring"

13  missed payments.  Countrywide required its customer service representatives to market refinance

14  loans to borrowers who called with questions, including borrowers who were behind on their

15  monthly payments or facing foreclosure.

16       117.  Countrywide  also solicited existing customers on other occasions, including on

17  their annual loan "anniversaries" (see paragraph 111, above) and shortly before a rate or payment

18  was to reset on Pay Option or Hybrid ARMs, without regard to whether the loan had a

19  prepayment penalty period that had not yet expired.  In doing so, the Countrywide Defendants

20  refinanced borrowers while the prepayment penalty on their prior Countrywide loan was still in

21  effect, often concealing the existence of the prepayment penalty.

22       118.  Countrywide claims that approximately 60% of FSLD's business has been

23  comprised of refinancing Countrywide loans.

24  **C.**  **Countrywide Misled Borrowers About the True Terms of Pay Option and Hybrid ARM Loans by Focusing the Borrowers' Attention on Low**

25  **Beginning Payments and Teaser Rates**

26       119.  Because Pay Option ARM and Hybrid ARMs start with lower monthly payments

27  and interest rates than most other types of loan products, and given their complex nature,

28

1  Countrywide was able to easily sell such loans to borrowers by focusing on the initial low

2  monthly payments and/or rates and by obscuring or misrepresenting the true risks of such loans.

3      120.    With respect to Pay Option ARMs, the crux of Countrywide's sales approach was

4  to "sell the payment." When presenting a borrower with various loan options, for example,

5  Countrywide would "sell the payment" by showing the borrower the minimum monthly

6  payments for the Pay Option ARM in comparison to other loan products with larger payments.

7  Then, Countrywide would ask which payment the borrower preferred without discussing other

8  differences between the loan products. Naturally, in this situation, most borrowers chose the

9  option with the lowest payment, the Pay Option ARM, without realizing that the payment would

10 last for only a short time before it would begin to increase.

11     121.    If, instead, Countrywide presented the Pay Option ARM as the only option, it

12 would "sell the payment" by emphasizing the low minimum payment and how much the

13 borrower would "save" every month by making such a low payment, without discussing the

14 payment shock and negative amortization that inevitably result when borrowers make minimum

15 payments. Given the complexity of Pay Option ARMs, such a presentation easily misled

16 borrowers regarding the long-term affordability of their loans.

17     122.    Countrywide also represented that the initial monthly payment would last for the

18 entire term of the loan, or for some period longer than that provided for by the loan's terms.

19     123.    Countrywide engaged in similar deceptive representations with respect to Hybrid

20 ARMs. For example, Countrywide focused its sales presentation on the interest-only payments

21 during the initial fixed-rate period, i.e. the 2-year period on a 2/28 ARM or the 3-year period on a

22 3/27 ARM, not on how the payment would adjust to include both principal and interest after the

23 initial fixed-rate period. It also represented that the payments would last for the entire term of the

24 loan, or for some period longer than that provided for by the loan's terms.

25     124.    When selling Pay Option and Hybrid ARMs, Countrywide engaged in another

26 deceptive practice – rather than selling the payment, it would sell the rate. Countrywide either

27 focused exclusively on the initial one-month, two-year, or three-year "fixed" interest rate, for

28 example, without discussing that the rate would reset after the initial period to a potentially much

1   higher rate, or it represented that the initial interest rate would last for a much longer period than

2   it actually did or for the entire term of the loan.

3      125.    Countrywide's letter and e-mail solicitations, as well as telemarketing calls, also

4   focused borrowers' attention on short-term low monthly payments.  FSLD loan officers, for

5   example, were required to memorize scripts that marketed low monthly payments by focusing (a)

6   on the potential customer's dissatisfaction with his or her current monthly payments under his or

7   her current mortgage loan and/or (b) on so-called "savings" that result from minimum monthly

8   payments.  As just one of many potential examples, to overcome a borrower's claim that he or

9   she already has a loan with a low interest rate, Countrywide required FSLD loan officers to

10  memorize the following response:  "I certainly understand how important that is to you.  But let

11  me ask you something . . . .  Which would you rather have, a long-term fixed payment, or a short-

12  term one that may allow you to realize several hundred dollars a month in savings?  I am able to

13  help many of my clients lower their monthly payments and it only takes a few minutes over the

14  phone to get started."  What the FSLD loan officer did not state was that the borrowers would, in

15  fact, not save money because the payment on the new loan would ultimately exceed the payment

16  on the borrower's current loan.

17     126.    Borrowers subjected to any of the deceptive marketing practices described above

18  would not understand the true risks and likely unaffordability of their Pay Option or Hybrid

19  ARMs.  Many borrowers did not read their loan documents and disclosures before signing

20  because Countrywide often made borrowers sign a large stack of documents without providing

21  the borrower with time to read them.  Other borrowers were unable to read English.  And, given

22  the complexity of Pay Option and Hybrid ARMs, many borrowers who managed to read their

23  loan documents did not understand the terms of the loans they were being sold.

24     127.    As a result, many borrowers who obtained Pay Option and Hybrid ARMs did not

25  understand that their initial monthly payment would at some point "explode," that their initial

26  interest rate would increase and become adjustable, or that the principal amount of their loans

27  could actually increase.  Countrywide received numerous complaints regarding these practices

28  from consumers, including over 3,000 complaints per year handled by the Office of the President

1  alone between approximately January 2005 and August 2007.  Many borrowers complained that

2  they did not understand the terms of their Pay Option and Hybrid ARMs, including the potential

3  magnitude of changes to their monthly payments, interest rates, or loan balances.  Many

4  borrowers also complained that Countrywide's loan officers either did not tell them about the

5  payment or rate increases on such loans or promised that they would have fixed-rate, fixed

6  payment loans, rather than adjustable rate mortgage loans with increasing payments.

7      128.    Despite these complaints, Defendants did not alter their deceptive marketing

8  practices and did not address the hardship created by their practice of making Pay Option and

9  Hybrid ARMs with little or no regard to affordability.  Defendants cared only about doing

10  whatever it took to sell increasing numbers of loans.

11  **D.    Countrywide Misled Borrowers About their Ability to Refinance Before The**
       **Rates or Payments on Their Pay Option and Hybrid ARMs Increased**

13      129.    If a borrower was able to figure out that he or she had obtained a Pay Option or

14  Hybrid ARM *before* signing the loan documents, he or she may still have been misled by

15  Countrywide in another way – Countrywide's loan officers often overcame borrower concerns

16  about exploding monthly payments or increasing interest rates by promising that they would be

17  able to refinance with Countrywide into a loan with more affordable terms before the payments

18  or rate reset.

19      130.    Countrywide often represented that the value of a borrower's home would

20  increase, thus creating enough equity to obtain a loan with better terms.  However, borrowers

21  with interest-only or negatively amortizing loans that encumbered as much as, if not more than,

22  100% of their home's appraised value, were highly unlikely to be able to refinance into another

23  loan if their home did not increase in value.  Additionally, any consumers who sought to

24  refinance a Countrywide mortgage would likely incur a substantial prepayment penalty, thus

25  limiting their ability to obtain a more favorable loan.

26      131.    Countrywide loan officers often misrepresented or obfuscated the fact that a

27  borrower's loan had a prepayment penalty or misrepresented that a prepayment penalty could be

28  waived.  Countrywide also promised borrowers that they would have no problem refinancing

**FIRST AMENDED COMPLAINT**

their Pay Option or Hybrid ARMs, when in fact they might have difficulty refinancing due to the existence of prepayment penalties. Prepayment penalties on Pay Option and Hybrid ARMs essentially prevent many borrowers from refinancing such unaffordable loans before their payments explode or rates reset.

132.    Countrywide received numerous complaints from borrowers who claimed that they had not been told about the prepayment penalty or that the loan officer promised they would not have one. Again, despite receiving such complaints, Defendants turned a blind eye to deceptive marketing practices regarding prepayment penalties and the resulting adverse financial consequences to borrowers.

**E.    Countrywide Misled Borrowers About the Cost of Reduced and No Document Loans**

133.    Countrywide touted its low documentation requirements, urging borrowers to get "fastrack" loans so that they could get cash more quickly. However, many borrowers who obtained these loans possessed sufficient documentation to qualify for full document mortgages, and some submitted that documentation to their loan officer or to one of Countrywide's business partner brokers. In emphasizing the ease, speed and availability of reduced or no document loans, Countrywide and its brokers concealed the fact that borrowers could qualify for a lower rate or reduced fees if they elected to apply for a mortgage by fully documenting their income and assets.

**F.    Countrywide Misled Borrowers Regarding the Terms of HELOCs**

134.    Countrywide misrepresented the terms of HELOCs, including without limitation by failing to inform the borrower that he or she would not have access to additional credit because he or she was receiving a full draw or that the monthly payment on the HELOC was interest-only and the borrower therefore would not be able to draw additional funds on the HELOC at a later date.

135.    Countrywide also misrepresented or obfuscated the payment shock that borrowers would experience after the interest-only payment period on the HELOCs ended. Countrywide's Call Center received large numbers of calls from borrowers complaining that they did not

1  understand that the payments on their full-draw HELOCs would only cover interest, or that the

2  interest rates on their HELOCs would adjust and increase.

3  **VII.   IN ORDER TO INCREASE MARKET SHARE, DEFENDANTS CREATED A
   HIGH-PRESSURE SALES ENVIRONMENT WHERE EMPLOYEES WERE
4  REWARDED FOR SELLING AS MANY LOANS AS THEY COULD, WITHOUT
   REGARD TO BORROWERS' ABILITY TO REPAY**

5

6  136.   Despite touting itself as a lender that cared about its borrowers, Countrywide was,

7  in essence, a mass production loan factory set up to produce an ever-increasing stream of loans

8  without regard to borrowers' ability to repay their loans and sustain homeownership.  In order to

9  provide an endless supply of loans for sale to the secondary market, Defendants pressured

10 Countywide employees involved in the sale and processing of loans to produce as many loans as

11 possible, as quickly as possible, and at the highest prices.

12 137.   Defendants created this pressure through a compensation system, which

13 predictably led employees to disregard Countrywide's minimal underwriting guidelines and to

14 originate loans without regard to their sustainability.  Countrywide's compensation system also

15 motivated its loan officers to engage in the deceptive marketing practices described in the

16 preceding sections.

17 138.   Defendants incentivized managers to place intense pressure on the employees they

18 supervised to sell as many loans as possible, as quickly as possible, at the highest prices possible.

19 Branch managers received commissions or bonuses based on the net profits and loan volume

20 generated by their branches.  In most circumstances, however, branch managers were eligible for

21 such commissions or bonuses only if their branches sold a minimum number of loans during the

22 applicable time period.   Branch managers were also rewarded for meeting production goals set

23 by corporate management, increasing the number of loan sold per loan officer, and reducing the

24 time periods between the loan application stage and funding – or penalized for failing to do so.

25 139.   Countrywide provided branch managers with access to computer applications and

26 databases that allowed them to monitor loan sales on a daily basis and pressure employees to

27 "sell, sell, sell."  A branch manager could input the type of loan (such as a Pay Option ARM), the

28 principal loan amount, the borrower's FICO score, the loan-to-value ratio, and the level of

34
**FIRST AMENDED COMPLAINT**

1  required documentation (such as Stated Income Stated Asset) and determine what price a

2  borrower would pay for that loan, as well as the amount of profit the loan would likely generate

3  for the branch. Branch managers could also monitor their branches' loan sales performance by

4  tracking loans that were in the process of being underwritten and the prices and characteristics of

5  loans sold by the branch and by particular loan officers, during any specified time period.

6      140.    With such tools available, Countrywide's branch managers were able to

7  constantly pressure loan officers, loan processors, and underwriters to do their part in increasing

8  loan production – by hunting down more borrowers, selling more loans, and processing loans as

9  quickly as possible, thereby boosting loan production, branch profits, and branch manager

10  commissions and bonuses. This high-pressure sales environment invited deceptive sales

11  practices and created incentives for retail branch managers, other managers, loan officers, loan

12  specialists, and underwriters to jam loans through underwriting without regard to borrower

13  ability to repay.

14      141.    Countrywide created additional pressure to engage in deceptive marketing

15  practices and sell loans without regard to their sustainability by paying its loan officers and

16  managers a modest base salary that could be supplemented by commissions or bonuses. In most

17  circumstances, the employees were eligible to receive these commissions or bonuses only if they,

18  or the employees they supervised, sold a minimum number or dollar volume of loans.

19      142.    Not only did this compensation system create incentives for employees to sell as

20  many loans as possible, as quickly as possible, it also created incentives for retail employees to

21  steer borrowers into riskier loans. For example, Countrywide paid greater commissions and

22  bonuses to CMD managers and loan officers for selling full-draw piggyback HELOCs, as

23  opposed to HELOCs with low initial draw amounts. Countrywide also paid greater commissions

24  and bonuses to FSLD managers and loan officers for "subprime," as opposed to "prime," loans.

25      143.    Countrywide's compensation system also created incentives for wholesale loan

26  officers to steer brokers and their clients into riskier loans. Countrywide's wholesale loan

27  officers worked one-on-one with "business partner" brokers approved by Countrywide. The loan

28  officers cultivated relationships with brokers in order to persuade them to bring their business to

Countrywide and, in particular, to work with a particular loan officer so that he or she, and his or her managers, could earn greater commissions. From March 1, 2005 to May 1, 2006, WLD loan officers received higher commissions for refinance Pay Option ARMs and "Expanded Criteria" (loans in which certain underwriting standards were eased) than they did for all other types of refinance loans. In addition, WLD branch managers were rewarded if their branches sold increasing numbers of HELOCs in tandem with loans carrying loan-to-value ratios greater than 80%.

144.    Countrywide's compensation system also rewarded employees for selling loans at a premium, i.e., at prices above what borrowers would otherwise qualify for based on Countrywide's posted prices. Monthly commissions were increased for selling loans with premiums and reduced for selling loans with prices below those posted by Countywide. Thus, loan officers in Countrywide's wholesale branches were motivated to persuade loan brokers to negotiate loans at high premiums for their borrowers, which was not typically in the borrowers' best interests.

145.    Countrywide's high-pressure sales environment and compensation system encouraged serial refinancing of Countrywide loans. The retail compensation systems created incentives for loan officers to churn the loans of borrowers to whom they had previously sold loans, without regard to a borrower's ability to repay, and with the consequence of draining equity from borrowers' homes. Although Countrywide maintained a policy that discouraged loan officers from refinancing Countrywide loans within a short time period after the original loan funded (Countrywide often changed this time period, which was as low as three months for some loan products), loan officers boosted their loan sales by targeting the easiest group of potential borrowers to locate – Countrywide borrowers – as soon as that period expired.

146.    Countrywide management at all levels pressured the employees below them to sell and approve more loans, at the highest prices, as quickly as possible, in order to maximize Countrywide's profits on the secondary market. Defendant Sambol, for example, monitored Countrywide's loan production numbers and pressured employees involved in selling loans or supervising them to produce an ever-increasing numbers of loans, faster. Regional vice

presidents pressured branch managers to increase their branches' loan numbers.  Branch
managers pressured loan officers to produce more loans, faster, and often set their own branch-
level production quotas.

147.    Underwriters were also pressured to approve greater numbers of loans quickly and
to overlook underwriting guidelines while doing so.  Defendant Sambol pressured underwriters
to increase their loan production and to increase approval rates by relaxing underwriting criteria.
Regional operations vice presidents, branch operations managers, branch managers, and loan
officers all pressured underwriters to rush loan approvals.  Countrywide required underwriters to
meet loan processing quotas and paid bonuses to underwriters who exceeded them.

148.    Customer service representatives at Countrywide's Call Center also were expected
to achieve quotas and received bonuses for exceeding them.  Countrywide required service
representatives to complete calls in three minutes or less, and to complete as many as sixty-five
to eighty-five calls per day.  Although three minutes is not sufficient time to assist the confused
or distressed borrowers who contacted them, Countrywide required service representatives to
market refinance loans or piggyback HELOCs to borrowers who called with questions --
including borrowers who were behind on their monthly payments or facing foreclosure.  Using a
script, the service representatives were required to pitch the loan and transfer the caller to the
appropriate Countrywide division.  Service representatives also received bonuses for loans that
were so referred and funded.

149.    Countrywide employees from senior management down to branch managers
pressured the employees below them to sell certain kinds of products.  Regional vice presidents,
area managers, and branch managers pushed loan officers to sell Pay Option ARMs, piggyback
HELOCs, and loans with prepayment penalties, primarily because such loans boosted branch
profits, manager commissions, and Countrywide's profits on the secondary market.

150.    If any of these employees, including branch managers, loan officers, loan
processors, underwriters, and customer service representatives, failed to produce the numbers
expected, Countrywide terminated their employment.

1

2

3

VIII.  **AS PART OF ITS DECEPTIVE SCHEME, COUNTRYWIDE COMPENSATED ITS BUSINESS PARTNER BROKERS AT A HIGHER RATE FOR MORE PROFITABLE LOANS, WITHOUT CONSIDERATION OF SERVICES ACTUALLY PROVIDED BY THE BROKERS**

4

5

6

7

8

9

10

11

151.    In California, a mortgage broker owes his or her client a fiduciary duty.  A mortgage broker is customarily retained by a borrower to act as the borrower's agent in negotiating an acceptable loan.  All persons engaged in this business in California are required to obtain real estate licenses and to comply with statutory requirements.  Among other things, the mortgage broker has an obligation to make a full and accurate disclosure of the terms of a loan to borrowers, particularly those that might affect the borrower's decision, and to act always in the utmost good faith toward the borrower and to refrain from obtaining any advantage over the borrower.

12

13

14

15

16

17

152.    Countrywide paid brokers compensation in the form of yield spread premiums or rebates to induce brokers to place borrowers in loans that would earn Countrywide the greatest profit on the secondary market, regardless of whether the loans were in the best interest of, or appropriate for, the borrowers.  In fact, the mortgages that earned Countrywide the highest profit, and therefore would pay the highest rebates or yield spread premiums to brokers, often were not in the best interest of the borrower.

18

19

20

21

22

23

24

25

26

153.    For example, Countrywide paid a yield spread premium to brokers if a loan was made at a higher interest rate than the rate for which the borrower qualified and without regard for the services actually provided by the broker.  Countrywide paid a rebate to a broker if he or she originated or negotiated a loan that included a prepayment penalty.  A three-year prepayment penalty resulted in a higher rebate to the broker than a one-year prepayment penalty.  Countrywide would pay this higher rebate even in instances where the loan did not include a provision, such as a more favorable origination fee or interest rate, to counterbalance the prepayment penalty, and where brokers did not perform any additional services in connection with the loan.

27

28

154.    Countrywide also would pay rebates in exchange for a broker providing an adjustable rate loan with a high margin (the amount added to the index to determine the interest

1    rate). Countrywide would provide an additional rebate to brokers if they were able to induce a

2    borrower to obtain a line of credit.

3        155.    Countrywide accepted loans from brokers in which the broker earned up to six

4    points (i.e., six percent of the amount of the loan), whether in origination fees, rebates, or yield

5    spread premiums. This high level of compensation was well in excess of the industry norm and

6    encouraged brokers to sell Countrywide loans without regard to whether the loans were in their

7    clients' best interest. In addition, the compensation paid by Countrywide to brokers was well in

8    excess of, and not reasonably related to, the value of the brokerage services performed by

9    Countrywide's business partner brokers.

10       156.    In order to maximize their compensation from Countrywide, brokers misled

11   borrowers about the true terms of Pay Option and Hybrid ARMs, misled borrowers about their

12   ability to refinance before the rates or payments on their loans increased, misled borrowers about

13   the cost of reduced and no document loans, and misled borrowers regarding the terms of

14   HELOCs by engaging in the same kinds of deceptive practices alleged at paragraphs 58 through

15   64, 75 through 77, 108 through 117, and 119 through 135 above.

16       157.    Borrowers often did not realize that their loans contained terms that were

17   unfavorable to them and provided greater compensation to their brokers specifically as payment

18   for those unfavorable terms. An origination fee or other charges imposed by a broker are either

19   paid by the borrower or financed as part of the loan. In contrast, rebates and yield spread

20   premiums are not part of the principal of the loan and instead are paid separately by Countrywide

21   to the broker. Documentation provided to the borrower might indicate, at most, that a yield

22   spread premium or rebate was paid outside of closing (often delineated as "p.o.c." or "ysp poc"),

23   with no indication that the payment constituted compensation from Countrywide to the broker for

24   placing the borrower in a loan with terms that were not in the borrower's best interest, such as a

25   higher interest rate or lengthier prepayment penalty.

26       158.    Countrywide closely monitored and controlled the brokers with whom it worked.

27   Countrywide required brokers it accepted as "business partners" to cooperate and provide all

28   information, documents and reports it requested so that Countrywide could conduct a review of

1    the broker and its operations.  In addition, Countrywide required the broker to warrant and

2    represent that all loans were closed using documents either prepared or expressly approved by

3    Countrywide.

4    **IX.**    **AS A RESULT OF DEFENDANTS' DECEPTIVE SCHEME, THOUSANDS OF CALIFORNIA HOMEOWNERS HAVE EITHER LOST THEIR HOMES OR FACE FORECLOSURE AS THE RATES ON THEIR ADJUSTABLE RATE MORTGAGES RESET**

5

6

7        159.    Due to Countrywide's lack of meaningful underwriting guidelines and risk-

8    layering, Countrywide's deceptive sales tactics, Countrywide's high-pressure sales environment,

9    and the complex nature of its Pay Option and Hybrid ARMs, a large number of Countrywide

10   loans have ended in default and foreclosure, or are headed in that direction.   Many of its

11   borrowers have lost their homes, or are facing foreclosure, because they cannot afford the

12   payment shock and their properties are too heavily encumbered for them to be able to refinance

13   and pay prepayment penalties.

14       160.    The national pace of foreclosures is skyrocketing.  In the month of May 2008,

15   approximately 20,000 Californians lost their homes to foreclosure, and approximately 72,000

16   California homes (roughly 1 out of 183 homes) were in default.  This represented an 81%

17   increase from May 2007, at which point the rate was roughly 1 out of every 308 households,

18   while the May 2007 rate represented a 350% increase from May 2006.

19       161.    Countrywide mortgages account for a large percentage of these delinquencies and

20   foreclosures.  Countrywide's 10-K filed in February, 2008, estimated that as of December 31,

21   2007, a staggering 27.29% of its non-prime mortgages were delinquent.  As of that date,

22   approximately 26% of Countrywide's loans were secured by properties located in California.

23       162.    These numbers have only worsened.  As of April, 2008, 21.11% of the mortgages

24   owned by Countrywide Home Loans were in some stage of delinquency or foreclosure, including

25   47.97% of originated non-prime loans, and 21.23% of Pay Option ARMs.

26       163.    In January and March, 2008, Countrywide recorded 3,175 notices of default in

27   Alameda, Fresno, Riverside, and San Diego counties alone.  Those 3,175 notices of default

28   represented an aggregate total of delinquent principal and interest of more than 917 million

1  dollars.  An October 2007 report prepared by Credit Suisse estimated that Countrywide's

2  delinquency and foreclosure rates are likely to double over the next two years.

3      164.    This may well understate the extent of the crisis facing California homeowners

4  with Countrywide mortgages, as more and more Pay Option ARMs go into delinquency.

5  Approximately 60% of all Pay Option ARMs (made by any lender) were made in California, and

6  many of these were made by Countrywide.  Once the thousands of Pay Option ARMs sold by

7  Countrywide to California borrowers reach their negative amortization cap or otherwise reset to

8  require fully indexed principal and interest payments, which will occur over the next two years

9  for many such loans made between 2003 and 2006, the number of such loans in default is likely

10 to skyrocket even above their current high delinquency rate.

## FIRST CAUSE OF ACTION AGAINST ALL DEFENDANTS

## VIOLATIONS OF BUSINESS AND PROFESSIONS CODE SECTION 17500

## (UNTRUE OR MISLEADING STATEMENTS)

14     165.    The People reallege and incorporate by reference all paragraphs above, as though

15 fully set forth in this cause of action.

16     166.    Defendants have violated and continue to violate Business and Professions Code

17 section 17500 by making or disseminating untrue or misleading statements, or by causing untrue

18 or misleading statements to be made or disseminated, in or from California, with the intent to

19 induce members of the public to enter into mortgage loan or home equity line of credit

20 transactions secured by their primary residences.  These untrue and misleading statements

21 include but are not necessarily limited to:

22          a.      Statements that Countrywide was a mortgage loan expert that could be

23     trusted to help borrowers obtain mortgage loans that were appropriate to their financial

24     circumstances, as described in paragraphs 109 through 113, above;

25          b.      Statements regarding the terms and payment obligations of Pay Option

26     ARMs offered by Countrywide, including statements that the initial payment rate was the

27     interest rate, statements regarding the duration of the initial payment, statements

28     regarding the duration of the initial interest rate, and statements obfuscating the risks

associated with such mortgage loans, as described in paragraphs 58 through 64, 119 through 122, and 124 through 128, above;

      c.     Statements regarding the terms and payment obligations of Hybrid ARMs offered by Countrywide, including statements regarding the duration of the initial interest-only payment, statements regarding the duration of the initial interest rate, and statements obfuscating the risks associated with such mortgage loans, as described in paragraphs 75 through 77, 119, and 123 through 128, above;

      d.     Statements regarding the terms and payment obligations of HELOCs, as described in paragraphs 134 through 135, above; and

      e.     Statements that borrowers with Pay Option and Hybrid ARMs offered by Countrywide would be able to refinance the mortgage loans before the interest rates reset, when in fact they most likely could not, as described in paragraphs 62, 76, 77, and 129 through 132, above;

      f.     Statements regarding prepayment penalties on Pay Option and Hybrid ARMs offered by Countrywide, including statements that the mortgage loans did not have prepayment penalties, when in fact they did, and statements that prepayment penalties could be waived, when in fact they could not, as described in paragraphs 63, 64, 76, and 131 through 132, above;

      g.     Statements regarding the costs of reduced or no documentation mortgage loans, as described in paragraph 133, above;

      h.     Statements regarding the benefits or advisability of refinancing mortgage loans with Pay Option and Hybrid ARMs offered by Countrywide, as described in paragraphs 110 through 118, above; and

      i.     Statements regarding the existence of prepayment penalties on mortgage loans being refinanced with Countrywide mortgage loans, as described in paragraph 117, above.

      167.    Defendants knew, or by the exercise of reasonable care should have known, that these statements were untrue or misleading at the time they were made.

**FIRST AMENDED COMPLAINT**

## SECOND CAUSE OF ACTION AGAINST ALL DEFENDANTS

## VIOLATIONS OF BUSINESS AND PROFESSIONS CODE SECTION 17200

## (UNFAIR COMPETITION)

168.     The People reallege and incorporate by reference all paragraphs above, as through fully set forth in this cause of action.

169.     Defendants have engaged in, and continue to engage in, acts or practices that constitute unfair competition, as that term is defined in Section 17200 of the Business and Professions Code. Such acts or practices include, but are not limited to, the following:

a.     Creating and maintaining a deceptive scheme to mass produce loans for sale on the secondary market, as described in paragraphs 15 through 164, above;

b.     Making untrue or misleading representations that Countrywide could be trusted to sell borrowers mortgage loans that were appropriate to their financial circumstances, as described in paragraphs 109 through 113, above;

c.     Making untrue or misleading representations regarding the terms and payment obligations of Countrywide's Pay Option and Hybrid ARMs, including representations regarding the payment rate, the duration of initial interest rates, the duration of initial monthly payments, the inclusion of prepayment penalties, the waivability of prepayment penalties, the payment shock that borrowers were likely to experience, and the risks associated with such mortgage loans, as described in paragraphs 58 through 64, 75 through 77, and 119 through 132, above;

d.     Making untrue or misleading representations regarding the terms and payment obligations of Countrywide's HELOCs, as described in paragraphs 134 through 135, above;

e.     Making untrue or misleading representations regarding the costs of reduced or no documentation mortgage loans, as described in paragraph 133, above;

f.     Making untrue or misleading representations regarding the true likelihood or circumstances under which borrowers would be able to refinance Pay Option or Hybrid

ARMs offered by Countrywide, as described in paragraphs 62, 76, 77, and 129 through 132, above;

g.    Soliciting borrowers to refinance mortgage loans by misrepresenting the benefits of doing so or by misrepresnting or obfuscating the fact that in doing so the borrowers will incur a prepayment penalty, as described in paragraphs 110 through 118, above;

h.    Making mortgage loans and extending HELOCs without regard to whether borrowers would be able to afford monthly payments on those loans or HELOCs after the expiration of the initial interest rates on the mortgage loans, or the draw periods on the HELOCs, as described in paragraphs 85 through 107, above;

i.    Aiding and abetting the breach of the fiduciary duty owed by mortgage brokers to California borrowers, as described in paragraphs 151 through 158, above;

j.    Failing to provide borrowers with documents sufficient to inform them of their payment obligations with respect to fully drawn HELOCs, as described in paragraphs 81 through 84, above;

k.    Paying compensation to mortgage brokers that was not reasonably related to the value of the brokerage services they performed, as described in paragraphs 152 through 155, above; and

l.    Violating Section 17500 of the Business and Professions Code, as described in the First Cause of Action, above.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for judgment as follows:

1.    Pursuant to Business and Professions Code section 17535, that all Defendants, their employees, agents, representatives, successors, assigns, and all persons who act in concert with them be permanently enjoined from making any untrue or misleading statements in violation of Business and Professions Codes section 17500, including the untrue or misleading statements alleged in the First Cause of Action.

2.    Pursuant to Business and Professions Code section 17203, that all Defendants,

their employees, agents, representatives, successors, assigns, and all persons who act in concert with them be permanently enjoined from committing any acts of unfair competition, including the violations alleged in the Second Cause of Action.

3.    Pursuant to Business and Professions Code sections 17535, that the Court make such orders or judgments as may be necessary to prevent the use or employment by any Defendant of any practices which violate section 17500 of the Business and Professions Code, or which may be necessary to restore to any person in interest any money or property, real or personal, which may have been acquired by means of any such practice.

4.    Pursuant to Business and Professions Code section 17203, that this court make such orders or judgments as may be necessary to prevent the use or employment by any Defendant of any practice which constitutes unfair competition or as may be necessary to restore to any person in interest any money or property, real or personal, which may have been acquired by means of such unfair competition.

5.    Pursuant to Business and Professions Code section 17536, that Defendants, and each of them, be ordered to pay a civil penalty in the amount of two thousand five hundred dollars ($2,500) for each violation of Business and Professions Code section 17500 by Defendants, in an amount according to proof.

6.    Pursuant to Business and Professions Code section 17206, that Defendants, and each of them, be ordered to pay a civil penalty in the amount of two thousand five hundred dollars ($2,500) for each violation of Business and Professions Code section 17200 by Defendants, in an amount according to proof.

7.    That Plaintiff recover its costs of suit, including costs of investigation.

///

///

///

8.    For such other and further relief that the Court deems just, proper, and equitable.

1

DATED:   July 17, 2008

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

EDMUND G. BROWN JR.
  Attorney General
ALBERT NORMAN SHELDEN
  Senior Assistant Attorney General
RONALD REITER
  Supervising Deputy Attorney General
KATHRIN SEARS
ROBYN SMITH
BENJAMIN G. DIEHL
LINDA HOOS
  Deputy Attorneys General

By:   _____
      BENJAMIN G. DIEHL
      Deputy Attorney General

**FIRST AMENDED COMPLAINT**

# EXHIBIT 4

| SUPERIOR COURT OF CALIFORNIA, COUNTY OF SAN DIEGO | |
|---|---|
| STREET ADDRESS:     330 West Broadway | |
| MAILING ADDRESS:    330 West Broadway | |
| CITY AND ZIP CODE:   San Diego, CA 92101 | |
| BRANCH NAME:        Central | |
| TELEPHONE NUMBER:  (619) 450-7073 | |

| PLAINTIFF(S) / PETITIONER(S):      Roy V Hursh |
|---|
| DEFENDANT(S) / RESPONDENT(S):  Countrywide Financial Corporation et.al. |

| HURSH VS. COUNTRYWIDE FINANCIAL CORPORATION | |
|---|---|
| **NOTICE OF CASE ASSIGNMENT** | CASE NUMBER:<br>37-2008-00086826-CU-OR-CTL |

Judge:  Steven R. Denton                              Department: C-73

**COMPLAINT/PETITION FILED:** 07/02/2008

---

**CASES ASSIGNED TO THE PROBATE DIVISION ARE NOT REQUIRED TO COMPLY WITH THE CIVIL REQUIREMENTS LISTED BELOW**

IT IS THE DUTY OF EACH PLAINTIFF (AND CROSS-COMPLAINANT) TO SERVE A COPY OF THIS NOTICE WITH THE COMPLAINT (AND CROSS-COMPLAINT).

ALL COUNSEL WILL BE EXPECTED TO BE FAMILIAR WITH SUPERIOR COURT RULES WHICH HAVE BEEN PUBLISHED AS DIVISION II, AND WILL BE STRICTLY ENFORCED.

**TIME STANDARDS:** The following timeframes apply to general civil cases and must be adhered to unless you have requested and been granted an extension of time. General civil consists of all cases except: Small claims appeals, petitions, and unlawful detainers.

**COMPLAINTS:** Complaints must be served on all named defendants, and a CERTIFICATE OF SERVICE (SDSC CIV-345) filed within 60 days of filing. This is a mandatory document and may not be substituted by the filing of any other document.

**DEFENDANT'S APPEARANCE:** Defendant must generally appear within 30 days of service of the complaint. (Plaintiff may stipulate to no more than a 15 day extension which must be in writing and filed with the Court.)

**DEFAULT:** If the defendant has not generally appeared and no extension has been granted, the plaintiff must request default within 45 days of the filing of the Certificate of Service.

THE COURT ENCOURAGES YOU TO CONSIDER UTILIZING VARIOUS ALTERNATIVES TO LITIGATION, INCLUDING MEDIATION AND ARBITRATION, PRIOR TO THE CASE MANAGEMENT CONFERENCE. MEDIATION SERVICES ARE AVAILABLE UNDER THE DISPUTE RESOLUTION PROGRAMS ACT AND OTHER PROVIDERS. SEE ADR INFORMATION PACKET AND STIPULATION.

YOU MAY ALSO BE ORDERED TO PARTICIPATE IN ARBITRATION PURSUANT TO CCP 1141.10 AT THE CASE MANAGEMENT CONFERENCE. THE FEE FOR THESE SERVICES WILL BE PAID BY THE COURT IF ALL PARTIES HAVE APPEARED IN THE CASE AND THE COURT ORDERS THE CASE TO ARBITRATION PURSUANT TO CCP 1141.10. THE CASE MANAGEMENT CONFERENCE WILL BE CANCELLED IF YOU FILE FORM SDSC CIV-359 PRIOR TO THAT HEARING

---

SDSC CIV-721 (Rev. 11-06)                          **NOTICE OF CASE ASSIGNMENT**                          Page: 1

1    Joseph J. Rego, Esq. (SBN 163183)
      4019 Park Boulevard
2    San Diego, California 92103
      Tel: 619-293-0310
3    Fax: 619-293-0940
      Email: jjrego2@msn.com
4
      Attorney for Plaintiff
5    ROY V HURSH

6

7

                SUPERIOR COURT OF CALIFORNIA,
8
                   COUNTY OF SAN DIEGO
9
   ROY V HURSH, an Individual,       )    Case No. 37-2008-00086826-CU-OR-CTL
10                                   )
        Plaintiff,               )    __CLASS ACTION__
11                                     )
   v.                                  )    COMPLAINT FOR
12                                     )    1. VIOLATION OF BUSINESS AND
   COUNTRYWIDE FINANCIAL          )    PROFESSIONS CODE SECTION
13    CORPORATION, a Delaware          )    17500 (UNTRUE OR MISLEADING
   corporation; COUNTRYWIDE HOME    )    STATEMENTS)
14    LOANS, INC., a New York Corporation; )
   FULL SPECTRUM LENDING, INC., a    )
15    California Corporation; ANGELO      )    2. VIOLATIONS OF BUSINESS AND
   MOZILO, an individual; DAVID SAMBOL,)   PROFESSIONS CODE SECTION
16    an individual; and DOES 1-100,       )    17200 (UNFAIR COMPETITION)
   inclusive.                               )
17                                     )

18                                     )

19                                     )

20                                     )

21    _____ )

22

23

24      1. Plaintiff, Roy V. Hursh individually, on behalf of all others similarly situated and
25
on behalf of the general public of the State of California as a private attorney general,
26
bring (s) this action against the defendant(s) COUNTRYWIDE FINANCIAL
27
CORPORATION, a Delaware corporation; COUNTRYWIDE HOME LOANS, INC., a
28

1 | New York Corporation; FULL SPECTRUM LENDING, INC., a California Corporation;

2 | ANGELO MOZILO, an individual; DAVID SAMBOL, an individual; and DOES 1-100,

3 | inclusive, and allege(s), on information and belief (except as to those allegations

4 | relating to Plaintiff himself, which are asserted on personal knowledge, as follows:

5 | <u>INTRODUCTION</u>

6 | 2. This action is brought as a class action under the provisions of the California

7 | Code of Civil Procedure section 382. Plaintiff also seeks relief as a private attorney

8 | general on behalf of the general public of the State of California and those persona and

9 | entities affected by the practice, pursuant to Business and Professions Code section

10 | 17204.

11 | <u>JURISDICTION</u>

12 | 3. This Court has jurisdiction over this action pursuant to Code of Civil Procedure

13 | section 410.10 and Business and Professions Code section 17203. On behalf of

14 | himself and all others similarly situated, Plaintiff(s) seek(s) damages in excess of the

15 | jurisdictional minimum of this Court.

16 | <u>PARTIES AND VENUE</u>

17 | 4. At all relevant times, Plaintiff Roy V Hursh ("HURSH"), an individual, resides

18 | and has resided in the County of San Diego, State of California.

19 | 5. At all relevant times, defendant Countrywide Financial Corporation ("CFC"), a

20 | Delaware corporation, has transacted and continues to transact business throughout

21 | the State of California, including in San Diego County.

22 | 6. At all relevant times, defendant Countrywide Home Loans, Inc. ("CHL"), a New

23 | York corporation, has transacted and continues to transact business throughout the

24 | State of California, including in San Diego County. CHL is a subsidiary of CFC.

25 | 7. At all relevant times, until on or about December 15, 2004, Full Spectrum

26 | Lending, Inc. (Full Spectrum"), was a California corporation that transacted business

27 | throughout the State of California, including San Diego County, and was a subsidiary of

28 | CLC. On or about December 15, 2004, Full Spectrum was merged into and became a

1  division of CHL.  For all conduct that occurred on or after December 15, 2004, any
2  reference in this complaint to CHL includes reference to its Full Spectrum division.
3      8.  Defendants CFC, CHL, and Full Spectrum are referred to collectively herein as
4  "Countrywide" or "Countrywide Defendants"..
5      9.  At all times pertinent hereto, defendant Angelo Mozilo ("Mozilo") was the
6  Chairman and Chief Executive Officer of CFC.  Defendant Mozilo directed, authorized,
7  and ratified the conduct of the Countrywide Defendant as set forth herein.
8      10.  At all times pertinent hereto, defendant David Sambol ("Sambol") is and was
9  President of CHL and since approximately September 2006 has served as the
10  President and Chief Operating Officer of CFC.  Sambol directed, authorized and ratified
11  the conduct of CHL, and after September 2006, the Countrywide Defendants, as set
12  forth herein.
13      11.  Plaintiff(s) are not aware of the true names and capacities of the defendants
14  sued as Does 1 through 100, inclusive, and therefore sues those defendants by such
15  fictitious names.  Each of these fictitiously names defendants is responsible in some
16  manner for the activities alleged I this Complaint.  Plaintiff(s) will amend to add the true
17  names of the fictitiously named defendants once they are discovered.
18      12.  The defendants identified in paragraphs 5 through 11, above shall be referred
19  to collectively as "Defendants.".
20      13.  Whenever reference is made in this Complaint to any act of any defendant(s),
21  that allegation shall mean that each defendant acted individually and jointly with the
22  other defendant.
23      14.  Any allegation about acts of any corporate or other business defendant means
24  that the corporation or other business did the acts alleged through its officers, directors,
25  employees, agents and/or representatives while they were acting within the actual or
26  ostensible scope of their authority.
27      15.  At all relevant times, each defendant committed the acts, caused or directed
28  others to commit the acts, or permitted others to commit the acts alleged in this

1  Complaint. Additionally, some or all of the defendants acted as the agent of the other

2  defendants, and all of the defendants acted within the scope of their agency if acting as

3  an agent of the other.

4      16. At all times relevant, each defendant knew or realized that the other

5  defendants were engaging in or planned to engage in the violations of law alleged in

6  this Complaint. Knowing or realizing that other defendants were engaging in or

7  planning to engage in unlawful conduct, each defendant nevertheless facilitated the

8  commission of those unlawful acts. Each defendant intended to and did encourage,

9  facilitate, or assist in the commission of the unlawful act, and thereby aided and abetted

10  the other defendants in the unlawful conduct.

11      17. At all relevant times, Defendants have engaged in a conspiracy, common

12  enterprise, and common course of conduct, the purpose of which is and was to engage

13  in the violations of law alleged in this Complaint. This conspiracy, common enterprise,

14  and common course of conduct continues to present.

15      18. The violations of law alleged in this Complaint occurred in San Diego County

16  and elsewhere throughout California and the United States.

17      **PRIVATE ATTORNEY GENERAL AND CLASS ACTION ALLEGATIONS**

18      19. Plaintiff(s) bring(s) this action in his individual capacity, on behalf of all persons

19  similarly situated, and on behalf of the general public as defined in Business and

20  Professions Code section 17204, and that portion of the general public affected by

21  defendants' alleged wrongful conduct. Such a representative action is necessary to

22  prevent and remedy the deceptive, unlawful and unfair practices alleged herein.

23      20. This action is brought and may be properly maintained as a class action

24  pursuant to the provisions of Code of Civil Procedure section 382. Plaintiff(s) bring(s)

25  this action of behalf of himself and all members of the class, defined as follows: any

26  consumer who obtain any type of mortgage funding from defendants from 2000 to

27  present. Excluded from the proposed class are defendants: any entities in which the

28  defendants have a controlling interest; and the officers, directors, affiliates, attorneys,

1   heirs, predecessors and successors in interest, subsidiaries, employees, agents and/or

2   assigns of any of the defendants.

3       21.  The members of the class are so numerous that joinder of all members is

4   impracticable.  While the exact number of class members is unknown to plaintiffs at this

5   time and can only be ascertained through discovery, plaintiff(s) believe that there are at

6   least 20,000 members of the proposed class.

7       22.  There is a well-defined community of interest among the members of the

8   proposed class.  Plaintiff(s) like all other members of the class cannot pay for their

9   homes and/or are facing foreclosure.  The factual bases of defendant's misconduct are

10  common to all members of the class and represent a common practice of wrongful

11  conduct resulting in damages to all members of the class.

12      23.  There are numerous questions of law and fact common to plaintiff(s) and the

13  members of the class and those questions predominate over any questions that may

14  affect individual members of the class.  The common questions of fact include the

15  following:

16          (a)
            1.  Did Defendant engage in deceptive advertising?
17          2.  Did Defendant engage in deceptive practices in the sale of complex
            and risky loans to consumers?
18          3.  Did Defendant engage in deceptive underwriting to approve loans?
            4.  Did Defendant create a high-pressure sales environment where
19          employees were rewarded for selling as many loans as they could without
            regard as to borrowers ability to re-pay?
20
21      24.  Among the questions of law common to the class are the following:

22          (a)
            1.  Did defendant breach a duty to each member of the class?
            2.  Should defendant be enjoined from engaging in mortgage lending?
23          3.  Are Plaintiff(s) entitled to compensatory damages?

24      25.  Plaintiff(s)' claims are typical of the claims of the other members of the class.

25  Plaintiff(s) and all the members of the class have sustained economic damage arising

26  out of the common course of conduct as alleged herein.

27      26.  Plaintiff(s) will fairly and adequately represent and protect the interests of the

28  class.  They have retained counsel with substantial experience in prosecuting consumer

1   class actions. Plaintiff(s) and his counsel are committed to vigorously prosecuting this

2   action on behalf of the class and have the financial resources necessary to do so.

3   Neither Plaintiff(s) nor his counsel have any interest adverse to this of the class.

4       27. A class action is superior to other available methods for the fair and efficient

5   adjudication of this controversy since individual joinder of all members of the class is

6   impractical. Furthermore, as the damages suffered by each individual member of the

7   class may be relatively small, the expense and burden of individual litigation would

8   make it difficult or impossible for the individual members of the class to redress the

9   wrongs done to them. The cost to the court system of such individual adjudication

10  would be substantial. Individual litigation would also present the potential for

11  inconsistent or contradictory judgments and would magnify the delay and expense to all

12  parties and the court system in multiple trials of identical factual issues. By contrast,

13  the conduct of this action as a class action presents fewer management difficulties,

14  conserves the resources of the parties and the court system and protects the rights of

15  each class member.

16      28. As per California Code of Civil Procedure 1021.5 Attorney fees are

17  appropriate as follows: As per court order.

18                              **FACTUAL ALLEGATIONS**

19      29. This action is brought against Defendants, who engaged in false advertising

20  and unfair competition in the origination of residential mortgage loans and home equity

21  lines of credit (HELOCs").

22      30. Countrywide originated mortgage loans and HELOCs through several

23  channels, including a wholesale origination channel and a retail origination channel.

24  The countrywide employees who marketed, sold or negotiated the terms of mortgage

25  loans and HELOCs in any of its origination channels, either directly or indirectly working

26  with mortgage brokers, are referred to herein as "loan officers".

27      31. In countrywide's wholesale channel, loan officers in its wholesale lending

28  division ("WLD") and Specialty Lending Group ("SLG") worked closely with a nationwide

1   network of mortgage brokers to originate loans. In its wholesale channel, Countrywide

2   often did business as "America's Wholesale Lender", a fictitious business named by

3   CHL. In Countrywide's retail channel, loan officers employed by countrywide in its

4   Consumer Markets Division ("CMD") sold loans directly to consumers.  In addition, loan

5   officers employed by Full Spectrum Lending Division ("FSLD") sold loans directly to

6   consumers as part of Countrywide's retail channel.

7       32.  Countrywide maintained sophisticated electronic databases by means of which

8   corporate management, including but not limited to defendants Mozilo and Sambol,

9   could obtain information regarding Countrywide's loan production status, including the

10  types of loan products, the number and dollar volume of loans, the underwriting

11  analysis for individual loans, and the number of loans which were approved via the

12  underwriting exceptions.  Defendants used this information, together with date they

13  received regarding the secondary market trends, to develop and modify the loan

14  products that Countrywide offered and the underwriting standards  that Countrywide

15  applied.

16      33.  The mortgage market changed in recent years from one in which lenders

17  originated mortgages for retention in their own portfolios to one in which lenders

18  attempted to generate as many mortgage loans as possible for resale on the secondary

19  marker.  The goal for lenders such as Countrywide was not only to originate high

20  mortgage volumes but also to originate loans with above-market interest rates and

21  other terms which would attract premium prices on the secondary market.

22      34.  In 2004, in an effort to maximize Countrywide's profits, Defendants set out to

23  double Countrywide's share of the national mortgage market to 30% through a

24  deceptive scheme to mass produce loans for sale on the secondary market.

25  Defendants viewed borrowers as nothing more than the means for producing more

26  loans, originating loans with little or no regard to borrowers' long-term ability to afford

27  and to sustain home ownership.  This scheme was created and maintained with the

28  knowledge, approval and ratification of defendants Mozilo and Sambol.

35.  Defendants implemented this deceptive scheme through misleading marketing practices designed to sell risky and costly loans to homeowners, the terms and dangers of which they did not understand, including by (a) advertising that it was the nation's largest lender and could be trusted by consumers; (b) encouraging borrowers to refinance or obtain purchase money financing with complicated mortgage instruments like hybrid adjustable rate mortgages or payment option adjustable rate mortgage that were difficult for consumers to understand;( c) marketing these complex loan products to consumers by emphasing the very low initial "teaser" or "fixed" rates while obfuscating or misrepresenting the later steep monthly payments and interest rate increases or risk of negative amortization; and (d) routinely soliciting borrowers to refinance only a few months after Countrywide or the loan brokers with whom it has "business partnerships" has sold them loans.

36.  Defendants also employed various lending policies to further their deceptive scheme and to sell ever- increasing numbers of loans, including (a) the dramatic easing of Countrywide's underwriting standards; (b) the increased use of low-or no-documentation loans which allowed for no verification of stated income or stated assets or both, or no request for income or asset information at all; ( c) urging borrowers to encumber their homes up to 100% (or more) of the assessed value ; and (d) placing borrowers in "piggyback" second mortgages in the form of higher interest rate HELOCs while obscuring their total monthly payment obligations.

37.  Also to further the deceptive scheme, Defendants created a high-pressure sales environment that propelled its branch managers and loan officers to meet high production goals and close as many loans as they could without regard to the borrower ability to repay.  Defendants high-pressure sales environment also propelled loan officers to sell the riskiest types of loans, such as payment option and hybrid adjustable rate mortgages, because loan officers could easily sell them by deceptively focusing borrowers attention on the low initial monthly payment or interest rate.  Defendants also made arrangements with a large network of mortgage brokers to procure loans for

1   Countrywide and, through its loan pricing structure, encouraged these brokers to place
2   homeowners in loans with interest rates higher than those for which they qualified, as
3   well as prepayment penalty obligations.  The system of compensation aided and
4   abetted brokers in breaching their fiduciary duties to borrowers by inducing borrowers to
5   accept unfavorable loan terms without full disclosure of the borrowers options and also
6   compensated brokers beyond the reasonable value of brokerage services they
7   rendered.

8       38.  Countrywide received numerous complaints from borrowers claiming that they
9   did nor understand their loan terms.  Despite these complaints, Defendants turned a
10  blind eye to the ongoing deceptive practices engaged in by Countrywide's loan officers
11  and loan broker "business partners", as well as to the hardships created for borrowers
12  by its loose underwriting practices.  Defendants cared only about selling increasing
13  numbers of loans at any cost, in order to maximize Countrywide's profits on the
14  secondary market.

15      39.  Defendants' deceptive scheme had one primary goal-to supply the secondary
16  market with as many loans as possible, ideally loans that would earn the highest
17  premiums.  Over a period of several years, Defendants constantly expanded
18  Countrywide's share of the consumer market for mortgage loans through a variety of
19  deceptive practices, undertaken with the direction, authorization, and ratification of
20  defendants Sambol and Mozilo, in order to maximize its profits from the sale of those
21  loans to the secondary market.

22      40.  While Countrywide retained ownership of some of the loans it originated, it
23  sold the vast majority of its loans on the secondary market, either as mortgage-backed
24  securities or as pools of whole loans.

25      41.  In the typical securitization transaction involving mortgage-based securities,
26  loans were "pooled" together and transferred to a trust controlled by the securitizer,
27  such as Countrywide.  The trust then created and sold securities backed by the loans in
28  the pool.  Holders of the securities received the right to a portion of the monthly

1 payment stream from the pooled loans, although they were not typically entitled to the

2 entire payment stream.  Rather, the holders received some portion of the monthly

3 payments.  The securitizer or the trust it controlled often retained an interest in any

4 remaining payment streams not sold to security holders.  These securitization could

5 involve the pooling of hundreds or thousand of loans, and the sale of many thousands

6 of shares.

7     42. Countrywide generated massive revenues through loan securitization.  Its

8 reported securities trading volume grew from 647 billion dollars in 2000, to 2.9 trillion

9 dollars in 2003, 3.1 trillion dollars in 2004, 3.6 trillion dollars in 2005, and 3.8 trillion

10 dollars in 2006.  (These figures relate to the ostensible values given to the securities by

11 Countrywide or investors, and include securities backed by loans made by other

12 lenders and purchased by Countrywide.)

13     43. For the sale of whole loans, Countrywide pooled loans and sold them in bulk

14 to third-party investors.  The sale of whole loans generated additional revenues for

15 Countrywide.   Countrywide often sold the whole loans at a premium, meaning that the

16 purchaser paid Countrywide a price in excess of 100% of the total principal amount of

17 the loans included in the loan pool.

18     44.. The price paid by purchasers of securities or pools of whole loans varied

19 based on the demand for the particular types of loans included in the securitization or

20 sale of whole loans.  The characteristics of the loans, such as whether the loans are

21 prime or subprime, whether loans have an adjustable or fixed rate, or whether the loans

22 include a prepayment penalty, all influenced the price.

23     45. Various types of loans and loan terms earned greater prices, or "premiums" in

24 the secondary market.  For example, investors in mortgages and mortgage backed

25 securities have been willing to pay higher premiums for loans with prepayment

26 penalties.  Because the prepayment penalty deters borrowers from refinancing early in

27 the life of the loan, it essentially ensures the income stream for the loan will continue

28 while the prepayment penalty is in effect.  Lenders, such as Countrywide, sought to

1  market loans that earned it higher premiums, including loans with prepayment

2  penalties.

3    46.  In order to maximize the profits earned by the sale of its loans to the

4  secondary market, Countrywide's business model increasingly focused on finding ways

5  to generate an ever larger volume of the types of loans desired by investors.

6  Countrywide then developed the types of loans which would be easiest sold to the

7  investors with no regard to the consumer.

8    47.  Countrywide would also sell loans before they were even made.  Countrywide

9  would sell loans "forward" before the loan funded.  In order to determine the best loans

10  to sell "forward" Countrywide would examine the loans in various stages of production

11  and examine its projected volume of production over the next several months.

12    48.  Loans that were sold forward were sold subject to a set of stipulations between

13  Countrywide and the purchaser.  Example: Countrywide would agree on October 1 that

14  on December 1 it would deliver 2000 adjustable rate mortgages loans with an average

15  rate of 6.0%, half of which would be subject to a prepayment penalty, among other

16  characteristics.  None of the loans would have been made prior to October 1.  Based on

17  these stipulations regarding the characteristics of the loans to be included in the pool,

18  an investor might agree to pay a price totaling 102.25% of the total face value of the

19  loans.  In other word the purchaser agreed in advance to pay a premium of 2.25%.

20  Then, if the loans actually delivered on December 1 had a slightly higher or lower

21  average interest rate, the terms of the stipulation would specify how much the final price

22  would be adjusted.

23    49.  The information regarding the premiums that particular loans products and

24  terms could earn on the secondary market was forwarded to Countrywide's production

25  department.

26    50.  Countrywide originated as many loans as possible not only to maximize its

27  profits on the secondary market, but to earn greater profits from servicing the

28  mortgages it sold.  Countrywide often retained the right to service the loans it

securitized and sold as pools of whole loans.  The terms of the securitization and sales
agreements for pools of whole loans authorized Countrywide to charge the purchasers
a monthly fee for servicing the loans, typically a percentage of the payment stream on
the loan.

51.  Tantalized by the hug profits earned by selling loans on the secondary market,
Defendants constantly sought to increase Countrywide's market share: the greater the
number and percentage of loans it originated, the greater the revenue it could earn on
the secondary market.  Countrywide executive, including defendant Mozilo, publicly
stated they sought to increase Countrywide's market share to 30% of all mortgage
loans made and HELOCs extended in the country.

52.  In its 2006 annual report, Countrywide trumpeted the fact that "while the
overall residential loan production market in the United States has tripled in size since
2000, from $1.0 trillion to $2.9 trillion at the end of 2006, Countrywide has grown nearly
three times faster, going from $62 billion in loan originations in 2000 to $463 billion in
2006."

53.  In addition, Countrywide directly and indirectly motivated its branch managers,
loan officers and brokers to market the loans that would earn the highest premiums on
the secondary market without regard to borrowers ability to repay.

54.  The secondary market affected Countrywide's pricing of products and, in order
to sell more loans on the secondary market, Countrywide relaxed its underwriting
standards and liberally granted exceptions to those standards.  Countrywide managers
and executives, including but not limited to defendants Mozilo and Sambol, had access
to information that provided transparency and a seamless connection between the
secondary market transactions, the loan production process and managerial and sales
incentives.

## COUNTRYWIDE ENGAGED IN DECEPTIVE PRACTICES IN THE SALE OF
## COMPLEX AND RISKY LOANS TO CONSUMERS

55.  Countrywide offered a variety of loan products that were both financially risky and difficult for borrowers to understand, including in particular payment option and hybrid adjustable rate mortgages and second loans in the form of home equity lines of credit.

A.  **The Pay Option ARM,**

56.  **Plaintiff Roy V Hursh has personal knowledge of this allegations and was placed in this type of mortgage by Countrywide in 2006.**

57.  Particularly after 2003, Countrywide aggressively marketed its payments option adjustable rate mortgage ("Pay option ARM") under the direction, authorization and ratification of defendants Mozilo and Sambol.  The pay option ARM, which Countrywide classified as a "prime" product, is a complicated mortgage product which entices consumers by offering a very low "teaser" rate-often as low as 1%-for an introductory period of one or three months.  At the end of the introductory period, the interest rate increases dramatically.  Despite the short duration of the low initial interest rate, Countrywide's Pay Option ARM often include a one, two or three year prepayment penalty.

58.  When the teaser rate on a Pay Option ARM expires, the loan immediately becomes an adjustable rate loan.  Unlike most adjustable rate loans, where the rate can only change once every year or every sox months, the interest rate on a Pay Option ARM can change every month(if there is a change in the index used to compute the rate.

59.  Countrywide's Pay option ARMs were typically tied to either the "MTA" "LIBOR" or "COFI" index.  The MTA index is the 12-month average of the annual yields on actively traded United States Treasury Securities adjusted to a constant maturity of one year as published by the Federal Reserve Board.  The LIBOR (London Interbank Offered Rate) index is based on rates that contributor banks in London offer each other for inter-bank deposits.  Separate LIBOR indices are kept one month, six-month, and one-year periods, based on the duration of the deposit.  The COFI (11th District Cost of

1  Funds Index) is the monthly weighted average of the interest rates paid on checking

2  and savings accounts offered by financial institutions operating in the states of Arizona,

3  California and Nevada.

4      60.  Although the interest rate increased immediately after the expiration of the

5  short period of time during which the teaser rate is in effect, Plaintiff Hursh had the

6  option of making monthly payments as though the interest rate had not changed.

7  Plaintiff Hursh had four different payments options during the first five years of the loan.

8  The first option is a "minimum" payments that is based on the introductory interest rate

9  which was 1.5%.  The minimum payment, which Countrywide marketed as the

10  "payment rate" was the lowest of the payment options present to Plaintiff Hursh.

11  Plaintiff Hursh choose to make the minimum payment, which was $1,449.50.

12      61.  The minimum payment of the Pay Option ARM usually is less than the interest

13  accruing on the loan.  The unpaid interest was added to the principal amount of Plaintiff

14  Hursh's loan, resulting in a negative amortization.  The minimum payment remained the

15  same for the first year and then began to increase substantially.  By March 2008 the

16  payment was $3,189.51 approximately 2.5 times the original payment, which resulted in

17  "payment shock" for Plaintiff Hursh.

18      62.  However the loan balance on his Pay Option ARM also has a negative

19  amortization cap, 115% of the original  principal of the loan.  When the balance hits the

20  cap, the monthly payment will immediately raise to fully amortizing level (i.e., all

21  payments after the date the cap is reached must be sufficient to pay off the new

22  balance over the remaining life of the loan).  When this happens, Plaintiff Hursh will

23  experience significant payment shock.  Plaintiff's loan balance at the time of inception

24  was $420,000.00, in just two years the balance is already $442,848.23 and increasing

25  each month.

26      63.  Instead of making the minimum payment as Plaintiff Hursh did, a borrower has

27  the option of making an interest-only payment for five years.  The borrower then

28  experience payment shock when the payment recasts to cover both the principal and

1  interest for the remaining term of the loan.

2      64.  Example of Pay Option ARM Loan: initial balance of $460,000.00, a teaser

3  rate of 1%, and a margin of 2.9%.  After the teaser rate expired, based on the 1-month

4  LIBOR rate as of the date the borrower obtained the loan, the interest rate would

5  increase to 7.00%.  Assuming the 7.00% rate remained and the borrower chose to

6  make the minimum payment for as long as possible the payments would be:

7  (approximately rounded to the nearest dollar)

8              A. $1,480.00 per month  for the first year.

9              B. $1,591.00 per month for the second year

10              C. $1,710.00 per month for the third year

11              D. $1,839.00 per month for the fourth year

12              E. $1,975.89 per month for the fifth year

13              F. $3,748.00 per month for the remainder of the life of the loan.

14      65.  Once the payments have reached $3,748.00 this Pay Option ARM will have

15  negatively amortized such that the balance of the loan will have increased to a

16  staggering $523,793.00.  The borrower is now forced to make a payment more than two

17  and half times greater than the initial payment and likely unable to refinance unless the

18  home has increased in value at least commensurately with the increased loan balance.

19      66.  During the underwriting process, Countrywide did not consider whether

20  Plaintiff Hursh would be able to afford such payment shock.

21      67.  Nearly all Countrywide's Pay Option ARM borrowers will experience payment

22  shock.  As of December 31, 2006, almost 88% of the Pay Option ARM portfolio held by

23  Defendants consisted of loans that had experienced some negative amortization.  The

24  percentage increased to 91% as of December 31, 2007.

25      68.  Countrywide sold thousands of Pay Option ARMs, wither through it branches

26  or through brokers.

27      69.  These loans were highly profitable.  Countrywide had a gross profit margin of

28  approximately 4% on Pay Option ARMs, compared to 2% on mortgages guaranteed by

1  the Federal Housing Administration.

2      70.  Countrywide retained ownership of a number of loans for investment

3  purposes, including thousand of Pay Option ARMs.  Countrywide reported the negative

4  amortization amounts on these Pay Option ARMs as income on its financial statements.

5  The negative amortization "income" earned by Countrywide totaled 1.2 billion dollars by

6  the end of 2007.

7      71.  Moreover, Pay Option ARMs with higher margins could be sold for a higher

8  premium on the secondary market, because the higher margins would produce a

9  greater interest rate and therefore a larger income stream.  To insure an abundant

10  stream of such loans, Countrywide pushed its loan officers to sell Pay Option ARMs

11  and paid loan brokers greater compensation for selling a Pay Option ARM with a higher

12  margin, or above-par rate, thus encouraging them to put consumers into higher cost

13  loans.  Countrywide also used a variety of deceptive marketing techniques to sell its

14  Pay Option ARM to consumers.

15      72.  Countrywide deceptively marketed the Pay Option ARM by aggressively

16  promoting the teaser rate.  Television commercials emphasized that the payment rate

17  could be as low as 1% and print advertisements lauded the extra cash available to

18  borrowers because of the low minimum payment on the loan.  Television

19  advertisements did not effectively distinguish between the "payment rate" and the

20  interest rate on the loans, and any warning about potential negative amortization in

21  Countrywide's print advertisements were buried in densely written small type.

22      73.  Borrowers, enticed by the low teaser rate, were easily distracted from the fine

23  print in the loan documentation and did not fully understand the terms or the financial

24  implications of Countrywide's Pay Option ARMs.

25      74.  When a borrower obtained a Pay Option ARM from Countrywide, the only

26  initial monthly payment amount that appeared anywhere in his loan documentation was

27  the minimum payment.  Countrywide assumed that was the payment the Plaintiff Hursh

28  or any other borrower would make.  Thus Plaintiff Hursh or any other borrower did not

1  know the monthly payments necessary to make a payment that would cover accruing
2  interest, until he received the first statement after the expiration of the teaser rate, well
3  after all loan documentation was signed.

4      75. Countrywide and the brokers it accepted as it "business partners"
5  misrepresented or obfuscated the true terms of the Pay Option ARMs offered by
6  Countrywide, including but not limited to misrepresenting or obfuscating the amount of
7  time that the interest rate would be fixed for the loan, misrepresenting or obfuscating
8  the risk of negative amortization and the fact that the payment rate was not the interest
9  rate, and misrepresenting or obfuscating that the minimum payment would not apply for
10 the life of the loan.

11     76. Countrywide and its business partner brokers also misrepresented ir
12 obfuscated how difficult it would be for borrowers to refinance a Pay Option ARM loan.
13 In f ct, after making only the minimum payments, because of negative amortization the
14 borrower likely would not be able to refinance the loan unless the home serving as
15 security has increased in value.  This is particularly true in cases for borrowers whose
16 loans had a very high loan-to-value ration.  This is true in the Plaintiff Hursh, he is
17 unable to refinance the loan.

18     77. Countrywide and its business partners often misrepresented or obfuscated the
19 fact that a particular Pay Option ARM included a prepayment penalty and failed to
20 explain the effect that making only the minimum payment would have on the amount of
21 the prepayment penalty.  If Plaintiff Hursh had sought to refinance after having make
22 only the minimum payments, the negative amortization of his loan caused the
23 prepayment to increase.  Prepayment penalties typically equal six months worth of
24 accrued interest.  As a negative amortization cause the loan principal to increase, it also
25 causes an increase in the amount of interest that accrues each month, thereby
26 increasing the prepayment penalty.

27     78. Countrywide and its business partner brokers also represented that the
28 prepayment penalty could be waived if the borrower refinanced with Countrywide.

1    However, Countrywide sold most of the loans and therefore lost the authority to waive
2    the penalty.

3        B. **Hybrid ARM Loans**

4        79. Countrywide offered "Hybrid" ARM Loans. These loans have a fixed rate for a
5    period of 2,3,5,7, or 10 years, and then an adjustable rate for the remaining loan period.
6    The products described below were offered with the approval of defendants Sambol
7    and Mozilo.

8        (1) 2/28 and 3/27 ARMs

9        80. Countrywide typically offered "2/28" Hybrid ARMs through its Full Spectum
10   Lending Division. These 2/28 ARM loans have low, fixed interest rates for the first two
11   years (the "2" in "2/28"). The loans often required interest-only payments during the
12   period the initial  rate was in effect, or sometimes for the first five years of the loan.

13       81. After the initial rate expires, the interest rate can adjust once every six months
14   for the next 28 years. During this period , the interest rate is typically is determined by
15   adding a margin to the one-year LIBOR index, except that the amount the interest rate
16   can increase at one time may be limited to 1.5%. Because the initial rate is set
17   independent of the index, the payment increase can be dramatic, particularly is the loan
18   called for interest-only payments for the first two or five years.

19       82. Countrywide also offered "3/27" ARMs, which operate similarly to 2/28 ARMs,
20   except that the low initial rate is fixed for three rather than two years, and the interest
21   rate adjusts for 27 rather than 28 years.

22       83. Countrywide underwrote 2/28 and 3/27 ARMs based on the payment required
23   while the initial rate was in effect, without regard to whether the borrower could afford
24   the loan thereafter. And, like the Pay Option ARMs, Countrywide's 2/28 and 3/27
25   ARMs typically contain prepayment penalties.

26       84. A borrower with a 2/28 ARM, like a borrower with a Pay Option ARM, is
27   subjected to steadily increasing payments as well as payment shock. Example: A
28   Countrywide borrower obtained a 2/28 ARM for $570,000.00, with an initial rate of

8.95% for the first two years.  Thereafter the interest rate was calculated by adding a margin of 7.95% to the six-month LIBOR index.  The promissory note for this 2/28 ARM provides that the interest rate can never be lower 8.95% and can go as high as 15.95%.  Based on the LIBOR rate that applied at the time the borrower received the loan and the terms of the note governing interest rate increases, the anticipated payment schedule was:

> A. $4566.00 per month for two years

> B. $5142.00 per month for six months

> C. $5,766.00 per month for six months; and

> D.  Payments of $6,404.00 per month or more thereafter.

85.  This borrower's monthly payments of this 2/28 ARM will increase by approximately 40% just during 12 months between the end of the second year and beginning of the fourth year of the loan.

2. 5/1,7/1, and 10/1 ARMs

86.  Countrywide also offered 5/1,7/1, and 10/1 "interest-only" loans.  Marketed having "fixed" or "fixed period" interest rates, these loans carried a fixed rate for the first 5,7, or 10 years respectively.  These loans were underwritten based on the initial rate, interest only payment until the end of 2005.  However when the fixed period expires, the interest rate adjusts once per year and is determined by adding a margin to the index.  The monthly payments dramatically increase after the interest-only period because payments over the remaining 25,23 or 20 years are fully amortized to cover both principal and interest.

87.  Collectively 2/28, 3/27, 5/1. 7/1 and 10/1 ARMs will be referred to herein as "Hybrid ARMs".

88.  Countrywide marketed Hybrid ARMs by emphasing the low monthly payment and low "fixed" initial interest rate.  Countrywide and its business partner brokers misrepresented or obfuscated the true terms of these loans, including but not limited to misrepresenting or obfuscating the amount of time that the fixed rate would be in effect,

1  misrepresenting the fact that the interest rate on the loans are adjustable rather than

2  fixed, and obfuscating or misrepresenting the amount by which payments could

3  increase once the initial fixed rate expired.

4     89.  Countrywide and its business partners also often misrepresented the fact that

5  Hybrid ARMs included prepayment penalties.

6     90.  Countrywide and its business partners also misrepresented how difficult it

7  might be for borrowers to refinance the Hybrid ARMs.  Because the loan had usually

8  increased in value and the unless the home had increased substantially there would be

9  no equity in the home.

10     **C.  Home Equity Lines of Credit**

11     91.  Countrywide also aggressively marketed HELOCs, particularly to borrowers

12  who had previously obtained or were in possession of obtaining a first mortgage loan

13  from Countrywide.  Defendants referred to such HELOCs as "piggies" or "piggyback

14  loans" and referred to simultaneously funded first and HELOCs as "combo loans".  The

15  first loan typically covered 80% of the appraised value of the home securing the

16  mortgage, while the HELOC covered any of the home's remaining value up to (and

17  sometimes exceeding) 20%.  Thus, the HELOC and the first loan together encumbered

18  100% or more of a home's appraised value.

19     92.  Under the terms of the piggyback HELOCs, borrowers received monthly bills

20  for interest only payments for the first five years of the loan term during which time they

21  could also tap any unused amount of the equity line.  This was called the "draw period".

22  93.  Because Countrywide offered HELOCs as piggybacks to Pay Option and Hybrid

23  ARMs, 100% or more of a property's appraised value could be encumbered with loans

24  that required interest-only payments or allowed for negative amortization.

25     93.  Countrywide typically urged borrowers to draw down the full line of credit when

26  HELOC initially funded.   This allowed Countrywide to earn as much interest as possible

27  on the HELOCs it kept in its portfolio and helped generate a payment stream for

28  HELOCs sold on the secondary market.

94. Upon the end of the draw period, the HELOC notes generally required borrowers to repay the principal and interest in fully amortizing payments over a period of fifteen years. A fully drawn HELOC was therefore functionally a 20 or 25 year closed end mortgage. However, Countrywide did not provide borrowers with any documents or other material to help them calculate the principal and interest payments that would be due after the draw, or interest-only period.

95. Countrywide HELOCs were underwritten not to the fully amortizing payment, but to the interest-only payments during the draw period. Countrywide typically charged an early termination fee for HELOCs closed before three years, and sometimes would charge a monthly fee for HELOCs where the balance fell below a specified amount,

96. A borrower with an interest-only or a negatively amortizing loan faces even greater payment shock if he or she has a fully drawn HELOC.

## COUNTRYWIDE EASED AND DISREGARDED UNDERWRITING STANDARDS IN ORDER TO INCREASE ITS MARKET SHARE

97. Driven by its push for market share, Countrywide did whatever it took to sell more loans, faster-including by easing it underwriting criteria and disregarding the minimal underwriting criteria it claimed it required. By easing and disregarding its underwriting criteria, Countrywide increased the risk the that borrowers would lose their homes. Defendant Mozilo and Sambol actively pushed for easing Countrywide's underwriting standards and documentation requirements, allowed the liberal granting of exceptions to those already eased standards and requirements, and received reports detailing the actual underwriting characteristics and performance of the loans Countrywide funded.

### Countrywide's low-and-No-Documentation Loans

98. Typically, lenders require borrowers seeking loans to document their income, by providing W-2, 1099's or tax returns, as well as assets. Countrywide however disregarded such documentation requirements with respect to its riskiest loan products and introduced a variety of reduced or no documentation loan programs that eased and

1  quickened the loan origination process.  The vast majority of the Hybrid ARMs and
2  nearly all of the Pay Option ARMs originated by Countrywide were reduced or no
3  documentation loans.  Plaintiff Hursh has personal knowledge of this allegation.
4  Countrywide accepted stated income from the Plaintiff, nothing was verified.

5      99.  These low-and no-documentation programs, enable Countrywide to process
6  loans more quickly and therefore make more loans.  Stated income also encouraged
7  the overstating of income-loan brokers and officers either overstated the borrowers
8  income with their knowledge, or led the borrower into overstating his or her income
9  without explaining the risk of default that the borrower would face with a loan he
10 Countrywide loan officers would tell a borrower that based upon their credit score they
11 needed to say that this was their income.  Many borrowers agreed by stating that was
12 their income.  Plaintiff Hursh has personal knowledge of this allegation.

13     100.  For stated income loans, it became a standard practice for loan processors
14 and underwriters to check www.salary.com to see if a state income was within a
15 reasonable range, with more tolerances given to California salaries.  Because loan
16 officers knew this, they would look the parameters up prior to submitting to underwriting
17 so they had the correct state income.

18     101.  Countrywide also relaxed the traditional underwriting standards in order to
19 produce more loans for the secondary market.  Countrywide relaxed the credit score
20 requirement so more borrowers qualified for the stated income programs.

21     102.  Countrywide further relaxed the loan-to value ratios and the debt-to income
22 ratios to produce more loans.

23     103.  Countrywide approved loans that it knew to be high risk, and therefore likely
24 to end up in default, by ignoring its own minimum underwriting.  Based upon the
25 proposed loan terms and the borrower's financial and credit information, Countrywide's
26 computerized underwriting system ("CLUES") issued a loan analysis report that rated
27 the consumer's credit and ability to repay the loan, and also indicated whether a
28 proposed loan was in compliance with Countrywide's underwriting guidelines.

104. The CLUES result was only a recommendation, not a final decision. The role of the underwriter was to verify the information and ultimately decide whether to approve the loan. Underwriters could overcome potential violations or other underwriting issued flagged by CLUES by adding on "compensating factors", such as letter from the borrowers addressing the problems.

105. Underwriters were under intense pressure to process and fund as many loans as possible. They were expected to process 60 to 70 loans per day, as the pressure to produce loans increased, underwriters, their superiors, branch managers and regional vice presidents were given the authority to grant exceptions to the CLUES recommendations. Even if CLUES denied a loan, the underwriter could override the decision and approve the loan if he or she obtained approval from their supervisor.

106. Because of the intense pressure, underwriters had to justify why they were not approving loans.

107. To attract more business Countrywide promoted its relaxed underwriting standards and ready grants of exceptions to brokers. Countrywide stated that its "Specialty Lending Group's experienced and knowledgeable loan experts are empowered to review all loan packages, make sound credit decisions and provide quality lending solutions-yes, even for 'hard to close' loans".

108. Countrywide compromised it underwriting standards even further by risk layering, i.e. combining high risk loans with one or more relaxed underwriting standards. Countrywide was well aware that layered risk created a greater likelihood that borrowers would lose their homes.

109. Driven by its push for market share, Countrywide did whatever it took to sell more loans faster-including engaging in a number of deceptive marketing practices under the direction and with the ratification of defendants Mozilo and Sambol.

**COUNTRYWIDE DECEPTIVELY LULLED BORROWERS INTO BELIEVING THAT IT WAS A "TRUSTED ADVISOR" LOOKING OUT FOR BORROWERS BEST**

**INTEREST.**

110.  Countrywide sought to induce borrowers into believing that it was looking out for their best interest through various types of solicitations.  Countrywide published television, radio and print advertising, for example claiming it was a "Company you could trust", "join the millions of homeowners who have trusted Countrywide".  Countrywide capitalized on its status as the "number one mortgage broker".  Countrywide also solicited existing Countrywide customers with letters and emails pushing their Pay Option ARMs claiming it was in their best interest.

111.  In order to produce more loans for the secondary market Countrywide encouraged serial refinancing to its existing customers.  Countrywide misled these borrowers by pushing their Pay Option ARMs and their Hybrid ARMs.  Countrywide knew that borrowers who could not afford the inevitable payment increase on such loans and who were unable to refinance would be at greater risk for losing their homes.

112.  Because the Pay Option ARM and Hybrid ARM start with lower monthly payments and interest rate and the complex nature of the loan, Countrywide was easily able to sell this type of loan to the borrower with no regard as to the borrowers ability to repay once it adjusted.  Countrywide's approach was to "sell the payment", borrowers were eager to accept the Pay Option ARMs because they did not understand them and they were not explained by Countrywide.

113.  Borrowers subjected to any of the deceptive marketing practices would not of fully understood the true risks and likely unaffordability of their Pay Option or Hybrid ARMs.  Many borrowers did not read their loan documents and disclosures before signing.  Countrywide often makes borrowers sign a large stack of documents without providing borrower time to read them or have them explained.  Even if a borrower did read the documents they did not fully understand them.

114.  Countrywide's tricky advertising focused borrower on the short term low payments not on the true terms of the loans.  Countrywide telemarketer were given scripts that led consumers away from any questions regarding the true terms of the

1    loans.

2        115. If a borrower was able to understand the payment would increase and

3    questioned the ARM, he or she was misled another way, Countrywide would represent

4    that the value of their home would increase, thus creating equity to obtain a loan with

5    better terms. However Countrywide failed to clearly explain the prepayment penalty,

6    nor the fact that the home was probably already encumbered 100% and the borrower

7    was in a negative amortization loan.

8        116. Countrywide received numerous complaints from borrowers who claimed

9    they had not been told about the prepayment penalty or that the loan officer had

10   promised that they would not be one, Defendants turned a blind eye to borrowers.

11       117. Countrywide touted its low documentation requirements, urging borrowers to

12   get "fastrack" loans so that they could get cash more quickly. However many borrowers

13   who obtained these loans possessed sufficient documentation to qualify for full

14   document mortgages, and some submitted that documentation to their loan offices or to

15   one of Countrywide's business partner brokers. In emphasizing the ease, speed and

16   availability of reduced or no document loans, Countrywide concealed the fact that

17   borrowers could qualify for a lower rate or reduced fees if they elected to apply for a

18   mortgage by fully documenting their income and assets.

19       118. Countrywide misrepresented the terms of HELOCs, including without

20   limitation by failing to inform the borrower that he or she would not have access to

21   additional credit because he or she was receiving a full draw or that the monthly

22   payment on the HELOC was interest-only and the borrower therefore would not ve able

23   to draw additional funds on the HELOC at a later date.

24       **IN ORDER TO INCREASE MARKET SHARE, DEFENDANTS CREATED A HIGH-**

25   **PRESSURE SALES ENVIRONMENT WHERE THE EMPLOYEES WERE REWARDED**

26   **FOR SELLING AS MANY LOANS AS POSSIBLE WITHOUT REGARD TO**

27   **BORROWERS ABILITY TO REPAY.**

28       119. Despite touting itself as a lender that cared about its borrowers, Countrywide

1   was in essence, a mass production loan factory set up to produce an ever-increasing

2   stream of loans without regard to borrowers ability to repay the loans and sustain home

3   ownership.  In order to provide an endless supply of loans for the secondary market,

4   Defendants pressured Countrywide employed involved in the sale and processing of

5   the loans to produce as many loans as possible, as quickly as possible and at the

6   highest price.

7       120.  Defendants created this pressure through a compensation system, which

8   predictably led employees to disregard Countrywide's minimal underwriting guidelines

9   and to originate loans without regard to their sustain ability..  Countrywide's

10  compensation system also motivated its loan officers to engage in the deceptive

11  marketing practices in the preceding sections.  If any of the employees failed to

12  produce the numbers expected by Countrywide they were terminated.

13  **AS PART OF THE DECEPTION, COUNTRYWIDE COMPENSATED ITS**

14  **BUSINESS PARTNER BROKERS AT A HIGHER RATE FOR MORE PROFITABLE**

15  **LOANS, WITHOUT CONSIDERATION OF SERVICES ACTUALLY PERFORMED BY**

16  **THE BROKERS.**

17      121.  In California, a mortgage broker owes his or her client a fiduciary duty.  A

18  mortgage broker is customarily retained by a borrower to act as the borrower's agent in

19  negotiating an acceptable loan.  All persons engaging in this business in California are

20  required to obtain real estate licenses and to comply statutory requirements.  Among

21  other things, the mortgage broker has an obligation to make a full and accurate

22  disclosure of the terms of a loan to borrowers, particularly those that might affect the

23  borrowers decision, and to act always in the utmost good faith toward the borrower and

24  to refrain from obtaining any advantage over the borrower.

25      122.  Countrywide paid brokers compensation in the form of yield spread

26  premiums or rebates to induce brokers to place borrowers in loans that would earn

27  Countrywide the greatest profit on the secondary market, regardless of whether the

28  loans were in the best interest of, or appropriate for, the borrowers.  In fact, the

mortgages that earned Countrywide the highest profit, and therefore would pay the highest rebates or yield spread premiums to brokers, often were not in the best interest of the borrower.

123.  Countrywide would also pay rebates in exchange for a broker providing an adjustable rate loan with a high margin.  Countrywide would provide an additional rebate to brokers if they were able to induce a borrower to obtain a line of credit.

124.  In order to maximize their compensation from Countrywide, brokers misled borrowers about the true terms of Pay Option and Hybrid ARMs, misled borrowers about their ability to refinance before the rates or payments on their loans increased, misled borrowers about the cost of reduced and no document loans, and misled borrowers regarding the terms of HELOCs.  Plaintiff Hursh has personal knowledge of this allegation.

125.  Borrowers often did not realize that their loans contained terms that were unfavorable to them and provided greater compensation to their brokers specifically as payment for those unfavorable terms.  An origination fee or other charges imposed by a broker are either paid by the borrower or financed as part of the loan.  In contrast, rebates, and yield spread premiums are not part of the principal of the loan and instead are paid separately by Countrywide to the broker.

126.  Countrywide closely monitored and controlled the brokers with whom it worked.  Countrywide required brokers it accepted as "business partners" to cooperate and provide all information, documentation and reports requested so that Countrywide could conduct a review of the broker and its operations.  In addition, Countrywide required the brokers to warrant and represent that all loans were closed using documents wither prepared or expressly approved by Countrywide.

**AS A RESULT OF DEFENDANT'S DECEPTIVE SCHEME THOUSANDS OF CALIFORNIA HOMEOWNERS HAVE EITHER LOST THEIR HOMES OR FACE FORECLOSURE AS THE RATE OF THEIR ADJUSTABLE MORTGAGE RESET.**

127.  Due to Countrywide's lack of meaningful underwriting guidelines and risk

1    layering, Countrywide deceptive sales tactics, high-pressure sales environment and the

2    complex nature of it Pay Option and Hybrid ARMs, a large number of Countrywide

3    loans are in default and foreclosure, or are headed in that direction.  Many of its

4    borrowers have lost their homes, or are facing foreclosure because they cannot afford

5    the payment shock and their properties are too heavily encumbered for them to be able

6    to refinance and pay prepayment penalties.  Plaintiff Hursh has personal knowledge of

7    this allegations and currently received a NOTICE OF DEFAULT.

8        128.  The national pace of foreclosures is skyrocketing.  In the month of May 2008

9    approximately 20,000 Californians lost their homes to foreclosure, and approximately

10   72,000 California homes were in default.  This represents an 81% increase from May

11   2007.

12       129.  Countrywide's mortgages account for a large percentage of these

13   delinquencies and foreclosures.  Countrywide's 10-K filed in February 2008, estimated

14   that as of December 31, 2007, a staggering 27.29% of it non-prime mortgages were

15   delinquent.  An October 2007 report prepared by Credit Suisse estimated that

16   Countrywide's delinquency and foreclosure rates are likely to double over the next two

17   years.

18       130.  This may well understate the extent of the crisis facing California

19   Homeowners with Countrywide mortgages, as more and more Pay Option ARMs go

20   into delinquency.

21                  **FIRST CAUSE OF ACTION AGAINST ALL DEFENDANT**

22              **VIOLATIONS OF BUSINESS AND PROFESSIONS SECTION 17500**

23                       **(UNTRUE OR MISLEADING STATEMENTS)**

24       131.  Plaintiff Hursh reallege and incorporate by reference all paragraphs above,

25   as though fully set forth in this cause of action.

26       132.  Defendants violated and continue to violate Business and Professions Code

27   section 17500 by making or disseminating untrue or misleading statements, or by

28   causing untrue or misleading statements to be made or disseminated, in or from

1   California, with the intent to induce members of the public to enter into mortgage loan or

2   home equity line of credit transactions secured by their primary residences.  These

3   untrue and misleading statements include but are not necessary limited to:

4        a.  Statements that Countrywide was a mortgage loan expert that could be

5   trusted to help borrowers obtain mortgage loans that were appropriate to their financial

6   circumstances, as described in paragraphs 110 through 115 above;

7        b.  Statements regarding the terms and payment obligations of Pay Option ARMs

8   offered by Countrywide, including statements that the initial payment rate was the

9   interest rate, statements regarding the duration of the initial payments, statements

10   regarding the risks associated with such loans as described in Paragraph 56 through

11   78, Plaintiff Hursh has personal knowledge of these statements.

12       C.  Statements regarding the terms and payment obligations of Hybrid ARMs

13   offered by Countrywide, including statements regarding the duration of the initial

14   interest rate, and statements obfuscating the risks associated with such mortgage loans

15   as described in paragraphs 79-90.

16       d.  Statements regarding the terms and payments obligations of HELOCs, as

17       described in paragraphs 91-96.

18       e.  Statements that borrowers with Pay Option and Hybrid ARMs offered by

19   Countrywide would be able to refinance the mortgage loans before the interest rates

20   reset, when in fact they most likely could not, as described in paragraphs 56-90.

21       f.  Statements regarding prepayment penalties on Pay Option and Hybrid ARMs

22   offered by Countrywide, including statements that the mortgage loans did not have

23   prepayment penalized, when in fact they did and statements that prepayment penalties

24   could be waived, when in fact they could not as described in paragraphs 56 through

25   130.

26       g.  Statements regarding the costs of reduced or no documentation mortgage

27   loans as described in paragraphs 98-100.

28       h.  Statements regarding the benefits or advisability of refinancing mortgage

1  loans with Pay Option and Hybrid ARMs offered by Countrywide as described in
2  paragraph 110 through 115.

3        133.  Defendants knew, or by the exercise of reasonable care should have
4  known, that these statements were untrue and misleading at the time they were made.

5        **SECOND CAUSE OF ACTION AGAINST ALL DEFENDANTS**
6        **VIOLATIONS OF BUSINESS AND PROFESSIONS CODE SECTION 17200**
7        **(UNFAIR COMPETITION)**

8        134.  Plaintiff Hursh realleges and incorporates by reference all paragraphs
9  above, as though fully set forth in this cause of action.

10       135.  Defendants have engaged in and continue to engage in, acts or practices
11 that constitute unfair competition, as that term is define in Section 17200 of the
12 Business and Professions Code.  Such acts or practices include, but are not limited to,
13 the following:

14       a.  Creating and maintaining a deceptive scheme to mass produce loans for sale
15 on the secondary market as described in paragraphs 29 through 130.

16       b.  Making untrue or misleading representations that Countrywide would be
17 trusted to sell borrowers mortgage loans that were appropriate to the financial
18 circumstances as described in paragraph 110 through 115.

19       C.  Making untrue or misleading representations regarding the terms and
20 payments obligations of Countrywide's Pay Option and Hybrid ARMs and HEOLCs as
21 described in paragraphs 56 through 96.

22       d.  Making untrue or misleading representations regarding the costs of reduced
23 or no documentation mortgage loans as described in paragraphs 98-100.

24       e.  Making untrue or misleading representations regarding the true likelihood or
25 circumstances under which borrowers would be able to refinance the ARM or HELOC
26 as described in paragraph 110 to 115.

27       f.  Soliciting borrowers to refinance mortgage loans by misrepresenting the
28 benefits of doing so or by misrepresenting or obfuscating the fact that in doing so

1    borrower will incur a prepayment penalty as described in paragraphs 110 through 115.

2        g.  Making loans and extending HELOCs without regard to whether borrowers

3    would be able to afford monthly payments on those loans or HELOGs after the

4    expiration of the initial interest rate on the loans or the draw periods on the HELOGs as

5    described in paragraphs 56 through .

6        h.  Aiding and abetting the breach of fiduciary duty owed by mortgage brokers to

7    California borrowers, as described in paragraphs 121 through 126

8        I.  Failing to provide borrowers with documents sufficient to inform them of their

9    payment obligations with respect to fully drawn HELOGs as described in paragraphs

10   91 to 96.

11       j.  Paying compensation to mortgage brokers that was not reasonably related to

12   the value of the brokerage services they performed, as described in paragraphs

13   121 to 126.

14       k.  Violating section 17500 of the Business and Professions Code as described

15   in the First Cause of Action, above.

16

17

18

19

20

21

22   //

23

24

25

26

27

28

1    **PRAYER FOR RELIEF FOR ALL CAUSES OF ACTION**

2    1. For certification of this action as a plaintiff class action as set forth hereinabove.

3    2. For an award of compensatory damages in an amount not less than

4    5,000,000.00 or  according to proof at trial.

5    3. For punitive damages in an amount not less than 5,000,000.00 or an amount

6    sufficient to deter, punish and make an example of defendants according to proof at

7    trial.

8    4. For an order requiring defendant to make restitution of all revenues, earning,

9    compensation and benefits obtained as a result of its wrongful conduct.

10   5. For an award of costs and attorneys' fees as permitted by law as California

11   Code of Civil Procedure 1021.5.

12   6. For such other and further relief as the Court deems just and proper.

13

14

15

16   Dated: 7/1 , 2008

17                                    JOSEPH J REGO
                                      ATTORNEY FOR PLAINTIFFS
18

19

20

21

22

23

24

25

26

27

28

1

## VERIFICATION

2     I, Plaintiff ROY V HURSH, an Individual , am the Plaintiff in this action. I have read the
foregoing Complaint and know the contents thereof. The same is true of my own

3     knowledge, except as to those matters that are therein stated on information and belief,
and as to those matters, I believe them to be true.

4

      I declare under penalty of perjury under the laws of the State of California that the

5     foregoing is true and correct.

6

Date: June 30, 2008                    By: _____

7                                            Plaintiff ROY V HURSH, an Individual

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# SUMMONS
## (CITACION JUDICIAL)

**SUM-100**

**NOTICE TO DEFENDANT:**
*(AVISO AL DEMANDADO):*
COUNTRYWIDE FINANCIAL CORPORATION, a Delaware
corporation; COUNTRYWIDE HOME LOANS, INC., a New York
Corporation; FULL SPECTRUM LENDING, INC., a
California Corporation; ANGELO MOZILO, an individual;
DAVID SAMBOL, an individual; and DOES 1-100,
inclusive,

**YOU ARE BEING SUED BY PLAINTIFF:**
*(LO ESTÁ DEMANDANDO EL DEMANDANTE):*
ROY V HURSH, an individual

FOR COURT USE ONLY
*(SOLO PARA USO DE LA CORTE)*

2008 JUL -2  A  9: 15

---

You have 30 CALENDAR DAYS after this summons and legal papers are served on you to file a written response at this court and have a copy served on the plaintiff. A letter or phone call will not protect you. Your written response must be in proper legal form if you want the court to hear your case. There may be a court form that you can use for your response. You can find these court forms and more information at the California Courts Online Self-Help Center (www.courtinfo.ca.gov/selfhelp), your county law library, or the courthouse nearest you. If you cannot pay the filing fee, ask the court clerk for a fee waiver form. If you do not file your response on time, you may lose the case by default, and your wages, money, and property may be taken without further warning from the court.

There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may want to call an attorney referral service. If you cannot afford an attorney, you may be eligible for free legal services from a nonprofit legal services program. You can locate these nonprofit groups at the California Legal Services Web site (www.lawhelpcalifornia.org), the California Courts Online Self-Help Center (www.courtinfo.ca.gov/selfhelp), or by contacting your local court or county bar association.

*Tiene 30 DÍAS DE CALENDARIO después de que le entreguen esta citación y papeles legales para presentar una respuesta por escrito en esta corte y hacer que se entregue una copia al demandante. Una carta o una llamada telefónica no lo protegen. Su respuesta por escrito tiene que estar en formato legal correcto si desea que procesen su caso en la corte. Es posible que haya un formulario que usted pueda usar para su respuesta. Puede encontrar estos formularios de la corte y más información en el Centro de Ayuda de las Cortes de California (www.courtinfo.ca.gov/selfhelp/espanol), en la biblioteca de leyes de su condado o en la corte que le quede más cerca. Si no puede pagar la cuota de presentación, pida al secretario de la corte que le dé un formulario de exención de pago de cuotas. Si no presenta su respuesta a tiempo, puede perder el caso por incumplimiento y la corte le podrá quitar su sueldo, dinero y bienes sin más advertencia.*

*Hay otros requisitos legales. Es recomendable que llame a un abogado inmediatamente. Si no conoce a un abogado, puede llamar a un servicio de remisión a abogados. Si no puede pagar a un abogado, es posible que cumpla con los requisitos para obtener servicios legales gratuitos de un programa de servicios legales sin fines de lucro. Puede encontrar estos grupos sin fines de lucro en el sitio web de California Legal Services, (www.lawhelpcalifornia.org), en el Centro de Ayuda de las Cortes de California, (www.courtinfo.ca.gov/selfhelp/espanol) o poniéndose en contacto con la corte o el colegio de abogados locales.*

---

The name and address of the court is:
*(El nombre y dirección de la corte es):*
SUPERIOR COURT OF CALIFORNIA
330 W. BROADWAY
SAN DIEGO, CA 92101

CASE NUMBER:
*(Número del Caso):*
**37-2008-00086826-CU-OR-CTL**

The name, address, and telephone number of plaintiff's attorney, or plaintiff without an attorney, is:
*(El nombre, la dirección y el número de teléfono del abogado del demandante, o del demandante que no tiene abogado, es):*
JOSEPH J REGO          SBN163183          619-293-0310
4019 PARK BOULEVARD
SAN DIEGO, CA 92103

DATE: JUL - 2 2008          Clerk, by _____ RUSSELL TAYLOR _____, Deputy
*(Fecha)*          *(Secretario)*          *(Adjunto)*

(For proof of service of this summons, use Proof of Service of Summons (form POS-010).)
*(Para prueba de entrega de esta citación use el formulario Proof of Service of Summons, (POS-010)).*

[SEAL]

**NOTICE TO THE PERSON SERVED:** You are served
1. ☐ as an individual defendant.
2. ☐ as the person sued under the fictitious name of *(specify):*

3. ☐ on behalf of *(specify):*

   under: ☐ CCP 416.10 (corporation)          ☐ CCP 416.60 (minor)
          ☐ CCP 416.20 (defunct corporation)          ☐ CCP 416.70 (conservatee)
          ☐ CCP 416.40 (association or partnership)          ☐ CCP 416.90 (authorized person)
          ☐ other *(specify):*
4. ☐ by personal delivery on *(date):*

Page 1 of 1

Form Adopted for Mandatory Use
Judicial Council of California
SUM-100 [Rev. January 1, 2004]

**SUMMONS**



Code of Civil Procedure §§ 412.20, 465

CM-010

| ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name, State Bar number, and address):* | FOR COURT USE ONLY |
|---|---|

JOSEPH REGO    SBN163183
4019 PARK BOULEVARD
SAN DIEGO, CA 92103

TELEPHONE NO.: 619-293-0310    FAX NO.: 619-293-0940
ATTORNEY FOR *(Name):* PLAINTIFF

CIVIL BUS... OFFICE 9

2008 JUL -2  A  9: 15

CLE... ...COURT
SA... ...TY, CA

SUPERIOR COURT OF CALIFORNIA, COUNTY OF  SAN DIEGO
STREET ADDRESS: 330 W. BROADWAY
MAILING ADDRESS:
CITY AND ZIP CODE: SAN DIEGO, CA 92101
BRANCH NAME:

CASE NAME:
HURSH V. COUNTRYWIDE, ET AL

| CIVIL CASE COVER SHEET | | Complex Case Designation | | CASE NUMBER: |
|---|---|---|---|---|
| ☑ Unlimited (Amount demanded exceeds $25,000) | ☐ Limited (Amount demanded is $25,000 or less) | ☐ Counter  ☐ Joinder  Filed with first appearance by defendant (Cal. Rules of Court, rule 3.402) | | 37-2008-00086826-CU-OR-CTL |
| | | | | JUDGE: |
| | | | | DEPT: |

*Items 1–6 below must be completed (see instructions on page 2).*

1. Check **one** box below for the case type that best describes this case:

**Auto Tort**
☐ Auto (22)
☐ Uninsured motorist (46)
**Other PI/PD/WD (Personal Injury/Property Damage/Wrongful Death) Tort**
☐ Asbestos (04)
☐ Product liability (24)
☐ Medical malpractice (45)
☐ Other PI/PD/WD (23)
**Non-PI/PD/WD (Other) Tort**
☐ Business tort/unfair business practice (07)
☐ Civil rights (08)
☐ Defamation (13)
☐ Fraud (16)
☐ Intellectual property (19)
☐ Professional negligence (25)
☐ Other non-PI/PD/WD tort (35)
**Employment**
☐ Wrongful termination (36)
☐ Other employment (15)

**Contract**
☐ Breach of contract/warranty (06)
☐ Rule 3.740 collections (09)
☐ Other collections (09)
☐ Insurance coverage (18)
☐ Other contract (37)
**Real Property**
☐ Eminent domain/Inverse condemnation (14)
☐ Wrongful eviction (33)
☐ Other real property (26)
**Unlawful Detainer**
☐ Commercial (31)
☐ Residential (32)
☐ Drugs (38)
**Judicial Review**
☐ Asset forfeiture (05)
☐ Petition re: arbitration award (11)
☐ Writ of mandate (02)
☐ Other judicial review (39)

**Provisionally Complex Civil Litigation (Cal. Rules of Court, rules 3.400–3.403)**
☐ Antitrust/Trade regulation (03)
☐ Construction defect (10)
☐ Mass tort (40)
☐ Securities litigation (28)
☐ Environmental/Toxic tort (30)
☐ Insurance coverage claims arising from the above listed provisionally complex case types (41)
**Enforcement of Judgment**
☐ Enforcement of judgment (20)
**Miscellaneous Civil Complaint**
☐ RICO (27)
☐ Other complaint *(not specified above)* (42)
**Miscellaneous Civil Petition**
☐ Partnership and corporate governance (21)
☐ Other petition *(not specified above)* (43)

2. This case ☑ is  ☑ is not  complex under rule 3.400 of the California Rules of Court. If the case is complex, mark the factors requiring exceptional judicial management:
   a. ☑ Large number of separately represented parties
   b. ☑ Extensive motion practice raising difficult or novel issues that will be time-consuming to resolve
   c. ☑ Substantial amount of documentary evidence
   d. ☑ Large number of witnesses
   e. ☑ Coordination with related actions pending in one or more courts in other counties, states, or countries, or in a federal court
   f. ☑ Substantial postjudgment judicial supervision

3. Remedies sought *(check all that apply):* a. ☑ monetary  b. ☐ nonmonetary; declaratory or injunctive relief  c. ☑ punitive
4. Number of causes of action *(specify):* 2
5. This case ☑ is  ☐ is not  a class action suit.
6. If there are any known related cases, file and serve a notice of related case. *(You may use form CM-015.)*

Date: 7/1/08
JOSEPH REGO
_____
(TYPE OR PRINT NAME)

▶ _____
(SIGNATURE OF PARTY OR ATTORNEY FOR PARTY)

**NOTICE**
- Plaintiff must file this cover sheet with the first paper filed in the action or proceeding (except small claims cases or cases filed under the Probate Code, Family Code, or Welfare and Institutions Code). (Cal. Rules of Court, rule 3.220.) Failure to file may result in sanctions.
- File this cover sheet in addition to any cover sheet required by local court rule.
- If this case is complex under rule 3.400 et seq. of the California Rules of Court, you must serve a copy of this cover sheet on all other parties to the action or proceeding.
- Unless this is a collections case under rule 3.740 or a complex case, this cover sheet will be used for statistical purposes only.

Page 1 of 2

| Form Adopted for Mandatory Use Judicial Council of California CM-010 [Rev. July 1, 2007] | **CIVIL CASE COVER SHEET** | Cal. Rules of Court, rules 2.30, 3.220, 3.400–3.403, 3.740; Cal. Standards of Judicial Administration, std. 3.10 www.courtinfo.ca.gov |
|---|---|---|
| | | American LegalNet, Inc. www.FormsWorkflow.com |

CM-010

## INSTRUCTIONS ON HOW TO COMPLETE THE COVER SHEET

**To Plaintiffs and Others Filing First Papers.** If you are filing a first paper (for example, a complaint) in a civil case, you **must** complete and file, along with your first paper, the *Civil Case Cover Sheet* contained on page 1. This information will be used to compile statistics about the types and numbers of cases filed. You must complete items 1 through 6 on the sheet. In item 1, you must check **one** box for the case type that best describes the case. If the case fits both a general and a more specific type of case listed in item 1, check the more specific one. If the case has multiple causes of action, check the box that best indicates the **primary** cause of action. To assist you in completing the sheet, examples of the cases that belong under each case type in item 1 are provided below. A cover sheet must be filed only with your initial paper. Failure to file a cover sheet with the first paper filed in a civil case may subject a party, its counsel, or both to sanctions under rules 2.30 and 3.220 of the California Rules of Court.

**To Parties in Rule 3.740 Collections Cases.** A "collections case" under rule 3.740 is defined as an action for recovery of money owed in a sum stated to be certain that is not more than $25,000, exclusive of interest and attorney's fees, arising from a transaction in which property, services, or money was acquired on credit. A collections case does not include an action seeking the following: (1) tort damages, (2) punitive damages, (3) recovery of real property, (4) recovery of personal property, or (5) a prejudgment writ of attachment. The identification of a case as a rule 3.740 collections case on this form means that it will be exempt from the general time-for-service requirements and case management rules, unless a defendant files a responsive pleading. A rule 3.740 collections case will be subject to the requirements for service and obtaining a judgment in rule 3.740.

**To Parties in Complex Cases.** In complex cases only, parties must also use the *Civil Case Cover Sheet* to designate whether the case is complex. If a plaintiff believes the case is complex under rule 3.400 of the California Rules of Court, this must be indicated by completing the appropriate boxes in items 1 and 2. If a plaintiff designates a case as complex, the cover sheet must be served with the complaint on all parties to the action. A defendant may file and serve no later than the time of its first appearance a joinder in the plaintiff's designation, a counter-designation that the case is not complex, or, if the plaintiff has made no designation, a designation that the case is complex.

### CASE TYPES AND EXAMPLES

**Auto Tort**
  Auto (22)—Personal Injury/Property
    Damage/Wrongful Death
  Uninsured Motorist (46) *(if the
    case involves an uninsured
    motorist claim subject to
    arbitration, check this item
    instead of Auto)*

**Other PI/PD/WD (Personal Injury/
Property Damage/Wrongful Death)
Tort**
  Asbestos (04)
    Asbestos Property Damage
    Asbestos Personal Injury/
      Wrongful Death
  Product Liability *(not asbestos or
    toxic/environmental)* (24)
  Medical Malpractice (45)
    Medical Malpractice–
      Physicians & Surgeons
    Other Professional Health Care
      Malpractice
  Other PI/PD/WD (23)
    Premises Liability (e.g., slip
      and fall)
    Intentional Bodily Injury/PD/WD
      (e.g., assault, vandalism)
    Intentional Infliction of
      Emotional Distress
    Negligent Infliction of
      Emotional Distress
    Other PI/PD/WD

**Non-PI/PD/WD (Other) Tort**
  Business Tort/Unfair Business
    Practice (07)
  Civil Rights (e.g., discrimination,
    false arrest) *(not civil
    harassment)* (08)
  Defamation (e.g., slander, libel)
    (13)
  Fraud (16)
  Intellectual Property (19)
  Professional Negligence (25)
    Legal Malpractice
    Other Professional Malpractice
      *(not medical or legal)*
  Other Non-PI/PD/WD Tort (35)

**Employment**
  Wrongful Termination (36)
  Other Employment (15)

**Contract**
  Breach of Contract/Warranty (06)
    Breach of Rental/Lease
      Contract *(not unlawful detainer
      or wrongful eviction)*
    Contract/Warranty Breach–Seller
      Plaintiff *(not fraud or negligence)*
    Negligent Breach of Contract/
      Warranty
    Other Breach of Contract/Warranty
  Collections (e.g., money owed, open
    book accounts) (09)
    Collection Case–Seller Plaintiff
    Other Promissory Note/Collections
      Case
  Insurance Coverage *(not provisionally
    complex)* (18)
    Auto Subrogation
    Other Coverage
  Other Contract (37)
    Contractual Fraud
    Other Contract Dispute

**Real Property**
  Eminent Domain/Inverse
    Condemnation (14)
  Wrongful Eviction (33)
  Other Real Property (e.g., quiet title) (26)
    Writ of Possession of Real Property
    Mortgage Foreclosure
    Quiet Title
    Other Real Property *(not eminent
      domain, landlord/tenant, or
      foreclosure)*

**Unlawful Detainer**
  Commercial (31)
  Residential (32)
  Drugs (38) *(if the case involves illegal
    drugs, check this item; otherwise,
    report as Commercial or Residential)*

**Judicial Review**
  Asset Forfeiture (05)
  Petition Re: Arbitration Award (11)
  Writ of Mandate (02)
    Writ–Administrative Mandamus
    Writ–Mandamus on Limited Court
      Case Matter
    Writ–Other Limited Court Case
      Review
  Other Judicial Review (39)
    Review of Health Officer Order
    Notice of Appeal–Labor
      Commissioner Appeals

**Provisionally Complex Civil Litigation (Cal.
Rules of Court Rules 3.400–3.403)**
  Antitrust/Trade Regulation (03)
  Construction Defect (10)
  Claims Involving Mass Tort (40)
  Securities Litigation (28)
  Environmental/Toxic Tort (30)
  Insurance Coverage Claims
    *(arising from provisionally complex
    case type listed above)* (41)

**Enforcement of Judgment**
  Enforcement of Judgment (20)
    Abstract of Judgment (Out of
      County)
    Confession of Judgment *(non-
      domestic relations)*
    Sister State Judgment
    Administrative Agency Award
      *(not unpaid taxes)*
    Petition/Certification of Entry of
      Judgment on Unpaid Taxes
    Other Enforcement of Judgment
      Case

**Miscellaneous Civil Complaint**
  RICO (27)
  Other Complaint *(not specified
    above)* (42)
    Declaratory Relief Only
    Injunctive Relief Only *(non-
      harassment)*
    Mechanics Lien
    Other Commercial Complaint
      Case *(non-tort/non-complex)*
    Other Civil Complaint
      *(non-tort/non-complex)*

**Miscellaneous Civil Petition**
  Partnership and Corporate
    Governance (21)
  Other Petition *(not specified
    above)* (43)
    Civil Harassment
    Workplace Violence
    Elder/Dependent Adult
      Abuse
    Election Contest
    Petition for Name Change
    Petition for Relief From Late
      Claim
    Other Civil Petition

# EXHIBIT 5

1  Christopher Kim (Bar No. 082080)
   George Busu (Bar No. 235993)
2  **LIM RUGER & KIM, LLP**
3  1055 West Seventh Street, Suite 2800
   Los Angeles, California 90017
4  Telephone: (213) 955-9500
5  Facsimile: (213) 955-9511
   email: christopher.kim@lrklawyers.com
6          george.busu@lrklawyers.com

**ORIGINAL**

7
   *Add'l counsel listed on signature page*
8

9          **UNITED STATES DISTRICT COURT**

10         **CENTRAL DISTRICT OF CALIFORNIA**

11              **WESTERN DIVISION**

12                  S A C V 0 8 - **787** DOC   MLGx

SYMONE LEYVAS, JOHN          )  No. _____
13  LEYVAS and JUNE HARDING     )
14  BROWN, on behalf of themselves )  **CLASS ACTION COMPLAINT**
    and all others similarly situated, )
15                              )  **[JURY TRIAL DEMANDED]**
16      Plaintiffs,             )
                                )
17  v.                          )
                                )
18                              )
    BANK OF AMERICA CORP.,      )
19  COUNTRYWIDE FINANCIAL       )
20  CORP., COUNTRYWIDE HOME     )
    LOANS, INC., COUNTRYWIDE    )
21  BANK, FSB, FULL SPECTRUM    )
    LENDING, INC. and DOES 1-10 )
22  inclusive,                  )
23                              )
24      Defendants.             )
                                )
25                              )

26

27

28

1    Plaintiffs Symone Leyvas, John Leyvas and June Harding Brown
2  ("Plaintiffs"), on behalf of themselves and a class of all others similarly situated,
3  allege as follows:

## INTRODUCTION

4

5    1.    Defendants Countrywide Financial Corp., Countrywide Bank, FSB,
6  Full Spectrum Lending, Inc. and Bank of America Corp. (collectively
7  "Countrywide") are home mortgage lenders who have engaged in unfair
8  competition and false advertising in the origination of residential mortgage loans
9  and home equity lines of credit ("HELOCs").

10    2.    Home ownership is a key component of the American dream.
11  Capitalizing on this, Countrywide has routinely and consistently employed
12  deceptive marketing practices and steered consumers into risky and costly home
13  loans.

14    3.    As a result, many consumers are now suffering under the immense
15  weight of unsuitable, over-priced mortgage loans.

16    4.    This is a proposed national class action brought by Plaintiffs on behalf
17  of themselves and a class of all other similarly situated borrowers who have
18  suffered from Countrywide's deceptive, unfair and unlawful business practices.

19    5.    Plaintiffs seek both monetary and injunctive relief for themselves and
20  all other members of the Class.

## JURISDICTION AND VENUE

21

22    6.    This Court has jurisdiction over Plaintiffs' claims pursuant to 28
23  U.S.C. § 1332(d) because this is a Class action in which: (1) there are 100 or more
24  members in the proposed Class; (2) many Plaintiffs and Class members have a
25  different citizenship from the Defendants; and (3) the claims of the proposed Class
26  members exceed $5,000,000 in the aggregate.

27

28

- 2 -
CLASS ACTION COMPLAINT

7.    Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b), as Defendants reside in this district and a substantial part of the events or omissions giving rise to the claims occurred in this district.

## THE PARTIES

**Plaintiffs**

Symone and John Leyvas

8.    Plaintiffs Symone and John Leyvas ("Mr. and Mrs. Leyvas") has been harmed by Defendants' unlawful conduct. Mr. and Mrs. Leyvas obtained a home loan from Countrywide on or about August 31, 2007.

9.    In July of 2007, Mr. and Mrs. Leyvas began looking to refinance their then-existing mortgage, seeking to lower their debts and lower their existing interest rate (about 9%) and get $15,000 cash out.

10.    Mr. and Mrs. Leyvas were told by their broker that Countrywide would provide them with a 30-year fixed rate loan, with an interest rate between 7% and 8.5%.

11.    At closing, Mr. and Mrs. Leyvas were confused and surprised by their loan terms. First, the amount of the cash-out that they had been promised had been lowered. Second, they were presented with conflicting amortization schedules—both for 40-year terms and depicting different amounts. Third, they learned that the loan was actually a hybrid ARM with an initial rate of 10.25%. Fourth, there were several copies of disclosure statements representing different interest rates, closing costs, etc.

12.    At the closing, Mr. and Mrs. Leyvas were instructed to sign multiple copies of the same disclosure documents, indicating different terms and different dates. At closing, upon information and belief, Mr. and Mrs. Leyvas were instructed to backdate certain disclosure documents with respect to their loan. For example, some of their disclosure documents indicate that they were prepared on

1   computer-generated date of August 15, 2007, yet were signed and "dated" August
2   13, 2007.

3       13.    They did not receive copies of all of the signed documents.

4       14.    Further, according to Mr. and Mrs. Leyvas, their income had been
5   falsified.

6       15.    Countrywide paid Mr. and Mrs. Leyvas' broker a fee of $5,130.00
7   (the broker had already charged them a $645 "application fee").

8       16.    Recently, Mr. and Mrs. Leyvas have been contacted by Countrywide
9   on numerous occasions, with generalized solicitations to refinance with
10  Countrywide and, essentially, reward the Company with additional revenue.  As
11  Countrywide knows, Mr. and Mrs. Leyvas' loan is saddled with a prepayment
12  penalty, increasing their costs of refinancing within the first three years following
13  closing.

14      17.    Mr. and Mrs. Leyvas have been harmed by the conduct alleged herein
15  and seek redress for themselves and the members of the proposed Class.

16  June Harding Brown

17      18.    Plaintiff June Harding Brown ("Brown") has also been harmed by
18  Defendants' unlawful conduct.  Plaintiff Brown, a senior citizen, obtained a home
19  loan from Countrywide on or about August 17, 2007, secured by her residence
20  located at 7913 Pompey Place, Philadelphia, PA.

21      19.    At the time of her loan, Plaintiff Brown had a good credit score, but
22  was on a fixed income.  Accordingly, she was seeking to lower her monthly
23  payments.

24      20.    According to Plaintiff Brown, the broker with whom she dealt
25  promised to save her money.  However, following the closing, she was surprised to
26  find that, if she made only the payment that she was promised would save her
27  money, she would suffer negative amortization.  Thus, Plaintiff Brown suddenly
28

- 4 -
CLASS ACTION COMPLAINT

1  found herself having to *increase* her monthly payment in order to avoid negative
2  amortization.

3      21.   Plaintiff Brown was placed into a pay option ARM, one of the most
4  risky, harmful loans that Countrywide offered.  Under the terms of her loan, she
5  has four options each month, with respect to her payment, one of which is to make
6  a minimum monthly payment calculated according to a rate significantly lower
7  than the actual loan rate.  According to Plaintiff Brown, prior to closing, no one
8  explained to her that this would cause negative amortization.  However, paying
9  only the "minimum payment"—used to lure her into the loan—would cause
10 Plaintiff Brown to owe approximately $14,000 more than she borrowed, after five
11 years.

12     22.   According to Plaintiff Brown, when she questioned the possible
13 increase in her payment, her broker told her "not to worry about it" and that she
14 should focus only upon the minimum monthly payment.  Subsequent to closing,
15 once she discovered the negative amortization feature, Plaintiff Brown called
16 Countrywide to complain about her loan.  The representative with whom she spoke
17 admitted that she should never have been placed into this loan product, and
18 informed her that she must pay a higher amount each month, based upon a 30-yr
19 amortization schedule and including both principal and interest, in order to avoid
20 negative amortization.

21     23.   To make matters worse, Plaintiff Brown did not even receive a low
22 initial rate for her pay option ARM.  Plaintiff Brown's initial interest rate under her
23 pay option ARM was 9.750%--higher than the rate of the prior loan that she was
24 refinancing.  Outside of closing, Countrywide paid Plaintiff Brown's broker a yield
25 spread premium of $3,240.00.

26

27

28

CLASS ACTION COMPLAINT

24.    Recently, Plaintiff Brown has been contacted by Countrywide on numerous occasions, with generalized solicitations to refinance with Countrywide and, essentially, reward the Company with additional revenue.

25.    As Countrywide knows, Plaintiff Brown's loan is saddled with a prepayment penalty, increasing her costs of refinancing within the first three years following closing.

26.    Plaintiff Brown has been harmed by the conduct alleged herein and seeks redress for herself and the members of the proposed Class.

**Defendants**

27.    Defendant Bank of America Corp. is a Delaware corporation, with its corporate headquarters located in Charlotte, North Carolina.  On July 1, 2008, Bank of America Corp. acquired Countrywide and, accordingly, is Countrywide's successor-in-interest.

28.    Prior to the merger with Bank of America Corp., Defendant Countrywide Financial Corp. was a publicly traded corporation, duly formed and existing under the laws of the State of Delaware. Countrywide's corporate headquarters is located in Calabasas, California.

29.    During the Class Period, Defendant Countrywide Home Loans, Inc. was Countrywide's flagship subsidiary and provided home loans nationwide. Countrywide Home Loans is a New York corporation with its corporate headquarters in Calabasas, California.

30.    Defendant Countrywide Bank, FSB ("Countrywide Bank") is a federally chartered savings bank, headquartered in Thousand Oaks, California. Countrywide Bank funds loans originated by the Company's home loan division.

31.    Defendant Full Spectrum Lending, Inc. ("Full Spectrum"), a division of Countrywide, originated subprime mortgage loans during the relevant time period. Full Spectrum is headquartered in Calabasas, California.

1    32.    At all times herein mentioned, Defendants, both individually and
2  collectively, including affiliates not herein named, are and were agents or joint
3  venturers of each of the other Defendants, and in doing the acts alleged herein were
4  acting within the course and scope of such agency.  Each Defendant had actual
5  and/or constructive knowledge of the acts of each of the other Defendants, and
6  ratified, approved, joined in, acquiesced in, and/or authorized the wrongful acts of
7  each co-Defendant, and/or retained the benefits of said wrongful acts.

8    33.    The actions of each of the Defendants were controlled by, *inter alia*, a
9  program of centralized policy-making, policy software, dissemination, and
10  training, as well as the implementation of centralized decision-making and policy
11  control by and through Countrywide's overlapping officers/corporate-subsidiary
12  oversight and/or by a process of policy dissemination.

13                          **CLASS ACTION ALLEGATIONS**

14    34.    Plaintiffs bring this action on their own behalf and, pursuant to the
15  provisions of Fed. R. Civ. P. 23(a), (b)(2), and/or (b)(3) of the Federal Rules of
16  Civil Procedure, on behalf of a nationwide class of all others similarly situated (the
17  "Class"), defined as:

18              All persons in the United States who, at any time
19              between July 17, 2004 and July 1, 2008[1], obtained at
20              least one residential mortgage loan from Countrywide
21              and were subject to any of the unlawful lending practices
22              described herein, including unfair, misleading and/or
23              deceptive solicitation practices, excessive fees, unfair,
24              abusive or undisclosed loan terms and deceptive steering.

25
26

27  [1] Defendant Bank of America Corp. has stated that, following its July 1, 2008 acquisition of Countrywide, it will
    discontinue many of Countrywide's predatory lending practices. *See e.g.*
28  *http://newsroom.bankofamerica.com/index.php?s=press_releases&item=8202*

35. Such practices include any representations, misrepresentations, omissions, disclosures or any other acts, events, facts, transactions, occurrences, or conduct, whether oral, written or otherwise, by Countrywide, including its employees or agents, arising out of, or relating to any of the following:

    (a)    loan types and terms;

    (b)    interest rates;

    (c)    disclosures, including both oral and written disclosures; prepayment penalties; and

    (d)    material changes in terms that have the effect of increasing the payment obligations of the borrower.

36. The members of the Class are so numerous and geographically dispersed across the country that joinder of all members is impracticable. While the exact number of Class members is unknown to the Plaintiffs at this time, Plaintiffs believe that there are at least tens of thousands of Class members. Detailed information on the Class can be ascertained through appropriate discovery and from records maintained by Countrywide.

37. Plaintiffs' claims are typical of the claims of the members of the Class, as Plaintiffs and all other members of the Class sustained damages arising out of the same pattern of wrongful conduct by Countrywide. All of the conduct alleged herein occurred by virtue of the Company's centralized business practices or stemmed from policies and procedures that originated from and/or were controlled by Countrywide.

38. Plaintiffs will fairly and adequately represent and protect the interests of the members of the Class and have retained counsel competent and experienced in Class action and consumer litigation.

39.    Common questions of law and fact exist as to all members of the Class and predominate over any questions affecting solely individual class members. Among these common questions of law and fact common are:

(a)    Whether Countrywide has been or is engaged in a false, misleading and/or deceptive marketing practices;

(b)    Whether Countrywide has steered borrowers toward unsuitable, over-priced and risky loan products, including pay option ARMs and hybrid ARMs;

(c)    Whether Countrywide has incentivized and/or encouraged its employees and brokers to increase loan volume, regardless of the borrowers' ability to pay;

(d)    Whether Countrywide's solicitations were unfair, misleading, unconscionable, deceptive, untrue, misleading, or omitted material facts and disclosures;

(e)    Whether Countrywide has been or is engaged in unfair and unlawful business practices, and whether the alleged conduct violated the California Business and Professions Code and the California Consumer Legal Remedies Act; and

(f)    Whether the Plaintiffs and the Class are entitled to relief, and if so, the measure of such relief.

40.    A class action is superior to other available methods for the fair and efficient adjudication of Countrywide's uniform unlawful practices because joinder of all members is impracticable.  Prosecution of separate actions by individual Class members would create an inherent risk of inconsistent and varying adjudications, with the concomitant risk of the establishment of incompatible and conflicting standards of conduct for Countrywide.

- 9 -
CLASS ACTION COMPLAINT

41.   In addition, due to the vastly unequal market power between the parties, and the fact that many Class members are in ongoing commercial relationships with Countrywide, a Class action may be the only way, as a practical matter, that the cases can and should be prosecuted.   Plaintiffs foresee no significant difficulties in managing this action as a Class action.

## FACTUAL ALLEGATIONS

### I.   Countrywide's Mortgage Lending Operations

42.   On July 1, 2008, Countrywide was acquired by Bank of America Corp.

43.   Prior to July 1, 2008, Countrywide was one of the nation's largest residential mortgage lenders, with over hundreds of billions of dollars in loan production each year and a residential mortgage servicing portfolio in excess of $1 trillion.  Its mortgage lending segment operated in a variety of sectors, including retail, wholesale and correspondent lending.

44.   In addition to over 15,000 field salespersons pursuing customer leads and originating home loans, Countrywide sourced loans through a network of over 30,000 mortgage brokers.

45.   According to its 2007 Form 10-K annual report, Countrywide's retail channel consisted of its Consumer Markets Division and the Full Spectrum Lending Division.  The Company's Consumer Markets Division CMD generally originated loans through relationships with existing consumers, builders and realtors and through the Company's joint ventures.  The Company reached customers through call centers, the internet, retail branches,

46.   The Company's Full Spectrum Lending Division focused on new customer acquisitions through internet, direct mail and mass media marketing channels and specialized in refinance and home equity products.

CLASS ACTION COMPLAINT

47.    Countrywide's wholesale lending channel underwrote and funded mortgage loans sourced by mortgage loan brokers and other financial intermediaries.

## II.    Countrywide's Sole Concern Was With Increasing its Volume of Loans – at any Cost

48.    Countrywide sold the majority of its mortgage loans into the secondary market, in the form of securities.

49.    With mortgage-backed securities, essentially, mortgage loans are purchased from banks, mortgage companies, and other originators and then assembled into pools and transferred to a trust controlled by the securitizer, such as Countrywide.    The entity then issues securities that represent claims on the principal and interest payments made by borrowers on the loans in the pool, a process known as securitization.  Holders of the securities received the right to a portion of the monthly payment stream from the pooled loans, typically in the form of a portion of the monthly payments.  Rather, the holders received some portion of the monthly payments.

50.    For the sale of whole (*i.e.*, unsecuritized) loans, Countrywide pooled loans and sold them in bulk to third-party investors, often (but not exclusively) Wall Street firms.  The sale of whole loans generated additional revenues for Countrywide.  Countrywide often sold the whole loans at a premium, meaning that the purchaser paid Countrywide a price in excess of 100% of the total principal amount of the loans included in the loan pool.

51.    As the State of the California noted, the price paid by purchasers of securities or pools of whole loans varied based on the demand for the particular types of loans included in the securitization or sale of whole loans.    The characteristics of the loans, such as whether the loans are prime or subprime,

CLASS ACTION COMPLAINT

1    whether the loans have an adjustable or fixed interest rate, or whether the loans
2    include a prepayment penalty, all influenced the price.

3        52.    Further, various types of loans and loan terms earned greater prices, or
4    "premiums," in the secondary market.  For instance, investors in mortgages and
5    mortgage-backed securities have been willing to pay higher premiums for loans
6    with prepayment penalties.  Essentially, prepayment penalties are designed to
7    deter borrowers from refinancing early in the life of a loan.  Thus, prepayment
8    penalties provide investors with assurance that the income stream from the loans
9    will likely continue while the penalty is in effect.  Countrywide typically sought
10   to market to its customers loans that earned it higher premiums, including loans
11   with prepayment penalties.

12       53.    In order to maximize the profits earned by the sale of its loans to the
13   secondary market, Countrywide's business model increasingly focused on finding
14   ways to generate an ever larger volume of the types of loans most demanded by
15   investors.  For example, Countrywide developed and modified loan products by
16   discussing with investors the prices they would be willing to pay for loans with
17   particular characteristics (or for securities backed by loans with particular
18   characteristics), and this enabled Countrywide to determine which loans were
19   most likely to be sold on the secondary market for the highest premiums.

20       54.    The California investigation also showed that, rather than waiting to
21   sell loans until after they were made, Countrywide would sell loans "forward"
22   before loans were funded.  In order to determine what loans it could sell forward,
23   Countrywide would both examine loans in various stages of production and
24   examine its projected volume of production over the next several months.

25       55.    Loans that were sold forward were sold subject to a set of stipulations
26   between Countrywide and the purchaser.  For example, in a sale of whole loans,
27   Countrywide might agree on October 1 that on December 1 it would deliver 2000

28

- 12 -
CLASS ACTION COMPLAINT

1  adjustable rate mortgage loans with an average interest rate of 6.0%, half of
2  which would be subject to a prepayment penalty, among other characteristics.
3  (None of these loans would have been made as of October 1.)  Based on these
4  stipulations regarding the characteristics of the loans to be included in the pool, an
5  investor might agree to pay a price totaling 102.25% of the total face value of
6  the loans.  In other words, the purchaser agreed in advance to pay a premium of
7  2.25%.  Then, if the loans actually delivered on December 1 had a slightly higher
8  or lower average interest rate, the terms of the stipulation would specify how much
9  the final price would be adjusted.

10      56.    Information regarding the premiums that particular loan products and
11  terms could earn on the secondary market would be forwarded to Countrywide's
12  production department.

13      57.    Countrywide then directly and indirectly motivated its branch
14  managers, loan officers and brokers to market the loans that would earn the
15  highest premiums on the secondary market without regard to borrower ability to
16  repay.  For example, the value on the secondary market of the loans generated by a
17  Countrywide branch was an important factor in determining the branch's
18  profitability and, in turn, branch manager compensation.  Managers were highly
19  motivated to pressure their loan officers to sell loans that would earn Countrywide
20  the highest premium on the secondary market, which resulted in aggressive
21  marketing of such loans to consumers.

22      58.    Essentially, as investors' interest in the mortgage market increased,
23  Countrywide had an increased incentive to increase its volume of loans.  To
24  increase its pipeline of mortgage-backed securities, the Company had a huge
25  financial incentive to lower its underwriting standards and make more risky loans.

26      59.    In 2004, in an effort to maximize Countrywide's profits, Defendants
27  set out to double Countrywide's share of the national mortgage market to 30%

28

CLASS ACTION COMPLAINT

through a deceptive scheme to mass produce loans for sale on the secondary market. Defendants viewed borrowers as nothing more than the means for producing more loans, originating loans with little or no regard to borrowers' long-term ability to afford them and to sustain homeownership.

60. Countrywide generated massive revenues through these loan securitizations. Its reported securities trading volume grew from $647 billion in 2000 to $3.8 trillion in 2006.

61. In its 2006 annual report, Countrywide boasted: "[w]hile the overall residential loan production market in the United States has tripled in size since 2000, from $1.0 trillion to $2.9 trillion at the end of 2006, Countrywide has grown nearly three times faster, going from $62 billion in loan originations in 2000 to $463 billion in 2006."

62. Countrywide became less concerned with borrowers' ability to repay over the long term and more concerned with its mere volume of loans over the short term. This is because the Company's profits largely depended on the quantity, rather than the quality of loans that they closed. As a result, many loans were made to borrowers that exceeded the borrowers' ability to repay.

63. Countrywide's insatiable lust for increased loan volume was also driven by a desire to boost its profits earned from servicing the mortgages it sold. Countrywide often retained the right to service the loans it securitized and sold as pools of whole loans. The terms of the securitizations and sales agreements for pools of whole loans authorized Countrywide to charge the purchasers a monthly fee for servicing the loans, typically a percentage of the payment stream on the loan.

64. Essentially, Countrywide did everything within its power to simply close as many loans as possible, so as to sell them into the secondary market. The results for consumers have been catastrophic.

III.  **Countrywide Engaged in Unfair and Deceptive Practices in Selling Risky, Unsuitable Mortgage Loans to its Customers**

65.  One of the largest players in the subprime mortgage lending market, Countrywide engaged in uniform unfair, unconscionable, deceptive and unlawful commercial practices in soliciting and closing residential mortgage transactions nationwide.

66.  Rather than serve the best interests of its customers, Countrywide engaged in numerous predatory lending practices that have harmed hundreds of thousands of homeowners across the United States.

67.  As recently described in a lawsuit against Countrywide filed by the State of California, Countrywide implemented this deceptive scheme through misleading marketing practices designed to sell risky and costly loans to homeowners, the terms and dangers of which they did not understand, including by (a) advertising that it was the nation's largest lender and could be trusted by consumers; (b) encouraging borrowers to refinance or obtain purchase money financing with complicated mortgage instruments like hybrid adjustable rate mortgages or payment option adjustable rate mortgages that were difficult for consumers to understand; (c) marketing these complex loan products to consumers by emphasizing the very low initial "teaser" or "fixed" rates while obfuscating or misrepresenting the later steep monthly payments and interest rate increases or risk of negative amortization; and (d) routinely soliciting borrowers to refinance only a few months after Countywide or the loan brokers with whom it had "business partnerships" had sold them loans.

68.  Countrywide also employed various lending policies to further its deceptive scheme and to boost its volume of loans, including (a) significantly easing its underwriting standards; (b) increasing its use of low- or no-documentation loans—including allowing for no verification of stated income or

CLASS ACTION COMPLAINT

stated assets or both, or no request for income or asset information at all; (c) encouraging borrowers to encumber their homes up to 100% (or more) of the assessed value; and (d) placing borrowers in "piggyback" second mortgages in the form of higher interest rate HELOCs, while obscuring their total monthly payment obligations.

69.    The State of California's investigation revealed that Countrywide received numerous complaints from borrowers claiming that they did not understand their loan terms.  However, despite these complaints, Defendants turned a blind eye to the ongoing deceptive practices engaged in by Countrywide's loan officers and loan broker "business partners," as well as to the hardships created for borrowers by its loose underwriting practices.  As described above, Countrywide cared only about selling increasing numbers of loans at any cost, in order to maximize its profits on the secondary market.

70.    Countrywide's tactics included the deceptive marketing of such products as the pay option ARM.  The pay option ARM is a complicated mortgage product which entices consumers by offering a very low "teaser" rate – often as low as 1% – for an introductory period of one or three months.  At the end of the introductory period, the interest rate increases dramatically.

71.    Further, despite the short duration of the low initial interest rate, Countrywide's pay option ARMs often included a one, two or three-year prepayment penalty.  As a result, the borrower was basically stuck in the loan—he or she could not, without penalty, refinance into a better, less expensive loan before expiration of the initial low interest rate period.

72.    When the teaser rate on a pay option ARM expires, the loan immediately becomes an adjustable rate loan. Unlike most adjustable rate loans, where the rate can only change once every year or every six months, the interest

1   rate on a pay option ARM can change every month (if there is a change in the
2   index used to compute the rate).

3        73.   Although the interest rate increases immediately after the expiration
4   of the short period of time during which the teaser rate is in effect, a borrower with
5   a pay option ARM has the option of making monthly payments as though the
6   interest rate had not changed.  Borrowers with pay option ARMs typically have
7   four different payment options during the first five years of the loan.  The first
8   option is a "minimum" payment that is based on the introductory interest rate.  The
9   minimum payment, which Countrywide marketed as the "payment rate," is the
10  lowest of the payment options presented to the borrower.  As Countrywide
11  undoubtedly knew, most of its pay option ARM borrowers chose to make the
12  minimum payment.

13       74.   The minimum payment on a pay option ARM usually is less than the
14  interest accruing on the loan.  The unpaid interest is added to the principal amount
15  of the loan, resulting in negative amortization.  The minimum payment remains
16  the same for one year and then increases by 7.5% each year for the next four
17  years.  At the fifth year, the payment will be "recast" to be fully amortizing,
18  causing a substantial jump in the payment amount often called "payment shock."

19       75.   However, the loan balance on a pay option ARM also has a negative
20  amortization cap, typically 115% of the original principal of the loan.  If the
21  balance hits the cap, the monthly payment is immediately raised to the fully
22  amortizing level (i.e., all payments after the date the cap is reached must be
23  sufficient to pay off the new balance over the remaining life of the loan).  When
24  that happens, the borrower experiences significant payment shock.  A borrower
25  with a Countrywide pay option ARM with a 1% teaser rate, who is making the
26  minimum payment, is very likely to hit the negative amortization cap and suffer
27  payment shock well before the standard 5-year recast date.

28

76.    Instead of making the minimum payment, the borrower also has the option of making an interest-only payment for five years.  The borrower then experiences payment shock when the payment recasts to cover both principal and interest for the remaining term of the loan.  Alternatively, the borrower can choose to make a fully amortizing principal and interest payment based on either a 15-year or a 30-year term.

77.    Products such as Countrywide's pay option ARM are among the most troublesome mortgage products in the market.  For example:

> For some borrowers, option ARMs are ticking time bombs. The loans are tempting because they give borrowers several payment choices each month, including a minimum payment that lets them pay no principal and only part of the interest normally due. When borrowers choose that option, the loan balance expands -- a phenomenon known in the mortgage trade as "negative amortization."
>
> After a specified period, often five years, borrowers must start repaying the principal and meeting the full interest payments. That can cause monthly payments to more than double. If the balance outstanding gets too high -- the ceiling generally is 110% to 125% of the original amount borrowed -- borrowers can face sharply higher payments even sooner.

James Hagerty and Ruth Simon, *Option ARMs Emerge as Home-Loan Worry*, The Wall Street Journal (April 19, 2007), *available at:* http://www.realestatejournal.com/buysell/mortgages/20070419-hagerty.html (accessed July 10, 2008).

78.    Pay option ARM mortgages are extremely problematic and have notoriously led to increased mortgage loan defaults among borrowers. *See e.g.* Kathleen Pender, *Hazards of Option ARMs*, San Francisco Chronicle, p. D-1 (June 1, 2005).

79.    During the underwriting process, Countrywide did not consider whether borrowers would be able to afford the payment shock the Company knew was almost certain to occur. Further, depending on the state of his or her finances, even the interim increases in the minimum payment may well have caused dramatic hardship for the borrower.

80.    The State of California's investigation revealed that, as of December 31, 2006, almost 88% of Countrywide's pay option ARM portfolio consisted of loans that had experienced some negative amortization. This percentage increased to 91% as of December 31, 2007.

81.    Without regard for borrowers' ability to repay, Countrywide sold thousands of pay option ARMs, either through its branches or through brokers. For example, on a national basis, approximately 19% of the loans originated by Countrywide in 2005 were pay option ARMs.

82.    While devastating to borrowers, these loans were highly profitable for Countrywide. The Company had a gross profit margin of approximately 4% on pay option ARMs, compared to 2% on mortgages guaranteed by the Federal Housing Administration.

83.    Further, Countrywide retained ownership of a number of loans for investment purposes, including thousands of pay option ARMs. Countrywide reported the negative amortization amounts on these pay option ARMs (i.e., the amount by which the balances on those loans increased) as income on its financial statements. The negative amortization "income" earned by Countrywide totaled $1.2 billion by the end of 2007.

84.   Additionally, as the California attorney general noted, pay option ARMs with higher margins could be sold for a higher premium on the secondary market, because the higher margins would produce a greater interest rate and, therefore, a larger income stream for investors.  Thus, to insure an abundant stream of such loans, Countrywide pushed its loan officers to sell pay option ARMs and paid loan brokers greater compensation for selling a pay option ARM with a higher margin, or above-par rate, thus encouraging them to put consumers into higher cost loans. Countrywide also used a variety of deceptive marketing techniques to sell its pay option ARMs to consumers.

85.   Countrywide deceptively marketed the pay option ARM by aggressively promoting the teaser rate.  Television commercials emphasized that the payment rate could be as low as 1% and print advertisements lauded the extra cash available to borrowers because of the low minimum payment on the loan. Television advertisements did not effectively distinguish between the "payment rate" and the interest rate on the loans, and any warnings about potential negative amortization in Countrywide's print advertisements were buried in densely written small type.

86.   Further, Countrywide marketed the pay option ARM to already-distressed borrowers seeking to lower their monthly mortgage payments.  Rather than adequately explain the certain negative amortization and payment shock, Countrywide would focus the borrowers' attention on the low minimum payment.

87.   Borrowers, then, enticed by the low teaser rate, were easily distracted from the fine print in the loan documents and did not fully understand the terms or the financial implications of Countrywide's pay option ARMs. Countrywide used this to its advantage.

88.   When a borrower obtained a pay option ARM from Countrywide, the only initial monthly payment amount that appeared anywhere in his or her loan

1  documents was the minimum payment amount.  In other words, documents
2  provided to the borrower assumed he or she would make only the minimum
3  payment.  Thus, a borrower would not know the monthly payment necessary to
4  make a payment that would, for example, cover accruing interest, until he or she
5  received the first statement after the expiration of the teaser rate, well after all
6  loan documents were signed.

7      89.    Countrywide and the brokers it accepted as its "business partners"
8  misrepresented or obfuscated the true terms of the pay option ARMs offered by
9  Countrywide, including, but not limited to, misrepresenting or obfuscating the
10  amount of time that the interest rate would be fixed for the loan, misrepresenting
11  or obfuscating the risk of negative amortization and the fact that the payment rate
12  was not the interest rate, and misrepresenting or obfuscating that the minimum
13  payment would not apply for the life of the loan.

14      90.    Countrywide and its business partner brokers also misrepresented or
15  obfuscated how difficult it might be for borrowers to refinance a pay option ARM
16  loan.  In fact, after making only the minimum payment, because of negative
17  amortization, the borrower likely would not be able to refinance a pay option
18  ARM loan unless the home serving as security for the mortgage had increased in
19  value.  This is particularly true in cases for borrowers whose loans have a very
20  high loan-to-value ratio.

21      91.    As a result, the borrower is often stuck in the loan—unable to sell and
22  unable to refinance.

23      92.    Countrywide and its business partner brokers often misrepresented or
24  obfuscated the fact that a particular pay option ARM included a prepayment
25  penalty and failed to explain the effect that making only the minimum payment
26  would have on the amount of the prepayment penalty.  If a borrower seeks to
27  refinance after having made the minimum payment for an extended period, but
28

CLASS ACTION COMPLAINT

1   while a prepayment penalty is still in effect, the negative amortization can cause
2   the amount of the prepayment penalty to increase.  Prepayment penalties typically
3   equal six months worth of accrued interest.  As negative amortization causes
4   the loan principal to increase, it also causes an increase in the amount of interest
5   that accrues that each month, thereby increasing the prepayment penalty.

6       93.    The State of California's investigation found that Countrywide and its
7   business partner brokers also represented that the prepayment penalty could be
8   waived if the borrower refinanced with Countrywide.  This was often false,
9   however, because Countrywide sells most of the loans it originates and has, at
10  most, limited authority to waive prepayment penalties on loans it does not own,
11  even when it controls the servicing.

12      94.    In addition to pay option ARMs, Countrywide deceptively marketed
13  hybrid ARM loans.  A hybrid ARM loan has a fixed interest rate for an initial
14  period of 2, 3, 5, 7, or 10 years, and then an adjustable interest rate for the
15  remaining loan term.

16      95.    Countrywide offered a variety of such loans, including:

17      (a)    2/28 ARMs—low, fixed rate for first two years; adjustable rate for
18             next 28 years;

19      (b)    3/27 ARMs—low fixed rate for first three years; adjustable rate for
20             next 27 years;

21      (c)    5/1, 7/1 and 10/1 ARMs—low, fixed rate for first five, seven or ten
22             years, respectively; thereafter, adjustable rate determined by adding
23             a margin to an index;

24      96.    Following the expiration of their initial fixed rates, borrowers with
25  hybrid ARMs often experience payment shock similar to borrowers with pay
26  option ARMs.

27

28

97.   Countrywide underwrote 2/28 and 3/27 ARMs based on the payment required while the initial rate was in effect, without regard to whether the borrower could afford the loan thereafter.   And, like pay option ARMs, Countrywide's 2/28 and 3/27 ARMs typically contained prepayment penalties.

98.   Countrywide's 5/1, 7/1 and 10/1 ARMs were marketed as having initial interest-only periods and, upon information and belief, were underwritten based on the initial fixed, interest-only payment until at least the end of 2005.

99.   Countrywide marketed its hybrid ARMs by emphasizing the low monthly payment and low "fixed" initial interest rate.   This included misrepresenting or obfuscating the amount of time that the fixed rate would be in effect, misrepresenting or obfuscating the fact that the interest rates on the loans are adjustable rather than fixed, and obfuscating or misrepresenting the amount by which payments could increase once the initial fixed rate expired.

100.   The State of California investigation also indicated that Countrywide and its business partner brokers also often misrepresented or obfuscated the fact that hybrid ARMs, particularly 2/28 and 3/27 ARMs, included prepayment penalties, or falsely represented that the prepayment penalties could be waived when the borrowers refinanced with Countrywide.

101.   Countrywide and its brokers also misrepresented or obfuscated how difficult it might be for borrowers to refinance hybrid ARMs. Although borrowers often were assured that they would be able to refinance, those seeking to refinance hybrid ARMs after the expiration of the initial interest-only period likely would be unable to do so, unless the home serving as security for the mortgage had maintained or increased its value. This was particularly true for borrowers whose loans have very high loan-to-value ratios, as there would be no new equity in the borrowers' homes to help them pay fees and costs associated with the refinances, as well as any prepayment penalties that may still apply.

CLASS ACTION COMPLAINT

102. Countrywide also deceptively marketed HELOCs, particularly to borrowers who had already obtained or were in the process of obtaining first mortgage loans from Countrywide.

103. The State of California investigation revealed numerous problems with Countrywide's marketing of such loans. According to the California attorney general: Countrywide referred to such loans as "piggies" or "piggyback loans," and referred to simultaneously funded first loans and HELOCs as "combo loans." For example, with an 80/20 loan, the first loan typically covered 80% of the appraised value of the home securing the mortgage, while the HELOC covered any of the home's remaining value up to (and sometimes exceeding) 20%. Thus, the HELOC and the first loan together often encumbered 100% or more of a home's appraised value.

104. Because Countrywide offered HELOCs as piggybacks to pay option and hybrid ARMs, 100% or more of a property's appraised value could be encumbered with loans that required interest-only payments or allowed for negative amortization.

105. Countrywide typically urged borrowers to draw down the full line of credit when HELOCs initially funded. This allowed Countrywide to earn as much interest as possible on the HELOCs it kept in its portfolio, and helped generate the promised payment streams for HELOCs sold on the secondary market. For the borrower, however, drawing down the full line of credit at funding meant that there effectively was no "equity line" available during the draw period, as the borrower would be making interest-only payments for five years.

106. Upon the end of the draw period, the HELOC notes generally require borrowers to repay the principal and interest in fully amortizing payments over a fifteen year period. A fully drawn HELOC was therefore functionally a 20- or 25-year closed-end mortgage. However, Countrywide did not provide

borrowers with any documents or other materials to help them calculate the principal and interest payments that would be due after the draw, or interest-only, period.

107. Countrywide HELOCs were underwritten not to the fully amortizing payment, but to the interest-only payments due during the draw period. Countrywide typically charged an early termination fee for HELOCs closed before three years, and sometimes would charge a monthly fee for HELOCs where the balance fell below a specified amount.

108. A borrower with an interest-only or a negatively amortizing loan faces even greater payment shock if he or she also has a fully drawn HELOC; however this was typically obfuscated from or not explained to borrowers. Moreover, a borrower with a piggyback HELOC, particularly a borrower whose first mortgage negatively amortized or allowed interest-only payments, is even less likely to be able to refinance at the time of his or her payment shock unless his or her home has increased in value.

## IV.    Countrywide Eased its Underwriting Standards

109. As discussed above, Countrywide was narrowly focused on increasing its loan volume. This translated into boosting the number of loans it originated, without regard to the borrowers' ability to pay, and substantially increased the risk of borrowers losing their homes.

110. Accordingly, Countrywide relaxed and/or disregarded underwriting standards. This included the utilization of low and no-documentation loans.

111. Typically, borrowers seeking mortgage loans are required to document their ability to pay by showing proof of their income. This usually includes, for example providing W-2s or tax returns, as well as assets. Countrywide, however, disregarded such documentation requirements with respect to its riskiest loan products and introduced a variety of reduced or no

CLASS ACTION COMPLAINT

1  documentation loan programs that eased and quickened the loan origination
2  process. The State of California's investigation revealed that the vast majority of
3  the hybrid ARMs and nearly all of the pay option ARMs originated by
4  Countrywide were reduced or no documentation loans.

5      112.  Employment was verbally confirmed and income was supposed to
6  be roughly consistent with incomes earned in the type of job in which the borrower
7  was employed.  Reduced documentation loans, in turn, allowed borrowers to
8  document their income through the provision of W-2 tax forms, bank statements,
9  or verbal verification of employment.  These low- and no-documentation
10 programs enabled Countrywide to process loans more quickly and therefore to
11 make more loans. Stated income loans also encouraged the overstating of income
12 – loan brokers and officers either overstated the borrower's income without his or
13 her knowledge, or led the borrower into overstating his or her income without
14 explaining the risk of default that the borrower would face with a loan

15     113.  Countrywide also eased its underwriting standards by lowering the
16 minimum requirements for certain types of loans.  For instance, the Company
17 decreased: (a) minimum requisite credit scores for stated income loans; (b)
18 qualifying interest rates; (c) requisite loan-to-value ratios; and (d) minimum debt-
19 to-income ratios.

20     114.  These practices had the effect of increasing the risk that
21 Countrywide's borrowers would be placed into mortgage loans that they could not
22 afford to repay.

23     115.  Countrywide also routinely encouraged the granting of exceptions
24 from its computerized underwriting system, known as "CLUES")—thus, willfully
25 ignoring its own minimal underwriting guidelines.

26     116.  The CLUES system would issue a loan analysis report, based upon the
27 proposed borrower's financial and credit information.  This report would both:
28

1  (a) rate the borrower's credit and ability to repay the loan; and (b) indicate
2  whether a proposed loan was in compliance with Countrywide's underwriting
3  guidelines.  The CLUES system would recommend that the loan be approved,
4  declined or referred to manual underwriting for special analysis by a
5  Countrywide underwriter.

6      117.  At this point, as the State of California's investigation noted,
7  underwriters could overcome potential rule violations or other underwriting issues
8  flagged by CLUES by adding on "compensating factors," such as letters from the
9  borrower that addressed a low FICO score or provided explanations regarding a
10  bankruptcy, judgment lien, or other issues affecting credit status.  Countrywide
11  heavily pressured its underwriters to process and fund as many loans as possible.
12  They were expected to process 60 to 70 loans per day, making careful
13  consideration of borrowers' financial circumstances and the suitability of the loan
14  product for them nearly impossible.  Even if CLUES had recommended denying a
15  loan, the underwriter could override that denial if he or she obtained approval
16  from his or her supervisor.  Supervisors, including branch managers and regional
17  vice presidents, were given liberal authority o grant such exceptions.

18      118.  As the State of California's investigation showed, it even came to a
19  point where, rather than having to show why they were seeking an exception to
20  Countrywide's underwriting standards, underwriters increasingly had to justify
21  why they were *not* approving a loan or granting an exception for unmet
22  underwriting criteria to their supervisors, as well as to dissatisfied loan officers and
23  branch managers who earned commissions based on loan volume.

24      119.  In short, Countrywide granted exceptions liberally, further diluting its
25  already minimal underwriting standards for making loans.  Exceptions were
26  granted when one or more standards were not met, including minimum credit
27  score, maximum loan-to-value and maximum loan amount.  Further, Countrywide
28

- 27 -
CLASS ACTION COMPLAINT

placed borrowers in risky loans such as hybrid and pay option ARMs, based on stated but not verified income and assets. The Company also readily promoted to brokers its willingness to lower underwriting standards. As the California attorney general noted, for example, Countrywide promoted "Unsurpassed Product Choices and Flexible Guidelines," including (a) "100% financing for purchase or refinancing" loans; (b) "80/20 combo loans for stated Self-Employed and Non Self-Employed;" (c) "Stated Self-Employed and Non Self-Employed loan programs with as low as a 500 credit score." Countrywide also stated that its "Specialty Lending Group's experienced and knowledgeable loan experts are empowered to review all loan packages, make sound credit decisions and provide quality lending solutions - yes, even for 'hard to close' loans."

## V.    Countrywide Engaged in Deceptive and Misleading Marketing Practices

### 1. Bait and Switch Tactics

120.    Countrywide engaged in a number of deceptive, unfair and misleading marketing practices.

121.    These included deceptive marketing campaigns, bait-and-switch tactics and fee-churning by encouraging chronic refinancing.

122.    For example, Countrywide engaged in "bait and switch" tactics in its residential loan transactions. Countrywide systematically baited customers into residential mortgage loan transactions with promises of fixed interest rates, low interest rates, low or no fees, lower monthly payments compared to then current payments, no prepayment penalties, and/or the existence or absence of particular terms. Countrywide targeted consumers for predatory, "subprime" home loans and induced borrowers to enter into unfair and deceptive residential mortgages without regard for the homeowners' interests, actual assets or ability to pay. By its

predatory loan practices, Countrywide engaged in a persistent "bait and switch" scheme through which it lures borrowers with promises of favorable interest rates, monthly payments and/or loan terms, and then often switched the terms to significantly less favorable ones.

123. When loan paperwork was presented to customers for signature at closing, the terms were often contrary to those initially promised. Due to the complexity of such paperwork, hurried closings, and improper disclosure procedures, borrowers were often unaware that the terms of the mortgage documents do not match Countrywide's prior representations.

124. This practice went hand in hand with Countrywide's aggressive and unfair sales tactics. These practices allowed Countrywide to systematically close loans that benefited the Company to the detriment and misfortune of its customers.

125. During the Class Period, Countrywide solicited borrowers by bombarding them with a barrage of advertisements, including phone, mail, and email refinance loan offers. Such advertisements promised easy debt consolidation, no or low cost closings and easy repayment terms. By way of example, the Countrywide's Full Spectrum website contained the following enticing language:

> Imagine having cash in hand and one easy payment in place of the many bills you have now. Now imagine a reduced total monthly payment. Countrywide Home Loans' Full Spectrum® Lending Division can help make this a reality.

http://www.fullspectrumlending.com/Refinance/loanoptions/debt_consolidation.asp, accessed on November 9, 2007.

126. Countrywide often targeted borrowers it knew to be in trouble—those with low incomes and those the Company knew were already having trouble

making payments or even facing foreclosure.   In targeting such borrowers, Countrywide often enticed them with the promise of help and a commitment to provide the best loan possible, yet often placed them into risky pay option ARM and hybrid ARM loans, without regard to the risk that the customer would default.

127.   In addition to contacting customers who were behind in their loan payments, Countrywide also solicited existing customers on other occasions, including on their annual loan "anniversaries" and shortly before a rate or payment was to reset on pay option or hybrid ARMs, without regard to whether the loan had a prepayment penalty period that had not yet expired.   In doing so, as the State of California's investigation revealed, Countrywide refinanced borrowers while the prepayment penalty on their prior Countrywide loan was still in effect, often concealing the existence of the prepayment penalty.   Thus, Countrywide would lure borrowers with the promise of reducing their debt, then extract as much money from them as possible, in the form of prepayment penalties and additional late charges, once the borrower began to default on the new loan.

**2.    Marketing Risky Pay Option ARM and Hybrid ARMs in a Misleading and Deceptive Manner**

128.   As with Plaintiff Brown, Countrywide often and readily took advantage of the complex nature of the pay option and hybrid ARMs.   As noted above, Countrywide lured borrowers with the promise of reducing their debt and having lower monthly payments.   Further, as discussed above, pay option ARM and hybrid ARM loans begin with lower monthly payments and interest rates than most other types of loan products.   Thus, Countrywide was able to easily sell such loans to borrowers by purposefully focusing on the initial low monthly payments and/or rates and by obscuring or misrepresenting the true risks of such loans.

129.   As in Plaintiff Brown's situation, Countrywide's common approach with respect to pay option ARMs was to focus the borrower's attention on the low

CLASS ACTION COMPLAINT

1  minimum payment—a payment that Countrywide knew would result in negative
2  amortization and payment shock.

3      130.  For example, when presenting a borrower with various loan options,
4  for example, Countrywide would "sell the payment" by showing the borrower
5  the minimum monthly payments for the pay option ARM in comparison to other
6  loan products with larger payments. Then, Countrywide would ask which payment
7  the borrower preferred without discussing other differences between the loan
8  products.  Naturally, in this situation, most borrowers chose the option with the
9  lowest payment, the pay option ARM, without realizing that the payment would
10 last for only a short time before it would begin to increase.

11     131.  As with Plaintiff Brown, another approach used by Countrywide was
12 to present the pay option ARM as the option, then "sell the payment" by focusing
13 the borrower's attention on how much the borrower would "save" every month by
14 making such a low payment, without discussing the payment shock and negative
15 amortization that inevitably result when borrowers make minimum payments.  It
16 also represented that the payments would last for the entire term of the loan, or
17 for some period longer than that provided for by the loan's terms.  Given the
18 complexity of pay option ARMs, such a presentation easily misled borrowers
19 regarding the long-term affordability of their loans.

20     132.  As the State of California's investigation revealed, Countrywide
21 engaged in similar deceptive representations with respect to hybrid ARMs.  For
22 example, Countrywide focused its sales presentation on the interest-only
23 payments during the initial fixed-rate period, i.e. the 2-year period on a 2/28 ARM
24 or the 3-year period on a 3/27 ARM, not on how the payment would adjust to
25 include both principal and interest after the initial fixed-rate period.  It also
26 represented that the payments would last for the entire term of the loan, or for
27 some period longer than that provided for by the loan's terms.

28

133. When selling pay option and hybrid ARMs, Countrywide engaged in another deceptive practice – rather than selling the payment, it would sell the rate. Countrywide either focused exclusively on the initial one-month, two-year, or three-year "fixed" interest rate, for example, without discussing that the rate would reset after the initial period to a potentially much higher rate, or it represented that the initial interest rate would last for a much longer period than it actually did or for the entire term of the loan.

134. According to the California attorney general: Countrywide's letter and e-mail solicitations, as well as telemarketing calls, also focused borrowers' attention on short-term low monthly payments. Full Spectrum loan officers, for example, were required to memorize scripts that marketed low monthly payments by focusing (a) on the potential customer's dissatisfaction with his or her current monthly payments under his or her current mortgage loan and/or (b) on so-called "savings" that result from minimum monthly payments. As just one of many potential examples, to overcome a borrower's claim that he or she already has a loan with a low interest rate, Countrywide required Full Spectrum loan officers to memorize the following response: "I certainly understand how important that is to you. But let me ask you something . . . . Which would you rather have, a long-term fixed payment, or a short-term one that may allow you to realize several hundred dollars a month in savings? I am able to help many of my clients lower their monthly payments and it only takes a few minutes over the phone to get started." What the Full Spectrum loan officer did not state was that the borrowers would, in fact, not save money because the payment on the new loan would ultimately exceed the payment on the borrower's current loan.

135. Yet another common tactic used by Countrywide was to downplay the true risk of the pay option ARM or hybrid ARM by misleading the borrower with respect to his/her ability to refinance before their rates/payments increased.

CLASS ACTION COMPLAINT

1 When the borrower asked questions, for instance, Countrywide would respond
2 that the borrower should not worry, as he or she could always simply refinance
3 and avoid any increased finance charges.

4     136.  Countrywide often represented that the value of a borrower's home
5 would increase, thus creating enough equity to obtain a loan with better terms.
6 However, borrowers with interest-only or negatively amortizing loans that
7 encumbered as much as, if not more than, 100% of their home's appraised value,
8 were highly unlikely to be able to refinance into another loan if their home did not
9 increase in value.  Additionally, any consumers who sought to refinance a
10 Countrywide mortgage would likely incur a substantial prepayment penalty, thus
11 limiting their ability to obtain a more favorable loan.

12     137.  Countrywide loan officers often misrepresented or obfuscated the fact
13 that a borrower's loan had a prepayment penalty or misrepresented that a
14 prepayment penalty could be waived.  Countrywide also promised borrowers that
15 they would have no problem refinancing their pay option or hybrid ARMs, when in
16 fact they might have difficulty refinancing due to the existence of prepayment
17 penalties. Prepayment penalties on pay option and hybrid ARMs essentially
18 prevent many borrowers from refinancing such unaffordable loans before their
19 payments explode or rates reset.

20     138.  Countrywide did everything within its power to take advantage of
21 unsophisticated borrowers.  The Company knew that borrowers subjected to any
22 of the deceptive marketing practices described above would not understand the true
23 risks and likely unaffordability of their loans.  For example, a common tactic, used
24 with each of the named Plaintiffs, was to require borrowers sign a large stack of
25 documents without providing the borrower with time to read them.

26     139.  Many borrowers have complained regarding Countrywide's practices.
27 The State of California found that Countrywide received numerous complaints
28

CLASS ACTION COMPLAINT

regarding these practices from consumers.   Many borrowers complained that they did not understand the terms of their pay option and hybrid ARMs, including the potential magnitude of changes to their monthly payments, interest rates, or loan balances.   Many borrowers also complained that Countrywide's loan officers either simply did not tell them about the payment or rate increases on such loans or promised that they would have fixed-rate, fixed payment loans, rather than adjustable rate mortgage loans with increasing payments.

140.   However,   despite   having   knowledge   of   these   complaints, Countrywide continued on its course.   Its narrow focus was on increasing its loan volume at any cost—without regard to the impact upon its customers.

**VI.   Countrywide Purposefully Incentivized its Employees and Brokers to Close as Many Loans as Possible and to Close as Many High-Priced, Risky Loans as Possible, Without Regard to Borrowers' Ability to Repay**

141.   Countrywide intentionally trained its sales force to seduce customers into bad loans by placing them at ease.   Countrywide boasted that it would provide the borrower with "the best loan possible."   Once the employee gained the customer's trust, however, he/she would often led the borrower to high-cost, risky loans that resulted in richer commissions for Countrywide's employees and larger fees for Countrywide.

142.   Countrywide utilized numerous sales and solicitation tactics, designed to lure customers into unsuitable, unfair and unreasonable loans.   As described herein, the Company's mission was to maximize its own profits at any cost— regardless of the impact upon its customers.   In furtherance of this—and as evidence thereof—Countrywide provided highly lucrative incentives to its employees for aggressively engaging in often misleading and deceptive sales practices.

CLASS ACTION COMPLAINT

143.    Former employees of Countrywide have stated that the Company's commission structure rewarded sales representatives for making risky, high-cost loans. For example, according to an anonymous mortgage sales representative affiliated with Countrywide, who spoke with the New York Times, adding a three-year prepayment penalty to a loan would generate an extra 1 percent of the loan's value in a commission. While mortgage brokers' commissions would vary on loans that reset after a short period with a low teaser rate, the higher the rate at reset, the greater the commission earned. One former sales representative stated, "The whole commission structure in both prime and subprime was designed to reward salespeople for pushing whatever programs Countrywide made the most money on in the secondary market," the former sales representative said. Gretchen Morgenson, *Inside the Countrywide Lending Spree*, N.Y. Times, August 26, 2007, *available at:*

http://www.nytimes.com/2007/08/26/business/yourmoney/26country.html (article hereinafter referred to as "Lending Spree").

144.    Countrywide not only permitted, but actually *encouraged* its sales force to make high risk, high cost loans—regardless of suitability to the customer or the fact that a customer should qualify for a lower-cost loan. The Company intentionally designed its compensation system in such a manner as to reward sales representatives and mortgage brokers for steering customers into higher-cost loans than those for which they qualified. For example:

> The Company's incentive system also encouraged brokers and sales representatives to move borrowers into the subprime category, even if their financial position meant that they belonged higher up the loan spectrum. Brokers who peddled subprime loans received commissions of 0.50 percent of the loan's value, versus

0.20 percent on loans one step up the quality ladder,
known as Alternate-A, former brokers said.

*Lending Spree.*

145. Countrywide specifically trained its employees to push often unsuitable loan products upon customers and to aggressively overcome the objections of prospective customers:

> One marketing manual used in Countrywide's subprime unit during 2005, for example, walks sales representatives through the steps of a successful call. "Step 3, Borrower Information, is where the Account Executive gets on the Oasis of Rapport," the manual states. "The Oasis of Rapport is the time spent with the client building rapport and gathering information. At this point in the sales cycle, rates, points, and fees are not discussed. The immediate objective is for the Account Executive to get to know the client and look for points of common interest. Use first names with clients as it facilitates a friendly, helpful tone."

If clients proved to be uninterested, the script provided ways for sales representatives to be more persuasive. Account executives encountering prospective customers who said their mortgage had been paid off, for instance, were advised to ask about a home equity loan. "Don't you want the equity in your home to work for you?" the script said. "You can use your equity for your advantage and pay bills or get cash out. How does that sound?"

*Lending Spree.*

146. Countrywide's high-pressure sales environment and compensation system encouraged serial refinancing of Countrywide loans, without regard to a

CLASS ACTION COMPLAINT

1  borrower's ability to repay, and with the consequence of draining equity from
2  borrowers' homes.

3      147.  Countrywide management at all levels pressured the employees below
4  them to sell and approve more loans, at the highest prices, as quickly as possible, in
5  order to maximize Countrywide's profits on the secondary market.  For instance,
6  the State of California's investigation found that at least one Countrywide
7  executive: (a) monitored Countrywide's loan production numbers and pressured
8  employees involved in selling loans or supervising them to produce an ever-
9  increasing numbers of loans, faster; and (b) pressured underwriters to increase their
10  loan production and to increase approval rates by relaxing underwriting criteria.
11  Further, regional vice presidents pressured branch managers to increase their
12  branches' loan numbers.  Branch managers pressured loan officers to produce
13  more loans, faster, and often set their own branch-level production quotas.
14  Further, Countrywide required underwriters to meet loan processing quotas and
15  paid bonuses to underwriters who exceeded them.

16      148. The State of California also found that customer service
17  representatives at Countrywide's Call Center were expected to achieve quotas and
18  received bonuses for exceeding them.  Countrywide required service
19  representatives to complete calls in three minutes or less, and to complete as many
20  as sixty-five to eighty-five calls per day.  Although three minutes is not sufficient
21  time to assist the confused or distressed borrowers who contacted them,
22  Countrywide required service representatives to market refinance loans or
23  piggyback HELOCs to borrowers who called with questions including borrowers
24  who were behind on their monthly payments or facing foreclosure.  Using a script,
25  the service representatives were required to pitch the loan and transfer the caller to
26  the appropriate Countrywide division.  Service representatives also received
27  bonuses for loans that were so referred and funded.

28

149.   Essentially, Countrywide placed intense pressure upon its employees and brokers to sell products that, although risky and harmful for borrowers, increased Countrywide's profits on the secondary market.

150.   Countrywide also made arrangements with a large network of mortgage brokers to procure loans for Countrywide and, through its loan pricing structure, encouraged these brokers to place homeowners in loans with interest rates higher than those for which they qualified, as well as prepayment penalty obligations.  This system of compensation aided and abetted brokers in breaching their fiduciary duties to borrowers by inducing borrowers to accept unfavorable loan terms without full disclosure of the borrowers' options and also compensated brokers beyond the reasonable value of the brokerage services they rendered.

## VIII. Numerous Borrowers Have Complained About Countrywide's Practices

151.   Plaintiffs are far from alone.  Numerous frustrated consumers have posted complaints on the internet, through various consumer complaint websites, describing their own experiences.  For instance, the following small sampling of complaints have been posted on a popular consumer Internet site, purportedly by disgruntled Countrywide customers:

***** of Haverhill MA (09/24/07)

I just pulled our loan application from the closing and it states my husband makes $15,000 a month!!  We never ever told them that....someone fudged the numbers to make the loan work, and now it has finally caught up....our combined monthly income is only $5,000!! we are in so much debt we can't afford to make payments.  I have all documentation...we did not sign the prelimary [sic] docs.

***** of Pico Rivera CA (08/14/07)

i have a ARM loan with a PMI. My payment went from 1857.41 to 2.022.22 per month. I bring home 1896.00 per month, this does not include my other bills. I called countrywide if they could work out a plan to lower my payment, they said yes but since jun [sic] 14, 2007 they still have not worked out a plan.

***** of Tampa FL (08/11/07)

I am a current Countrywide customer with an <u>adjustable rate mortgage</u> that I was looking to refinance to a fixed rate. I see advertised online no closing costs and I figure since I'm a current customer that would be great and that they would take care of me. Boy was I wrong about that!! After almost two months of haggling with them they finally give me a 'bottom line quote which was a savings of nineteen cents per month!! Then when I looked at the contract they were charging me over 7,000 in early termination fees how can you do that when you're refinancing with the SAME Company? You're not terminating, your [sic] extending your loan.

The total refinance amount they gave me was 220,500. They would not explain to me what the additional fees were for and added that they would not give me any cash out to make any home improvements. I ended up escalating this complaint up to their CEO. I still haven't gotten a straight answer out of anyone and I'm very upset and frustrated.

***** of Staten Island NY (08/08/07)

CLASS ACTION COMPLAINT

Countrywide lied to me about my loan. They gave me a loan with different payment options. My house is now in foreclosure.

**\*\*\*\*\* of Foothill Ranch CA (05/24/07)**

We moved from PA to CA in 2005. We were offered a 1% rate by Countrywide, yeah right! The rate is actually 8%. The loan offers you 4 payment options. We did the lowest one not knowing it was a neg am loan if we did that. We've lost most of our down payment due to the neg am. By the time I began reviewing the statements thoroughly, it was too late to pay the higher payments because they've increased due to the principle increasing. We cannot refi without paying a penalty and further the housing market values are currently suffering. In addition after making my payments for the first year - all interest, my year end mortgage interest payments did not equal their tax statement. I made several inquiries only to be told that THEY ARE RIGHT AND I AM WRONG.

**\*\*\*\*\* of Lakewood CA (05/08/07)**

I am glad that there are places like this that consumers can voice their concerns about Businesses that take advantage of consumers. Countrywide had called me when I was behind in my payment due to wage garnishment for medical bills when My wife had a baby three months early due to complication. Countrywide had the answer they would refinance my house and get me money pay the medical bills pay off my car pay the

CLASS ACTION COMPLAINT

back taxes pay the back payments and lower my payment. Well they took money out and put in escrow to pay the taxes and insurance but that money vaporised [sic].

I refinacned [sic] from Countrywide to Countrywide from a 30 year fixed to a two year fixed then arm. And it cost me $ 28000.00 to do this and they said that do to my economic situation it was the best thing for me to do. Now looking back on it it was good for them. Now they have me locked into a prepayment penalty loan...

***** of Sun City AZ (03/03/07)

I asked for a refinance to get out of a negative amortization loan. I asked for a fixed rate program as i was converting the house into a rental. During the refinance, I was never able to get a hold of the agent and he never returned any phone calls. He told me i was in a program that was a fixed payment and rate for the following year. I signed the documents, and after 3 months the payment changed to a negative amortization loan. I proceeded to contact the agent, of which he said there was a mistake in the loan and it shouldn't be a NEGAM. He promised me he would get it fixed and he would call me with all the details. He promised he would have it fixed before my next payment. I never heard back from him and he never returned a phone call or email again. Now i am stuck in the same loan program i

CLASS ACTION COMPLAINT

attempted to refinance out of with a higher balance due to refinancing costs

**\*\*\*\*\* of Delray Beach FL (11/15/05)**

I believe I have been fraudulently charged excessive and/or unjustified fees in conjunction with a loan modification executed in Sept. 04. After reams of letters to Countrywide requesting a line-by-line breakdown and justification of all fees charged me, Countrywide has STILL NOT, after over a year, provided me with this information, to which I am legally entitled. Their continued refusal and/or inability to provide me with this information only leads me to believe that there were improprieties involved in this transaction. I want to file a complaint with the appropriate government agency(s) and have this investigated, but I don't know which agency(s) has jurisdiction over mortgage companies/banks.

**\*\*\*\*\* of San Antonio TX (05/14/05)**

In short, FULL SPECTRUM LENDING (division of Countrywide) pre-approved us for a 100% LTV loan (after receiving and verifying our info) only to change that and the interest rate at the last minute before closing. They knew we were over a barrel and needed to close, so they took advantage of us. We should have walked away but didn't. They also stuck us with a fat prepayment penalty, hidden way down in the fine print during closing...

CLASS ACTION COMPLAINT

**Source**:     http://www.consumeraffairs.com/finance/countrywide_mortgage.html, accessed on September 28, 2007.

152.   Plaintiffs and the Class have suffered damages as a result of Countrywide's conduct.   The experiences of Plaintiffs and the Class stem from common course of conduct in which Countrywide engaged.   Plaintiffs and the Class have been injured by Countrywide's conduct and seek redress, as described herein.

## FIRST CASE OF ACTION
### (Unfair, Unlawful, and Deceptive Business Acts and/or Practices in Violation of California Business & Professions Code §§ 17200 *et seq.*)

153.   Plaintiffs hereby incorporate by reference the allegations contained in all preceding paragraphs.

154.   Countrywide's operations are based in California.   The unlawful, unfair and fraudulent business practices described herein emanated from California.

155.   All of the conduct alleged herein occurred in California by virtue of the Company's centralized business practices or stemmed from policies and procedures that originated from and were controlled by Countrywide's home offices in California.

156.   California Business & Professions Code §§ 17200 et seq. prohibits acts of unfair competition, including any "unlawful, unfair or fraudulent business act or practice."

157.   Throughout the Class Period, Countrywide engaged in unlawful, unfair or fraudulent business acts and practices in violation of California Business & Professions Code §§ 17200, et seq., in that: (a) Countrywide's practices and conduct are immoral, unethical, oppressive and substantially harmful to Plaintiffs and the members of the Class; (b) the justification for Countrywide's practices and

conduct outweighed by the gravity of the injury to Plaintiffs and the Class; and (c) Countrywide's practices constitute unfair, fraudulent, untrue or misleading actions in that such conduct is likely to deceive members of the public.

158.    Countrywide's unlawful, unfair, and/or fraudulent business practices are described herein and include, without limitation:

(a)    luring customers with false promises of low-cost mortgage loans;

(b)    charging unnecessary and/or exorbitant fees;

(c)    steering customers into high-cost cost loans with exorbitant fees and finance charges;

(d)    misrepresenting, concealing or failing to adequately disclose material loan terms, including, without limitation, the disclosure of the risks and ramifications of pay option ARMs and hybrid ARMs;

(e)    creating a scheme to increase loan volume at any cost, without regard to the borrowers' ability to repay;

(f)    concealing the existence and length of unfair and/or punitive prepayment penalty provisions;

(g)    making untrue or misleading representations regarding borrowers' ability to refinance their loans; and

(h)    utilizing unfair and/or punitive prepayment penalty provisions to discourage and/or prevent borrowers from refinancing their loans at lower rates with its competitors.

159.    The foregoing acts and practices are also unfair and/or fraudulent within the meaning of § 17200 in that they are likely to mislead the public as to:

(a)    the nature of the mortgage loans available to them;

(b)    the true risks associated with the mortgage loans that they received;

(c)    the true nature of the "assistance" of Countrywide's employees and agents, as such employees and agents were not actually assisting the

CLASS ACTION COMPLAINT

1    customer, but, rather, were incentivized to steer the customer into the

2    high cost loans that increase profits for Countrywide, to the

3    customer's detriment; and

4    (d)   the true costs of the loans that they received, including, without

5    limitation, increasing monthly payments and cost-prohibitive

6    prepayment penalties.

7    160.   The foregoing acts and practices have caused substantial harm to the

8    Plaintiffs, and the members of the Class.   Plaintiffs have suffered injuries in fact

9    and have lost money or property as a result of Countrywide's conduct.

10    161.   By reason of the foregoing, Countrywide should be required to pay

11    damages in an amount to be proven at trial, disgorge their illicit profits and/or

12    make restitution to the Plaintiffs, the general public, and the members of the Class,

13    and/or be enjoined from continuing in such practices pursuant to §§ 17203 and

14    17204 of the California Business & Professions Code.

15                            **SECOND CAUSE OF ACTION**

16    **(Violation of California Business & Professions Code §§ 17500 *et seq.*)**

17    162.   Plaintiffs hereby incorporate by reference the allegations contained in

18    all preceding paragraphs.

19    163.   Countrywide's operations are based in California.   The false and/or

20    misleading statements and advertising described herein emanated from California

21    and were directed toward consumers both within and outside of California.

22    164.   All of the conduct alleged herein occurred in California by virtue of

23    the Company's centralized business practices or stemmed from policies and

24    procedures that originated from and were controlled by Countrywide's home

25    offices in California.

26    165.   Defendants have violated and continue to violate Business and

27    Professions Code section 17500 by making or disseminating untrue or misleading

28

- 45 -
CLASS ACTION COMPLAINT

statements, or by causing untrue or misleading statements to be made or disseminated, in or from California, with the intent to induce members of the public to enter into mortgage loan or home equity line of credit transactions secured by their primary residences. These untrue and misleading statements include, without limitation:

    (a)    statements that borrowers would receive low-cost mortgage loans;

    (b)    statements that borrowers would lower their debt obligations by refinancing with Countrywide;

    (c)    statement that grossly underrepresented the true nature of the risk associated with Countrywide's adjustable rate mortgage loans, including statements that the initial payment rate was the interest rate, statements regarding the duration of the initial payment, statements regarding the duration of the initial interest rate, and statements obfuscating the risks associated with such mortgage loans;

    (d)    statements that borrowers with pay option and hybrid ARMs offered by Countrywide would be able to refinance the mortgage loans before the interest rates reset, when in fact they most likely could not;

    (e)    statements regarding prepayment penalties on pay option and hybrid ARMs offered by Countrywide, including statements that the mortgage loans did not have prepayment penalties, when in fact they did, and statements that prepayment penalties could be waived, when in fact they could not;

    (f)    statements regarding the risks and costs of reduced or no documentation mortgage loans with terms that borrowers could not actually afford;

- 46 -
CLASS ACTION COMPLAINT

166. Defendants knew, or by the exercise of reasonable care should have known, that these statements were untrue or misleading at the time they were made and that members of the public were likely to be deceived.

167. The foregoing conduct has caused substantial harm to the Plaintiffs, and the members of the Class. Plaintiffs and the Class have suffered injuries in fact and have lost money or property as a result of Countrywide's conduct, up to and including, without limitation:

1) paying excessive finance charges in the forms of increased interest rates;

2) experiencing payment shock;

3) experiencing negative amortization;

4) being forced to continue to pay excessive home finance charges, by way of being unable to refinance; and

5) paying prepayment penalties.

168. By reason of the foregoing, Countrywide should be required to disgorge its ill-obtained profits and/or make restitution full to the Plaintiffs, the general public, and the members of the Class.

### THIRD CAUSE OF ACTION
### (Unfair or Deceptive Acts or Practices in
### Violation of California Civil Code §§ 1750 et seq.)

169. Plaintiffs hereby incorporate by reference the allegations contained in all preceding paragraphs.

170. Plaintiffs hereby incorporate by reference the allegations contained in all preceding paragraphs.

171. Countrywide operations are based in California. The unfair and/or deceptive acts and practices described herein emanated from California.

CLASS ACTION COMPLAINT

172.   All of the conduct alleged herein occurred in California by virtue of the Company's centralized business practices or stemmed from policies and procedures that originated from and were controlled by Countrywide's home offices in California.

173.   By its wrongful conduct as alleged herein, Countrywide has created, engaged in and/or participated in unfair practices, in violation of the Consumers Legal Remedies Act, California Civil Code sections 1750 *et seq.*

174.   Countrywide has engaged in unfair or deceptive acts or practices intended to result in the sale of their goods and services in violation of California Civil Code §§1750 *et seq.*, including but not limited to: (a) Representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities which they do not have or that a person has a sponsorship, approval, characteristics, status, affiliation, or connection which he or she does not have, in violation of section 1770(a)(5); and (b) that a transaction confers or invokes rights, remedies, or obligations which it does not have or involve, or which are prohibited by law, in violation of section 1770(a)(14); and (c) Representing that the subject of a transaction has been supplied in accordance with a previous representation when it has not, in violation of section 1770(a)(16).

175.   As a proximate result of Countrywide's violations of the CLRA, Plaintiffs and the Class have suffered damages and, pursuant to §§ 1780 and 1782(d), Plaintiffs and members of the Class seek to enjoin the methods, acts and practices described herein.

176.   The actions described above constitute unlawful, unfair and/or defective acts or practices within the meaning of the Consumer Legal Remedies Act. The Plaintiffs and the Class Members are entitled an order enjoining Countrywide from engaging in the unlawful acts and practices described herein,

together with costs, attorney's fees and any other relief which the Court deems proper.

## FOURTH CAUSE OF ACTION

### (Unjust Enrichment/Disgorgement of Profits)

177.    Plaintiffs hereby incorporate by reference the allegations contained in all preceding paragraphs.

178.    Countrywide has unjustly enriched itself at the expense of Plaintiffs and the Class and, accordingly, should not be permitted to take advantage of its wrong.

179.    Further, Countrywide has acted in conscious disregard of the rights of Plaintiffs and the Class and should be required to surrender all money obtained through its unfair practices.

180.    Thus, Countrywide should be required to make restitution of property and/or benefits received, retained, or appropriated.

## FIFTH CAUSE OF ACTION
### (Declaratory and Injunctive Relief)

181.    Plaintiffs hereby incorporate by reference the allegations contained in all preceding paragraphs.

182.    On each cause of action stated above, Plaintiffs and the Class will be irreparably injured in the future by the Defendants' misconduct.

183.    Plaintiffs, on behalf of themselves and all Class members, seek a judgment declaring that the Defendants must cease the activities described herein, provide Class Members with adequate remedies, including, without limitation, rescission of their loans and/or refunds of unjustified, artificially inflated finance charges, and provide for adequate procedures and policies for the immediate and complete refund and/or cancellation of prepayment penalties.

CLASS ACTION COMPLAINT

184. To the extent that Plaintiffs and the Class members do not have a plain, adequate, speedy, or complete remedy at law to address the wrongs alleged in this Complaint, and will suffer irreparable injury as a result of the Defendants' misconduct unless injunctive and declaratory relief is granted.

185. By reason of the foregoing, Plaintiffs and the Class members are entitled to declaratory and injunctive relief as set forth herein.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs, on behalf of themselves and all members of the Class and the Class, request judgment and relief as follows:

(a) Certification of this case as a Class action pursuant to Rule 23 of the Federal Rules of Civil Procedure, declaring Plaintiffs as representatives of the Class, as well as appointing Plaintiffs' counsel as counsel for the Class;

(b) That the Court declare, adjudge and decree that Countrywide has committed the violations of law alleged herein;

(c) That Countrywide be enjoined from continuing the illegal course of conduct alleged herein;

(d) That the Court award damages, as set forth herein, to Plaintiffs and the Class, in an amount to be determined at trial;

(e) That the Court order disgorgement of Countrywide's ill-gotten gains and/or impose a constructive trust upon all such ill-gotten gains and award Plaintiffs and the Class full restitution of all monies wrongfully acquired by Countrywide;

(f) That Plaintiffs and the Class be granted such other, further and different relief that is necessary to remedy the continuing harm caused by and prevent the recurrence of Countrywide's unlawful conduct described herein; and

CLASS ACTION COMPLAINT

(g)    That the Court award Plaintiffs their attorneys' fees, costs and prejudgment interest and such other relief as the Court may deem just and proper.

Dated: July 17, 2008

LIM RUGER & KIM, LLP

By: _____
    Christopher Kim
    George Busu
    1055 West Seventh Street, Suite 2800
    Los Angeles, California 90017
    Telephone: (213) 955-9500

**SCHIFFRIN BARROWAY TOPAZ & KESSLER, LLP**
Joseph H. Meltzer
Edward W. Ciolko
Joseph A. Weeden
280 King of Prussia Road
Radnor, PA   19087
Telephone: (610) 667-7706
Facsimile: (610) 667-7056

*Attorneys for Plaintiffs*

CLASS ACTION COMPLAINT

1

### JURY TRIAL DEMANDED

2    Plaintiffs demand a trial by jury for all claims so triable.

3

4    Dated: July 17, 2008

LIM RUGER & KIM, LLP

5

6    By: _____

7    Christopher Kim

George Busu

8    1055 West Seventh Street, Suite 2800

Los Angeles, California 90017

9    Telephone: (213) 955-9500

10

11    **SCHIFFRIN BARROWAY TOPAZ & KESSLER, LLP**

12    Joseph H. Meltzer

Edward W. Ciolko

13    Joseph A. Weeden

280 King of Prussia Road

14    Radnor, PA   19087

Telephone: (610) 667-7706

15    Facsimile: (610) 667-7056

16

17    *Attorneys for Plaintiffs*

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT 6

MICHAEL J. AGUIRRE, City Attorney
California State Bar No. 60402
CHRISTOPHER S. MORRIS, Assistant City Attorney
MARGARET G. JACOBO, Assistant City Attorney
DIANE SILVA-MARTINEZ, Head Deputy City Attorney
DAVID J. KARLIN, Head Deputy City Attorney

NO FEE GC § 6103

Office of the City Attorney
Criminal Division
1200 Third Avenue, Suite 700
San Diego, California 92101
(619) 533-5500; Fax (619) 533-5505

Attorneys for Plaintiff

## SUPERIOR COURT OF CALIFORNIA

## COUNTY OF SAN DIEGO

| PEOPLE OF THE STATE OF CALIFORNIA, | ) | Case No. |
|---|---|---|
| Plaintiff, | ) | |
| v. | ) | **COMPLAINT FOR INJUNCTION, RESTITUTION, OTHER EQUITABLE RELIEF, AND CIVIL PENALTIES** |
| COUNTRYWIDE FINANCIAL CORPORATION, a Delaware corporation; BANK OF AMERICA, a Delaware corporation; ANGELO MOZILO, an individual; DAVID SAMBOL, an individual; STANFORD KURLAND, an individual; CARLOS GARCIA, an individual; DOES 1-200, and ROES 1-500, inclusive, | ) | I/C Judge: Dept.: Action Filed: Trial Date:    Not Set |
| Defendants. | ) | |

Michael J. Aguirre, acting in his official capacity as City Attorney for the City of San Diego, brings this action in the name of the People of the State of California ("Plaintiff"). Plaintiff is informed and believes, and based on such information and belief, alleges the following:

## I.    NATURE AND SUMMARY OF ACTION

1.    Defendant Countrywide Financial Corporation and its agents, officers, employees, and affiliated or associated parties engaged in a pattern of unlawful, fraudulent or unfair

1    predatory real estate lending practices causing victims of such behavior, in the City of San
2    Diego, to lose or be in jeopardy of losing their homes though foreclosure.

3          2.      As demonstrated in Exhibit 1, attached hereto, foreclosures have occurred
4    throughout San Diego County. Particularly hard hit are neighborhoods located in the southern
5    and southeastern portions of the City of San Diego.

6          3.      Defendants' unlawful, fraudulent or unfair "predatory" lending practices directed
7    against San Diego home purchasers and homeowners involved one of the following elements:

8          a.      Making loans based predominantly on the foreclosure or liquidation value of a
9    borrower's collateral rather than on the borrower's ability to repay the mortgage according to its
10   terms;

11         b.      Inducing the borrower to repeatedly refinance a loan in order to charge high
12   points and fees each time the loan is refinanced ("loan flipping"); or

13         c.      Engaging in fraud or deception to conceal the true nature of the mortgage loan
14   obligation.

15         4.      The goal of Countrywide's unlawful, fraudulent, or unfair "predatory" lending
16   practices was to increase the Company's share of the national mortgage market by mass
17   producing loans for sale on the secondary market. In this scheme, borrowers were nothing more
18   than the means for producing more loans. Countrywide originated loans with little or no regard
19   for the borrowers' financial ability to afford the loans or to sustain homeownership.

20         5.      Defendants were also motivated to engage in the unlawful, fraudulent or unfair
21   business practices for personal, financial benefit. As a result of directing Countrywide to engage
22   in unlawful, fraudulent, and unfair business practices as alleged in this Complaint, the Individual
23   Defendants, named below, personally benefited in the total sum exceeding $800 million.

24         6.      This action is brought to enjoin Countrywide from initiating or advancing any
25   foreclosure on any residential mortgage involving properties which are owner occupied in the
26   City of San Diego when the residential mortgage contains the following characteristics:

27         a.      The loan is an adjustable rate mortgage ("ARM") with an introductory rate period
28   of three years or less;

b.     The loan has an introductory or "teaser" rate for the initial period that is at least 3 percent lower than the fully indexed rate;

c.     The borrower has a debt-to-income ratio that would have exceeded 50 percent if the lender's underwriters had measured the debt, not by the debt due under the teaser rate, but by the debt due under the fully indexed rate; and

d.     The loan-to-value ratio is 100 percent or the loan carries a substantial prepayment penalty or a prepayment penalty that extends beyond the introductory period.

## II.    DEFENDANTS AND VENUE

7.     Defendant Countrywide Financial Corporation ("Countrywide" or "CFC" or the "Company") is a corporation organized and existing under the laws of the State of Delaware that transacted business in the County of San Diego, State of California and elsewhere in the United States and internationally. CFC carried out the unlawful, fraudulent, or unfair predatory lending practices though several divisions and subsidiaries including, but not limited to, Countrywide Home Loans, Inc. ("CHL"), a New York corporation; Full Spectrum Lending, Inc. ("Full Spectrum"), either as a California corporation or as a division of CHL.

8.     Defendant Bank of America Corporation ("BofA") is a corporation organized and existing under the laws of the State of Delaware. At all relevant times, BofA has transacted and continues to transact business in the City of San Diego. In January 2008, BofA announced that it had entered into an agreement to acquire Countrywide in an all-stock deal. It is believed that BofA's purchase of Countrywide was completed on July 1, 2008. BofA is named as a Defendant solely due to its purchase of Countrywide.

9.     Defendant Angelo R. Mozilo ("Mozilo") was a CFC director and has been since 1969. Defendant Mozilo is a co-founder of Countrywide and has been Chairman of the Board of the CFC since March 1999 and Chief Executive Officer of the CFC since February 1998. Defendant Mozilo was also President of the CFC from March 2000 through December 2003, and served in other executive capacities since the Company's formation in March 1969. Defendant Mozilo directed, authorized, and ratified the conduct of CFC as set forth herein. During the relevant time period, Defendant Mozilo sold over 12.8 million shares of Countrywide stock for

proceeds in excess of $474 million. Defendant Mozilo resides in the County of Ventura, California.

10.    Defendant David Sambol ("Sambol") is a CFC director and has been since September 2007.   Defendant Sambol joined CFC in 1985.   Defendant Sambol served as Executive Managing Director of Business Segment Operations, leading all revenue generating functions of the Company, as well as the corporate operational and support units comprised of Administration, Marketing and Corporate Communications and Enterprise Operations and Technology. Defendant Sambol is currently President and Chief Operating Officer ("COO") for CFC. Defendant Sambol also serves as Chairman and CEO of CHL, where he directed, authorized and ratified the conduct of CHL. Sambol admittedly "leads all operations of the Company" and has "oversight responsibility" for CHL, as well as CFC's bank, CFC's insurance group, CFC's Capital Markets Division and CFC's Global Operations Division. During the relevant time period, Defendant Sambol sold over 1.4 million shares of Countrywide stock for proceeds in excess of $54 million. Defendant Sambol resides in the County of Los Angeles, California.

11.    Defendant Stanford L. Kurland ("Kurland") resigned from the position of President and Chief Operating Officer ("COO") of CFC in September 2006.  Defendant Kurland began his career with CFC in 1979, and served in a number of executive positions, including President of CHL, Senior Managing Director of Finance, Chief Financial Officer ("CFO") and Vice President-Controller.  During the relevant time period, Defendant Kurland sold over 5.1 million shares of Countrywide stock for proceeds in excess of $185 million. Defendant Kurland resides in the County of Los Angeles, California.

12.    Defendant Carlos M. Garcia ("Garcia") joined the CFC in 1984 and oversaw all corporate operations, including the e–Business Division, Finance, Administration, Human Resources, and Information Technology.  Defendant Garcia has served as Chief Financial Officer ("CFO") of CFC and as a member of the board of directors for CFC Capital Markets, Inc., and as CEO of CFC Insurance Group, Inc. Defendant Garcia is currently Chairman of CFC Bank, FSB.  Defendant Garcia also serves as Executive Managing Director, Chief of Banking

and Insurance for CFC Financial Corporation and Chairman of Balboa Insurance Group, Inc. Defendant Garcia further serves as a member of the CFC Committee. During the relevant time period, Defendant Garcia sold over 1.2 million shares of Countrywide stock for proceeds in excess of $50 million. Defendant Garcia resides in the County of Los Angeles, California.

13.    Defendants Mozilo, Sambol, Kurland and Garcia may also be referred to collectively as the "Individual Defendants."

14.    The Individual Defendants, by reason of their positions as directors and/or officers and fiduciaries of Countrywide and because of their ability to control the business, corporate and financial affairs of the Company, were to ensure that Countrywide was managed and operated in compliance with all applicable federal and state laws, rules and regulations.

15.    The true names of Defendants DOES 1 through 200, who joined in the unlawful, fraudulent, or unfair predatory lending practices as officers, agents, employees, associated parties, or affiliates of the above-named Defendants, are currently unknown to the People, who, therefore, sue such Defendants by their fictitious names. The People will seek leave to amend this Complaint to allege the true names of DOES 1 through 200 when the same have been ascertained. The People are informed and believe, and based on such information and belief, alleges that each of the fictitiously named Defendants participated in some or all of the acts alleged herein.

16.    The true names of Defendants ROES 1 through 500, who otherwise assisted above-named Defendants who either engaged in the unlawful, fraudulent, or unfair predatory lending practices, or aided and abetted in the same by investing in the mortgage-backed securities, are currently unknown to the People, who, therefore, sue such Defendants by their fictitious names. ROES 1 through 500 may be discovered to be "securitizers" – investment banking firms from Wall Street and elsewhere that actually provided the cash used to make Countrywide's loans. The People will seek leave to amend this Complaint to allege the true names of ROES 1 through 500 when the same have been ascertained. The People are informed and believe, and based on such information and belief, alleges that each of the fictitiously named Defendants participated in some or all of the acts alleged herein.

17.    At all relevant times, each of the Defendants acted as the principal, agent, or representative of each of the other Defendants, and in doing the acts herein alleged, each Defendant was acting within the course and scope of the agency relationship with each of the other Defendants, and with the permission and ratification of each of the other Defendants.

18.    At all relevant times, Defendants have controlled, directed, formulated, known and/or approved of the various acts and practices of each of the Defendants.

19.    Whenever reference is made in this Complaint to any act of any corporate or other business defendant, such allegation shall mean that the corporation or other business did the acts alleged through its officers, directors; employees, agents and/or representatives while they were acting within the actual or ostensible scope of their authority.

20.    At all relevant times, each Defendant knew or realized that the other Defendants were engaging in or planned to engage in the violations of law alleged in this Complaint. Knowing or realizing that other Defendants were engaging in or planning to engage in unlawful conduct, each Defendant nevertheless facilitated the commission of those unlawful acts. Each Defendant intended to and did encourage, facilitate, or assist in the commission of the unlawful acts, and thereby aided and abetted the other Defendants in the unlawful conduct.

21.    At all relevant times, Defendants have engaged in a conspiracy, common enterprise, and common course of conduct, the purpose of which is and was to engage in the violations of law alleged in this Complaint. The conspiracy, common enterprise, and common course of conduct continue to the present.

22.    Whenever reference is made in this Complaint to any act of Defendants, such allegations shall mean that each Defendant acted individually and jointly with the other Defendants named in that cause of action.

23.    At all times mentioned in this Complaint, Defendants transacted business within and from the City of San Diego, State of California, and the violations of law described herein were committed within and from the City of San Diego, State of California.

/ / /

/ / /

## III.    FACTUAL ALLEGATIONS

24.    The factual allegations contained herein are based on the following: (a) an investigation conducted by the San Diego City Attorney's Office; (b) the review of public records in San Diego County; (c) allegations contained within the matter of the *People of the State of California v. Countrywide Financial Corporation*, Case No. LC081846, filed in the Superior Court of the State of California, County of Los Angeles; (d) allegations contained with the matter of *In re Countrywide Financial Corp. Derivate Litigation*, Case No. 07-CV-06923-MRP-(MANx), in the United States District Court for the Central District of California, that has be found sufficient to state a securities violations claim (*see In re Countrywide Financial Corp. Derivate Litigation*, 2008 WL 2064977 (C.D. Cal. May 14, 2008)); (e) allegations contained with the matter of *Commonwealth v. Fremont Inv. & Loan*, 2008 WL 517279 (Mass.Super. Feb. 26, 2008); and (f) allegations contained with the matter of *M & T Mortgage Corp. v. Foy*, 858 N.Y.S.2d 567 (2008). As such, the allegations contained herein are based on information and belief, and are likely to have evidentiary support after a reasonable opportunity for further investigation and discovery.

### A.    Countrywide's Residential Mortgage Operations

25.    Countrywide was one of the largest residential mortgage lenders in the United States, responsible for originating and/or servicing over 18% of residential mortgages nationally.

26.    Countrywide managed its business through five divisions:  (1) Mortgage Banking, which originated, purchased, sold and serviced non-commercial mortgage loans nationwide; (2) Banking, which was a federally registered banking institution that took deposits and invested in mortgage loans and home equity lines of credit ("HELOCs"), principally those issued by the Company's Mortgage Banking division but also through third party issued mortgages; (3) Capital Markets, which operated an institutional broker-dealer specializing in underwriting and trading mortgage-backed securities ("MBS"); (4) Insurance, which provided property, casualty, life, and disability insurance as well as reinsurance coverage to primary mortgage insurers; and (5) Global Operations, which licensed proprietary software to mortgage businesses abroad.

27.    Countrywide typically originated residential loans in the Mortgage Banking division, kept a portion of those loans on its balance sheet as investments, primarily in the Banking Division, and securitized and sold off the remainder of the mortgages or mortgage related rights and obligations to third parties, through the Capital Markets division.

28.    Countrywide originated residential mortgage loans and HELOCs through both wholesale and retail channels. In the wholesale channel, employees worked closely with a nationwide network of mortgage brokers to originate loans. In the retail channel, employees in Countrywide's Consumer Markets Division sold loans directly to consumers. Full Spectrum employees also sold loans directly to consumers as part of Countrywide's retail channel.

29.    Over the years, the residential mortgage banking business evolved from one in which lenders originated mortgages for retention in their own portfolios to one in which lenders originate loans for resale to the secondary mortgage market.

30.    During the relevant time period, many of the residential mortgages originated Countrywide were sold into the secondary mortgage market, primarily in the form of securities and to a lesser extent in the form of whole loan sales.

31.    Although the mortgages which it originated were generally sold into the secondary mortgage market, Countrywide typically performed the ongoing servicing functions related to the residential mortgage loans that it produced.

32.    Mortgages are "securitized" when loans are pooled together and transferred to a trust controlled by the securitizer, such as Countrywide. The trust then creates and sells securities backed by the loans in the pool. Holders of the securities received the right to a portion of the monthly payment stream from the pooled loans, although they were not typically entitled to the entire payment stream. Rather, the holders received some portion of the monthly payments. The securitizer, or the trust it controls, often retains an interest in any remaining payment streams not sold to security holders. These securitizations could involve the pooling of hundreds or thousands of loans, and the sale of many thousands of shares.

/ / /

/ / /

**B.**    **Countrywide Shifts Its Strategy From**
        **Traditional Loans To Risky Non-Traditional Loans**

33.    Through 2003, Countrywide primarily made traditional first lien home loans to highly creditworthy individuals.  These "conforming" loans are safer from a credit perspective.  Conforming loans are also easily sold to Fannie Mae and Freddie Mac, government-sponsored entities that provide liquidity to the market for home mortgages.

34.    Beginning in 2003 and carrying into the relevant time period, Countrywide moved to originating more non-conforming loans.  This exposed Countrywide to more risky loans, with higher default rates.  Moreover, these loans could not be sold to government-sponsored entities (like Fannie Mae and Freddie Mac), but had to be sold to private institutional investors.

35.    At the same time, Countrywide was also pursuing a dramatic shift in strategic direction away from traditional fixed-rate home loans to borrowers with "prime" credit scores, in favor of a wide range of non-traditional, high-risk home loans designed to allow borrowers from all credit levels to borrow more money for home purchases than would have been available under traditional fixed product lending guidelines.

36.    Mortgage brokers and other employees were compensated based on the volume of loans originated and received higher payments when selling these non-traditional loan products than they would selling standard loans. Accordingly, Countrywide's employees targeted more and more borrowers who were stretching to afford the loans – many of whom had no realistic ability to repay the loans.

37.    Examples of these "non-traditional" loan products include:

a.    Adjustable rate mortgages ("ARMs"), which typically provide for a low "teaser" interest rate for a predetermined introductory time period, ranging between 2 to 10 years. The majority of ARMs sold to subprime borrowers were called "2/28 loans," meaning that the teaser rate lasts for only two years before "resetting" to higher rates, which are typically tied to specified benchmarks or other criteria, as dictated by the fine print in the loan documentation. As a result, borrowers' monthly obligations would often increase dramatically after the introductory period.

9
COMPLAINT

     b.    Interest-only mortgages, which allow the borrower to pay only the interest accruing on the loan on a monthly basis for a predetermined time period. Thus, the loan principal balance remains constant. At the end of the initial time period, borrowers have to pay interest plus principal, and the interest may adjust depending on whether the loan is a fixed rate or ARM.

     c.    Pay-Option ARMs, which give the borrower the "option" whether to pay down loan principal, to make the monthly interest payment, or to make a "minimum" payment that is less than the interest accruing that month. If a borrower makes only the "minimum" payment, the difference between that amount and the monthly interest payment is added to the remaining loan principal. Thus, while a standard mortgage loan amortizes as principal is paid down and an "interest only" mortgage is non-amortizing, Pay-Option ARMs are subject to negative amortization, *i.e.*, the principal balance increases when interest payments are "skipped."

     d.    Stated income loans, which are based on a borrower's representations about ability to pay, with little or no documentation from the borrower to substantiate those representations. In these loans, the lender typically agrees not to inquire behind the borrower's represented income, leading many to call these products "liar loans."

     e.    Home equity lines of credit ("HELOCs"), which are second loans secured only by the difference between the value of a home and the amount due on a first mortgage. Upon a default and foreclosure, the HELOC lender receives proceeds from the sale of the underlying home only after the first lien holder is paid in whole.  HELOCs sit in the "first loss" position. Therefore, even a 10-20% reduction in home prices can have a dramatic effect on the collateral securing HELOCs – resulting in the entire amount of the HELOC becoming unsecured.

     38.    Beginning in 2003, Countrywide substantially increased its production of non-traditional, high-risk mortgages – both in absolute dollar amounts and as a percentage of the company's total mortgage origination. The table below sets forth the company's non-traditional mortgage originations – loans which are particularly sensitive to a drop in housing prices and/or an interest rate increase:

10
COMPLAINT

|  | 2002 | 2003 | 2004 | 2005 | 2006 |
|---|---|---|---|---|---|
| Adjustable-Rate Loans as % of Total Loans Originated | 14% | 21% | 52% | 52% | 45% |
| HELOCS as % of Total Loans Originated | 4.6% | 4.2% | 8.5% | 9.0% | 10.2% |
| Non-Prime Loans as % of Total Loans Originated | 3.7% | 4.6% | 10.9% | 8.9% | 8.7% |

39.    The following chart illustrates how Countrywide's origination of HELOCs, non-prime mortgages, and ARMs grew in absolute numbers and as a percentage of the company's total mortgage origination before and during the relevant time period.

| Mortgage Loan Production Years Ended December 31, | | | | | |
|---|---|---|---|---|---|
|  | 2002 | 2003 | 2004 | 2005 | 2006 |
| (in millions) | | | | | |
| Total Mortgage Loans | $251,901 | $434,864 | $363,364 | $499,301 | $468,172 |
| HELOC (% of total) | 11,650 (4.6%) | 18,103 (4.2%) | 30,893 (8.5%) | 44,850 (9.0%) | 47,876 (10.2%) |
| Nonprime Mortgage (% of total) | 9,421 (3.7%) | 19,827 (4.6%) | 39,441 (10.9%) | 44,637 (8.9%) | 40,596 (8.7%) |
| Pay-option ARMs as a % of total | N/A | N/A | 6% | 19% | 14% |
| Adjustable-Rate Loans as a % of total | 14% | 21% | 52% | 52% | 45% |

40.    Countrywide increased its production of these loans by offering them to persons who could not or would not provide documentation of their income. In 2004, 78% of the Pay-Option ARMs originated by Countrywide were "low-doc" mortgages in which the borrower did not fully document income or assets. This number grew to 91% in 2006. According to the Company's Form 10-Q filed with the SEC on November 9, 2007, by the end of 2006, 81% of the

11

COMPLAINT

Pay-Option ARMs held for investment by the Countrywide were loans with low or no stated income documentation. Countrywide also increased its origination of Pay-Option ARMs by allowing borrowers to obtain Pay-Option ARMs without making substantial down payments.

41.    At the time the Countrywide was growing the amount of risky loans it originated, it was increasing the amount of Pay-Option ARMs held by the Company for investment. Pay-Option ARM loans represented 46% of the mortgage loans held for investment on December 31, 2006. As set forth below, the amount of Pay-Option ARMs held by Countrywide for investment grew significantly during the Relevant Period (in $ millions):

|  | 2003 | 2004 | 2005 | 2006 |
|---|---|---|---|---|
| **PAY-OPTION ARMS HELD FOR INVESTMENT** | N/A | 4,698 | 26,101 | 32,732 |

**C.    Countrywide Deviates Significantly From Its Underwriting Standards In Order To Capture Greater Market Share**

42.    As Countrywide shifted to selling riskier, non-traditional loan products, it also transitioned into predatory lending practices. A substantial and material percentage of the residential loans originated by Countrywide during the relevant period involved significant variations from the Company's underwriting standards.

43.    The active monitoring and control over Countrywide's underwriting and credit risk assessment processes was particularly important with respect to the Company's strategic shift favoring the origination of high-risk, non-traditional loans such as Pay-Option ARMs. In theory, if borrowers are good credit risks and reasonably sophisticated, they can make their mortgage payment options as needed to manage their cash flow needs over time. However, the risk becomes very significant if Countrywide sold Pay-Option ARMs: (1) to riskier borrowers (including those who would struggle even to make the minimum monthly interest payment); (2) at greater than expected loan to value ("LTV")(*i.e.*, the ratio of the loan amount to the appraised home value); and/or (3) based on limited if any documentation of income and repayment ability.

1  Yet, Countrywide failed to adopt strong internal controls necessary to adequately manage the
2  risks associated with these products.

3      44.    In carrying out its lending practices, Countrywide and its affiliated and
4  associated parties failed to comply with prudent lending standards as follows:

5      a.    Loan decisions were not based upon all relevant factors including the capacity of
6  the borrower to adequately service the debt. For example, borrowers were entering into Pay-
7  Option ARMs were very likely to experience "payment shock" when the loans reset. Under these
8  circumstances, prudent qualifying standards would recognize the potential effect of payment
9  shock in evaluating a borrower's ability to service debt;

10      b.    A borrower's repayment capacity was not evaluated in terms of the borrower's
11  ability to repay the debt by its final maturity at the fully indexed rate, assuming a fully
12  amortizing repayment schedule;

13      c.    Borrowers were not qualified based upon the quantification of the borrower's
14  repayment capacity by a debt-to-income (DTI) ratio, which should have included an assessment
15  of a borrower's total monthly housing-related payments (e.g., principal, interest, taxes, and
16  insurance, or what is commonly known as PITI) as a percentage of gross monthly income. This
17  was not done even when there was additional risk-layering such as reduced documentation, or
18  simultaneous second lien mortgages.

19      45.    Even when these risk-layering features were present, there was an absence of
20  mitigation factors to support Countrywide's underwriting decisions. Thus, the borrowers'
21  repayment capacity was not verified, the borrowers' income (source and amount) was not
22  checked, and the borrower's assets and liabilities were not confirmed.

23      46.    Countrywide also regularly approved "stated income" or no-documentation loans
24  even though the same applicant had been refused a loan under the Company's full-
25  documentation loan program. In such instances, the Company's loan officers would "assist" the
26  applicant in switching to a no-document loan.

27      47.    Countrywide operated a computer system that routed highly risky loans out of
28  the normal loan approval process and to a central underwriting group for evaluation. The system

was called the Exception Processing System. The Exception Processing System identified loans that violated the Company's underwriting requirements. For example, the system flagged loans in which the loan-to-value ratio was too high when compared with the borrower's FICO score. Flagged loan applications were then routed to the company's "Central Underwriting" group located in Plano, Texas (headquarters of the Retail Lending group).

48.    There, loan applications identified by the Exception Processing System as violating the Company's underwriting standards were not rejected. Rather, the applications were evaluated on whether Countrywide should require a higher price (i.e., "up front points") or a higher interest rate in light of the violation at issue.

49.    Furthermore, the Individual Defendants knew Countrywide was extending loans that did not comply with the Company's underwriting policies and procedures. Countrywide's approval of loans that it knew to be high risk and likely to end up in default demonstrated an utter disregard for the well-being of the borrower.

50.    These practices also clearly demonstrated that almost anyone could get a loan, even if they had very little to no chance of paying it back.

51.    Countrywide's strategic shift towards the relaxation of its underwriting and origination procedures was brought about to facilitate an increase in the Company's market share of the residential mortgage business. The Company pushed one goal above all others – originating loans and selling them to the secondary markets as fast as possible.

**D.    Countrywide Engages in Deceptive, Predatory
Practices To The Detriment Of Borrowers**

52.    Countrywide also utilized deceptive lending practices to extend credit to individuals who did not understand the terms and dangers of the costly loans they could not afford. Countrywide's agents, associated parties, and affiliates used predatory lending practices in which borrowers were convinced to agree to unfair and abusive loan terms including interest rates and/or fees that were unreasonably high.

53.    Countrywide's deceptive lending practices included (a) advertising that the Company, as the nation's largest lender, could be trusted by consumers; (b) encouraging

1  borrowers to refinance or obtain purchase money financing with complicated mortgage
2  instruments like hybrid ARMs or Pay-Option ARMs that consumers did not understand; (c)
3  marketing these complex loan products by emphasizing the very low initial "teaser" or "fixed"
4  rates; (d) representing to borrowers that they could refinance prior to scheduled rate increases
5  without disclosing the dangers of negative amortization or pre-payment penalties; and (e)
6  routinely soliciting borrowers to refinance.

7        54.    Defendants knew, or should have known, that Countrywide was required to
8  operate within specific statutory and regulatory parameters limiting the interest rate and other
9  fees that could lawfully be charged to borrowers as well as the types of selling practices that the
10 Company could utilize.

11        55.    Defendants knew that predatory lending practices were a significant problem in
12 the industry, requiring they monitor the Company's lending practices closely.

13        56.    Instead of closely monitoring the Company's lending practices, Defendants
14 created and adopted an incentive compensation system that induced brokers and sales
15 representatives to engage in predatory practices. For example, borrowers were routinely moved
16 into the subprime category even if their financial position dictated that they belonged higher up
17 on the loan spectrum.  This occurred because the Company's brokers and sales representatives
18 earned a greater commission by placing a borrower in a sub-prime loan. Brokers received
19 commissions of 0.50% of the loan's value versus 0.20% on loans one step up the quality ladder,
20 known as Alternate-A loans.

21        57.    Countrywide's sale of ARMs provides another example of predatory lending
22 practices exhibited by the Company. As described, these types of mortgages offered low initial
23 payments based on a fixed introductory or "teaser" rate that expires after a short period, and then
24 adjusts to a variable rate plus a margin for the remaining term of the loan. When the rate resets,
25 borrowers experience "payment shock" and are unable to afford the higher payments. These
26 types of loans were typically offered to subprime borrowers and issued with limited or no
27 document basis. Additionally, ARMs typically carry substantial pre-payment penalties. Yet, the
28

borrowers of these loans are likely to have to resort to frequently refinancing in order to maintain an affordable monthly payment.

58.    Countrywide deceptively marketed Pay-Option ARMs by aggressively promoting the teaser rate. Advertisement did not effectively distinguish between the "payment rate" and the interest rate on the loans, and any warnings about potential negative amortization.

59.    Borrowers, enticed by the low teaser rate, did not fully understand the fine print in the loan documents or the financial implications of Countrywide's Pay-Option ARMs.

60.    It is clear that borrowers did not understand the risks and consequences of obtaining this type of ARM loan. Borrowers who obtained these loans faced unaffordable monthly payments after the initial rate adjustment, difficulty in paying real estate taxes and insurance that were not escrowed, or expensive refinancing fees, any of which could cause borrowers to default and potentially lose their homes.

61.    These consumers were not protected from unfair, deceptive, and other predatory lending practices. Countrywide failed to provide clear and balanced information about the risks and features of these loans to the detriment of its borrowers.

62.    Compounding the predatory nature of Countrywide's lending practices, Countrywide aggressively marketed refinance loans to, among others, Countrywide's customers. Countrywide created a perpetual market for its refinance loans by selling Pay-Option and hybrid ARMs that borrowers would have to refinance in order to avoid payment shock. Countrywide knew that borrowers who could not afford the inevitable payment increase on such loans and who were unable to refinance would be at great risk of losing their homes.

63.    Refinancing also served as a means to overcome a borrower's apprehension about purchasing a Pay-Option or hybrid ARM. Countrywide often overcame a borrower's concerns by promising the borrower that they would be able to refinance into a loan with more favorable terms before the rate reset and the monthly payments increased.

64.    Countrywide failed to inform borrowers with interest-only or negative amortizing loans that refinancing was highly unlikely unless the value of their home increased. Further, Countrywide did not adequately inform borrowers about pre-payment penalties that would

1  essentially prevent many borrowers from refinancing prior to rates resetting and the
2  accompanying payment explosion.

3      65.    As a direct consequence of Countrywide's unfair, unlawful and fraudulent
4  practices, borrowers were unable to afford the monthly payments after the initial rate adjustment
5  due to payment shock. These borrowers also experienced difficulty in paying real estate taxes
6  and insurance that were not escrowed. They incurred expensive refinancing fees, frequently due
7  to closing costs and prepayment penalties. Ultimately, most borrowers ended up losing their
8  homes.

9      66.    Countrywide, on the other hand, continued its deceptive marketing practices for
10  it cared only about doing whatever it took to increase the numbers of loans.

11  ## FIRST CAUSE OF ACTION

12  VIOLATIONS OF BUSINESS AND PROFESSIONS CODE SECTION 17200

13  (UNFAIR COMPETITION)

14      67.    Plaintiff realleges paragraphs 1 through 66 of the Complaint and incorporates
15  same by this reference as though fully set forth herein.

16      68.    Beginning on an exact date unknown to Plaintiff, but within four years prior to
17  the filing of this Complaint, and continuing to the present, Defendants engaged in unfair
18  competition in violation of Business and Professions Code 17200, including, but not limited to,
19  one or more unlawful, unfair or fraudulent business acts or practices:

20      a.    By significantly deviating from traditional underwriting standards when
21  originating non-traditional loan products such as Pay-Option ARMs and hybrid ARMs;

22      b.    By ignoring internal controls that suggested certain loan applications be denied
23  and funding those loan applications merely to increase market share;

24      c.    By creating an incentive based compensation system that induced brokers and
25  sales associates to engage in predatory practices; and

26      d.    By utilizing deceptive lending practices including, but not limited to, (i)
27  aggressively promoting introductory or teaser rates; (ii) by failing to provide clear and balanced
28  information concerning the risks and features of its non-traditional loans; and (iii) by creating a

17
COMPLAINT

perpetual refinancing market for itself when placing borrowers in loans they had no ability to repay.

**PRAYER**

WHEREFORE, Plaintiff prays for judgment against Defendants, DOES 1 through 200, and ROES 1 through 500, and each of them, on all causes of action as follows:

1.    For judgment in favor of Plaintiff and against Defendants;

2.    For a permanent injunction enjoining Defendants, their successors, assigns, agents, representatives, employees and all persons who act in concert with them from initiating or advancing any foreclosure on any residential mortgage involving properties which are owner occupied and where the following four factors exist:

a.    The loan is an ARM with an introductory period of three years or less;

b.    The loan has an introductory or "teaser" rate for the initial period that is at least 3 percent lower than the fully indexed rate;

c.    The borrower has a debt-to-income ratio that would have exceeded 50% if the lender's underwriters had measured the debt, not by the debt due under the teaser rate, but by the debt due under the fully indexed rate; and

d.    The loan-to-value ratio is 100% or the loan carries a substantial prepayment penalty or a prepayment penalty that extends beyond the introductory period.

3.    For an order that Defendants can only reinitiate foreclosure proceedings on the above properties after showing proof to the City of San Diego that Defendants have met with the borrower and taken reasonable steps in an attempt to resolve their differences and avoid foreclosure.

4.    For a permanent injunction enjoining Defendants, their successors, assigns, agents, representatives, employees and all persons who act in concert with them from engaging in unfair competition as defined in Business and Professions Code section 17200, including, but not limited to, the acts or practices alleged in this Complaint.

5.    For the imposition of a civil penalty of $2,500 pursuant to Business and Professions Code section 17536 against each Defendant for each violation of Business and

18
COMPLAINT

1  Professions Code section 17500 as alleged in this Complaint. Plaintiff requests that civil penalty

2  of no less than $100,000 be imposed against each Defendant.

3        6.     For costs of suit incurred herein; and

4        7.     For such further and other relief as the Court deems just and proper.

5

6

7  Dated:_____

                                  _____

8                                      MICHAEL J. AGUIRRE, City Attorney

9                                      Attorney for Plaintiff

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT 7

on
## MULTIDISTRICT LITIGATION

**CHAIRMAN:**
Judge John G. Heyburn II
United States District Court
Western District of Kentucky

**MEMBERS:**
Judge J. Frederick Motz
United States District Court
District of Maryland

Judge Robert L. Miller, Jr.
United States District Court
Northern District of Indiana

Judge Kathryn H. Vratil
United States District Court
District of Kansas

Judge David R. Hansen
United States Court of Appeals
Eighth Circuit

**DIRECT REPLY TO:**
Jeffery N. Lüthi
Clerk of the Panel
One Columbus Circle, NE
Thurgood Marshall Federal
Judiciary Building
Room G-255, North Lobby
Washington, D.C. 20002

Telephone: [202] 502-2800
Fax:          [202] 502-2888
http://www.jpml.uscourts.gov

July 30, 2008

Re: MDL No. 1988 -- IN RE: Countrywide Financial Corp. Mortgage Marketing and Sales Practices Litigation

DOCUMENT FILED: Motion of Defendants Countrywide Financial Corp., Countrywide Bank, FSB, Countrywide Home Loans, Inc., and Bank of America Corp. for Transfer of Actions to the Central District of California for Coordinated or Consolidated Pretrial Proceedings Pursuant to 28 U.S.C. § 1407

Dear Counsel:

Today we have filed the above-described motion. Papers filed with the Panel and all correspondence MUST bear the **DOCKET NUMBER** and **CAPTION ASSIGNED** by the Panel as noted above.

Enclosed is a summary of the Rules of Procedure of the Judicial Panel on Multidistrict Litigation, 199 F.R.D. 425 (2001). Pursuant to Rule 5.2(c), you must notify this office within the next 11 days of the name and address of the attorney designated to receive service of all papers relating to practice before the Panel. **ONLY ONE ATTORNEY SHALL BE DESIGNATED FOR EACH PARTY.** We will prepare a Panel Attorney Service List on the basis of the appearances received and transmit it to you for your use in complying with our service requirements. **PLEASE COOPERATE BY PROMPTLY RETURNING THE ENCLOSED APPEARANCE FORM.**

### APPEARANCE AND RULE 5.3 CORPORATE DISCLOSURE STATEMENT ARE DUE NO LATER THAN NOON EASTERN TIME : August 11, 2008

Panel Rule 5.2(a) requires that responses to motions be served on ALL parties in ALL actions. An **ORIGINAL and FOUR** copies of all pleadings, as well as a **COMPUTER GENERATED DISK** of the pleading in Adobe Acrobat (PDF) format, are currently required for filing.

### RESPONSES DUE ON OR BEFORE:     August 19, 2008

Panel Rule 7.2(i) requires any party or counsel in these actions to promptly notify this office of any potential tag-along in which that party is also named or in which that counsel appears.

You will be notified when this matter has been scheduled for a hearing session before the Panel. You must file a response if you wish to participate in oral argument, if it is scheduled by the Panel. Please carefully review Panel Rule 16.1 dealing with hearing sessions.

Very truly,

Jeffery N. Lüthi
Clerk of the Panel

Enclosures

# UNITED STATES JUDICIAL PANEL
# ON MULTIDISTRICT LITIGATION

**TO:** United States Judicial Panel
on Multidistrict Litigation
Thurgood Marshall Federal Judiciary Bldg.
One Columbus Circle, N.E., Room G-255
Washington, D.C. 20002

**THIS FORM MUST BE RETURNED TO
THE JUDICIAL PANEL NO LATER THAN
(Noon Eastern Time)   August 11, 2008**
Panel Fax No.: (202) 502-2888

MDL No. **1988** -- IN RE: **Countrywide Financial Corp. Mortgage Marketing and Sales Practices Litigation**

# NOTICE OF APPEARANCE

**PARTIES REPRESENTED (indicate plaintiff or defendant--attach list if necessary):**

**SHORT CASE CAPTION(s) (Include District(s), Civil Action No(s).-- attach list if necessary):**

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

In compliance with Rule 5.2(c), R.P.J.P.M.L., 199 F.R.D. 425, 431 (2001), the following designated attorney is authorized to receive service of all pleadings, notices, orders, and other papers relating to practice before the Judicial Panel on Multidistrict Litigation on behalf of the plaintiff(s)/ defendant(s) indicated. I am aware that only one attorney can be designated for each party.

_____
Date

_____
Signature of Attorney or Designee

**Name and Address of Designated Attorney:**

Telephone No.: _____    Fax No.:_____

Email Address: _____

## ORIGINAL ONLY OF APPEARANCE NEEDED BY US FOR FILING
A CERTIFICATE OF SERVICE WILL BE REQUIRED IF THE APPEARANCE IS RECEIVED AFTER THE DUE DATE PRINTED ABOVE

JPML Form 18

# SUMMARY OF PANEL RULES – 199 F.R.D. 425 (2001)
[Revised July 30, 2007]

Responses and replies to motions or orders to show cause are to be filed and served in conformity with Rules 5.11, 5.12, 5.13, 5.2, 7.1, 7.2 and 7.3 of the <u>Rules of Procedure of the Judicial Panel on Multidistrict Litigation</u>. Please note the following:

**Address to:**

Clerk of the Panel
Judicial Panel on Multidistrict Litigation
Thurgood Marshall Federal Judiciary Building
One Columbus Circle, N.E.
Room G-255, North Lobby
Washington, DC 20002-8004

Telephone: 202/502-2800
Office Hours: 9 a.m. to 4 p.m.

FAX: 202/502-2888 (24 hours)
Website:  www.jpml.uscourts.gov

**No papers are to be left with or mailed to a Judge of the Panel or his/her chambers for filing.**

Rule 5.12(a) identifies those documents which require an original only for filing. An original and four copies of motions, briefs, responses, etc., must be submitted for filing. Rule 5.12(d) states that papers requiring only an original may be faxed to the Panel office with prior approval. Papers requiring multiple copies will NOT be accepted via fax.

Rule 5.13 requires that whenever an original and four copies is required to be submitted for filing to the Clerk of the Panel pursuant to Rule 5.12(a), a copy of the paper must also be submitted on a computer generated disk in Adobe Acrobat (PDF) format.

Rule 5.2 requires that all papers filed with the Panel must be served on <u>all</u> parties in <u>all</u> actions involved in the litigation. If liaison counsel has been appointed by the transferee court in an existing MDL docket, this rule is satisfied by serving each party in each affected action and all liaison counsel. Recipients of a motion have ELEVEN (11) days (Rule 5.2(c)) to notify this office in writing of one attorney per party to receive service of future Panel pleadings filed in the litigation. A "Panel Service List" will be prepared and distributed by this office in compliance with Rule 5.2(d). A copy of this "Panel Service List" must be attached to the proof of service and supplemented in the event of the presence of additional parties or successor counsel.

Rule 5.3 requires any nongovernmental corporate party to file a Corporate Disclosure Statement within eleven days of the filing of a motion or order to show cause.

Rule 7.1 outlines the format for pleadings filed with the Panel and notes that the heading on the first page of each pleading shall commence not less than 3 inches from the top of the page. Each pleading shall bear the heading "Before the Judicial Panel on Multidistrict Litigation," the identification "MDL Docket No. ___" and the descriptive title designated by the Panel. For new litigations, movant should use an appropriate descriptive title. Papers may be fastened in the upper left corner without side binding or front or back covers. Each brief submitted for filing shall be <u>limited to twenty pages</u>, exclusive of exhibits. Exhibits exceeding 50 pages must be fastened separately from the accompanying pleading.

Review Rule 7.2 for identification of accompaniments to motions under 28 U.S.C. §1407. See Rule 6.2 for guidance on requesting extensions of time. Counsel are required by Rules 7.2(f) and 7.3(e) to advise the Panel of any developments in the litigation which would partially or completely moot a matter being considered by the Panel.

Rules 7.2(i), 7.3(a) and 7.5(e) require parties and counsel to notify the Panel of any potential tag-along actions in which they are involved.

◄  SEE OTHER SIDE FOR MORE INFORMATION  ►

Rule 16.1, "Hearing Sessions and Oral Argument," deals with the setting of matters for oral argument or for submission without oral argument, notices of appearance or waiver of oral argument, parties entitled to present oral argument, and time limits.

Please note in Rule 1.5 that pendency before the Panel does not affect or suspend orders and pretrial proceedings in the district court in which the action is pending and does not in any way limit the pretrial jurisdiction of that court.

Copying and certification fees are charged in accordance with Rule 5.1 and are as follows:  $.50 per page for copying, $9.00 per document for certification, $25.00 per diskette, and $26 for each name/item researched. Payment for copying and certification must be made by check or money order payable to the "Judicial Panel on Multidistrict Litigation." [Effective as of November 1, 2003]

---

Fasten documents in top, left-hand corner

Start document 3" from top of page

**BEFORE THE JUDICIAL PANEL ON MULTIDISTRICT LITIGATION**

**In re** [descriptive title used by Panel or appropriate descriptive title for new motion]

MDL No. _____

Identify document:
  **MOTION**
  **BRIEF**  (limited to 20 pages -- giving background of litigation; factual and legal contentions of movant w/citation of applicable authorities )
  **RESPONSE TO MOTION**
  **REPLY**
  **EXHIBITS** (fastened separately if exceed 50 pages)

  ORIGINAL PLUS FOUR OF ALL PLEADINGS EXCEPT original only of proof of service, notice of appearance, corporate disclosure statement, notice of opposition, notice of related action, application for extension of time, hearing appearance/waiver.

---

**Schedule of Actions**
[Must be attached to motions]

Include only related cases pending in FEDERAL DISTRICTS.  Necessary information as follows:

  COMPLETE name of each case, listing full name of each party on district court's docket sheet  [Do NOT include "et als., etc."]
  DISTRICT in which case is pending
  DIVISION (or division number)
  CASE NUMBER
  Name of assigned JUDGE

DO NOT INCLUDE terminated actions or actions pending in state courts.

Notices or letters advising of RELATED ACTIONS or of TAG-ALONG ACTIONS must include this information.  **One courtesy copy of each complaint and docket sheet would be helpful.**

---

**MOTIONS FILED WITH THE PANEL:** When a motion is filed, the Panel will send a letter to all recipients of the motion as notification of the filing date, MDL docket number and caption, briefing schedule and pertinent Panel policies.

**CALENDAR – CALENDAR – CALENDAR**

**Appearances**: 11 days from filing of original motion
**Corporate Disclosure Statement**: 11 days from filing of motion
**Responses** to motion: 20 days
**Reply** to Responses (by movant): 5 days
**Oppositions** to Conditional Transfer Order: 15 days
**Motions to Vacate** Conditional Transfer Order:
      15 days (after opposition is filed)

HUG-05-2008   13:08     ATTY GEN OFFICE                          ☒002/003
                                                                    P.02

JUDICIAL PANEL ON
MULTIDISTRICT LITIGATION

**AUG – 6 2008**

FILED
CLERK'S OFFICE

Request of Pltfs. the People of the State
of California for Extension of Time to file
Response — GRANTED TO **ALL PARTIES**
TO AND INCLUDING **August 29, 2008**.
(jwn – August 6, 2008)

## BEFORE THE JUDICIAL PANEL
## ON MULTIDISTRICT LITIGATION

IN RE COUNTRYWIDE MORTGAGE
LITIGATION

MDL DOCKET NO.
1988

## PEOPLE OF THE STATE OF CALIFORNIA'S ASSENTED-TO
## APPLICATION TO EXTEND TIME TO RESPOND TO MOTION FOR
## TRANSFER

The People of the State of California, plaintiff in case no. 08-cv-04861 (C.D.
Ca.), respectfully request that the Judicial Panel for Multidistrict Litigation extend
to August 29, 2008, the time by which the People may file a response to the Motion
For Transfer and Consolidation or Coordination made by Defendants Countrywide
Financial Corporation, Countrywide Bank, FSB, Countrywide Home Loans, Inc., and
Bank of American Corporation. This application is made pursuant to Rule 6.2 of the
Rules of Procedure of the Panel.

In support of this request, the People state as follows:

1.     The People currently have until August 19, 2008 to file any response to Defendants' Motion for Transfer.

2.     The People have not previously requested any extension of time to respond to the Motion for Transfer.

3.     Due to previously scheduled commitments, the People respectfully request an additional ten days in which to file their response to Defendants' Motion, making the new deadline for a response August 29, 2008.

4.     This request for a brief additional period of time to respond to the Motion for Transfer will allow the People an opportunity to respond fully to the arguments by Defendants in their motion.

5.     Counsel for the People consulted with counsel for Defendants prior to the filing of this application, and they assented to the People's request for additional time to file a response to the Motion for Transfer.

August 5, 2008

Benjamin G. Diehl
Frances T. Grunder
Kathrin Sears
Robyn Smith
Linda Hoos
OFFICE OF THE CALIFORNIA
ATTORNEY GENERAL
300 S. Spring St., Ste. 1702
Los Angeles, CA 90013
(213) 897-5548 (telephone)
(213) 897-4951 (facsimile)
benjamin.diehl@doj.ca.gov

2

# EXHIBIT 8

**BEFORE THE JUDICIAL PANEL
ON MULTIDISTRICT LITIGATION**

|  |  |  |
|---|---|---|
|  | ) |  |
|  | ) |  |
| IN RE COUNTRYWIDE MORTGAGE | ) | MDL Docket No. _____ |
| LITIGATION | ) |  |
|  | ) |  |
|  | ) |  |

**MOTION OF DEFENDANTS COUNTRYWIDE FINANCIAL CORPORATION,
COUNTRYWIDE BANK, FSB, COUNTRYWIDE HOME LOANS, INC., AND BANK OF
AMERICA CORPORATION FOR TRANSFER AND COORDINATION OR
CONSOLIDATION PURSUANT TO 28 U.S.C. § 1407**

Countrywide Financial Corporation, Countrywide Bank, FSB, Countrywide Home Loans,

Inc., and Bank of America Corporation (individually or collectively, "Movants") hereby

respectfully move the Judicial Panel on Multidistrict Litigation under 28 U.S.C. § 1407 for an

order of transfer and pretrial coordination or consolidation of five civil actions pending in more

than one district that share common questions of fact. Movants hereby request that the Panel

issue an order (a) transferring to the United States District Court for the Central District of

California the two actions subject to this motion that are not already pending in that Court, and,

with the consent of that Court, assigning to the Hon. Stephen V. Wilson of that Court the four actions subject to this motion not already assigned to him; and (b) coordinating or consolidating pretrial proceedings in the five actions pursuant to 28 U.S.C. § 1407. A schedule identifying the five actions is attached hereto as Schedule A.

In support of the transfer of these actions, Movants aver the following, as more fully set forth in the accompanying supporting memorandum:

1.     As required by 28 U.S.C. § 1407(a), the cases proposed for transfer are pending in different districts and "involv[e] one or more common questions of fact." The cases are all premised on allegations that Countrywide Financial Corporation, Countrywide Bank, FSB, and/or Countrywide Home Loans, Inc. (individually or collectively, "Countrywide") originated or serviced certain residential mortgage loans in an unlawful, unfair, or deceptive fashion.

2.     The five actions allege many of the same claims for relief. Four out of the five complaints allege violations of the California Unfair Competition Law, Cal. Bus. & Prof. Code §§ 17200 *et seq.* and False Advertising Law, Cal. Bus. & Prof. Code §§ 17500 *et seq.* The fifth complaint (the Illinois attorney general action) alleges violations of the Illinois analogue to California's Unfair Competition Law.

3.     The proposed class definitions of the private actions overlap substantially. These actions seek certification of nationwide classes of borrowers of mortgage loans originated or serviced by Countrywide. In addition, the attorney general actions are brought to seek redress for alleged injuries to many of the same borrowers encompassed by the putative classes in the private actions.

4.     Given this significant overlap among the cases as to factual questions, claims for relief, and putative classes or otherwise covered borrowers, transfer and coordination or

consolidation will promote the "just and efficient conduct of [the] actions." 28 U.S.C. § 1407. Absent centralization, multiple judges would be required to decide the same issues with respect to the same plaintiffs and the same defendants, and the parties would risk obtaining inconsistent rulings from multiple courts.

5.     Transfer and coordination or consolidation also will "be for the convenience of parties and witnesses" so that common pretrial matters such as depositions and document discovery can occur in an orderly, non-duplicative fashion based on coordinated proceedings in a single forum. 28 U.S.C. § 1407.

6.     Movants respectfully suggest that the two actions not already pending before the Central District of California are appropriate for transfer to that Court. Three of the five constituent actions are pending in the Central District of California. That district also includes Countrywide's principal place of business. An overwhelming number of the witnesses and documents with discoverable information will be located in or near the Central District of California because Countrywide Financial Corp.'s principal place of business is in that district.

7.     Transfer to the Hon. Stephen V. Wilson is appropriate because the earliest-filed action of the five actions is assigned to him.

This motion is based on the Memorandum filed by Movants this day, the pleadings and papers on file herein, and such other matters as may be presented to the Panel at the time of hearing.

Dated:  July 24, 2008                    Respectfully submitted,


                                         John H. Beisner
                                         Brian D. Boyle
                                         O'MELVENY & MYERS LLP
                                         1625 Eye Street, N.W.
                                         Washington, D.C.  20006
                                         (202) 383-5300 (phone)
                                         (202) 383-5414 (fax)


*Attorneys for Countrywide Financial Corp., Countrywide Bank, FSB,
Countrywide Home Loans, Inc., and Bank of America Corporation*

**BEFORE THE JUDICIAL PANEL
ON MULTIDISTRICT LITIGATION**

| | |
|---|---|
| IN RE COUNTRYWIDE MORTGAGE LITIGATION | ) <br> ) <br> )    MDL Docket No. _____ <br> ) <br> ) <br> ) |

**MEMORANDUM IN SUPPORT OF DEFENDANTS COUNTRYWIDE FINANCIAL CORPORATION, COUNTRYWIDE BANK, FSB, COUNTRYWIDE HOME LOANS, INC., AND BANK OF AMERICA CORPORATION'S MOTION FOR TRANSFER AND PRETRIAL COORDINATION OR CONSOLIDATION PURSUANT TO 28 U.S.C. § 1407**

## INTRODUCTION

Pursuant to 28 U.S.C. § 1407 and Rule 7.2(a) of the Rules of Procedure of the Judicial Panel on Multidistrict Litigation, Countrywide Financial Corporation, Countrywide Bank, FSB, Countrywide Home Loans, Inc.,[i] and Bank of America Corporation (individually or collectively, "Movants") seek transfer and pretrial coordination or consolidation of five actions against

---

[i]      Countrywide Financial Corporation, Countrywide Bank, FSB, Countrywide Home Loans, Inc. are referred to individually or collectively as "Countrywide."

Movants filed on the basis of the same core factual allegations relating to the origination and/or servicing of residential mortgage loans.[2]  The actions subject to this petition include two representative state attorney general actions (California and Illinois) and three putative class action lawsuits.  All five actions are based on the same or similar allegations and claims for relief.  A multidistrict litigation ("MDL") proceeding is warranted because all of the statutory criteria for transfer and coordination or consolidation are abundantly present.

These cases present a compelling case for MDL transfer and coordination or consolidation because: (i) the cases easily meet the threshold requirement of "involving one or more common questions of fact; (ii) transfer will "be for the convenience of parties and witnesses"; and (iii) transfer "will promote the just and efficient conduct of [the] actions" by ensuring centralized discovery oversight, reducing the risk of inconsistent class certification and other pretrial rulings, and avoiding duplicative proceedings.  28 U.S.C. § 1407.

*First*, the complaints rest on the same core factual allegations and, hence, involve "one or more common questions of fact" under 28 U.S.C. § 1407.  Plaintiffs allege that Countrywide originated or serviced residential mortgage loans, including Pay Option Adjustable Rate Mortgages ("ARMs") and Hybrid ARMs,[3] in an unlawful, unfair, or deceptive fashion by misrepresenting or concealing the terms, risks, or suitability of the loans, and/or by placing borrowers in loans that they could not afford.  Plaintiffs allege that as a result of Countrywide's alleged conduct, they (or, in the attorney general actions, consumers on whose behalf the claims

---

[2]     The actions subject to this petition are *Sizemore v. Countrywide Financial Corp.*, Case No. CV07-006094-SVW (AJWx) (C.D. Cal.); *People of the State of Illinois v. Countrywide Financial Corp.*, (N.D. Ill.) (removed July 24, 2008, case number to be supplied separately); *People of the State of California v. Countrywide Financial Corp.*, (C.D. Cal.) (removed July 24, 2008, case number to be supplied separately); *Hursh v. Countrywide Financial Corp.*, 08CV-1313 J NLS (S.D. Cal.); and *Leyvas v. Bank of America Corp.*, Case No. CV08-787 DOC (MLGx) (C.D. Cal.).  Courtesy copies of the operative complaint in each action are submitted herewith.

[3]     A Pay Option ARM generally refers to a mortgage where the rate may adjust and the borrower is given a number of different payment options each month.  A Hybrid ARM generally refers to an mortgage that is subject to an interest rate for an initial period, followed by an interest rate that may adjust thereafter.

are being brought) suffered damages stemming from higher interest rates than they anticipated paying, negative amortization, prepayment penalties, and other allegedly undisclosed or partially disclosed fees or expenses. Plaintiffs also allege that Countrywide's conduct led to foreclosures and harm to plaintiffs' credit and financial position.

*Second*, the complaints allege many of the same claims for relief. Four out of the five complaints allege violations of the California Unfair Competition Law, Cal. Bus. & Prof. Code §§ 17200 *et seq.* ("UCL") and False Advertising Law, Cal. Bus. & Prof. Code §§ 17500 *et seq.* ("FAL"). The fifth complaint (the Illinois attorney general action) alleges violations of the Illinois analogue to California's UCL, as well as violations of the Illinois Fairness in Lending Act.

*Third*, the proposed class definitions of the private actions overlap substantially. These actions seek certification of nationwide classes of borrowers of mortgage loans originated or serviced by Countrywide. In addition, the attorney general actions are brought to seek redress for alleged injuries to many of the same borrowers encompassed by the putative classes in the private actions.

*Fourth*, given this significant overlap among the cases as to factual questions, claims for relief, and putative classes or otherwise covered borrowers, transfer and coordination or consolidation will promote the "just and efficient conduct of [the] actions." 28 U.S.C. § 1407. Absent centralization, multiple judges would be required to decide the same issues with respect to the same plaintiffs and the same defendants, and the parties would risk obtaining inconsistent rulings from multiple courts.

*Fifth*, transfer and coordination or consolidation will "be for the convenience of parties and witnesses" so that common pretrial matters such as depositions and document discovery can

occur in an orderly, non-duplicative fashion based on coordinated proceedings in a single forum. 28 U.S.C. § 1407.

*Finally*, these cases are appropriate for transfer to the United States District Court for the Central District of California. Three of the five constituent actions are pending in the Central District of California. That district also includes Countrywide's principal place of business.

## BACKGROUND

These cases allege claims against Movants relating to Countrywide's origination and servicing of home mortgage loans in the United States. The actions allege that in an effort to maximize its profits and increase its share of the consumer market for mortgage loans, Countrywide engaged in a scheme to deceive consumers into taking out complex, risky, and unsuitable mortgage loans, including Pay Option ARMs and Hybrid ARMs. Plaintiffs allege that Countrywide carried out this scheme by relaxing underwriting standards and by misrepresenting or concealing material terms of the loans. Plaintiffs allege that as a result of this conduct, the private plaintiffs and other Countrywide borrowers have suffered damages or lost money in the form of concealed or inadequately disclosed interest and principal payments, fees, and penalties. Plaintiffs also allege that they and other members of the putative classes (as well as borrowers whose loans are at issue in the attorney general actions) face the possibility of foreclosure and a resulting loss of their homes, as well as harm to their credit and financial position.

*Sizemore* was originally filed on September 19, 2007. The California and Illinois Attorney General actions were filed in state court on June 25, 2008. The California complaint was amended on July 17, 2008. Both actions were removed to federal court on July 24, 2008. *Hursh* was filed in state court on July 2, 2008 and removed to federal court on July 22, 2008. *Leyvas* was filed in federal court on July 17, 2008. *Hursh* and *Leyvas* largely copy the

allegations and claims for relief of the California Attorney General's complaint. A description of each of the five constituent actions is as follows:

- *Sizemore v. Countrywide Financial Corp.*, Case No. CV07-006094-SVW (AJWx) (C.D. Cal., filed September 19, 2007, and originally captioned *White v. Countrywide Financial Corp.*), was filed in the Central District of California against Countrywide Financial Corp., Countrywide Bank, N.A., Countrywide Home Loans, Inc., Countrywide Tax Services Corp., LandSafe, Inc., LandSafe Appraisal Services, Inc., LandSafe Credit, Inc., and LandSafe Flood Determination, Inc. The Second Amended Complaint ("*Sizemore* SAC") alleges that defendants "systematically steered borrowers into inappropriate subprime loans with excess charges and inadequately disclosed risks, including drastic and unexpected increases in required monthly payments, that have caused a flood of foreclosures and financial woes among the class." (*Sizemore* SAC ¶ 3.) The complaint asserts violations of the UCL, the FAL, the Racketeer Influenced Corrupt Organizations Act (18 U.S.C. §§ 1961 *et seq.*), and common law unjust enrichment. Plaintiffs seek to represent a putative "nationwide Class of all persons who, from September 19, 2003 to the date of Class certification, obtained a subprime loan issued by Countrywide." (*Sizemore* SAC ¶ 161.)

- *People of the State of Illinois v. Countrywide Financial Corp.*, (N.D. Ill., removed on July 24, 2008, case number to be supplied separately) (the "Illinois AG Action") was filed on June 25, 2008 in the Circuit Court of Cook County, State of Illinois, against Countrywide Financial Corp., Countrywide Home Loans, Inc., Countrywide Bank, FSB, Full Spectrum Lending, Inc., and Countrywide Financial Corp. Chief Executive Officer Angelo Mozilo. Plaintiff alleges violations of the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 Ill. Comp. Stat. Ann. 505/2, and the Illinois Fairness in Lending Act, 815 Ill. Comp. Stat. Ann. 120/4, arising out of an alleged scheme to deceptively market complex, risky, and unsuitable mortgage loans in order to maximize Countrywide's profits and its share of the secondary mortgage market.

- *People of the State of California v. Countrywide Financial Corp.*, (C.D. Cal., removed on July 24, 2008, case number to be supplied separately) (the "California AG Action") was filed on June 25, 2008 in the Superior Court of California, County of Los Angeles against Countrywide Financial Corp., Countrywide Home Loans, Inc., Countrywide Bank, FSB, Full Spectrum Lending, Inc., as well as Angelo Mozilo and David Sambol, another Countrywide officer. Plaintiff filed an amended complaint on July 17, 2008. Plaintiff alleges violations of the UCL and FAL arising out of an alleged scheme to deceptively market complex, risky, and unsuitable mortgage loans in order to maximize Countrywide's profits and its share of the secondary mortgage market.

- *Hursh v. Countrywide Financial Corp.*, Case No. 08-CV-1313 J NLS (S.D. Cal., removed on July 22, 2008), was filed on July 2, 2008 in the Superior Court of California, County of San Diego against the same defendants named in the California Attorney General action. Plaintiff makes essentially the same allegations and asserts the same claims (violations of UCL and FAL) as the California AG Action. (*Compare* California AG Action Compl. ¶¶ 15-84, 159-64 *with Hursh* Compl. ¶¶ 29-96, 127-30.) Plaintiff seeks to represent a putative class consisting of "any consumer who obtain [*sic*] any type of mortgage funding from defendants from 2000 to present." (*Hursh* Compl. ¶ 20.)

- *Leyvas v. Bank of America Corp.*, Case No. CV08-787 DOC (MLGx) (C.D. Cal., filed July 17, 2008) was filed in the Central District of California against Bank of America Corp., Countrywide Financial Corp., Countrywide Home Loans, Inc., Countrywide Bank, FSB, and Full Spectrum Lending, Inc. Plaintiffs make essentially the same allegations as the California AG Action and assert claims under the UCL, FAL, and the California Consumers Legal Remedies Act, Cal. Civ. Code §§ 1750 *et seq.* Plaintiffs expressly and repeatedly refer to the California AG Action and the investigation leading up to it. (*See, e.g., Leyvas* Compl. ¶¶ 51, 54, 67, 80.) Plaintiffs seek to represent a putative class consisting of "[a]ll persons in the United States who, at any time between July 17, 2004 and July 1, 2008, obtained at least one residential mortgage loan from Countrywide" that was subject to the allegedly unlawful conduct asserted in the complaint. (*Id.* ¶ 20.)

## ARGUMENT

## I.    THESE ACTIONS ARE APPROPRIATE FOR TRANSFER AND PRETRIAL COORDINATION OR CONSOLIDATION UNDER 28 U.S.C. § 1407.

28 U.S.C. § 1407(a) provides that this Panel may transfer for pretrial coordination or consolidation two or more civil cases upon a determination (i) that the cases "involve[] one or more common questions of fact," (ii) that the transfers would further "the convenience of parties and witnesses," and (iii) that the transfers "will promote the just and efficient conduct of [the] actions." The cases subject to this petition plainly meet these criteria and should be transferred for coordinated pretrial proceedings.

DCI 751767.1

A.    **These Actions Involve One Or More Common Questions Of Fact.**

1.    **The Actions Involve The Same Or Similar Facts And Theories Of Recovery.**

These actions easily meet the threshold requirement of § 1407(a) because they involve "one or more common questions of fact." The factual allegations underlying each of the actions are extremely similar and, in the case of the California AG Action, *Hursh*, and *Leyvas*, are identical to one another in many material respects. All the complaints allege that in an effort to maximize its profits and its share of the secondary market for mortgage loans, Countrywide originated or serviced residential mortgage loans in an unlawful, unfair, or deceptive fashion by misrepresenting or concealing the terms, risks, or suitability of the loans, and/or by placing borrowers in loans that they could not afford.[4] Plaintiffs allege that this conduct resulted in financial harm to borrowers in the form of concealed or inadequately disclosed principal, fees, penalties, and expenses, as well foreclosure, loss of their homes, and damage to their credit and financial position.[5] "Common" factual allegations thus exist across these cases.

The claims for relief are also similar. Four out of the five complaints allege violations of California's UCL and FAL, and the remaining complaint alleges violations of the Illinois analogue to California's UCL.[6]

The Panel has recognized that actions asserting such similar claims based on such similar underlying factual allegations are particularly well suited for coordination or consolidation

---

[4]    (*See, e.g.*, *Sizemore* Compl. ¶¶ 2-32; Illinois AG Action Compl. ¶¶ 72-171, 231-269; California AG Action Compl. ¶¶ 15-84, 119-135; *Hursh* Compl. ¶¶ 29-96; *Leyvas* Compl. ¶¶ 48-108.)

[5]    (*See, e.g.*, *Sizemore* Compl. ¶ 32; Illinois AG Action Compl. ¶¶ 54-58, 80, 103-135, 294-299; California AG Action Compl. ¶¶ 49-53, 75-77, 83-84, 159-164, *Hursh* Compl. ¶¶ 64-67, 88-90, 95-96, 127-30; *Leyvas* Compl. ¶¶ 71-75, 99-101, 107-08.)

DC1:751767.1

pursuant to § 1407. *See, e.g., In re Wireless Tel. Replacement Prot. Programs Litig.*, 180 F.

Supp. 2d 1381, 1382 (J.P.M.L. 2002) (transfer ordered where there were "common questions of

fact arising out of nearly identical allegations that the similar wireless telephone replacement

protection programs . . . violate state insurance, consumer protection and/or deceptive business

practices statutes"); *In re Cooper Tire & Rubber Co. Tires Prods. Liab. Litig.*, No. 1393, 2001

WL 253115 (J.P.M.L. Feb. 23, 2001) (transfer ordered where "[a]ll actions involve allegations

relating to Cooper's tire design and its manufacturing process"); *In re St. Jude Med., Inc., Silzone

Heart Valves Prods. Liab. Litig.*, Docket No. 1396, 2001 U.S. Dist. LEXIS 5226, at *2-3

(J.P.M.L. Apr. 18, 2001) (transfer ordered where "[a]ll actions are brought as class actions . . .

and arise from the same factual milieu, namely the manufacture and marketing of allegedly

defective heart valve and replacement products"); *In re America Online, Inc., Version 5.0

Software Litig.*, Docket No. 1341, 2000 U.S. Dist. LEXIS 13262, at *2-3 (J.P.M.L. June 2, 2000)

(transfer ordered where class action plaintiffs alleged that AOL Version 5.0 conflicted with

various types of non-AOL software); *In re GMC Type III Door Latch Prods. Liab. Litig.*, Docket

No. 1266, 1999 U.S. Dist. LEXIS 5075, at *1-2 (J.P.M.L. Apr. 14, 1999) (transfer ordered where

"the three actions in this litigation involve common questions of fact concerning allegations that

the 'unmodified Type III door latches' on certain GM vehicles are defective and prone to

failure"); *In re Chrysler Corp. Vehicle Paint Litig.*, Docket No. 1239, 1998 U.S. Dist. LEXIS

15675, at *2 (J.P.M.L. October 2, 1998) (transfer ordered where "the actions in this litigation

involve common questions of fact concerning allegations by overlapping classes of defects in the

---

[6]      (*See Sizemore* Compl. ¶¶ 190-198 (UCL and FAL claims); Illinois AG Action Compl. ¶¶ 292-299 (Illinois Consumer Fraud and Deceptive Business Practices Act claim); California AG Action Compl. ¶¶ 165-169 (UCL and FAL claims); *Hursh* Compl. ¶¶ 131-135 (UCL and FAL claims); *Leyvas* Compl. ¶¶ 153-168 (UCL and FAL claims).)

paint of certain Chrysler vehicles that result in chipping, peeling and discoloration of the paint finish").

### 2. The Three Private Actions Seek Certification Of Overlapping Nationwide Classes, And The Attorney General Actions Seek Relief On Behalf Of Many Of The Same Borrowers.

The case for transfer and coordination or consolidation is particularly strong here because in the three putative class actions, plaintiffs seek certification of significantly overlapping nationwide classes.[7] For their part, the attorney general actions assert claims for relief based on the same injuries allegedly sustained by many of the same borrowers otherwise covered by the putative class actions.[8] Such overlapping class and mass actions almost by definition satisfy the requirements of § 1407. *See, e.g., In re Jamster Mktg. Litig.*, 427 F. Supp. 2d 1366, 1368 (J.P.M.L. 2006) (ordering transfer where "[e]ach action is brought as a class action against overlapping defendants and is predicated on the same factual allegations"); *In re High Sulfur Content Gasoline Prods. Liab. Litig.*, 344 F. Supp. 2d 755, 756 (J.P.M.L. 2004) (finding centralization warranted of five "overlapping putative class actions brought on behalf of purchasers of gasoline that contained high levels of sulfur in May 2004."); *In re Chrysler Corp. Vehicle Paint Litig.*, 1998 U.S. Dist. LEXIS 15675, at *2 (transfer ordered where "the actions in this litigation involve common questions of fact concerning allegations by overlapping classes of defects in the paint of certain Chrysler vehicles that result in chipping, peeling and discoloration of the paint finish"); *In re Int'l House of Pancakes Franchise Litig.*, 331 F. Supp. 556, 557 (J.P.M.L. 1971) (transfer ordered where actions brought by franchisees "present virtually identical legal theories and involve substantially identical questions of fact with regard to the

---

[7]    (*See Sizemore* Compl. ¶ 161; *Hursh* Compl. ¶ 20; *Leyvas* Compl. ¶ 34.)

[8]    (*See* Illinois AG Action Compl. Preamble; *id.* ¶ 1; *id.* Count I, Prayer for Relief ¶¶ D-H, Count II, Prayer for Relief ¶¶ C and D; California AG Action Compl. ¶¶ 14, 166, 169; *id.* Prayer for Relief ¶ 3.)

defendant's franchise agreements," and "at least four of these actions are brought as class actions under Rule 23, F.R. Civ. P. and present conflicting and overlapping class claims."). Absent coordination or consolidation, multiple federal courts will simultaneously be handling the same claims brought by the same classes of plaintiffs—or attorneys general acting on behalf of the same individuals—against the same defendants.

### 3.    There Is No Reason To Wait For Additional Actions.

The actions subject to this petition warrant transfer and coordination or consolidation. This petition involves three purported class actions as well as two representative state attorney general actions. The Panel has not hesitated to afford MDL treatment to litigation matters involving two or three class actions when necessary to serve the interests of convenience, coordination, and judicial economy.[9] If the pending cases are transferred and coordinated, any later-filed lawsuits may be included as "tag-along" cases in the MDL proceeding. *See In re Gas Meter Antitrust Litig.*, 464 F. Supp. 391 (J.P.M.L. 1979) (major reason for the Panel's transfer order was the salutary effect of providing a ready forum for the inclusion of expected newly filed actions).

### B.    Coordination Or Consolidation Will Serve The Convenience Of Parties And Witnesses.

Coordination or consolidation of these actions also will serve the "convenience of [the] parties and witnesses" and, hence, satisfy the second criterion of § 1407(a). Absent coordination or consolidation, unnecessarily duplicative discovery and other pretrial burdens will be imposed

---

[9]    *See, e.g., In re LifeUSA Holdings, Inc. Annuity Contracts Sales Practices Litig.*, No. 1273, 1999 U.S. Dist. LEXIS 4918 (J.P.M.L. Apr. 7, 1999) (consolidating two actions); *In re the Hartford Sales Practices Litig.*, No. 1204, 1997 U.S. Dist. LEXIS 19671 (J.P.M.L. Dec. 8, 1997) (consolidating two actions); *In re Mountain States Tel. & Tel. Co. Employees Benefit Litig.*, No. 798, 1989 U.S. Dist. LEXIS 13673 (J.P.M.L. Feb. 2, 1989) (consolidating two actions); *In re New Mexico Natural Gas Antitrust Litig.*, 482 F. Supp. 333 (J.P.M.L. 1979) (consolidating three actions); *In re California Armored Car Antitrust Litig.*, 476 F. Supp. 452, 454 (J.P.M.L. 1979) (consolidating three actions); *In re First Nat'l Bank*, 451 F. Supp. 995, 997 (J.P.M.L. 1978) (consolidating two actions); *In re E. Airlines,*

upon the parties, the witnesses, and the courts.  For example, the defendants may be subjected to duplicative discovery demands, party and non-party witnesses may be subjected to duplicative depositions, and multiple courts may have to hear and decide identical pretrial issues.

By contrast, centralization will avoid duplicative efforts.  Because discovery has not yet commenced in any of the actions, it can be efficiently coordinated by the transferee court from the outset of any MDL proceeding.  Transfer would thus "effectuate a significant overall savings of cost and a minimum of inconvenience to all concerned with the pretrial activities." *In re Cuisinart Food Processor Antitrust Litig.*, 506 F. Supp. 651, 655 (J.P.M.L. 1981).

**C.    Coordination Or Consolidation Will Promote The Just And Efficient Conduct Of The Actions.**

Coordination of the pending actions will also promote the third Section 1407(a) criterion – the just and efficient conduct of the actions.

**1.    Coordination Or Consolidation Will Prevent Conflicting Pretrial Rulings.**

Given the substantially similar factual allegations, theories of recovery, and proposed class definitions, pretrial activities such as motion practice will overlap substantially.  Moreover, additional motions and discovery will overlap considerably, risking inconsistent rulings by different district courts on the same issues.  Transfer is thus warranted.  *See, e.g., In re Cooper Tire & Rubber Co. Tires Prods. Liab. Litig.*, No. 1393, 2001 WL 253115, at *1 (J.P.M.L. Feb. 23, 2001) ("Motion practice and relevant discovery will overlap substantially in each action. Centralization under Section 1407 is thus necessary in order to eliminate duplicative discovery, prevent inconsistent pretrial rulings, and conserve the resources of the parties, their counsel and the judiciary."); *In re St. Jude Med., Inc., Silzone Heart Valves Prods. Liab. Litig.*, Docket No.

---

*Inc. Flight Attendant Weight Program Litig.*, 391 F. Supp. 763 (J.P.M.L. 1975) (consolidating two actions); *In re Cross-Florida Barge Canal Litig.*, 329 F. Supp. 543 (J.P.M.L. 1971) (consolidating two actions).

DCI:751767.1

1396, 2001 U.S. Dist. LEXIS 5226, at *3 (J.P.M.L. Apr. 18, 2001) ("Centralization under Section 1407 is necessary in order to eliminate duplicative discovery, prevent inconsistent pretrial rulings (especially with respect to questions of privilege issues, confidentiality issues and class certification), and conserve the resources of the parties, their counsel and the judiciary."); *In re Am. Online, Inc., Version 5.0 Software Litig.*, Docket No. 1341, 2000 U.S. Dist. LEXIS 13262, at *3-4 (J.P.M.L. June 2, 2000) (to same effect); *In re Gen. Motors Corp. Type III Door Latch Prods. Liab. Litig.*, Docket No. 1266, 1999 U.S. Dist. LEXIS 5075, at *2 (J.P.M.L. Apr. 14, 1999) (to same effect); *In re Chrysler Corp. Vehicle Paint Litig.*, Docket No. 1239, 1998 U.S. Dist. LEXIS 15675, at *2 (J.P.M.L. Oct. 2, 1998) (to same effect).

2.    **Coordination Or Consolidation Will Minimize The Possibility Of Conflicting Injunctive Or Other Equitable Relief Claims**

Transfer and coordination or consolidation will have the further effect of reducing the possibility of conflicting requests for preliminary injunctive or other equitable relief—such as loan modifications or foreclosure relief—as to the same borrowers. The Illinois AG Action seeks preliminary injunctive relief against Countrywide.[10] The California AG Action presently seeks permanent injunctive relief, but plaintiff may move for preliminary injunctive relief.[11] *Sizemore* and *Leyvas* seek injunctive relief on behalf of nationwide putative classes.[12] Hence, absent coordination or consolidation, Countrywide may be subjected to competing and inconsistent injunctions entered in various federal courts. *See In re Operation of the Mo. River Sys. Litig.*, 277 F. Supp. 2d 1378, 1379 (J.P.M.L. 2003) (holding that MDL treatment was necessary to avoid inconsistent pretrial rulings "particularly with respect to requests for

---

[10]    (*See* Illinois AG Action Compl. Count I, Prayer for Relief ¶ C, Count II, Prayer for Relief ¶ B.)

[11]    (*See* California AG Action Compl. Prayer for Relief ¶¶ 1-2.)

[12]    (*See Sizemore* Compl. ¶ Prayer for Relief ¶ (g);.*Leyvas* Compl. Prayer For Relief ¶ (c).)

preliminary injunctive relief imposing or threatening to impose conflicting standards of conduct"); *In re General Motors Class E Stock Buyout Sec. Litig.*, 696 F. Supp. 1546, 1547 (J.P.M.L. 1988) ("The presence of common questions in *Hart* and the MDL-720 actions is further illustrated by the overlapping injunctive relief sought in both proceedings. Transfer of *Hart* under Section 1407 is thus necessary in order to avoid duplication of discovery, prevent inconsistent pretrial rulings, and conserve the resources of the parties, their counsel and the judiciary.")

3.    **Coordination or Consolidation Will Facilitate Uniform Class Certification Decisions.**

Because there is significant overlap between the class allegations and definitions in the private actions, the arguments presented both for and against certification will likely be similar. There is a danger of inconsistent rulings on class certification and other class action-related issues if these cases are not coordinated.

The Panel has "consistently held that transfer of actions under § 1407 is appropriate, if not necessary, where the possibility of inconsistent class determinations exists." *In re Sugar Indus. Antitrust Litig.*, 395 F. Supp. 1271, 1273 (J.P.M.L. 1975); *see also In re Bridgestone/Firestone, Inc. ATX, ATX II and Wilderness Tires Prods. Liab. Litig.*, 2000 U.S. Dist. LEXIS 15926 (J.P.M.L. Oct. 24, 2000) ("Centralization under Section 1407 is thus necessary in order to . . . prevent inconsistent pretrial rulings (particularly with respect to overlapping class certification requests)"); *In re America Online, Inc., Version 5.0 Software Litig.*, 2000 U.S. Dist. LEXIS 13262 (same); *In re Washington Pub. Power Supply Sys. Sec. Litig.*, 568 F. Supp. 1250, 1251 (J.P.M.L. 1983) (where "overlapping class certifications have been sought in all thirteen actions," "[c]entralization under Section 1407 is thus necessary in order to eliminate duplicative discovery, prevent inconsistent pretrial rulings, and conserve the

resources of the parties, their counsel, and the judiciary."); *In re Roadway Express, Inc. Employment Practices Litig.*, 384 F. Supp. 612, 613 (J.P.M.L. 1974) ("the existence of and the need to eliminate [the possibility of inconsistent class determinations] presents a highly persuasive reason favoring transfer under Section 1407"); *In re Plumbing Fixtures Cases*, 308 F. Supp. 242, 244 (J.P.M.L. 1970) (ordering transfer because "a potential for conflicting or overlapping class actions presents one of the strongest reasons for transferring such related actions to a single district for coordinated or consolidated pretrial proceedings which will include an early resolution of such potential conflicts"); *In re Plumbing Fixture Cases*, 298 F. Supp. 484, 493 (J.P.M.L. 1968) (transfer necessary to avoid "pretrial chaos in conflicting class action determinations"); *In re Hawaiian Hotel Room Rate Antitrust Litig.*, 438 F. Supp. 935, 936 (J.P.M.L. 1977) ("[s]ection 1407 centralization is especially important to ensure consistent treatment of the class action issues"); *In re Mut. Fund Sales Antitrust Litig.*, 361 F. Supp. 638, 639-40 (J.P.M.L. 1973) ("we have frequently held that the possibility for conflicting class determinations under [Fed. R. Civ. P. 23] is an important factor favoring transfer of all actions to a single district").

## II.     THIS PANEL SHOULD TRANSFER THESE ACTIONS TO THE CENTRAL DISTRICT OF CALIFORNIA.

Movants respectfully recommend that this Panel transfer these cases to the United States District Court for the Central District of California and, with the consent of that Court, to the Hon. Stephen V. Wilson, before whom *Sizemore* is pending. Transfer of these cases there would maximize the benefits of coordination by serving the interests and convenience of the parties and the courts.

***First,*** the Central District of California already has three of the five constituent actions pending before it—more cases than are pending in any other district. MDL actions are

commonly transferred to a forum where one or more actions is pending. *In re High Sulfur Content Gasoline Prods. Liab. Litig.*, 344 F. Supp. 2d at 757 (transferring to the court in which four out of the five actions subject to the petition were pending). Furthermore, *Sizemore* has been pending the longest of the five constituent actions.

**Second**, an overwhelming number of the witnesses and documents with discoverable information will be located in or near the Central District of California because Countrywide Financial Corp.'s principal place of business is in that district. *See In re Salomon Bros. Treasury Sec. Litig.*, 796 F. Supp. 1537, 1538 (J.P.M.L. 1992) (designating as transferee court the district where the documents and witnesses relating to the defendant's conduct were located); *In re Air Disaster at Denver*, 486 F. Supp. 241, 243 (J.P.M.L. 1980) (same); *In re Air Crash Disaster at Stapleton International Airport*, 447 F. Supp. 1071, 1073 (J.P.M.L. 1978) (same); *In re U. S. Financial Sec. Litig.*, 375 F. Supp. 1403, 1404 (J.P.M.L. 1978) (same); *In re Holiday Magic Sec. and Antitrust Litig.*, 368 F. Supp. 806, 807 (J.P.M.L. 1973) (same).

**Finally**, for similar reasons, the Central District of California is a convenient forum for most of the parties. Plaintiffs in three out of the five cases—*Sizemore*, *Leyvas*, and the California AG Action—*chose* to file their complaints in the Central District or in a state court embraced by the Central District. Thus, the Central District is the most sensible and convenient forum in which to conduct pretrial proceedings. *In re Washington Pub. Power Supply Sys. Sec. Litig.*, 568 F. Supp. at 1251-52 (transferring to district that "is the center of gravity of this litigation and the focal point for discovery"; securities issuer was headquartered in that district, the majority of the defendants resided in the same geographic area, and the majority of the cases subject to the petition were already pending in that district).

## CONCLUSION

For all the foregoing reasons, the coordination or consolidation of these overlapping putative class and attorney general actions would further "the convenience of [the] parties and witnesses and [would] promote the just and efficient conduct of [the] actions." 28 U.S.C. § 1407(a). Therefore, Movants respectfully request that this Panel enter an order transferring the actions listed in the accompanying Schedule of Actions that are not already pending in the United States District Court for the Central District of California to that Court and, with the consent of that Court, to the Hon. Stephen V. Wilson, for coordinated or consolidated pretrial proceedings.

Dated: July 24, 2008

Respectfully submitted,

John H. Beisner
Brian D. Boyle
O'MELVENY & MYERS LLP
1625 Eye Street, N.W.
Washington, D.C. 20006
(202) 383-5300 (phone)
(202) 383-5414 (fax)

*Attorneys for Countrywide Financial Corp., Countrywide Bank, FSB,
Countrywide Home Loans, Inc., and Bank of America Corporation*